**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

RON DESANTIS, in his official capacity as Governor of Florida; LARRY KEEFE, in his official capacity as Florida Chief of Domestic Security; JAMES UTHMEIER, in his official capacity as Florida Attorney General; BLAISE INGOGLIA, in his official capacity as Florida Chief Financial Officer; WILTON SIMPSON, in his official capacity as Florida Commissioner of Agriculture; GINGER BOWDEN MADDEN, in her official capacity as State Attorney for the 1st Judicial Circuit; JACK CAMPBELL, in his official capacity as State Attorney for the 2nd Judicial Circuit; JOHN DURRETT, in his official capacity as State Attorney for the 3rd Judicial Circuit; MELISSA NELSON, in her official capacity as State Attorney for the 4th Judicial Circuit; BILL GLADSON, in his official capacity as State Attorney for the 5th Judicial Circuit; BRUCE BARTLETT, in his official capacity as State Attorney for the 6th Judicial Circuit; R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit; BRIAN KRAMER, in his official capacity as State Attorney for the 8th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit; BRIAN HAAS, in his official capacity as State Attorney for the 10th Judicial Circuit;

Case No. 4:26-cv-521

KATHERINE FERNANDEZ RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit; ED BRODSKY, in his official capacity as State Attorney for the 12th Judicial Circuit; SUSAN LOPEZ, in her official capacity as State Attorney for the 13th Judicial Circuit; LARRY BASFORD, in his official capacity as State Attorney for the 14th Judicial Circuit; ALEXCIA COX, in her official capacity as State Attorney for the 15th Judicial Circuit; DENNIS WARD, in his official capacity as State Attorney for the 16th Judicial Circuit; HAROLD PRYOR, in his official capacity as State Attorney for the 17th Judicial Circuit; WILLIAM SCHEINER, in his official capacity as State Attorney for the 18th Judicial Circuit; THOMAS BAKKEDAHL, in his official capacity as State Attorney for the 19th Judicial Circuit; and AMIRA FOX, in her official capacity as State Attorney for the 20th Judicial Circuit,

*Defendants*.
_______________________________________/

# COMPLAINT

## TABLE OF CONTENTS

Introduction .......... 5

Jurisdiction and Venue .......... 8

Parties .......... 8

Factual Background .......... 10

I. Florida's Unprecedented Regime for Designating American Entities as "Domestic Terrorist Organizations" .......... 10

A. The Designation Process .......... 12

B. Critical Protections Missing from the Designation Process ............... 16

C. The Draconian Consequences of Designation .................................. 19

II. Plaintiffs CAIR and CAIR-Florida ........................................................... 28

A. Plaintiffs Engage in Faith-Based Speech and Advocacy .................... 31

B. Plaintiffs Engage in Lawful Advocacy for Palestinian Human Rights ........................................................................................................ 34

C. Plaintiffs Are Not Engaged in, and Do Not Support, Terrorist Activity ........................................................................................................ 37

III. The State Executive Defendants Are Using the DTO Regime to Punish Plaintiffs, Whose Advocacy and Ideology They Disagree With ....................... 38

A. Governor DeSantis's and the Cabinet's Hostility Toward Islamic Religious Practices and Muslim Civil Rights Advocacy, Including by CAIR and CAIR-Florida ............................................... 39

B. The State Executive Defendants Planned To Designate Plaintiffs Long Before the Vote ........................................................ 45

C. The State Executive Defendants Are Using the DTO Regime to Punish Plaintiffs for Their Speech and Advocacy .............................. 49

IV. Plaintiffs' Designation Under the DTO Regime ............................................. 55

A. The Initial Threat of Designation ....................................................... 55

B. The First Notice of Intent and Pause for Emergency Rulemaking ..................................................................................................... 56

C. The Approval and Imminent Publication of the Designations ............ 59

D. Plaintiffs' Ongoing and Imminent Injuries ......................................... 61

V. The Federal Government's Role in the Designation of Terrorist Organizations, Foreign Affairs, National Security, and Foreign Commerce .... 67

A. The SDGT Regime ............................................................................ 68

B. The FTO Regime ............................................................................... 73

C. The SDGT and FTO Regimes Reflect a Careful Balancing of Federal Interests ....................75

D. Federal Sanctions Targeting the Muslim Brotherhood, Hamas, and Alleged Affiliated Organizations and Individuals ....................76

Claims for Relief ....................78

Request for Relief ....................95

## INTRODUCTION

1. This lawsuit challenges Florida's unprecedented "domestic terrorist organization" designation regime, enacted this year by HB 1471.

2. HB 1471 authorizes a handful of state executive officials to decide that an American group—such as a nonprofit organization—is engaging in criminal terrorist activity, and to then deem the group a "domestic terrorist organization" ("DTO"). Once designated, the American organization is radioactive: an elaborate set of prohibitions makes it a serious crime for the organization to do virtually anything in the State of Florida, and for others to work for or otherwise actively associate with it. The consequences of violating these prohibitions are severe, including up to life imprisonment. As a result of designation, an organization's lawful, constitutionally protected speech and association are immediately rendered illegal and impossible—simply because state executive officials say so.

3. Florida already has, and has long had, criminal laws allowing it to prosecute U.S. groups for engaging in actual terrorist activity. The state's new designation regime is different: it is a thinly veiled effort to bypass the criminal process entirely, sidestepping the fundamental protections that the Constitution guarantees to criminal defendants.

4. Under HB 1471, Florida executives have the power to designate and debilitate U.S. groups—again, including nonprofits—without filing charges,

initiating judicial proceedings, proving their case beyond a reasonable doubt, submitting the case to a jury, or complying with any of the other constitutional requirements of the criminal legal system. The new regime transforms Florida's Governor, Chief of Domestic Security, and Cabinet into judge, jury, and nonprofit executioner.

5. The plaintiffs in this lawsuit are two U.S. nonprofits: CAIR, the largest Muslim civil rights organization in the country, and its state chapter, CAIR-Florida. Their shared mission, rooted in faith, is to help people understand Islam, protect civil rights, promote justice, and empower American Muslims. For decades, they have pursued this mission the same way as countless other nonprofits—by holding community events, publishing educational and advocacy materials, opining on government policies, petitioning elected officials, and providing legal advice and representation.

6. The state has never indicted, much less convicted, either CAIR or CAIR-Florida under any criminal law—and certainly not a criminal law involving the serious charge of terrorism. If the state tried, it would fail. The reason is simple: neither CAIR nor CAIR-Florida is engaged in terrorist activity, and the state would be unable to prove its case in a court of law.

7. But today, due to HB 1471, proof in a court of law is no longer a prerequisite. Florida officials have used the powers conferred on them by HB 1471

to designate CAIR and CAIR-Florida as "domestic terrorist organizations." Absent judicial intervention, that designation will be effective on November 5, 2026.

8. The effects of designation on CAIR and CAIR-Florida will be immediate and devastating. In Florida, their speech will be silenced, their doors will be shut, and they will be branded with the stigma of one of society's most infamous and reviled labels.

9. CAIR's and CAIR-Florida's designations are not only wrong, they are unconstitutional. Florida's new designation scheme—the "DTO regime"—and its application to CAIR and CAIR-Florida violates the First Amendment and the Fourteenth Amendment's guarantee of due process.[1] The DTO regime is also preempted by federal law.

10. Plaintiffs seek a declaration that the designation scheme is unconstitutional, an injunction that prevents Plaintiffs' designations from going into effect, and an injunction that bars enforcement of the DTO regime's penalties.

---

[1] The DTO regime consists of the following, with respect to provisions implicating "domestic terrorist organizations": Florida Statutes §§ 617.1420, 775.30, 775.33, 775.34, 874.03 (and the related "criminal gang" provisions in Sections 823.05 and 874.04–12), 943.03102, and Florida Department of Law Enforcement Emergency Rule 11RER26-8 ("11RER26-8").

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

12. Venue is proper in this district under 28 U.S.C. § 1391 because at least one Defendant resides here and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

13. Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR Foundation") is a District of Columbia nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Washington, D.C. CAIR's faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims. CAIR operates in Florida and nationwide.

14. Plaintiff CAIR Florida, Inc. ("CAIR-Florida") is a Florida nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Tampa. CAIR-Florida is an affiliated chapter of CAIR and works to advance CAIR's mission through advocacy on legal, cultural, social, nonpartisan political, and civic issues of public concern to American Muslims.

15. Defendant Ron DeSantis is the Governor of Florida. He is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102. He is sued in his official capacity.

16. Defendant Larry Keefe is Florida's Chief of Domestic Security and the Executive Director and Commissioner of the Florida Department of Law Enforcement ("FDLE"). Keefe was appointed to this position on September 29, 2026. Before his appointment, Mark Glass served as the Chief of Domestic Security and Executive Director and Commissioner of FDLE. Keefe is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). He is sued in his official capacity.

17. Defendants James Uthmeier, Blaise Ingoglia, and Wilton Simpson are Florida's Attorney General, Chief Financial Officer, and Commissioner of Agriculture, respectively. Together they constitute the Florida Cabinet and are some of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). They are each sued in their official capacity (together, with Governor DeSantis and Defendant Keefe, "State Executive Defendants"). Additionally, the Attorney General's Department of Legal Affairs, through the Office of Statewide Prosecution within it, has the power to investigate and bring criminal charges under the DTO regime for alleged multi-circuit crimes. Fla. Const. art. IV, § 4(b); Fla. Stat. § 16.56.

18. Defendants Ginger Bowden Madden, Jack Campbell, John Durrett, Melissa Nelson, Bill Gladson, Bruce Bartlett, R.J. Larizza, Brian Kramer, Monique Worrell, Brian Haas, Katherine Fernandez Rundle, Ed Brodsky, Susan Lopez, Larry Basford, Alexcia Cox, Dennis Ward, Harold Pryor, William Scheiner, Thomas Bakkedahl, and Amira Fox are Florida's twenty state attorneys (together, "State Attorney Defendants"). In those roles, they are each responsible for investigating and bringing criminal charges against persons under Florida's DTO regime. Fla. Stat. §§ 775.30, 775.32–.34, 823.05, 874.01, *et seq.* They are each sued in their official capacity.

## FACTUAL BACKGROUND

### I. Florida's Unprecedented Regime for Designating American Entities as "Domestic Terrorist Organizations"

19. On April 6, 2026, Governor Ron DeSantis signed HB 1471. That law grants Florida's executive branch the extraordinary and unprecedented authority to single out and punish U.S. groups—including nonprofit organizations engaged in speech and association protected by the First Amendment—that it unilaterally deems to be criminals and security threats. The law became effective on July 1, 2026.

20. On September 11, 2026, FDLE used Florida's emergency rulemaking procedures to promulgate Emergency Rule 11RER26-8.[2] The emergency rule implements HB 1471. It expires 90 days from its promulgation. Fla. Stat. § 120.54(4)(c).

21. The DTO regime empowers Florida's Chief of Domestic Security, Governor DeSantis, and the Florida Cabinet to designate U.S. groups as "domestic terrorist organizations."

22. As a predicate to designation, the DTO regime authorizes Florida's Chief of Domestic Security, Governor DeSantis, and the Florida Cabinet to find that a U.S. organization "is engaging" in a particularly heinous form of criminal wrongdoing: "terrorist activity." Once effective, "designation" triggers the application of a distinct set of criminal and civil laws, such that otherwise-lawful activity now subjects the organization and people associated with it to severe penalties, including life in prison. Designation silences and incapacitates the designated organization—as well as its employees, its members, and a wide range of others associated with it—through these extraordinarily broad and extreme penalties.

---

[2] *See* Fla. Admin. Code & Fla. Admin. Reg., *Notice: 31366131* (Sept. 11, 2026), https://flrules.org/Gateway/View_notice.asp?id=31366131 (available at https://perma.cc/G7TX-39V4).

23. In effect, the DTO regime authorizes five members of Florida's executive branch to judge the criminal culpability of American organizations and subject them to corresponding criminal punishments while bypassing the fundamental requirements—and protections—of criminal procedure.

**A. The Designation Process**

24. Under the DTO regime, Florida's Chief of Domestic Security may designate a U.S. group as a "domestic terrorist organization" if he "finds" that it meets three criteria: (1) the organization is based or operates in Florida or anywhere else in the United States; (2) the "organization is engaging in terrorist activity as defined in [Florida Statutes] § 775.30; and (3) "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)1.[3]

25. Under Florida law, the definition of "terrorist activity" has two elements. First, "terrorist activity" must involve either (a) a "violent act or an act dangerous to human life which is a violation of the criminal laws of [Florida] or of the United States" or (b) a violation of the Florida Computer Crimes Act, Florida Statutes

[3] HB 1471 also allows the Chief of Domestic Security to designate entities as "foreign terrorist organizations" ("FTOs") if they have already been federally designated as an FTO "by the United States Secretary of State pursuant to § 219 of the Immigration and Nationality Act" and "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)2.

§ 815.06. Fla. Stat. § 775.30(1)(a)1-a–b. Second, "terrorist activity" must be committed with the intent to "[i]ntimidate, injure, or coerce a civilian population," "[i]nfluence the policy of a government by intimidation or coercion," or "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." *Id.* § 775.30(1)(a)2.

26. The Chief of Domestic Security must "provide written notice to the Governor and Cabinet of his or her intent to designate" a group as a terrorist organization. Fla. Stat. § 943.03102(2)(a). The written notice "must be accompanied by a summary of the basis for [the] designation." *Id.*

27. The Governor and Cabinet may approve or reject the designation by majority vote no earlier than "7 days after receipt of" the notice from the Chief of Domestic Security. Fla. Stat. § 943.03102(2)(d).

28. The Chief of Domestic Security may not take action on the designation "[u]nless and until the Governor and Cabinet advise that they will hold a meeting to consider the notice of intent." 11RER26-8(1). This requirement appears solely in the emergency rule. The plain language of the DTO statute empowers the Chief of Domestic Security to designate a U.S. group as a "domestic terrorist organization" with or without a majority vote of the Governor and Cabinet, and the DTO statute requires publication of his designation on the FDLE website, Fla. Stat. § 943.03102(1)(b); the approval of the Governor and Cabinet is a prerequisite only

to the publication of the designation in the Florida Administrative Register. *Id.* § 943.03102(2)(e).

29. If the Governor and Cabinet "advise that they will hold a meeting to consider the notice of intent," the Chief of Domestic Security must "promptly" provide the organization in question with the notice of intent, "the date, time, and location of the meeting," and "any materials relating to the notice of intent that are not confidential, exempt, or otherwise protected from disclosure by state or federal law." 11RER26-8(2).

30. The Chief of Domestic Security need not deliver the notice of intent and accompanying materials to the organization unless the organization has a readily discernable location and the notice can be safely delivered. Fla. Stat. § 943.03102(2)(b). The DTO regime does not specify who determines whether the organization's location is readily discernible or whether notice can safely be delivered; nor does it set a deadline by which notice to the organization must be served.[4]

31. An organization that receives a notice of intent under the DTO regime "may, within seven days of receipt, object to the proposed designation in writing

[4] Although 11RER26-8(2)(a) contemplates that notice will be given at least seven days before a scheduled public meeting, nothing in the statute prevents the Chief of Domestic Security from delivering the notice to the organization just before the Governor and Cabinet vote. Fla. Stat. § 943.03102(2)(b).

and provide any information and documentation the organization believes would counsel against the designation." 11RER26-8(2)(a).

32. If the Governor and Cabinet hold a meeting to consider the notice of intent, they "may permit, at their sole discretion, the organization to appear at the meeting and present argument, for a period of time specified by the Governor and Cabinet, as to why the information and documentation the organization previously submitted counsels against the designation." 11RER26-8(2)(b). Nothing in the DTO regime or emergency rule requires the Governor and Cabinet to provide advance notice to the organization regarding whether they will be given an opportunity to present argument, how much time they will be given, or any other procedures to be followed at the meeting.

33. When the Governor and Cabinet approve a designation, the Chief of Domestic Security must publish notice of the designation in the Florida Administrative Register within seven days. Fla. Stat. § 943.03102(2)(e). The Chief of Domestic Security also must "maintain and publish on [FDLE's] website a current list of organizations that" have been designated as DTOs. *Id.* § 943.03102(1)(b).

34. The designation of a domestic group as a "terrorist organization" is deemed "effective" 30 days after publication in the Florida Administrative Register. 11RER26-8(3); Fla. Stat. §§ 775.30(1)(b), 775.33(1)(b), 874.03(1), (7)(a).

35. Within 30 days of the designation's publication in the Florida Administrative Register, the organization, or any of its members, "may appeal [its] designation by challenging it in the circuit court of the Second Judicial Circuit in and for Leon County, Florida." 11RER26-8(2)(e); Fla. Stat. § 943.03102(f).

**B. Critical Protections Missing from the Designation Process**

36. The DTO regime does not require state executives to notify designated groups of all the bases or evidence—if any—underlying their designations. On the contrary, the DTO regime authorizes the executives to withhold materials related to the notice of intent on otherwise undefined "state or national security" grounds. Fla. Stat. § 943.03102(2)(c), (g).[5]

37. The DTO regime does not expressly require the Chief of Domestic Security to meet any evidentiary threshold as a condition of finding that U.S. groups, including nonprofit corporations like CAIR and CAIR-Florida, are "engaging in terrorist activity" in violation of state or federal law.

38. The DTO regime sets forth no standards governing the relevance, reliability, or admissibility of the evidentiary bases, if any, upon which the Chief of Domestic Security may find that U.S. groups—including nonprofit corporations

---

[5] In HB 1473, a companion bill to HB 1471, the Florida legislature modified the state's public records law, exempting from disclosure "any portion of the information . . . provided under [the DTO regime] by the Chief of Domestic Security to the Governor and Cabinet which would reveal information critical to state or national security." Fla. Stat. § 943.03102(g).

like CAIR and CAIR-Florida—are "engaging in terrorist activity" in violation of state or federal law.

39. The DTO regime does not require the Governor and Cabinet to determine that the Chief of Domestic Security's finding satisfies any evidentiary threshold or burden of proof before voting to approve the designation of U.S. groups—including nonprofit corporations like CAIR and CAIR-Florida—as "domestic terrorist organizations."

40. The DTO regime does not, as a condition of designation, require the State Executive Defendants to prove to a jury or neutral magistrate that U.S. groups are "engaging in terrorist activity" in violation of state or federal law.

41. Prior to designation, the DTO regime does not grant U.S. groups the opportunity to obtain document discovery, depose or cross-examine witnesses, present live witness testimony, or otherwise meaningfully test the bases on which the State Executive Defendants intend to designate them.

42. The DTO regime does not require a judicial hearing, judicial ruling, or jury verdict before the Chief of Domestic Security designates a U.S. group as a "domestic terrorist organization." Likewise, the DTO regime does not require a judicial hearing, judicial ruling, or jury verdict before the Chief of Domestic Security publishes designation of a U.S. group in the Florida Administrative Register, or before the designation becomes effective. This is so even though the

designation is predicated on a "finding" of criminal conduct, and even though designation is a form of criminal punishment, as discussed below.

43. In any "challenge" or "appeal" of a designation brought in Florida court under the DTO regime, Fla. Stat. § 943.03102(2)(f) (noting availability of "challenge"); 11RER26-8(2)(e) (noting availability of "appeal"), the DTO regime does not require the court to hold a hearing, order discovery, take testimony, issue a ruling, or otherwise act before the designation becomes "effective."

44. In any "challenge" or "appeal" of a designation brought in Florida court under the DTO regime, the DTO regime does not require the Chief of Domestic Security, Governor, and Cabinet to produce all of the evidence in their possession, inculpatory and exculpatory, relevant to their decision to designate the organization.

45. In any "challenge" or "appeal" of a designation brought in Florida court under the DTO regime, the DTO regime does not specify the applicable standard of review, which party bears the burden of proof, what procedures or rules apply, or what evidence may be submitted by either the state or the designated organization.

46. In any "challenge" or "appeal" of a designation brought in Florida court under the DTO regime, the state court "may not compel the public disclosure of any document that is confidential or exempt under state law or that is confidential,

restricted, or otherwise protected from public disclosure according to federal law." Fla. Stat. § 943.03102(2)(f).

47. The DTO regime provides that a designated organization may petition FDLE "at any time, for the removal of [its] designation." Fla. Stat. § 943.03102(3)(a). Yet the statute fails to provide any procedures FDLE must use in considering such a petition or to specify on what grounds such a petition should be granted.

**C. The Draconian Consequences of Designation**

48. Once an organization's designation under the DTO regime becomes effective, it is impossible for the organization to continue operating in Florida. The consequences of designation include harsh penalties for virtually any activity intended to further the group's interests or otherwise benefit it.

49. Immediately after a designation becomes effective, designated organizations—as well as their employees, officers, board members, and third parties—are subject to a staggering array of severe penalties for First Amendment-protected speech and conduct. These penalties effectively criminalize any activities that designated organizations—and their employees, officers, board members, or third parties—may take to advance their mission, including their speech. They also criminalize a wide array of third-party interactions with designated organizations,

which in turn limits designated organizations' ability to speak, receive information, and otherwise function.

50. In short, the DTO regime effectively criminalizes the existence of designated organizations in Florida. A designated organization simply cannot function or exist in Florida in any meaningful sense.

51. **Material Support.** The DTO regime makes it a first-degree felony, punishable by up to 30 years in prison, for any person to "knowingly provide[] material support or resources to a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3).[6]

52. The term "material support or resources" is defined broadly to include providing "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives,

[6] The material support provision states that "[i]t is the intent of the Legislature that subsections (2) and (3)," including the prohibition on providing material support and resources to a designated DTO, "be interpreted in a manner consistent with federal case law interpreting 18 U.S.C. §§ 2339A and 2339B." Fla. Stat. § 775.33(7). Sections 2339A and 2339B prohibit persons from providing material support and resources to aid in the commission of certain specified crimes and to aid federally designated FTOs.

personnel, or transportation," but not "medicine or religious materials." Fla. Stat. § 775.33(1)(d).

53. A person is deemed to provide "personnel" to a designated DTO if the person "knowingly provides" or "attempts" or "conspires" to provide "himself or herself or another person to" either "[w]ork under the direction and control of" the designated DTO or "[o]rganize, manage, supervise, or otherwise direct the operations of" the designated DTO. Fla. Stat. § 775.33(5)(a).

54. The term "expert advice or assistance" is defined as "advice or assistance derived from scientific, technical, or other specialized knowledge." Fla. Stat. § 775.33(1)(c).

55. The material support provision's "knowing" requirement is satisfied if, among other things, a person has mere "knowledge that the organization" "is a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3). There is no requirement of an intent to engage in criminal conduct.

56. The statutory definition of "material support or resources" is broad. On its face, the material support provision threatens to punish:

a. Any designated organization's employees, officers, board members, and volunteers who serve as "personnel" to the designated organization or who provide it a "service" by engaging in work on the organization's behalf;

b. Any person, including members of the organization, or entity who donates or pays money to the designated organization, or who provides tangible goods to the designated organization (whether free or for payment);

c. Any person or entity providing any direct services to the designated organization, including banking, financial, administrative, professional, legal, management, communications, or advertising services;

d. Any person or entity providing a designated organization with indirect services, such as use of social media or speaking platforms or physical and digital data and information storage systems;

e. Any person or entity that rents or leases property to or from the designated organization;

f. Any person or entity who advises or provides specialized expert assistance, including legal, financial, or accounting assistance.

57. Emergency Rule 11RER26-8 creates a narrow exception to this prohibition. It states that the FDLE "will not consider there to be cause for prosecution for a violation of" the material support statute "based solely on the provision of legal counsel or legal support services to the organization for purposes of representing or providing advice in connection with existing or anticipated

litigation concerning a designation or defending against a criminal prosecution." 11RER26-8(4)–(5). The emergency rule (and this exception) expires 90 days after promulgation—*i.e.*, on December 10, 2026. Fla. Stat. § 120.5(4)(c)(1).

58. On its face, Emergency Rule 11RER26-8's legal services exception does not apply to the provision of legal services to a designated organization in civil proceedings unrelated to existing or anticipated litigation concerning a designation, including for general compliance and regulatory purposes. Nor does it protect organizational employees who act to support a designated group in litigation by, for example, reviewing and approving filings or participating in document discovery.

59. **Criminal Gang Prevention Act.** The DTO regime amends Florida's Criminal Gang Prevention Act (the "CGPA"), Fla. Stat. § 874.01, *et seq.*, so that any organization designated under the regime—including nonprofits that have never been charged with or convicted of a crime—is also immediately and automatically deemed a "criminal gang" and thus subject to the many criminal penalties provided for under that act. *Id.* § 874.03(8).

60. The CGPA defines a "criminal gang" as "a formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or

symbols, including, but not limited to, terrorist organizations." Fla. Stat. § 874.03(1). The DTO regime amended this definition by further defining the term "terrorist organizations" to include any "domestic terrorist organization whose designation as such has been published in the Florida Administrative Register in accordance with § 943.03102." *Id.* § 874.03(8)(a).

61. Florida's classification of a designated "terrorist organization" as a criminal gang under the CGPA immediately exposes the group and its employees to another layer of substantial criminal and civil penalties and immediate and irreparable harm.

62. The CGPA makes it a felony, punishable by up to life in prison, if any person "knowingly initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10. Under Florida law, "[t]he word 'person' includes . . . corporations." Fla. Stat. § 1.01(3). The term "criminal gang-related activity" is defined broadly to include, among other things, any "activity committed with the intent to benefit, promote, or further the interests of a criminal gang." Fla. Stat. § 874.03(4)(a). Designation therefore subjects an organization and its employees to an immediate risk of criminal prosecution, and up to a life sentence, for engaging in virtually any activity—including speech—intended to further the organization's mission, even if that mission is lawful.

63. The CGPA also makes it a felony of the third degree for "[a]ny person," who, "for the purpose of benefiting, promoting, or furthering the interests of" a DTO, "uses electronic communication . . . to advertise his or her presence in the community." Fla. Stat. § 874.11

64. Relatedly, Florida Statutes § 775.34 makes it a second-degree felony to willfully become a "member" of a DTO who "serves under the direction or control of that organization with the intent to further the illegal acts of the organization." Fla. Stat. § 775.34(2). Given the breadth of "illegal acts" under the CGPA, this provision effectively criminalizes all active membership in a DTO, as members work to further the organization's and its employees' "initiat[ion]" of "criminal gang-related activity." Fla. Stat. §§ 874.03(4), 874.10.

65. Like under the material support provision, Emergency Rule 11RER26-8 creates a limited exception under the CGPA for the provision of legal services to a designated group related to pending or anticipated litigation concerning a designation or in defense against a criminal prosecution. 11RER26-8(5). But this exception has the substantive limitations discussed above and expires after 90 days. Fla. Stat. § 120.5(4)(c)(1).

66. **The designated group is at immediate risk of real and personal property seizure and forfeiture.** Under the CGPA, "[a]ll profits, proceeds, and instrumentalities of criminal gang activity and all property used or intended or

attempted to be used to facilitate the criminal activity of any criminal gang or of any criminal gang member; and all profits, proceeds, and instrumentalities of criminal gang recruitment and all property used or intended or attempted to be used to facilitate criminal gang recruitment are subject to seizure and forfeiture." Fla. Stat. § 874.08. Asset seizure and forfeiture are governed by the Florida Contraband Forfeiture Act. Fla. Stat. § 932.701, *et seq.* That Act authorizes immediate seizure of personal property and assets, and an organization whose assets have been seized may challenge the seizure only in a post-seizure hearing. *Id.* § 932.703(3)(a)–(b).

67. Designation further allows the state and private parties to sue to enjoin the organization's activities. Criminal gangs are considered per se public nuisances under Florida's nuisance statute. Fla. Stat. § 823.05(2)(b)–(c). Under that statute, either the government or private individuals may sue to "abate[] or enjoin[]" the criminal gang and prevent it from any "use of a location" for purposes of engaging in "criminal gang-related activity," *id.*, which is broadly defined to include any activity that furthers a criminal gang's interests, *id.* §§ 823.05(a), 874.03(4).

68. A designated group is also at immediate risk of civil liability for violating the far-reaching provisions of the CGPA. Fla. Stat. § 874.06(1), (2)(b) (authorizing the government and private actors to sue criminal gangs for CGPA violations).

69. Under the DTO regime, designated groups, their employees, board members, volunteers, and others who associate with them face even further consequences, beyond the material support prohibitions and the CGPA.

70. **Prohibition on State Contracts and Funding.** Once the designation of the group has been published in the Florida Administrative Register, no "state agency, political subdivision, or public school district authorized to expend state-appropriated funds or levy ad valorem taxes" may "[e]xpend such funds or taxes to support . . . a domestic terrorist organization, or a member of such organization." Fla. Stat. § 943.03102(4)(a). Nor may any of these state and municipal entities "[c]ontract with . . . a domestic terrorist organization"; nor may they "[a]ccept any funds from . . . a domestic terrorist organization, or a member of such organization," with narrow exceptions. *Id.* § 943.03102(4)(b)–(c).

71. **Dissolution.** The Florida Department of State "may commence" an administrative proceeding "to administratively dissolve" any corporation that "has been designated as a domestic terrorist organization," after "any timely judicial challenge . . . has been resolved." Fla. Stat. § 617.1420. A dissolved corporation "may not conduct any affairs except that necessary to wind up," including liquidating or distributing its assets. *Id.* § 617.1421(3).

72. **Other Penalties for Supporting Designated Organizations.** In addition to the above penalties, Florida law imposes significant consequences on

other third parties that engage in a broad range of other kinds of support to designated organizations, including students and advocacy groups. Among other things, Florida law prohibits certain private schools from contracting with people "affiliated with" a designated DTO, Fla. Stat. § 1002.421(1)(t), and restricts public school spending on activities that "[p]romote" any person or entity who has provided material support to a designated DTO, Fla. Stat. § 1003.035.

## II. Plaintiffs CAIR and CAIR-Florida

73. CAIR is the United States' largest Muslim civil rights and advocacy organization.[7] Its faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment. CAIR pursues its mission nationwide, working in coordination with affiliate chapters in multiple states, including CAIR-Florida. CAIR has two employees and an independent contractor who live in Florida and perform remote work for CAIR on national and interstate matters; all three work at the managerial or executive level. Two members of CAIR's Board also live in Florida, including the Board Chair. Both work remotely from Florida on CAIR Foundation matters, including matters relating to CAIR's work in Florida.

---

[7] CAIR was established in 2005. Its predecessor organization was founded in 1994.

74. CAIR-Florida is an affiliated chapter of CAIR. Like CAIR, CAIR-Florida's faith-driven mission is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. In association with CAIR, CAIR-Florida engages in advocacy, education, and civic participation in Florida. CAIR-Florida operates statewide, with offices located in Tampa and Sunrise. It has five board members, all of whom are based in Florida, and eleven staff members, ten of whom are based in Florida. It also works with six contractors, all of whom are based in Florida, and one subcontractor, who is not based in Florida.

75. CAIR and its 16 affiliated state chapters, including CAIR-Florida, work to advance CAIR's mission through advocacy on legal, cultural, social, policy, and civic issues of public concern to American Muslims. In doing so, CAIR and CAIR-Florida seek to promote religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States. Their advocacy includes legal action in state and federal courts, and public policy advocacy, training, education, community organizing, interfaith commentary, and public commentary directed at federal, state and local executive and legislative government officials and the public.

76. CAIR and CAIR-Florida are active in furthering their mission throughout Florida and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence.

77. As part of their public education and advocacy efforts, employees of CAIR and CAIR-Florida regularly appear on and are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern. These nonprofits regularly issue press releases and action alerts and hold press conferences as a part of their advocacy and in furtherance of their mission. In addition, Plaintiffs regularly post on social media outlets, like X, Instagram, and Facebook, to communicate with the public and with government officials as part of their advocacy efforts. Plaintiffs, through their employees, use electronic communications to let people know about their presence in the community as a resource for information and legal services. These nonprofits also regularly engage in meetings with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public as part of their advocacy efforts. CAIR and CAIR-Florida engage in these activities in support of their advocacy efforts individually or jointly, and in some instances CAIR-Florida may do so alone but on behalf of itself and CAIR.

78. CAIR and CAIR-Florida's staff and board members have chosen to work for the organizations and serve on their boards, respectively, because they believe in, and wish to contribute to, the organizations' policy, religious, and civil rights advocacy. Through their work and service, including their provision of specialized skills and speech to the organizations, these individuals associate with one another and with the organizations to advance their shared missions.

**A. Plaintiffs Engage in Faith-Based Speech and Advocacy**

79. To further their missions, CAIR and CAIR-Florida engage in speech to educate, empower, and defend American Muslims on matters of public concern.

80. For example, CAIR and CAIR-Florida create and disseminate Know Your Rights materials for Muslims who face discrimination in the workplace and at elementary, secondary, and post-secondary schools. CAIR also creates and disseminates guides for Muslims who are traveling, and for those who are approached by law enforcement.

81. CAIR-Florida visits mosques in Florida to educate Muslims about their rights.

82. CAIR advocates for civil rights by providing legal representation and legal advocacy through its Legal Defense Fund. CAIR receives intakes and also represents clients from across the country, including from Florida, in litigation seeking to vindicate legal and constitutional rights. CAIR currently jointly

represents several Florida residents alongside CAIR-Florida in litigation outside of Florida.

83. CAIR-Florida provides a range of pro bono legal services to Florida residents, including those who have suffered government and workplace discrimination in violation of their civil rights and those navigating the immigration system. CAIR-Florida attorneys maintain a substantial immigration docket, representing clients in Miami and Orlando immigration courts as well as in interactions with U.S. Citizenship and Immigration Services. CAIR-Florida also represents multiple clients across several cases related to discrimination, including cases currently pending before the Equal Employment Opportunity Commission. In addition, CAIR-Florida jointly represents several Florida residents alongside CAIR in out-of-state proceedings.

84. During Ramadan, the holiest and most important month of the year for Muslims, CAIR and CAIR-Florida create specialized programing that includes how to request accommodations at work and at school. CAIR-Florida also contacts Florida correctional facilities to remind them of their duty under federal and state law not to curtail the rights of Muslims in their custody.

85. CAIR and CAIR-Florida empower and educate Muslims to be civically engaged through participation in the democratic process. CAIR hosts Muslim Hill Day at the U.S. Capitol, which brings Muslims from across the country, including

from Florida, to engage in advocacy with their members of Congress. In 2026, representatives from CAIR-Florida participated in the event.

86. CAIR-Florida hosts its own Muslim Day at the state Capitol in Tallahassee, Florida. CAIR-Florida's 2026 Muslim Day addressed issues such as free speech and legislation directly harming Muslim American communities; it culminated in the passage of House Resolution 8001, which celebrated the contributions of Florida's Muslim American community and recognized February 2026 as "Muslim American Heritage Month."

87. CAIR and CAIR-Florida also encourage eligible American Muslims to register to vote and to exercise their right to vote through nonpartisan voter education and registration activities. For example, CAIR routinely participates in and supports National Muslim Voter Registration Day.

88. CAIR and CAIR-Florida's advocacy and public education also include participation in interfaith organizations and associations. CAIR and CAIR-Florida engage with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to dispel and counter false stereotypes, prejudices, disinformation, and misinterpretations of Islamic tenets, including with respect to Sharia, which is often invoked in political discourse.

89. As part of this work, CAIR and CAIR-Florida frequently counter disinformation about the nature of Sharia and its role in the lives of American

Muslims. CAIR's public materials explain that Sharia is not a threat; instead, it is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of faith in furtherance of values like honesty, service, and community—values they share with other Americans. CAIR and CAIR-Florida note that Sharia requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws, and that it guides ordinary people toward honesty, service, and community.

90. In 2025, CAIR and CAIR-Florida publicly opposed HB 119, commonly referred to as the "No Shari'a Act," much of which the Legislature eventually incorporated into HB 1471. CAIR-Florida publicly and sharply criticized Governor DeSantis's statements in support of the bill.

91. CAIR and CAIR-Florida's advocacy, public education, community outreach, and civil rights work depend on their employees. They also rely on ongoing association, interaction, and coordination with other faith- and non-faith-based groups, businesses, and the public as an essential predicate to engaging in protected speech, association, and petitioning activity.

**B. Plaintiffs Engage in Lawful Advocacy for Palestinian Human Rights**

92. To further their missions to promote civil rights and justice, CAIR and CAIR-Florida engage in public speech, expressive association, advocacy, and litigation in support of Palestinian human rights, and in defense of the First

Amendment rights of individuals and organizations advocating for Palestinian human rights.

93. For example, CAIR's and CAIR-Florida's work includes direct legal representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, including by Governor DeSantis, based on their speech, association, and viewpoints in support of Palestinian human rights.

94. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP student organization at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-281 (N.D. Fla. 2023).

95. Beyond the SJP litigation, CAIR and CAIR-Florida have played a leading role in defending the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement arising from criticism of Israeli government conduct.

96. For example, CAIR and CAIR-Florida engaged in an advocacy campaign to bring back Mohammed Ibrahim—a 16-year-old U.S. citizen from Florida—who was unjustly detained by Israel in February 2025 for almost ten

months. Part of the campaign included CAIR joining an August 2025 letter with more than 100 U.S. faith-based, human rights, and civil rights organizations to U.S. Secretary of State Marco Rubio calling for diplomatic action to secure Mohammed's release.

97. CAIR and CAIR-Florida also issued a March 2025 public statement condemning the Miami Beach mayor's effort to prevent a movie theater from showing an Oscar-winning Palestinian documentary based on its viewpoint.

98. In April 2025, CAIR sent a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers. CAIR also issued a February 2025 press release opposing President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it."

99. CAIR-Florida often petitions state officials through established legal processes to seek accountability for crimes targeting individuals based on their support for Palestinian human rights. For example, in March 2025, CAIR-Florida issued a press release and action alert urging Floridians to request that State Attorney Amira Fox pursue hate crime charges in connection with vandalism targeting pro-Palestine speech.

100. CAIR and CAIR-Florida have condemned and publicly advocated against U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR and CAIR-Florida

have also condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

### C. Plaintiffs Are Not Engaged in, and Do Not Support, Terrorist Activity

101. Through public education and advocacy, CAIR and its chapters, including CAIR-Florida, address and oppose narratives that portray Islam or American Muslims with false stereotypes, such as being inherently prone to violence, authoritarianism, religious intolerance, antisemitism, or extremism. Working in association with other faith-based and civil rights organizations, CAIR and CAIR-Florida strive to build a vibrant constitutional democracy where people of all religious traditions can thrive.

102. CAIR and CAIR-Florida have never been charged with, let alone convicted of, a crime. Nor have CAIR or CAIR-Florida ever been designated by the federal government under its terrorism sanctions regime.

103. CAIR and CAIR-Florida are not engaged in, and do not support, terrorist activity, as they have repeatedly stated. Indeed, ISIS, a federally designated Foreign Terrorist Organization, once threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

## III. The State Executive Defendants Are Using the DTO Regime to Punish Plaintiffs, Whose Advocacy and Ideology They Disagree With

104. Florida officials, including Governor DeSantis and Cabinet members, are using the DTO regime to target and punish their perceived political enemies and those whose speech they disfavor, targeting CAIR and CAIR-Florida, which engage in civil rights advocacy on behalf of American Muslims.

105. Governor DeSantis's and Cabinet members' hostility toward CAIR and CAIR-Florida's speech and advocacy has been public and persistent. Over the past several years, Florida officials have repeatedly attacked Muslim civil rights advocacy, including advocacy defending freedom of expression and religion. More recently, Governor DeSantis and Cabinet members have expressed increased hostility towards Muslim religious practices, falsely characterizing the Muslim religious tenets of Sharia as a threat. Governor DeSantis has also tied CAIR to this "threat." By characterizing Sharia as a threat, Governor DeSantis and Cabinet members have made clear that observant Muslims and Muslim organizations, such as Plaintiffs, are not welcome in Florida.

106. Because CAIR and CAIR-Florida are not engaged in terrorist activity of any kind, the State Executive Defendants' only basis for designating CAIR and CAIR-Florida under the DTO regime is their hostility to both organizations' faith-driven missions and political advocacy. Governor DeSantis, the Cabinet, and the Chief of Domestic Security (who, as FDLE's executive director, is appointed by

the Governor and Cabinet and serves at their pleasure) speak with one voice on this issue.

107. The Governor and Cabinet's September 29, 2026 vote to approve the designation of CAIR and CAIR-Florida as DTOs, despite the absence of any evidence supporting such a designation, is the culmination of a longstanding effort by Governor DeSantis to penalize Plaintiffs for their First Amendment-protected views, speech, and advocacy and to marginalize their voices in public discourse.

### A. Governor DeSantis's and the Cabinet's Hostility Toward Islamic Religious Practices and Muslim Civil Rights Advocacy, Including by CAIR and CAIR-Florida

108. Since at least 2023, Florida officials, including Governor DeSantis and the Cabinet, have expressed hostility toward Islamic religious practices and Muslim civil rights advocacy. Plaintiffs' advocacy for Palestinian human rights, their speech explaining that Sharia is a moral and spiritual framework that is consistent with American values and countering disinformation about it, and their opposition to state efforts to restrict freedom of expression have placed Plaintiffs in direct and public conflict with Governor DeSantis and the Cabinet. Likewise, CAIR and CAIR-Florida's advocacy against Islamophobia and anti-Muslim discrimination have placed them in direct and public conflict with Governor DeSantis and Cabinet members and positions they have taken regarding Muslim

civil rights, religious freedom, and religious tolerance. This hostility toward Plaintiffs' religious views, speech, and advocacy continues today.

**i. Hostility to Palestinian Human Rights**

109. In October 2023, Governor DeSantis publicly stated that the United States should not accept Palestinian refugees from Gaza because they were "all antisemitic." That same month, Florida officials issued a memorandum ordering the deactivation of SJP chapters in the State University System of Florida. The directive was issued by the Chancellor of the State University System in consultation with Governor DeSantis, who previously had publicly called for the student groups to be banned. As noted above, CAIR and CAIR-Florida brought a suit against Florida officials, including Governor DeSantis, challenging the directive as unconstitutional. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-281 (N.D. Fla. 2023).

110. In November 2023, CFO Ingoglia, in his previous role as a state senator, introduced SB 470, a bill designed to strip post-secondary education benefits from students who were found to "promote[] a foreign terrorist organization." He introduced the bill in the wake of pro-Palestinian protests on Florida university campuses in 2023.

111. In January 2024, Governor DeSantis's presidential campaign website referred to his efforts to deactivate SJP chapters. Specifically, he stated that his

administration had "directed Florida universities to enforce the law and terminate student chapters, such as National Students for Justice in Palestine (National SJP), that support Hamas' terrorism." Consistent with these statements, Governor DeSantis publicly called for SJP chapters at Florida universities to be banned based on their expressive activity and viewpoints.

**ii. Hostility to Islam and to Plaintiffs' Speech about Islam and Sharia**

112. Florida officials, including Governor DeSantis and the Cabinet, have demonstrated hostility to Islam, to Plaintiffs' speech about Islam, and to Plaintiffs' speech about Sharia in particular. CAIR's public materials explain that Sharia is not a threat. In its educational materials, CAIR explains that when Muslims pray to God five times a day, donate to charity, fast in Ramadan, or speak up against injustice, among many other practices, they are observing Sharia—just as Jews observe Halakha and Catholics abide by canon law. Yet Florida officials, including Governor DeSantis and the Cabinet, have sought to falsely portray Sharia as a dire threat to Floridians that must be suppressed.

113. In November 2023, during a nationally televised presidential debate, Governor DeSantis referred to efforts to combat Islamophobia as addressing "so-called Islamophobia" and stated that harassment of Muslims in the United States was not a real issue. That is false, as CAIR has explained in its public advocacy materials.

114. On October 8, 2025, in a post on X (formerly known as Twitter), Governor DeSantis endorsed HB 119 (the "No Shari'a Act"), which had been filed that same day. HB 119's sponsor, Representative Hillary Cassel (who also sponsored HB 1471 and HB 1473), stated that "Sharia law is incompatible with our values and our principles here in the United States."

115. On October 14, 2025, CAIR and CAIR-Florida in a joint press release publicly opposed the "No Shari'a Act" and Governor DeSantis's endorsement of it. In that release, both organizations sharply criticized Governor DeSantis's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Governor DeSantis's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill. The release expressly criticized Governor DeSantis personally and politically, challenged his priorities and leadership, and urged continued public opposition.[8]

116. According to an October 27, 2025 Florida Phoenix article, all three members of the Cabinet—Attorney General Uthmeier, CFO Ingoglia, and Commissioner Simpson—questioned the legality of "steer[ing] taxpayer-funded

---

[8] *See* Press Release, CAIR & CAIR-Florida, *Tell Ron DeSantis to Stop Wasting Time with Israel First Political Stunts Like 'No Sharia Act'* (Oct. 14, 2025), https://perma.cc/6AYH-UL7V (describing HB 119 as "disgraceful and bigoted," rooted in "lies, fearmongering, and political distraction," calling Governor DeSantis's endorsement "political cowardice and moral failure," and urging public opposition).

scholarships to private Islamic schools that they contend undermine 'Western' values." Their criticisms rested on the schools' alleged connection to Sharia law. For example, Uthmeier stated that "Sharia law seeks to destroy and supplant the pillars of our republican form of government and is incompatible with the Western tradition." Simpson amplified Uthmeier's post on X. Ingoglia also announced that he was "looking into" a basis to conduct an audit against the schools.

117. However, as Plaintiffs explain in their public advocacy, Governor DeSantis's and the Cabinet's assertions rest on false stereotypes about Islam and Sharia. In particular, Plaintiffs have emphasized that Sharia requires Muslims to comply with the laws of the country in which they reside.

118. On December 1, 2025, through a post on X, Governor DeSantis shared a Fox News article about the death of a Muslim woman in the Netherlands, which suggested that her family allegedly targeted her for not wearing a hijab (or headscarf). Governor DeSantis's comment accompanying the article was, "The wages of sharia…," despite the article itself not referencing Sharia. As CAIR has explained in its public educational materials, Islam does not allow honor killings.

119. In March 2026, as part of HB 1471, the legislature passed a prohibition on the judicial application of religious law and what it refers to as Sharia law in particular. *See* Fla. Stat. § 2.05. No other religious law was identified by name in

the bill, and Governor DeSantis publicly championed the legislation as an "anti-Sharia" law.

120. On April 6, 2026, at a press conference held after Governor DeSantis signed HB 1471, he stood behind a podium bearing a "no" symbol superimposed over the words "SHARIA LAW"—reflecting Islamophobia, hostility to Plaintiffs' views, and opposition to the values of religious freedom and tolerance advocated by Plaintiffs.

121. Months earlier, on December 8, 2025, Governor DeSantis explicitly tied CAIR to a Sharia threat, saying that the legislature was working "to stop the creep of Sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation." On June 16, 2026, he described the bill as an "anti-Sharia bill . . . that allows law enforcement to identify and then we can ratify, the Governor and the Cabinet, designated terror organizations," such as the "Council of [sic] American Islamic Relations."

122. Attorney General Uthmeier has also made clear that practicing Muslims are not welcome in Florida. Appearing on Newsmax on April 8, 2026, Uthmeier said that he viewed HB 1471 as a response to "a surge of Muslims in this country that are pushing Sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." Even if "we're not Dearborn, Michigan," he said—referring to the American city with the

largest share of Muslim residents—"it's important here for us to always be proactive."

123. Governor DeSantis and the Cabinet have knowledge of, disagree with, disapprove of, and are hostile to Plaintiffs' religious views and advocacy for religious freedom and tolerance; Plaintiffs' efforts to educate the public on the meaning of Sharia and its compatibility with American values; Plaintiffs' pro-Palestinian political advocacy; and Plaintiffs' public expression and dissemination of those views through speech, association, and petitioning activity.

**B. The State Executive Defendants Planned To Designate Plaintiffs Long Before the Vote**

124. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations."

125. In a post on X the same day, Governor DeSantis announced that "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as foreign terrorist organizations. Florida agencies are hereby directed to undertake all lawful measures to prevent unlawful activities by these organizations, including denying privileges or resources to anyone providing material support."

126. The Executive Order purported to designate CAIR as a "terrorist organization," as defined in Florida Statutes § 874.03, and to impose sweeping consequences on CAIR and those who had provided it "material support."

127. The Executive Order cited four allegations as supposedly justifying its designation of CAIR: (1) CAIR was founded by the "Palestine Committee" in 1994; (2) in the words of unspecified "persons affiliated with CAIR," CAIR was "founded by persons connected to the Muslim Brotherhood" as "an official U.S. cover" to "conceal ties to Islamic extremist groups"; (3) CAIR was named as an unindicted coconspirator (but never charged) in a terrorism-financing case involving the Holy Land Foundation that concluded nearly two decades ago; and (4) "individuals associated with CAIR have been convicted of providing, and conspiring to provide, material support to designated terrorist organizations."

128. The Executive Order failed to identify a single violent or dangerous act allegedly committed by CAIR.

129. The Executive Order failed to acknowledge that CAIR has never been charged with or convicted of any crime, let alone one related to terrorism.

130. The Executive Order failed to acknowledge that a federal court ruled that CAIR's public naming as an unindicted coconspirator in the Holy Land Foundation prosecution violated its Fifth Amendment rights because it was "unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion" and "[n]either CAIR nor the other unindicted co-conspirators ha[d] been charged with a crime and" so "ha[d] no judicial forum in which to defend against the accusation." *United States v. Holy Land Found. for*

*Relief & Dev.*, 2009 WL 10680203, at *5 (N.D. Tex. July 1, 2009), *aff'd in part, rev'd in part on other grounds*, 624 F.3d 685 (5th Cir. 2010).

131. The Executive Order's purported justification for designating CAIR as a "terrorist organization" relies entirely on guilt-by-association allegations.

132. The Executive Order's purported designation of CAIR as a terrorist organization within the meaning of Florida Statutes § 874.03 lacks a factual basis. CAIR has not engaged in and does not engage in "terrorism" or "terrorist activity."

133. The allegations asserted against CAIR in Executive Order 25-244 could not justify criminal charges, much less a criminal conviction, of any state or federal terrorism or terrorism-financing laws. Indeed, despite accusing CAIR of engaging in criminal conduct and falsely labeling it as a "terrorist organization," Defendants have not sought to charge CAIR with a crime—nor could they, in good faith.

134. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their constitutional rights under the First and Fourteenth Amendments. *CAIR-Found., Inc. v. DeSantis*, No. 4:25-cv-516-MW/MJF (N.D. Fla. 2025). On March 4, 2026, the district court preliminarily enjoined enforcement of the Executive Order against CAIR, holding that CAIR was likely to succeed in establishing that the Executive Order impermissibly attempted to coerce third parties into suppressing CAIR's speech, in violation of

the First Amendment. *CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1273, 1282 (N.D. Fla. 2026).

135. Governor DeSantis also has publicly revealed that, in addition to punishing CAIR and CAIR-Florida for their protected speech and advocacy, one of the purposes of the Executive Order was to obtain and access CAIR's financial records and internal information through discovery in a lawsuit by CAIR challenging the Executive Order. For example, after CAIR announced its intent to respond to the Executive Order, Governor DeSantis posted on X that "I look forward to discovery—especially the CAIR finances. Should be illuminating!"

136. On December 9, 2025, when asked by reporters about Plaintiffs' anticipated lawsuit, Governor DeSantis again stated that he welcomed the litigation not to defend the Executive Order's legality, but because it would allow the state to obtain CAIR's financial records through discovery. He repeatedly emphasized that CAIR's finances were, in his view, "really significant." He also asserted that "a lot of it is financial" and expressed that a lawsuit would enable the state to "get a lot of information" it does not have and otherwise could not obtain.

137. Governor DeSantis's public statements and actions confirm that the Executive Order was issued for retaliatory and improper purposes: to penalize Plaintiffs because he disapproves of the content and viewpoint of their religious and pro-Palestinian advocacy; to chill and deter constitutionally protected speech,

association, and petitioning activity; to coerce third parties into suppressing Plaintiffs' advocacy by deterring them from associating or cooperating with Plaintiffs; to impair the exercise of Plaintiffs' other constitutional rights; and to attempt to justify intrusive government surveillance and investigation of Plaintiffs that would be otherwise improper and unavailable to Defendants and the state.

138. Governor DeSantis's public statements and actions further establish that he has pre-judged the decision regarding CAIR and CAIR-Florida's designations under the DTO regime and intends to approve them.

**C. The State Executive Defendants Are Using the DTO Regime to Punish Plaintiffs for Their Speech and Advocacy**

139. On April 6, 2026—after the Executive Order was preliminarily enjoined as unconstitutional—Governor DeSantis signed HB 1471 and HB 1473 into law. Statements from legislators who supported the bills make clear that, in creating the DTO regime, the legislature intended to endorse Governor DeSantis's actions and Executive Order targeting Plaintiffs while adding a veneer of process and even harsher punishments. For example, Representative Hillary Cassel, the bills' sponsor, explained that she supported the Executive Order designating CAIR and the Muslim Brotherhood as terrorist organizations. HB 1471, in her view, would "create a due process" for organizations to be designated; but she later

acknowledged that it would not be "a judicial process."[9] Similarly, Senator Erin Grall, the sponsor of the companion Senate bill, characterized it as "seek[ing] to bring a process" to Governor DeSantis's Executive Order designations.[10] Senator Grall also acknowledged that, in light of the preliminary injunction, "there is an open question about what our governor will be able to do through executive order."[11]

140. In the weeks leading up to the passage of HB 1471 and HB 1473, and in the months afterward, Governor DeSantis's and Cabinet members' public statements demonstrate that they view the DTO regime's components as a means to target groups whose viewpoints they disfavor, including CAIR and CAIR-Florida.

141. Governor DeSantis and Attorney General Uthmeier's public statements further confirm that they pre-judged CAIR and CAIR-Florida as "terrorist organizations" before approving their designations.

142. On December 8, 2025, the same day he signed the Executive Order, Governor DeSantis foreshadowed Florida's DTO regime, making clear that he

---

[9] Fla. H. Judiciary Comm., 2:28:55–29:16 (Feb. 26, 2026) (statement of Rep. Cassel) https://www.flhouse.gov/VideoPlayer.aspx?eventID=11180; Fla. H. Comm., 3:41:56–42:00 (Mar. 3, 2026) (statement of Rep. Cassel) https://www.flhouse.gov/VideoPlayer.aspx?eventID=11197.

[10] Fla. S. Judiciary Comm., 1:25:08–25:25 (Feb. 3, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6080.

[11] Fla. S. Session, 3:26:43–27:04 (Mar. 5, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6273.

intended it to reinforce his designation of CAIR under the Executive Order and tying the organization to a Sharia "threat." In a post on X, he remarked, "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation."

143. What Governor DeSantis did not publicly disclose is that, according to emails obtained by the Miami Herald, his office had produced the original draft of SB 1632, HB 1471's Senate companion, which proposed the creation of the DTO designation regime. The Executive Office of the Governor's organizational representative confirmed during a Rule 30(b)(6) deposition in the litigation regarding Executive Order 25-244 that Governor DeSantis's office was "heavily involved" in "the creation and passing of [HB] 1471."

144. In January 2026, through an X post, Attorney General Uthmeier put the city commission of Coral Springs, Florida, "on notice" that "state and local resources cannot be used by any organization affiliated with CAIR." Following Attorney General Uthmeier's post, the South Florida Muslim Federation dissociated from CAIR-Florida, which had been a member of the Federation since its inception. CAIR-Florida was unable to take part in the Federation's annual conference in Coral Springs, of which CAIR-Florida had been a sponsor. CAIR-

Florida employees were also forced to withdraw from planned participation in multiple conference panels.

145. On February 1, 2026, Attorney General Uthmeier publicly commented on CAIR's designation under the Executive Order, posting: "In Florida, we take action! We will always oppose terrorist organizations. Thanks to [Governor DeSantis] for designating CAIR and the Muslim Brotherhood as foreign terrorist organizations under state law."

146. One day later, Attorney General Uthmeier "requested law enforcement to be on heightened alert for any possible security threats" related to CAIR's appearance at Muslim Day at the Florida Capitol, an annual civic engagement event. He wrote on X: "CAIR, a designated foreign terrorist organization under state law, has called for a presence around the Florida Capitol today . . . [T]errorist organizations are barred from using any and all state resources, and we expect the governor's executive order to be upheld."

147. Even after the Executive Order was preliminarily enjoined, Governor DeSantis continued to refer to CAIR publicly as a designated terrorist organization.

148. At Governor DeSantis's April 6, 2026, press conference on HB 1471, Governor DeSantis referenced CAIR's supposed designation as a foreign terrorist organization under the Executive Order and reiterated that "CAIR was an unindicted coconspirator in the largest terror-financing trial in American history,

the Holy Land Foundation"—repeating the Executive Order's misleading justification for CAIR's designation. Governor DeSantis also suggested that CAIR's affiliates should not benefit from public funds: "If there's a school that's allied with CAIR, should you have any of your money going to things like that?"

149. At the same event, Lieutenant Governor Jay Collins acknowledged that HB 1471 and HB 1473 are designed to discriminate on the basis of ideology: "[W]e will designate, defund, and dissolve people who don't stand for our values," Collins said.

150. In an April 6, 2026, post on X announcing his signing of HB 1471, Governor DeSantis shared a graphic with the header, "BANNING SHARIA LAW." Underneath the header, the text identified CAIR's designation under the Executive Order as part of "Florida's record" on the issues the law was meant to advance. Reposting the graphic from his personal X account, Governor DeSantis echoed his December 9, 2025, post that anticipated legislative ratification of CAIR's designation: "We have a responsibility to defend and reinvigorate Western Civilization and that means protecting against creeping sharia in all its forms."

151. During an April 7, 2026, interview with Sean Hannity on Fox News, Governor DeSantis described HB 1471 as a solution to "the broader issue of not allowing Islamist groups to get public money from things in Florida." He framed

the purpose of the DTO regime as "identify[ing] groups that are supporting these [Islamist] organizations" so as not to spend "one cent for jihad."

152. On April 8, 2026, Attorney General Uthmeier discussed HB 1471 during a Newsmax interview. As justification for the law, he stated, "[I]t's important here for us . . . to recognize that we do have a surge of Muslims in this country that are pushing sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." With respect to the DTO regime, Uthmeier claimed:

> We have heard reports of different Islamic groups working with foreign terrorist organizations and trying to build communities and infiltrate schools here in the state of Florida, especially in the Tampa area. . . . [W]e're going to investigate and where the state identifies that nonprofit groups and schools might be tied to terrorist organizations, we're going to shut down their opportunity to get many privileges here in the state of Florida.

153. At an April 24, 2026, press conference discussing HB 1471 and HB 1473, Governor DeSantis affirmed that the bills would target and apply to CAIR. Governor DeSantis stated that he had "signed some very important legislation recently banning any imposition of Sharia law" and that "we're not doing that—no use of state funds to go to any entity that is affiliated with groups like CAIR or the Muslim Brotherhood. We have designated them as foreign terrorist organizations."

154. On April 6, 2026, and again on June 16, 2026, Governor DeSantis publicly confirmed that he intended to ensure that CAIR would be designated once the DTO regime went into effect on July 1, 2026. In June, he stated:

> I signed the . . . anti-Sharia bill earlier this year that allows law enforcement to identify and then we can ratify, the governor and cabinet, designated terror organizations. And so you have some of these like the Muslim Brotherhood, the Council of [sic] American Islamic Relations, like that, no doubt . . . we'll be doing that after July 1 when that legislation takes effect.

155. As Governor DeSantis's statements make plain, he, the Chief of Domestic Security, and the Cabinet speak with one voice on this issue: they treat Plaintiffs as enemies on the basis of their protected speech and advocacy, conflate Plaintiffs with a Sharia "threat," and always intended to designate Plaintiffs as domestic terrorist organizations once the DTO regime went into effect.

## IV. Plaintiffs' Designation Under the DTO Regime

### A. The Initial Threat of Designation

156. Even before HB 1471 went into effect, the threat of designation began to injure Plaintiffs.

157. Plaintiffs understood that continuing to operate in Florida after being designated would expose them, their personnel, and their community stakeholders to extremely serious criminal punishments and civil liability. They had no choice but to begin preparing in advance. This required Plaintiffs to forgo speech they

would otherwise have made and to divert resources from their ordinary administrative, fundraising, and advocacy work.

**B. The First Notice of Intent and Pause for Emergency Rulemaking**

158. On July 1, 2026, Governor DeSantis's office issued a press release in which he "announced the intent to designate" three "organizations" under HB 1471, including the "Council on American-Islamic Relations (CAIR)." "Upon confirmation by the Florida Cabinet," the press release said, "these designations will carry the full force of state law. State and local governments will be prohibited from providing taxpayer funding, contracts, or other public support to designated organizations. Public colleges, universities, school districts, and other publicly funded institutions will be prohibited from using public resources to support or promote designated organizations. Organizations designated under Florida law may also be subject to dissolution as provided by statute, and individuals who knowingly provide material support or resources to designated organizations will face criminal penalties established under Florida law."

159. That same day, Governor DeSantis held a press conference with other Florida executive officials regarding the DTO regime.

160. During the press conference, Governor DeSantis noted that he had designated CAIR as a "terror organization" under the Executive Order. He then explained, referring to the DTO regime, "We did need to have more of a legal

structure to be able to add teeth to these designations, and the Legislature responded, and I signed that legislation earlier this year." The purpose of the DTO regime, the Governor said, was to "prevent any creep of Sharia law" and "put the state on the offense against terrorist organizations."

161. "We're going to move forward," Governor DeSantis said, "and we're going to make sure that we're very robust in doing this." He added, "My office and the Cabinet are poised to officially designate the first slew of terrorist organizations under the new law."

162. The forthcoming designations, the Governor said, would constitute "a reaffirmation of my prior Executive Order for the Muslim Brotherhood and the Council of [sic] American-Islamic Relations."

163. The Governor noted that designation under the DTO regime "requires ratification by the Cabinet," and he promised to "get that done very, very quickly." "We don't have a regularly scheduled Cabinet meeting in July," the Governor said, "but I think we're going to be able to . . . jump on a call and do an emergency meeting to be able to ratify this, and then, you know, off to the races."

164. On July 1, 2026, at 2:48 p.m., Governor DeSantis posted a graphic on X. "Today," the graphic said, "Governor DeSantis announced the first terrorist organization designations under Florida law. The notices of intent include: Council on American-Islamic Relations (CAIR) . . . ."

165. Governor DeSantis previously admitted in public filings that he also considers CAIR-Florida a terrorist organization and that it was also covered by Executive Order 25-244. *CAIR-Foundation, Inc. v. DeSantis,* No. 4:25-cv-516-MW/MJF (N.D. Fla. Feb. 11, 2026) ("*CAIR I*"), ECF No. 37 at 16 n.45. Accordingly, there was a substantial risk that CAIR-Florida would imminently be designated as well.

166. On July 1, Plaintiffs filed suit in the Northern District of Florida, challenging the DTO regime and Defendants' implementation of it. *CAIR-Foundation, Inc. v. DeSantis*, No. 4:26-cv-315-MW/MJF (N.D. Fla.) ("*CAIR II*"). On July 2, Plaintiffs moved for a temporary restraining order and preliminary injunction. *CAIR II*, ECF No. 19. On July 6 and 7, the court denied Plaintiffs' motions for a temporary restraining order. It noted, among other things, that it required further briefing and that Plaintiffs' "asserted harms are based on the assumption that Defendants will hold a vote tomorrow—an occurrence which is no certainty—and that this vote will result in ratifying the terrorist designation—another assumption this Court cannot make." *CAIR II*, ECF Nos. 26, 28.

167. Shortly thereafter, Defendants informed Plaintiffs that they intended to promulgate an emergency rule regarding the DTO regime and that accordingly, they would not move forward with the designation process until after the new rule

became effective. Defendants promulgated the temporary regulation on September 11, 2026.

**C. The Approval and Imminent Publication of the Designations**

168. By agreement of the parties, the first possible day on which FDLE could mail the notice of intent was September 15, 2026. FDLE mailed the notice of intent to Plaintiffs that day. Plaintiffs received the notice of intent on September 18.

169. The notice directed Plaintiffs to submit written objections and stated that a public meeting to vote on Plaintiffs' designation would take place on September 29, 2026 at 9:00 a.m.

170. On September 25, 2026, Plaintiffs submitted written objections to the notice of intent.

171. On September 29, 2026, the Governor and Cabinet held the public meeting described in the notice of intent.

172. Plaintiffs' counsel attended the meeting to present argument on behalf of Plaintiffs. As noted above, the Emergency Rule states that "The Governor and Cabinet may permit, at their sole discretion, the organization to appear at the meeting and present argument, for a period of time specified by the Governor and Cabinet, as to why the information and documentation the organization previously submitted counsels against the designation." 11RER26-8(2)(b). But the Governor and Cabinet refused to give counsel an opportunity to be heard.

173. Before the meeting began, Plaintiffs' counsel identified herself to a Cabinet aide and requested the opportunity to speak at the meeting. Although the aide said that she or another person would follow up with Plaintiffs' counsel, no one did. During the meeting, after Commissioner Glass finished speaking, and as Governor DeSantis began to move to approve the designations, Plaintiffs' counsel stood up and again requested an opportunity to speak on behalf of CAIR and CAIR-Florida. Governor DeSantis ignored counsel.

174. Although Florida Statutes § 943.03102 envisions that the Governor and Cabinet "hold a meeting to consider the notice of intent," their "consideration" was perfunctory: Commissioner Glass spoke briefly to note that Plaintiffs satisfied the criteria under Section 943.03102, and Governor DeSantis immediately moved to approve the designations "[u]pon reviewing the information submitted and the recommendations" of Commissioner Glass.

175. The motion was seconded, and the Governor and Cabinet approved the designations. The entire approval process took about 30 seconds.

176. Two days later, on October 1, the Court dismissed Plaintiffs' first lawsuit suit for lack of standing. *See CAIR II*, ECF No. 69. Although Defendants acknowledged that Plaintiffs had standing following the approval of their designations, *CAIR II*, ECF No. 68 at 2–3, the Court concluded that it was required

to evaluate Plaintiffs' standing as of July 1, and that Plaintiffs had lacked standing on that date.

**D. Plaintiffs' Ongoing and Imminent Injuries**

177. The DTO regime requires the Chief of Domestic Security to publish Plaintiffs' designations in the Florida Administrative Register "[w]ithin 7 days after approval by the Governor and Cabinet." Fla. Stat. § 943.03102(2)(e). By agreement of the parties, the Chief of Domestic Security will publish Plaintiffs' designations in the Florida Administrative Register no earlier than October 6, 2026.

178. Absent judicial intervention, Plaintiffs' designations will become effective on November 5, 2026.

179. Plaintiffs face a substantial risk that, once their designations become effective, the State Attorney Defendants and Office of Statewide Prosecution will seek to enforce the myriad criminal and civil penalties under the DTO regime against Plaintiffs. For example, at the Governor's July 1 press conference, Brad McVay, Florida's statewide prosecutor, said, "We stand here committed to . . . prosecute any individual or group associated with terrorist activity."

180. The DTO regime and the State Executive Defendants' targeting of Plaintiffs under the DTO regime has harmed, is harming, and will harm Plaintiffs. For example:

a. In anticipation of the vote on their designation, CAIR-Florida has had to turn away prospective legal clients and cancel its annual fundraising galas, which were scheduled for this fall. This took time and resources that CAIR-Florida would have otherwise used to engage in advocacy and other First Amendment-protected activity.

b. CAIR had to switch information-technology network services after the Florida-based company it used terminated its contract with CAIR in early July. This took time and resources that CAIR would have otherwise used to engage in advocacy and other First Amendment-protected activity.

c. Now that their designations have been approved, both CAIR and CAIR-Florida must spend time winding down operations and diverting resources from other First Amendment-protected activity in which they might have engaged absent the need to prepare for their designation becoming effective.

d. Being designated as a "domestic terrorist organization" and having that designation published in the Florida Administrative Register and on the FDLE website is inherently stigmatizing; it undermines the trust and credibility that CAIR and CAIR-Florida have built

over the lifetime of their existence with donors, community members, volunteers, and supporters. CAIR and CAIR-Florida's trust and credibility go beyond monetary value and are integral to their ability to carry out their missions.

181. On the date Plaintiffs' designations become effective, Plaintiffs will be unable to continue their political advocacy, receive charitable giving, provide legal services (and may even need to discontinue providing legal services to civil rights clients in court), and conduct other organizational activity in Florida, including but not limited to their speech and association. For example:

a. Plaintiffs will be unable, within Florida, to further engage in transactions fundamental to their operations—*e.g.*, withdrawing funds from, and depositing funds in, bank accounts; renting office space; and organizing public events.

b. Any employee, officer, or director of either Plaintiff who reports to work or otherwise knowingly contributes to either entity's operation, and who is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

c. Plaintiffs; any employee, officer, or director of either Plaintiff; and any third party who knowingly "initiates, organizes, plans, finances, directs, manages, or supervises" activity with the intent to further Plaintiffs' interests, and is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment, including life in prison, under the CGPA. Fla. Stat. § 874.10.

d. Plaintiffs may be unable, within Florida, to provide legal services and advice to members of their communities.

e. Persons or entities providing services to either Plaintiff—such as banks and other financial institutions; internet, telephone, and technology service providers (including email and data storage providers); vendors; retirement and other benefit administrators; accountants; financial advisors; and legal counsel—will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

182. On the date CAIR-Florida's designation becomes effective, CAIR-Florida's exercise of the corporate powers conferred on not-for-profit organizations by Florida law will be grievously impaired. These include, among others, CAIR-

Florida's power to: "[m]ake contracts and guaranties"; "[c]onduct its affairs, carry on its operations, and have offices and exercise the powers granted by this chapter in any state, territory, district, or possession of the United States or any foreign country"; and "exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is organized." Fla. Stat. § 617.0302.

183. On the date CAIR's designation becomes effective, CAIR's exercise of the corporate powers conferred on not-for-profit corporations under D.C. law will be significantly impaired. These include, among others, CAIR's power to "[c]onduct its activities, locate offices, and exercise the powers granted by this chapter within or without the District." D.C. Code § 29-403.02(10).

184. Designation will, at minimum, substantially hinder Plaintiffs' attempts to seek judicial relief and clear their names—including in this litigation.

a. The DTO regime (i) criminalizes the knowing provision of material support to designated organizations and (ii) does not expressly exempt employees, directors, or other personnel who act on behalf of their organizations for the purpose of pursuing the organizations' rights and clearing their names in federal or state court—by, for example, coordinating with legal counsel, providing sworn declarations, or providing live testimony. Fla. Stat. § 775.33(3).

b. The DTO regime (i) criminalizes initiating, organizing, planning, financing, directing, managing, or supervising activity committed with the intent to benefit promote or further the interests of a designated "domestic terrorist organization" and (ii) contains no express exemption authorizing organizations or their personnel to engage in activities incident to challenging the organization's designation or defending the organization in a criminal prosecution—by, for example, coordinating with legal counsel, providing sworn declarations, or providing live testimony. Fla. Stat. § 874.10.

185. CAIR and CAIR-Florida associate with one another and work together and independently to fulfill their mission by engaging in advocacy on cultural, social, nonpartisan political, and civic issues of public concern to American Muslims. This advocacy includes initiating and representing clients in litigation, engaging in public policy advocacy, conducting trainings, creating and publishing educational materials and hosting educational events, and leading community organizing efforts.

## V. The Federal Government's Role in the Designation of Terrorist Organizations, Foreign Affairs, National Security, and Foreign Commerce

186. Florida's new statutory regime for designating domestic terrorist organizations is also incompatible and in conflict with the federal government's exclusive powers over foreign affairs, national security, and foreign commerce, and with the federal regimes governing the designation and sanctioning of terrorist organizations. As a result, the DTO regime and its application to Plaintiffs is preempted.

187. The federal government manages foreign affairs, national security, and foreign commerce for the United States, and the intersection thereof, including the designation and sanctioning of terrorist organizations. The federal government exercises these powers through two longstanding regimes relevant here: (i) the regime for designating Specially Designated Global Terrorists ("SDGTs"), which authorizes the Secretary of State and the Secretary of the Treasury to designate and impose sanctions on certain foreign and domestic organizations and individuals, i.e., domestic organizations determined to have prohibited foreign relationships or activities; and (ii) the regime for designating Foreign Terrorist Organizations ("FTOs"), which authorizes the Secretary of State to designate and impose additional sanctions on foreign organizations based on statutory criteria—a

determination that also triggers criminal prohibitions on material support by both domestic and foreign organizations and individuals.

**A. The SDGT Regime**

188. The National Emergencies Act ("NEA"), Pub. L. No. 94-412, § 201, 90 Stat. 1255 (codified as 50 U.S.C. § 1621), enacted in 1976, and the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, § 201, 91 Stat. 1626 (codified as 50 U.S.C. § 1701), enacted in 1977, give the president broad authority to declare a national emergency with respect to a specified threat, and to take action in response to it.

189. Invoking these authorities after the September 11th attacks, President Bush issued Executive Order 13224 in 2001 ("E.O. 13224"), asserting the power to impose sanctions on foreign persons determined to be engaged in acts of terrorism that "threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States," as well as on domestic organizations and individuals determined to be acting for or on behalf of such foreign persons. Exec. Order No. 13224, 66 Fed. Reg. 49,079 (Sept. 23, 2001).

190. This designation and sanctions authority is now known as the SDGT regime. E.O. 13224 and its implementing regulations prohibit transactions with, and authorize the freezing of all assets of, any organization or individual the government designates a "specially designated global terrorist." 31 C.F.R.

§§ 594.101–.901. E.O. 13224, as amended, delegates this designation power to the Secretary of the Treasury and the Secretary of State, in consultation with the Secretary of Homeland Security and Attorney General. Exec. Order No. 13284, 68 Fed. Reg. 4075 (Jan. 23, 2003); Exec. Order No. 13372, 70 Fed. Reg. 8499 (Feb. 16, 2005). The Secretary of Treasury determines the designations of domestic organizations or individuals, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General. Federal officials recognize that designating domestic entities requires caution because domestic groups and individuals have constitutional rights, including under the First, Fourth, and Fifth Amendments.

191. In the USA PATRIOT Act of 2001, Congress amended IEEPA to permit the Secretary of the Treasury to block the assets of an entity pending its investigation as an SDGT. Pub. L. No. 107-56, § 106, 115 Stat. 272 (codified as amended 50 U.S.C. § 1702(a)(1)(B)).

192. Subsequent executive orders have modified and expanded E.O. 13224. The most significant is Executive Order 13886 ("E.O. 13886"), issued by President Trump in 2019, which expanded some of the criteria for designating SDGTs and "moderniz[ed]" the federal sanctions regime for combatting terrorism. Exec. Order No. 13886, 84 Fed. Reg. 48041 (Sept. 9, 2019) (promulgating new executive order

"to further strengthen and consolidate sanctions to combat the continuing threat posed by international terrorism").

193. The Office of Foreign Assets Control ("OFAC") within the Department of Treasury has issued regulations, titled "Global Terrorism Sanctions Regulations," to implement E.O. 13224. *See* 31 C.F.R. §§ 594.101–.901. It has amended those regulations on multiple occasions, including in response to subsequent executive orders like E.O. 13886. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA. OFAC administers and enforces economic regulations and sanctions, including SDGT sanctions.

194. One of OFAC's primary duties is to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It maintains and regularly updates several sanctions lists identifying countries, entities, and individuals considered to be threats to national security by the federal government, including the SDGT list.

195. The SDGT regime authorizes the designation of both foreign and domestic groups, as well as individuals, if specified criteria are met. 31 C.F.R. §§ 594.201.

196. The executive branch may designate domestic and foreign groups as SDGTs, and impose sanctions, for a range of terrorism-related activities. 31 C.F.R. § 594.201(a)(1)–(11). Among other bases, the Secretary of the Treasury may designate domestic and foreign groups as SDGTs upon a determination that the group has "materially assisted"; "sponsored"; "provided financial, material, or technological support for"; or provided "goods or services" in support of "an act of terrorism." 31 C.F.R. § 594.201(a)(3)(iii); *see* 31 C.F.R. § 594.311 (defining "terrorism"). Similarly, the Secretary of the Treasury may designate domestic and foreign groups as SDGTs upon a determination that the group is "owned, controlled, or directed by"; has "acted or purported to act for or on behalf of, directly or indirectly"; "own[s] or control[s], directly or indirectly"; or has "participated in training related to terrorism provided by"—an entity that is already blocked under certain SDGT regulations. 31 C.F.R. § 594.201(a)(3)(i), (ii), (iv). The SDGT regime also permits designation if the Secretary of the Treasury determines that any domestic or foreign group has "attempted or conspired to engage in" any of the preceding activities. 31 C.F.R. § 594.201(a)(3)(vi). Foreign

groups and individuals may be designated if they are determined to meet other conditions. 31 C.F.R. § 594.201(a)(1)–(11).

197. Groups and individuals designated as SDGTs are "blocked," meaning transactions involving their property and interests in property are broadly prohibited. 31 C.F.R. § 594.201(a). As noted, groups and individuals who are under investigation for possible designation as SDGTs can also be blocked. 50 U.S.C. § 1702(a)(1)(B).

198. Blocked groups and individuals are generally prohibited from accessing money or other forms of property: their assets cannot be transferred, withdrawn, "or otherwise dealt in." 31 C.F.R. § 594.201(a). Additionally, under the SDGT regime, U.S. law requires other U.S. people and entities to obtain a government license before engaging in "any transaction or dealing" with blocked groups and individuals. This includes not only providing funds, goods, or services to—or for the benefit of—a blocked group or individual, but also receiving funds, goods, or services from a blocked group or individual. 31 C.F.R. § 594.204. No license is required for certain forms of legal defense.

199. Violating these prohibitions can lead to civil and criminal penalties. 50 U.S.C. § 1705(b), (c).

**B. The FTO Regime**

200. The federal FTO designation regime sits alongside the federal SDGT regime. Congress created the FTO designation regime in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. No. 104-132, 110 Stat. 1214. Since then, Congress has amended the FTO regime on multiple occasions—including in the USA PATRIOT Act, Pub. L. No. 107-56, § 805, 115 Stat. 377 (2001), and the Intelligence Reform and Terrorism Prevention Act, Pub. L. No. 108-458, § 7119, 118 Stat. 3801 (2004).

201. In AEDPA, Congress authorized the Secretary of State to determine whether a foreign organization is an FTO. To designate an organization as an FTO, the Secretary must determine that the organization meets three criteria: (1) the organization is foreign; (2) the organization engages in, or has the capability and intent to engage in, terrorist activity or terrorism; and (3) the organization's terrorism or terrorist activity threatens the security of U.S. nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1); *see* 22 U.S.C. § 2656f(d)(2) (defining "terrorism"); 8 U.S.C. § 1182(a)(3)(B)(iii) (defining "terrorist activity"); 8 U.S.C. § 1182(a)(3)(B)(iv) (defining "engage in terrorist activity"); 8 U.S.C. § 1182(a)(3)(B)(vi) (defining "terrorist organization").

202. The consequences of FTO designation are severe. Even before an organization's designation goes into effect, the government may instruct U.S.

financial institutions to freeze the organization's assets. 8 U.S.C. § 1189(a)(2)(C). Once the organization is officially designated, its non-citizen members and representatives are barred from entering the United States. *Id.* §§ 1182(a)(3)(B)(i)(IV)–(V). Non-citizens already present in the United States may be detained and removed. *Id.* § 1227(a)(1)(A).

203. Perhaps most significantly, it is a federal crime for any entity or individual—domestic or foreign—to knowingly provide "material support" to an FTO. 18 U.S.C. § 2339B; *see* 18 U.S.C. § 2339A; 8 U.S.C. § 1189. Material support is defined to include providing property (tangible or intangible), resources, or services. 18 U.S.C. § 2339A; *see* 18 U.S.C. § 2339B; 8 U.S.C. § 1189. The criminal penalties for providing material support to an FTO include a fine of up to $500,000 and imprisonment for up to life. 18 U.S.C. § 2339B(a); 18 U.S.C. § 2339A(a); 18 U.S.C. § 3571.

204. As with the SDGT regime, OFAC has issued regulations, titled "Foreign Terrorist Organizations Sanctions Regulations," implementing the FTO regime. *See* 31 C.F.R. §§ 597.101–.901. It has amended those regulations on multiple occasions since Congress enacted the federal FTO regime in 1996. *See, e.g.*, 8 U.S.C. § 1189, *amended by*, Intelligence Reform and Terrorism Prevention Act, Pub. L. No. 108-458, § 7119, 118 Stat. 3801 (2004); USA PATRIOT Act, Pub.

L. No. 107-56, § 805, 115 Stat. 377. OFAC administers and enforces FTO sanctions.

205. The Department of Justice enforces the FTO regime's criminal prohibitions on material support, including against individuals and organizations in the United States.

**C. The SDGT and FTO Regimes Reflect a Careful Balancing of Federal Interests**

206. The SDGT and FTO regimes—in their scope, structure, and implementation—represent a deliberate balancing of federal interests. These regimes implement the federal government's primary powers to manage foreign affairs, protect the nation's security, regulate foreign commerce, and ensure national uniformity in these domains. The designation of terrorist organizations carries weighty implications for these federal interests: it affects foreign affairs and foreign policy, requires national security judgments, shuts down foreign and U.S. transactions by the organization, and imposes harsh criminal and civil penalties for violations. For many of the same reasons, the designation of terrorist organizations can also implicate the First Amendment speech and associational rights of domestic organizations and people in the United States, as Congress and the executive branch themselves have recognized.

207. Congress, aware of the severe practical and legal consequences of designating "terrorist organizations," exercised careful judgment in designing the

FTO regime. In doing so, it deliberately excluded domestic organizations from the scope of that regime. Likewise, the executive branch and Congress, in designing and amending the SDGT regime and regulations under IEEPA, have drawn deliberate lines in defining which domestic and foreign organizations may be sanctioned, under what circumstances, and for which specific types of terrorism-related conduct.

208. Through the federal SDGT and FTO regimes, Congress and the executive branch have also ensured national uniformity in the designation of terrorist organizations, foreclosing states from establishing a patchwork of separate schemes that interfere with foreign affairs and foreign commerce and threaten the First Amendment speech and associational rights, as well as due process and Fourth Amendment rights, of people and entities in the United States.

### D. Federal Sanctions Targeting the Muslim Brotherhood, Hamas, and Alleged Affiliated Organizations and Individuals

209. Over the past three decades, the executive branch has exercised its powers under the SDGT and FTO regimes to sanction Hamas, certain country-specific chapters of the Muslim Brotherhood, and alleged affiliated organizations and individuals both in the United States and abroad. For example, the executive branch designated Hamas and Palestinian Islamic Jihad ("PIJ") as FTOs in 1997 and as SDGTs in 2001. The executive branch also designated the Holy Land

Foundation, a domestic organization, as an SDGT in 2001, based on allegations about foreign terrorism-related activities and associations.

210. The use of these sanctions reflects a deliberate exercise of the federal government's foreign affairs, national security, and foreign commerce judgment. For example, the federal government has recently taken different, calibrated approaches with respect to different chapters of the Muslim Brotherhood. It has designated some chapters as SDGTs, with at least one chapter as both an FTO and an SDGT, and some Muslim Brotherhood-affiliated groups and political parties it has not designated at all. *See, e.g.*, E.O. 14362, "Designation of Certain Muslim Brotherhood Chapters as Foreign Terrorist Organizations and Specially Designated Global Terrorists," Exec. Order No. 14362, 90 Fed. Reg. 55033 (Nov. 24, 2025). This varied approach reflects, among other things, the delicate foreign affairs implications of accusing groups of terrorist activities, officially designating them as "terrorist organizations" or "global terrorists," and blocking their assets and transactions, especially when such groups may have complex relationships with foreign political parties, foreign governments, and foreign officials.

211. Likewise, sanctioning domestic organizations based on allegations about their relationships with foreign organizations or governments has weighty implications for the United States' foreign affairs, foreign policy, and national security. For example, publicly accusing foreign organizations of controlling,

directing, or influencing domestic organizations in connection with alleged terrorist activity carries significant diplomatic and foreign affairs ramifications for the United States' relationship with the country or countries where the foreign organization is located. Florida's new DTO regime, including its designation of Plaintiffs, impermissibly intrudes upon and conflicts with the federal government's power and policies in these domains.

212. In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—exclusively controls the designation of terrorist organizations in the United States. Florida's new DTO regime, and its application of that regime to Plaintiffs, is preempted and violates the Supremacy Clause of the U.S. Constitution.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of the First Amendment—Right to Free Speech**
(in violation of 42 U.S.C. § 1983, against all Defendants)

213. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 185.

214. The First Amendment protects Plaintiffs' speech and advocacy on matters of public concern, including faith and religion, government affairs, civil rights, and public policy.

215. The DTO regime and the designations of Plaintiffs as DTOs are unlawful because they directly suppress Plaintiffs' protected speech and coerce third parties to unlawfully suppress Plaintiffs' speech, as set forth above. In addition to criminalizing Plaintiffs' speech directly, *see, e.g.*, Fla. Stat. § 874.10, the DTO regime also criminalizes the speech of Plaintiffs' board members and staff in the service of the organization, *see, e.g.*, *id.*, and even allows the state to enjoin Plaintiffs' use of physical locations to speak, *see, e.g.*, Fla. Stat. § 823.05(2)(b)–(c). More generally, the DTO regime will make it impossible for Plaintiffs to have board members or staff in Florida. *See, e.g.*, Fla. Stat. § 775.33. As corporate entities, Plaintiffs can speak only through board members or staff. These restrictions will force CAIR-Florida to shut down altogether, and they will substantially impair CAIR's speech and advocacy. These restrictions are not narrowly tailored and do not actually advance a compelling state interest.

216. Once an organization's designation is effective, the DTO regime allows the state to punish speech by and to the designated organization that would otherwise be protected—simply because executive officials have deemed the organization a DTO. Executive officials decide whether an organization's protected speech will become a crime, based on their discretionary "finding" of criminality and subjective "threat" assessment. Fla. Stat. § 943.03102(1)(a), (2)(d). These officials decide whether an organization's ability to speak and to receive speech can

continue as usual, or whether that same speech will become a felony. Executive officials pick and choose which organizations are subject to unique criminal and civil restraints on their speech and advocacy.

217. The DTO regime and Plaintiffs' designations are unlawful because they impose an unconstitutional prior restraint. An organization designated as a DTO is subject to severe restrictions on its speech by executive officials—as well as severe restrictions on its ability to receive speech from members, supporters, and others—before the speech occurs. There is no guarantee of any judicial hearing, let alone a ruling, before the restraint becomes effective. The DTO regime does not require the state to bear the burden of going to court; does not require the state to bear the burden of proving that the speech it seeks to prohibit is unprotected; and does not assure an almost-immediate final judicial decision.

218. The DTO regime and Plaintiffs' designations are unlawful because the regime vests excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to silence, debilitate, and blacklist domestic advocacy organizations engaged in First Amendment-protected activity, such as Plaintiffs, by designating them as DTOs. The DTO regime does not require state officials to satisfy any burden of proof; does not require judicial review prior to designation; does not require an almost-immediate final judicial decision; and at no point requires disclosure of the state's evidence (if any) to the designated organization.

219. The DTO regime and Plaintiffs' designations are unlawful because they are a substantially overbroad restriction on a designated organization's right to engage in and receive speech.

220. The DTO regime and Plaintiffs' designations are unlawful because they burden Plaintiffs' speech, as well as Plaintiffs' right to receive information, on the basis of its content and viewpoint. For example, liability under Florida Statutes §§ 823.05, 874.10 and 874.11 turns on the message conveyed by the speech and, specifically, whether the speech is intended to further the interests of the organization. Speech advancing the interests of the organization is subject to sanctions, while speech opposing those same interests is not. Similarly, Florida Statutes § 775.33 burdens Plaintiffs' right to receive information on the basis of its content because it prevents people from providing, among other things, services and expert assistance in the form of speech to CAIR and CAIR-Florida. These burdens are not narrowly tailored to actually advance a compelling state interest.

221. The designations of Plaintiffs under the DTO regime are unlawful because Defendants' designations discriminate against Plaintiffs on the basis of their viewpoints, are not narrowly tailored, and do not actually advance a compelling government interest.

**COUNT TWO**
**Violation of the First Amendment—Right to Association**
(in violation of 42 U.S.C. § 1983, against all Defendants)

222. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 185.

223. The First Amendment guarantees freedom of association as an indispensable means of preserving other individual liberties. The right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion—constitutes expressive association and receives heightened constitutional protection.

224. In pursuing their faith-based mission, Plaintiffs' protected advocacy necessarily involves association, interaction, and coordination with their board members, staff, volunteers, donors, each other, members of the public, and other organizations and businesses as an essential predicate to public education, interfaith work, and legal, civil rights, and public policy advocacy.

225. The DTO regime and Plaintiffs' designations are unlawful because the regime vests excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to paralyze and debilitate the expressive associations of domestic advocacy organizations, such as Plaintiffs, by designating them as DTOs.

226. For example, the DTO regime will make it a crime for Plaintiffs—and anyone else—to knowingly "initiate[]" associational activities in furtherance of Plaintiffs' interests. *See* Fla. Stat. § 874.10. The DTO regime even allows the state to enjoin Plaintiffs' use of physical locations to associate. *See, e.g.*, Fla. Stat. § 823.05(2)(b)–(c). More generally, the DTO regime will make it impossible for Plaintiffs to have expressive associational relationships with board members, staff, or donors in Florida, given the criminalization of "material support" to designated organizations. *See, e.g.*, Fla. Stat. § 775.33. As corporate entities, Plaintiffs can only speak and associate with others via board members or staff. The DTO regime's restrictions will force CAIR-Florida to shut down altogether, and they will substantially impair CAIR's speech and advocacy.

227. The DTO regime is unlawful because it authorizes Defendants to impair organizations' ability to engage in expressive association and advocacy, as set forth above. It does so both directly and indirectly, through the array of criminal and civil penalties for individuals who associate with designated organizations in various respects. There is no substantial relationship between the DTO regime and a sufficiently important government interest, and the DTO regime is not narrowly tailored to achieve any such interest.

228. The designations of Plaintiffs under the DTO regime are unlawful because they profoundly impair their ability to engage in expressive association

and advocacy in Florida, as set forth above. The designations do so both directly and indirectly, through the array of criminal and civil penalties for Plaintiffs and for individuals who engage in expressive association with Plaintiffs—including Plaintiffs' board members, staff, volunteers, donors, and other supporters. There is no substantial relationship between the State Executive Defendants' designation of Plaintiffs and a sufficiently important government interest, and the designation is not narrowly tailored to achieve any such interest.

229. The DTO regime and Plaintiffs' designations are unlawful because they impose an unconstitutional prior restraint on protected association. An organization designated as a DTO is subject to severe restrictions on its expressive associations by executive officials before the associations occur. There is no guarantee of any judicial hearing, let alone a ruling, before the restraint becomes effective. The DTO regime is unlawful because it does not require the state to bear the burden of going to court; does not require the state to bear the burden of proving that the association it seeks to prohibit is unprotected; and does not assure an almost-immediate final judicial decision. The DTO regime is also unlawful because there is no substantial relationship between the DTO regime and a sufficiently important government interest, and the DTO regime is not narrowly tailored to achieve any such interest.

230. The DTO regime and Plaintiffs' designations under it are unlawful because they impose unconstitutional "guilt for association" on Plaintiffs' staff, board members, volunteers, donors, supporters, and others—an "impermissible basis upon which to deny First Amendment rights." *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920, 925 (1982). For example, once Plaintiffs' designations are effective, Plaintiffs' employees in Florida will face criminal liability for "material support" to Plaintiffs if they continue to associate with Plaintiffs by providing services to them. *See* Fla. Stat. § 775.33; *see also* Fla. Stat § 874.10 (criminalizing the knowing initiation of activity—including protected associational activity—in furtherance of a DTO's interests). The state cannot criminally prohibit association without first proving that (1) Plaintiffs possess unlawful aims and goals, and (2) Plaintiffs' staff, board members, volunteers, donors, supporters, and others in association with them have a specific intent to further those illegal aims. Although the state has not met and cannot meet this burden, executive officials have nevertheless deemed Plaintiffs guilty under the DTO regime, and people who associate with Plaintiffs face liability for their association as a result. The DTO regime has defined crimes in such a way that the state never needs to prove that Plaintiffs possess unlawful aims and goals. This "guilt for association," in turn, profoundly impairs Plaintiffs' protected associational relationships.

**COUNT THREE**
**Violation of the First Amendment—Retaliation**
(in violation of 42 U.S.C. § 1983, against all Defendants)

231. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 185.

232. The designations of Plaintiffs under the DTO regime are unlawful because they constitute government retaliation against them in violation of the First Amendment.

233. Plaintiffs' speech is constitutionally protected, as set forth above.

234. The designations of Plaintiffs under the DTO regime are an adverse action that materially harms Plaintiffs, as set forth above. The designations would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

235. Plaintiffs' protected speech and association are substantial or motivating factors in the state's challenged conduct, thus establishing a causal connection between the state's retaliatory actions and the protected activity, as set forth above.

**COUNT FOUR**
**Violation of the First Amendment—Right to Petition**
(in violation of 42 U.S.C. § 1983, against all Defendants)

236. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 103 and 156 to 185.

237. The First Amendment protects the right of the people to petition the government for a redress of grievances. The right to petition includes the ability of citizens and groups of them to approach the legislature, the executive branch, and the courts. The DTO regime and Plaintiffs' designations directly and indirectly substantially impair Plaintiffs' right to petition. The regime and designations suppress Plaintiffs' speech to the legislature, the executive branch, and the courts, as well as the speech and activity of others who would facilitate Plaintiffs' petitioning. *See, e.g.*, Fla. Stat. §§ 775.33, 874.10. These restrictions are not narrowly tailored to actually advance a compelling state interest, nor is there a substantial relationship between the impairment and a sufficiently important government interest.

**COUNT FIVE**
**Violation of the Fourteenth Amendment—Due Process**
(in violation of 42 U.S.C. § 1983, against all Defendants)

238. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 103 and 156 to 185.

239. **Executive Adjudication of Criminal Culpability and Imposition of Criminal Punishment.** The DTO regime violates the due process component of the Fourteenth Amendment because it empowers state executive officials to (a) find that a U.S. group is engaged in criminal wrongdoing under Florida or U.S. law and (b) severely punish the group on the basis of that finding, without providing the

group with any of the protections attending the criminal process, including those based on fundamental Fourteenth, Fifth, and Sixth Amendment rights, such as the presumption of innocence, the right to have one's charges proven beyond a reasonable doubt in a court of law, the right to confront witnesses, and the right to exculpatory evidence in the possession of the prosecution.

240. **Inadequate Procedural Protections.** Alternatively, the DTO regime violates the due process component of the Fourteenth Amendment as applied to U.S. corporations, including nonprofits like Plaintiffs, because it authorizes the deprivation of their constitutionally protected interests in liberty and property, as set forth above, while denying them adequate procedural protections.

241. In particular, the procedures prescribed by the DTO regime, as set forth above, create an extraordinarily high risk that the state will erroneously deprive U.S. corporations, including Plaintiffs, of critically important, constitutionally protected interests in liberty and property.

242. The state could feasibly provide significantly more robust procedural protections to U.S. corporations it seeks to designate, including Plaintiffs—and it has no legitimate interest in denying them such protections. Consequently, the state's current procedures for designating U.S. organizations as "domestic terrorist organizations" are constitutionally inadequate; the DTO regime denies U.S. corporations, including Plaintiffs, "the opportunity to be heard at a meaningful time

and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation modified).

**COUNT SIX**
**Violation of the Fourteenth Amendment—Right to Counsel**
(in violation of 42 U.S.C. § 1983, against all Defendants)

243. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 103 and 156 to 185.

244. The Fourteenth Amendment protects and guarantees litigants the right to retain and be represented by counsel in their legal proceedings, including the right to choose counsel free from arbitrary or unjustified governmental interference.

245. The designation of Plaintiffs under the DTO regime violates their Fourteenth Amendment right to counsel.

246. Under the DTO regime's material support provision, it is a felony, punishable by up to thirty years in prison, to provide any designated DTO with "material support or resources," which includes any "service" or "expert advice or assistance." Fla. Stat. § 775.33(1)(d). Further, it is a felony, punishable by up to life in prison, if any person knowingly "initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10.

247. These statutes do not exempt the provision of legal services, representation, and advice from these or any other prohibitions imposed under the DTO regime.

248. While Emergency Rule 11RER26-8(5) states that the FDLE "will not consider there to be cause for prosecution for a violation of section 775.33 or Chapter 874, F.S., based solely on the provision of legal counsel or legal support services to the organization for purposes of representing or providing advice in connection with existing or anticipated litigation concerning a designation or defending against a criminal prosecution," that does not suffice to protect Plaintiffs' right to counsel.

249. Emergency Rule 11RER26-8 expires after 90 days, at which point the prohibitions on providing legal counsel to designated organizations under Florida Statutes §§ 775.33 and 874.10 will again apply.

250. The interpretation set forth in Emergency Rule 11RER26-8 also applies only to existing or anticipated litigation concerning a designation and criminal prosecutions. It does not apply to legal support or advice provided in relation to other proceedings, such as civil or administrative proceedings, or other matters, such as general legal compliance services.

251. Once Plaintiffs' designations are effective, any lawyer or legal organization that provides or attempts to provide legal services or representation to

CAIR or CAIR-Florida unrelated to existing or pending litigation involving CAIR or CAIR-Florida's designation or a criminal proceeding faces a credible threat of criminal prosecution under the DTO regime, including under Florida Statutes §§ 775.33(1)(d) and 874.10.

252. Once Emergency Rule 11RER26-8 expires, any lawyer or legal organization that provides or attempts to provide legal services or representation to CAIR or CAIR-Florida for any purpose faces a credible threat of criminal prosecution under the DTO regime, including under Florida Statutes §§ 775.33(1)(d) and 874.10.

253. Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to Plaintiffs under the DTO regime, designation creates a substantial risk that Plaintiffs will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime once Emergency Rule 11RER26-8 expires. Further, even where Plaintiffs can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes Plaintiffs concrete harm.

254. Plaintiffs face a substantial risk that they will be denied their right to counsel under the Fourteenth Amendment and that this violation will cause Plaintiffs ongoing, irreparable harm.

**COUNT SEVEN**
**Violation of the First Amendment—Right to Counsel**
(in violation of 42 U.S.C. § 1983, against all Defendants)

255. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 103 and 156 to 185 above.

256. The First Amendment protects and guarantees litigants the right to retain and associate with counsel in their legal proceedings and to petition the government for redress of grievances.

257. The designation of Plaintiffs under the DTO regime violates their rights to retain and associate with counsel in their legal proceedings and to petition the government by exposing any person who provides CAIR or CAIR-Florida with legal services or representation to severe criminal penalties.

258. Once Plaintiffs' designations are effective, persons who provide legal services or representation to CAIR or CAIR-Florida unrelated to existing or pending litigation involving Plaintiffs' designations or a criminal proceeding face a credible threat that they will be prosecuted under the DTO regime, including under Florida Statutes §§ 775.33(1)(d) and 874.10.

259. Once Emergency Rule 11RER26-8 expires, any lawyer or legal organization that provides or attempts to provide legal services or representation to for any purpose faces a credible threat of criminal prosecution under the DTO regime, including under Florida Statutes §§ 775.33(1)(d) and 874.10.

260. Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to Plaintiffs under the DTO regime, designation creates a substantial risk that Plaintiffs will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime once Emergency Rule 11RER26-8 expires. Further, even where Plaintiffs can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes Plaintiffs concrete harm.

261. The DTO regime's restrictions on the ability of Plaintiffs to obtain legal services and representation violate the First Amendment because the state has no compelling or even legitimate interest in restricting Plaintiffs' access to counsel, and the restrictions are not closely drawn or narrowly tailored to further any interest.

262. Plaintiffs face a substantial risk that they will be denied their rights under the First Amendment and that this violation will cause Plaintiffs ongoing, irreparable harm.

**COUNT EIGHT**
**Violation of the Supremacy Clause of the U.S. Constitution**
**Preemption by Federal Regimes Governing**
**Designation of Terrorist Organizations, Foreign Affairs, Foreign Commerce, and National Security**
(Against all Defendants)

263. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 103 and 156 to 212 above.

264. The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

265. The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

266. Pursuant to the Supremacy Clause, Florida's new statutory regime for designating domestic terrorist organizations—and its designation of Plaintiffs under that scheme—is preempted by the federal regimes governing the designation of terrorist organizations, foreign affairs, national security, and foreign commerce, including the federal laws and executive orders providing for the designation of SDGTs and FTOs.

267. The U.S. Constitution vests the federal government with the primary powers to manage foreign affairs, protect the nation's security, regulate foreign commerce, and ensure national uniformity in those domains. *See, e.g.*, U.S. Const., art. I, § 10, cl. 1, 3 (foreign affairs); U.S. Const., art. I, §§ 8, 10 (national security); U.S. Const., art II, § 2 (same); U.S. Const., art. I, § 8, cl. 3 (commerce with foreign nations).

268. Under federal laws and regulations, the Department of Treasury and Department of State are authorized, inter alia, to investigate, designate, and sanction domestic and foreign organizations with respect to terrorist activities that threaten national security. OFAC is responsible for administering and enforcing the far-reaching sanctions that result from designation as an SDGT or FTO.

269. The enactment, designation, and impending enforcement of the prohibitions embodied by Florida's new DTO regime have caused and will continue to cause Plaintiffs ongoing and irreparable harm.

270. In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A. Enjoin Defendant Keefe from publishing the designations of Plaintiffs as "domestic terrorist organizations" in the Florida Administrative Register and on the FDLE website.

B. Issue an injunction requiring Defendant Keefe to rescind and remove the designations of Plaintiffs as "domestic terrorist organizations," and to rescind and remove any publication of such designation in the Florida Administrative Register and on the FDLE website.

C. Enjoin all Defendants from taking any steps to make the designations of Plaintiffs as "domestic terrorist organizations" effective.

D. Enjoin all Defendants from enforcing any provision of the DTO regime against Plaintiffs pursuant to their designations as "domestic terrorist organizations," and enjoin all Defendants from enforcing any provision of the DTO regime against others in connection with the designations of Plaintiffs under the DTO regime.

E. Enjoin all Defendants from enforcing any prohibition on provision of legal services to or by Plaintiffs in connection with any civil or criminal proceedings involving Plaintiffs as a party or counsel, pursuant to their designations as "domestic terrorist organizations" under the DTO regime.

F. Declare that the DTO regime and designation of Plaintiffs as "domestic terrorist organizations" pursuant to the DTO regime violates the First and Fourteenth Amendments.

G. Declare that the DTO regime and designation of Plaintiffs as "domestic terrorist organizations" pursuant to the DTO regime is unconstitutional under the Supremacy Clause of the U.S. Constitution and preempted by federal law.

H. Award reasonable attorneys' fees and costs.

I. Grant such other and further relief as the Court deems proper.

Respectfully submitted October 1, 2026,

Scott D. McCoy (FL Bar No. 1004965)
Aaron Fleisher*
Diego A. Soto*
Mary Ella W. Simmons*
**Southern Poverty Law Center**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org
aaron.fleisher@splcenter.org
arthur.ago@splcenter.org
diego.soto@splcenter.org
maryella.simmons@splcenter.org

Manoj S. “Sachin” Varghese*
Mark L. Bailey*
Kayla Polonsky Gannon*
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com
polonsky@bmelaw.com

*/s/ Daniel Tilley*
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Hina Shamsi*
Ashley Gorski*
Patrick Toomey*
Charles Hogle*
Celin Carlo-Gonzalez*
Jeffrey Stein*
Natalie Smith*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
jstein@aclu.org
n.smith@aclu.org
ptoomey@aclu.org

**Pro hac vice application forthcoming*

*Counsel for Plaintiffs*