**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-521-MW/MAF

RON DESANTIS, *et al.*,

*Defendants*.

________________________________/

**PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs—U.S. civil rights organizations engaged in First Amendment-protected speech, advocacy, and association—are in imminent danger of being forced to completely shut down operations in Florida, absent this Court's intervention. On September 29, 2026, the Governor and Cabinet voted to approve Plaintiffs' designations as "domestic terrorist organizations" under a new Florida law, HB 1471. The Chief of Domestic Security, Larry Keefe, will publish those designations in the Florida Administrative Register on October 6. Fla. Stat. § 943.03102(2)(e). Barring judicial intervention, the designations will become effective on November 5. Fla. Admin. Emergency R. 11RER26-8(3). If the designations become effective, Plaintiffs will be forced to shut their doors in Florida. The designations will immediately subject Plaintiffs to paralyzing

restrictions on their speech and association, under the threat of severe criminal penalties.[1]

Plaintiffs move the Court pursuant to Federal Rule of Civil Procedure 65 to enter a temporary restraining order and preliminary injunction to restore the status quo ante. Based on counts I, II, IV, and V in their Complaint, ECF No. 1, Plaintiffs seek the following relief:

Plaintiffs request that the Court enter a temporary restraining order and preliminary injunction directing Defendants Larry Keefe, Ron DeSantis, James Uthmeier, Blaise Ingoglia, and Wilton Simpson (together, the "State Executive Defendants") to remove the designation of Plaintiffs as "domestic terrorist organizations"; directing Defendant Keefe to rescind the publication of such designation in the Florida Administrative Register; and directing Defendant Keefe not to publish such designation on the FDLE website, pending final judgment in this suit.

In the alternative, Plaintiffs also move to temporarily restrain and preliminarily enjoin Florida's 20 state attorneys (together, "State Attorney

[1] Through this motion, Plaintiffs seek to temporarily restrain and preliminarily enjoin their designations as "domestic terrorist organizations" or "DTOs," and the enforcement of Florida Statutes §§ 617.1420, 775.30, 775.33, 775.34, 874.03 (and the related "criminal gang" provisions in Sections 823.05 and 874.04-12), and 943.03102, and Florida Department of Law Enforcement Emergency Rule 11RER26-8, insofar as they concern "DTOs" ("DTO regime").

Defendants") and the Attorney General from enforcing the DTO regime's provisions against Plaintiffs pursuant to their designations as DTOs, and from enforcing the DTO regime's provisions against third parties in connection with the designation of Plaintiffs as DTOs.[2]

[2] Given the complexity of the statutory regime, the number of constitutional issues it raises, and the exigent circumstances, Plaintiffs submit a memorandum exceeding the word limit, consistent with the modification requested and granted by this Court in *CAIR-Foundation, Inc. v. DeSantis*, No. 4:26-cv-315-MW/MJF (N.D. Fla. 2026), ECF No. 63.

# TABLE OF CONTENTS

MEMORANDUM OF LAW ....................................................................6

BACKGROUND ....................................................................9

I. Florida's Unprecedented Designation Regime ....................................................................9

A. The Designation Process ....................................................................9

B. The Extreme Consequences of Designation ....................................................................12

II. Florida Officials' Wrongful Designation of Plaintiffs ....................................................................15

A. The First Notice of Intent ....................................................................15

B. The Second Notice of Intent ....................................................................16

C. The Public Meeting and the Approval of Plaintiffs' Designation ............16

III. The Harm to Plaintiffs ....................................................................17

LEGAL STANDARD ....................................................................19

ARGUMENT ....................................................................20

I. The DTO Regime and Plaintiffs' Designations Violate the Fourteenth Amendment's Guarantee of Due Process. ....................................................................20

A. The DTO Regime Empowers Florida Officials To Impose Criminal Punishment Without Criminal Process. ....................................................................20

1. Designation is based on a finding of criminal guilt and imposes criminal punishment. ....................................................................21

2. The "process" available under the DTO regime falls far short of what the Constitution requires. ....................................................................25

B. Even if the DTO Regime Does Not Constitute Criminal Punishment, It Violates U.S. Organizations' Rights to Procedural Due Process. ..........26

1. Designation impairs U.S. corporations' protected interests in liberty and property, including Plaintiffs'. ....................................26

2. The procedures established by the DTO regime and temporary rule are constitutionally inadequate. ....29

a. The private interests at stake are immense....30

b. The risk of erroneous designation is intolerably high....30

c. Providing additional procedural protections would not undermine any legitimate state interest. ....35

II. The DTO Regime and Plaintiffs' Designations Violate the First Amendment. ..36

A. The DTO Regime and Plaintiffs' Designations Violate Their Freedom of Association. ....36

B. The DTO Regime and Plaintiffs' Designations Impose an Unlawful Prior Restraint on Their Speech and Association. ....41

1. Designation functions as a prior restraint. ....41

2. The DTO regime is unlawful because it vests excessive discretion in Florida's executive branch to suppress disfavored speech and association. ....43

3. The DTO regime lacks the necessary procedural safeguards....46

C. The DTO Regime and Plaintiffs' Designations Unlawfully Punish Speech Based on its Content and Viewpoint....49

III. Plaintiffs Satisfy the Remaining Requirements for Emergency Relief. ....51

A. Designation Is Already Causing Irreparable Injury to Plaintiffs, and Absent the Court's Intervention, Plaintiffs' Injuries Will Only Become More Severe. ....51

B. The Balance of Equities Favors Emergency Relief. ....51

C. Requested Relief....52

CONCLUSION....53

CERTIFICATE OF WORD COUNT....55

CERTIFICATE OF SERVICE ....56

## MEMORANDUM OF LAW

A new Florida statutory scheme, created by HB 1471, grants five members of the state's executive branch the power to decree that any group in the United States is engaged in criminal activity, and to "designate" the group as a "domestic terrorist organization." Designation does much more than brand organizations, including U.S. nonprofits, with a stigmatizing and reviled label: it converts designated groups into "criminal gangs" under Florida law, transforming their ordinary, previously legal operations—including their speech—into felonies. Likewise, designation transforms ordinary, otherwise legal association with targeted groups into a minefield of criminal liability.

Under Florida's new "domestic terrorist organization" designation regime (the "DTO regime"), donating even one dollar to a designated U.S. nonprofit could result in decades in prison. The same punishment applies to anyone who, among many other things, dares to work for a designated nonprofit, rent it property, provide it financial or technology services, or give it expert advice. Once the state officials responsible for implementing this regime designate a U.S. group as a domestic terrorist organization, the only way to avoid punishment is to wholly and permanently disassociate from the group. And the only way for the group to avoid punishment is to stop operating in Florida.

Despite these criminal ramifications, designation requires shockingly little process. To designate an organization, executive officials must find that it is engaged in criminal conduct: "terrorist activity." But unlike any other criminal proceeding, designation does not require the involvement of the courts. Instead, Florida's new regime authorizes the Governor, Cabinet, and Chief of Domestic Security to make findings of criminal wrongdoing, and, through designation, to criminalize an organization's protected speech and association—with none of the protections of criminal process. There is no judge, no jury, no adversarial hearing, no rules of evidence, and no burden of proof. While a designated organization can file an "appeal" in state court, there is no guarantee of a hearing, let alone a final ruling, before state officials' designation forces an organization to close its doors in Florida. In short, the DTO regime vests excessive discretion in executive officials and is ripe for abuse.

Unless this Court intervenes, Plaintiffs—CAIR and its state chapter, CAIR-Florida—will be the first casualties of Florida's unconstitutional and unprecedented expansion of state executive authority. Plaintiffs are two U.S. nonprofits engaged in civil rights work. Their shared mission, rooted in faith, is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. They have pursued this mission for decades, participating in

civic society like countless other faith-based nonprofit groups. They have never been charged with, let alone convicted of, a crime.

Governor DeSantis and Florida Cabinet officials have made no secret of their animus against Plaintiffs' faith-driven mission and advocacy. Now, the Governor, Cabinet, and Chief of Domestic Security have designated Plaintiffs as "domestic terrorist organizations," effective November 5, 2026. Once effective, Plaintiffs' designations will shut down their speech and shut off their lights in Florida. As the DTO regime allows them to do, Florida officials have provided Plaintiffs with only a thin veneer of process. A seven-page "Notice of Intent," which purported to inform Plaintiffs of the alleged basis for their designation, lacks any meaningful explanation of what laws Plaintiffs have supposedly violated or how they pose a threat to public safety. The "evidence" in the notice consists of recycled allegations from a twenty-year-old prosecution of a defunct organization, and a nebulous chart of purported and attenuated associations—virtually all of them decades-old and involving others, not Plaintiffs.

Florida's new designation regime and state officials' designations of Plaintiffs violate the Constitution. They violate the Fourteenth Amendment by imposing sweeping criminal punishment without meaningful procedural protections. They violate the First Amendment by bringing Plaintiffs' protected associations to a halt, and by creating, in effect, a censorship regime that gives five

officials unbridled discretion to suppress the speech of any organization in the country. Plaintiffs respectfully request that this Court enter a temporary restraining order and preliminary injunction to restore the status quo ante.

## BACKGROUND

### I. Florida's Unprecedented Designation Regime

The DTO regime empowers Florida officials to designate U.S. entities as "domestic terrorist organizations" and shut down their operations in the state. The process afforded to designated organizations is woefully inadequate, and the harms of designation are devastating. Once effective, designation triggers a web of criminal prohibitions that, combined, criminalize virtually any interaction with an organization. Put simply, the DTO regime gives executive officials a dangerous tool for silencing U.S. organizations they disfavor.

#### A. The Designation Process

The criteria for designation are broad, and the process is cursory.[3] Florida's Chief of Domestic Security may designate an organization as a DTO if he "finds": (1) it "is based or operates" anywhere in the United States; (2) it "is engaging in terrorist activity" as defined by Florida Statutes § 775.30; and (3) that activity "is

---

[3] The procedural requirements for designation are governed by Florida Statutes § 943.03102 and Florida Administrative Code Emergency Rule 11RER26-8, a temporary rule that is set to expire on December 10, 2026 ("11RER26-8"). *See* Fla. Stat. § 120.54(4)(c).

an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)1.

"Terrorist activity" is necessarily criminal. It involves "a violent act or an act dangerous to human life which is a *violation of the criminal laws* of [Florida] or of the United States," or a *violation of the Florida Computer Crimes Act*, Fla. Stat. § 815.06, that is intended to "[i]ntimidate, injure, or coerce a civilian population," "[i]nfluence the policy of a government by intimidation or coercion," or "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." Fla. Stat. § 775.30(1)(a) (emphases added).

The DTO regime does not specify any evidentiary standard the designation must satisfy. Nor does it require the Chief of Domestic Security to submit his "findings" to a neutral decisionmaker. Instead, the Chief of Domestic Security need only provide notice of his intent to designate a "domestic terrorist organization," along with "a summary of the basis for such designation," to the Governor and Florida Cabinet. Fla. Stat. § 943.03102(2)(a). After seven days, the Governor and Cabinet may approve the designation by a majority vote. Fla. Stat. § 943.03102(2)(a). To vote on the designation, the Governor and Cabinet must schedule a public meeting. 11RER26-8(1). If they approve the designation, the Chief of Domestic Security must publish it in the Florida Administrative Register within seven days. Fla. Stat. § 943.03102(2)(e). The designation becomes effective

30 days later. 11RER26-8(3). An organization has until the effective date to file a "challenge" in state circuit court. Fla. Stat. § 943.03102(2)(f).

The designated organization has no meaningful opportunity to object. If the Governor and Cabinet schedule a meeting to consider a designation, the Chief of Domestic Security must send the organization the notice of intent and "any materials relating to the notice of intent" not deemed confidential. 11RER26-8(2). The notice must state the date and time of the meeting and advise the organization that it may submit written objections to its designation within seven days. *Id.* But the organization is not entitled to argue, or even appear, at the meeting. 11RER26-8(2)(b). Rather, whether the organization can "appear at the meeting and present argument" is within the Governor and Cabinet's "sole discretion." *Id.*

The post-designation process is similarly anemic. As noted, an organization may "challenge" its designation 30 days after it is published. Fla. Stat. § 943.03102(2)(f). It may also "petition" the Florida Department of Law Enforcement ("FDLE") to remove a designation. *Id.* § 943.03102(3)(a). But the DTO regime does not specify the standard of review, burden of proof, or applicable procedural and evidentiary rules. Nor does it mandate that the challenging organization be given a hearing, that any post-vote challenge be resolved before the designation becomes effective, or that the state's "evidence" (if any) be shared with the designated organization.

**B. The Extreme Consequences of Designation**

Designation under the DTO regime inflicts severe consequences. Once an organization's designation is effective, the organization—and anyone who interacts with it—is subject to a kaleidoscope of criminal and civil liabilities for otherwise lawful, constitutionally protected activity. The prohibitions are so sweeping, and the penalties so severe, that a designated organization cannot continue operating in Florida in any meaningful sense. Designation fundamentally *changes the legal status* of protected speech and association—triggering debilitating liabilities for designated groups and those who associate with them.

For example, the DTO regime makes it a felony, punishable by up to 30 years' imprisonment, to knowingly provide a designated DTO with "material support." Fla. Stat. § 775.33(3). The term "material support" is broad. It includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance . . . facilities . . . personnel, or transportation." *Id.* § 775.33(1)(d). It prohibits anyone from working for the organization and serving under its "direction and control," and makes it a crime to "[o]rganize, manage, supervise, or otherwise direct" the organization's "operations." *Id.* § 775.33(5)(a).

The DTO regime also classifies designated organizations as "criminal gangs" under the Criminal Gang Prevention Act ("CGPA"), triggering sweeping criminal

prohibitions. Fla. Stat. § 874.03. For instance, under the CGPA, it is a felony, punishable by up to life in prison, if "[a]ny person . . . knowingly initiates, organizes, plans, finances, directs, manages, or supervises" activity intended to "benefit, promote, or further the interests" of a designated organization. *Id.* §§ 874.10, 874.03(4)(a). This prohibition forbids essentially any action taken to further the designated organization's interests, including actions taken by the organization itself.[4]

Emergency Rule 11RER26-8, which expires on December 10, 2026, purports to create two limited exceptions to criminal liability under the material-support law and CGPA. It states that FDLE "will not consider there to be cause for prosecution" under either the material support statute or CGPA (1) "based solely on membership in" a DTO, or (2) "based solely on the provision of legal counsel or legal support services to the [DTO] for purposes of representing or providing advice in connection with existing or anticipated litigation concerning a designation or defending against a criminal prosecution." 11RER26-8(4)-(5). But the "membership" exception is irrelevant to organizations that are not membership-based (like Plaintiffs), and it does not protect Plaintiffs' relationships with their

[4] Under Florida law, "[t]he word 'person' includes . . . corporations." Fla. Stat. § 1.01(3). Thus, Plaintiffs will be subject to felony charges under Section 874.10 for initiating any activity to further their faith-driven civil rights mission. Plaintiffs will also be subject to felony charges under Section 775.33 for providing material support to each other in any form.

employees, board members, and donors, who are necessary for the organization to operate. The legal support exception, meanwhile, is narrow: FDLE exempts only those who seek to provide legal support services to the organization in challenging its designation or in criminal proceedings; it does not exempt Plaintiffs themselves. 11RER26-8(5).

Designation imposes numerous additional penalties. Once designated, the state may immediately seize all "proceeds" and "instrumentalities" of activity intended to further the interests of the organization. Fla. Stat. § 874.08. Designated organizations, as statutory "criminal gangs," are considered a per se "public nuisance" and are subject to immediate abatement and enjoinment—including in suits by members of the public. *Id.* § 823.05(2). These are only *some* of the consequences of designation. *See, e.g.*, *id.* §§ 775.34, 874.06(1), (2)(b), 943.03102(4)(a); *see also, e.g.*, *id.* §§ 1002.421(1)(t), 1003.035.

For nonprofit advocacy organizations like Plaintiffs, these consequences are debilitating. A nonprofit cannot operate if all of its employees, vendors, contractors, volunteers, or donors can be prosecuted and sentenced to life in prison merely for providing it a service or initiating any activity that would further its interests. In short, these penalties make it impossible for a designated organization to operate within Florida.

## II. Florida Officials' Wrongful Designation of Plaintiffs

### A. The First Notice of Intent

On July 1, 2026, Governor DeSantis announced that he had received a notice of intent to designate CAIR as a "terrorist organization[]" under the DTO regime. Carlo-Gonzalez Decl., Exs. A, B at 2:00-16, C.[5] Governor DeSantis confirmed that he and the Cabinet intended to "ratify" the designation "very, very quickly." Ex. B at 1:30-2:00, 8:52-9:14. He further explained that the designation of CAIR was an express continuation and "reaffirmation" of his December 2025 Executive Order 25-244, which has since been preliminarily enjoined. *Id.* at 2:00-26; *see CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1279, 1282 (N.D. Fla. Mar. 4, 2026) ("*CAIR I*").

Plaintiffs filed suit the same day and moved to enjoin Governor DeSantis and the Cabinet from voting on Plaintiffs' designation. *CAIR-Found., Inc. v. DeSantis*, No. 4:26-cv-315-MW/MJF (N.D. Fla. 2026) ("*CAIR II*"), ECF Nos. 1, 19. Shortly after the Court denied Plaintiffs' motions, *CAIR II*, ECF Nos. 26, 28, Defendants informed Plaintiffs that they intended to promulgate an emergency rule regarding the DTO regime and would move forward with the designation process

---

[5] All references to "Ex." refer to the exhibits attached to the Declaration of Celin Carlo-Gonzalez filed with this motion.

once the rule was issued, *CAIR II*, ECF No. 33 at 2. Two months later, on September 11, 2026, Defendants promulgated 11RER26-8.

**B. The Second Notice of Intent**

On September 15, 2026, counsel for Defendants informed Plaintiffs that then-Chief of Domestic Security and FDLE Commissioner Mark Glass had issued a new Notice of Intent to designate Plaintiffs as "domestic terrorist organizations."[6] *CAIR II*, ECF No. 62 at 1. Defendants served the Notice on Plaintiffs on September 18. The Notice directed Plaintiffs to submit written objections and scheduled a public meeting to consider Plaintiffs' designation for September 29, 2026 at 9:00 a.m. Ex. D. Plaintiffs submitted written objections to their designation on September 25. Ex. E.

**C. The Public Meeting and the Approval of Plaintiffs' Designation**

Governor DeSantis and the Cabinet approved Plaintiffs' designation at the Cabinet meeting on September 29. Ex. F at 13:40-14:10. Their "consideration" of Plaintiffs' designation involved then-Commissioner Glass speaking for approximately 20 seconds to assert that designations satisfied the criteria under Florida Statutes § 943.03102, without explaining how. Governor DeSantis immediately moved to approve the designations without any explanation or

[6] Glass has since been replaced by Larry Keefe, who was appointed as the FDLE Commissioner and Chief of Domestic Security on September 29, 2026.

discussion of Cabinet members' consideration of evidence, reasoning, findings, or law. *Id.* The entire process took about 30 seconds. *Id.*; Declaration of Nicholas Warren ("Warren Decl.") ¶ 6.

During the meeting, Governor DeSantis and the Cabinet refused to hear Plaintiffs' counsel. Before the meeting began, Plaintiffs' counsel identified herself to a Cabinet aide and requested the opportunity to speak at the meeting on behalf of Plaintiffs. Warren Decl. ¶ 3. Although the aide said that she or another person would follow up with Plaintiffs' counsel, no one did. *Id.* During the meeting, after Commissioner Glass finished speaking, and as Governor DeSantis began to move to approve the designations, Plaintiffs' counsel stood and again asked to speak on behalf of CAIR and CAIR-Florida. *Id.* ¶¶ 4-5. Governor DeSantis ignored counsel and proceeded with approving the designations. *Id.* ¶ 5.

## III. The Harm to Plaintiffs

Plaintiffs have already suffered, and will continue to suffer, severe harm as a result of being targeted under HB 1471. Plaintiffs engage in protected speech and advocacy in Florida, including by litigating in state and federal court and engaging in public policy advocacy, training, education, community organizing, interfaith commentary, and public commentary directed at federal, state and local executive and legislative government officials and the public. Declaration of Edward Mitchell ("Mitchell Decl.") ¶¶ 8-28; Declaration of Wilfredo Ruiz ("Ruiz Decl.") ¶¶ 7-35;

Declaration of Maryam Hasan ("Hasan Decl.") ¶ 2. They do this to advance their missions and promote religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States. Mitchell Decl. ¶ 2; Ruiz Decl. ¶ 2.

The looming threat of their effective designations has already caused Plaintiffs harm. For example, CAIR-Florida has had to turn away prospective legal clients and indefinitely postpone its annual fundraising galas, which were scheduled for this fall. Ruiz Decl. ¶¶ 57-58, 60-61. CAIR had to switch information-technology network services after the Florida-based company it used terminated its contract with CAIR in early July 2026. Mitchell Decl. ¶ 41. These harms have diverted resources from Plaintiffs' First Amendment-protected advocacy work. Mitchell Decl. ¶¶ 36-39, 41-42; Ruiz Decl. ¶¶ 54-56. Plaintiffs also now must spend time winding down operations and diverting resources from other First Amendment-protected activity they might have engaged in. Mitchell Decl. ¶¶ 50, 58; Ruiz Decl. ¶ 56.

The designation of Plaintiffs as "domestic terrorist organizations" and the publication of that designation in the Florida Administrative Register and on the Florida Department of Law Enforcement website is harshly stigmatizing to Plaintiffs. It will undermine their trust and credibility with donors, volunteers, and other supporters. Mitchell Decl. ¶ 51; Ruiz Decl. ¶ 65.

Absent this Court's intervention, when Plaintiffs' designations become effective on November 5, they will be forced to cease all operations and advocacy in Florida. For example, they will cease hosting Florida-based events and engaging staff or volunteers to conduct on-the-ground research at Florida universities. Mitchell Decl. ¶¶ 52-56; Ruiz Decl. ¶¶ 69-76, 86-87; *see* Hasan Decl. ¶¶ 3-5. CAIR will place its Florida-based employees on administrative leave, suspend a key contractor and volunteer, and advise its Florida-based board members to recuse themselves from board functions and activities. Mitchell Decl. ¶¶ 59-67. CAIR-Florida will have no choice but to take even more drastic measures: it will fully suspend its operations. Ruiz Decl. ¶¶ 5-6, 51.

## LEGAL STANDARD

A temporary restraining order or preliminary injunction is appropriate when: (1) the movant is substantially likely to succeed on the merits, (2) the relief sought is necessary to prevent irreparable injury, (3) the movant's threatened injury outweighs the harm that the relief would cause the non-movant, and (4) the relief sought "would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). Plaintiffs satisfy all four factors.

## ARGUMENT

### I. The DTO Regime and Plaintiffs' Designations Violate the Fourteenth Amendment's Guarantee of Due Process.

#### A. The DTO Regime Empowers Florida Officials To Impose Criminal Punishment Without Criminal Process.

The Constitution is clear: a state may not impose criminal punishment without satisfying the procedural requirements of the criminal process. Indeed, no constitutional principle is more "axiomatic and elementary" than that the state must presume all persons innocent until proven guilty beyond a reasonable doubt in a court of law. *Coffin v. United States*, 156 U.S. 432, 453 (1895). This fundamental precept arises from the Fifth and Fourteenth Amendment right to due process, *In re Winship*, 397 U.S. 358, 363 (1970), and the Sixth Amendment "right to a speedy and public trial, by an impartial jury," *Erlinger v. United States*, 602 U.S. 821, 830 (2024). And it reflects the constitutional judgment "that every individual going about his ordinary affairs [should] have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *In re Winship*, 397 U.S. at 364.

Designation is criminal adjudication by another name. It bears all the hallmarks of criminal adjudication save one: criminal process. It gives five executive officers—the Governor, the three Florida Cabinet members, and the Chief of Domestic Security—power to accuse an organization of engaging in

criminal conduct, deem it guilty, and then punish it as a result. But no law can authorize an executive body to serve as judge, jury, and executioner.

**1. Designation is based on a finding of criminal guilt and imposes criminal punishment.**

The Florida legislature has made clear that designation is undoubtedly criminal in nature. In determining whether a punishment is criminal, "[a] court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (citation modified). The DTO regime's text and structure admit of no other interpretation.

Before designating an organization, the Governor, Cabinet, and Chief of Domestic Security must find that it is actively engaging in "terrorist activity." Fla. Stat. § 943.03102(1)(a)1-b. And "terrorist activity" is, by definition, criminal conduct. Fla. Stat. § 775.30(1)(a)1 (defining necessary element of "terrorist activity" as "[a] violent act or an act dangerous to human life which is *a violation of the criminal laws* of [Florida] or of the United States," or "[a] violation of § 815.06," a criminal statute (emphasis added)). The DTO regime thus was designed to apply exclusively to organizations that state officers decide are engaged in criminal activity.

If that were not clear enough, the DTO regime amended the CGPA to ensure that designated organizations are deemed "criminal gangs" within the meaning of

the statute. Fla. Stat. § 874.03(1) (defining a "[c]riminal gang" to include "terrorist organizations"); *id.* § 874.03(8) (defining "[t]errorist organization[s]" to include any "domestic terrorist organization" designated under the DTO regime). The CGPA is expressly criminal. It was enacted "to outlaw certain conduct associated with the existence and proliferation of criminal gangs" and "provide enhanced criminal penalties" for criminal gangs." *Id.* § 874.02(3). By declaring designated organizations to be criminal gangs, subject to the CGPA's many criminal penalties, the DTO regime makes plain that designation is inherently criminal. Indeed, the legislature placed the new designation statute within Title XLVII of the Florida statutory code, titled "Criminal Procedure and Corrections." Fla. Stat. § 943.03102.

Designation also imposes punishment that is clearly criminal. It triggers a dizzying array of unavoidable and debilitating criminal penalties for a designated organization, its employees, and those associated with it, based merely on the fact of designation. *See, e.g.*, Fla. Stat. §§ 775.33-34, 874.03(1), (4) (defining "criminal gang-related activity"), 874.10 (prohibiting initiation of "activity" intended to further DTO's interests). A corporation can act only through its employees, but a designated organization's employees are criminally prohibited from working on its behalf. And giving even a dollar to a designated organization, or offering to volunteer at an event hosted by it, could result in 30 years in prison. Fla. Stat. § 775.33(3). In short, the DTO regime makes it a crime for a designated

organization to continue functioning in Florida—and the sweep and severity of these penalties necessarily require an organization to shut its doors.

The DTO regime deliberately supplants the ordinary criminal process. Before the DTO regime was enacted, if the state wished to punish an organization for engaging in terrorist activity, it had to file criminal charges and prove beyond a reasonable doubt that the organization engaged in terrorist activity. Fla. Stat. §§ 775.30-31 (2025). But now, the state can cut off a U.S. organization's employees, board members, volunteers, and donors under the "material support" statute, Fla. Stat. § 775.33—without proving *anything* to a court about the organization itself, other than the fact of designation. Similarly, before the DTO regime, if the state wanted to treat an organization as a "terrorist organization" and criminal gang under the CGPA, it had to prove at trial beyond a reasonable doubt that the organization was "engaged in or organized for the purpose of engaging in terrorism as defined in § 775.30." Fla. Stat. § 874.03(7) (2025). But now, DTOs are "criminal gangs" by definition. As a result, they and any other person face felony liability simply for, e.g., initiating activity in furtherance of their interests, Fla. Stat. § 874.10—and the state need not prove *anything* about the organization, other than the fact of designation.

But the legislature cannot bypass the requirements of the criminal process simply by "choosing to route criminal prosecutions through executive" bodies.

*SEC v. Jarkesy*, 603 U.S. 109, 162 n.2 (2024) (Gorsuch, J., concurring). Indeed, the Supreme Court has long recognized that "[i]t is not consistent with the theory of our government that the legislature should, after having defined an offense as an infamous crime, find the fact of guilt, and adjudge the punishment by one of its own agents." *Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *see also In re Winship*, 397 U.S. at 365-66 (rejecting "civil labels and good intentions" and applying reasonable doubt standard to juvenile proceedings "where the issue is whether the child will be found to be 'delinquent,'"—i.e., to have engaged in conduct that, if the juvenile were an adult, would be a crime).

Nor may the legislature delegate authority to make criminal determinations to an executive or administrative body. Determinations of guilt must be made in the context of a criminal trial pursuant to a guilty verdict. *See Apprendi v. New Jersey*, 530 U.S. 466, 483-84 (2000) ("[P]ractice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reasonable doubt."). The legislature cannot circumvent this requirement by enacting a scheme that wholly removes the court and jury from the fact-finding process and replaces it with executive officers. *See id.* at 482-83; *Lipke v. Lederer*, 259 U.S. 557, 562 (1922) ("And certainly we cannot conclude . . . that Congress intended that penalties for crime should be enforced through the secret findings and summary

action of executive officers.”). As the Supreme Court has confirmed, “[t]he guaranties of due process of law and trial by jury are not [to] be forgotten or disregarded,” *Lipke*, 259 U.S. at 562—or evaded by delegation.

**2. The “process” available under the DTO regime falls far short of what the Constitution requires.**

Despite imposing criminal punishment, the DTO regime provides none of the protections afforded to criminal defendants. Designation does not require the state to prove its accusations beyond a reasonable doubt, and the Notice of Intent does not even attempt to meet that standard. Ex. D. Nor does the DTO regime incorporate other constitutionally required protections, such as the right to confront and cross-examine witnesses. *See Crawford v. Washington*, 541 U.S. 36, 57 (2004); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (due process requires disclosure of exculpatory evidence before trial).

Plaintiffs received none of these protections. Instead, Commissioner Glass issued a Notice of Intent that failed to identify what law he claims CAIR has violated, what conduct he claims constitutes “terrorist activity,” or how either CAIR or CAIR-Florida currently poses a threat to public safety. Ex. D. At the public meeting to vote on the designation, the Governor and Cabinet denied Plaintiffs an opportunity to be heard. Warren Decl. ¶¶ 4-5. Rather than give Plaintiffs their day in court and the opportunity to defend themselves against the odious and baseless allegations asserted against them, Governor DeSantis, the

Cabinet, and Commissioner Glass have used the DTO regime to criminally punish Plaintiffs while denying them any semblance of criminal process.

### B. Even if the DTO Regime Does Not Constitute Criminal Punishment, It Violates U.S. Organizations' Rights to Procedural Due Process.

Even if the DTO regime did not unconstitutionally permit state officials to make findings of criminal wrongdoing and impose criminal consequences outside the criminal process (it does), it would still violate the due process component of the Fourteenth Amendment as applied to U.S. corporations, including Plaintiffs. That is because the DTO regime permits state officials to deprive U.S. corporations, like Plaintiffs, of constitutionally protected interests in "life, liberty, or property," while affording them "inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *see also Howard v. Coonrod*, 134 F.4th 1136, 1149 (11th Cir. 2025). Indeed, the procedures established by the DTO regime are plainly designed not to meaningfully test the State Executive Defendants' accusations, but to ratify them.

#### 1. Designation impairs U.S. corporations' protected interests in liberty and property, including Plaintiffs'.

Designation impairs U.S. corporations' constitutionally protected interests in at least three ways:

**First**, designation infringes U.S. corporations' right to speak, associate, and petition the government for redress. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 780 (1978) ("Freedom of speech and the other freedoms encompassed by

the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause.”); *Benning v. Comm’r, Ga. Dep’t of Corr.*, 71 F.4th 1324, 1330 (11th Cir. 2023) (recognizing “protected liberty interest, grounded in the First Amendment”). As explained above, designation prohibits an organization from initiating, directing, organizing, or supervising any activity intended to further its own interests. Fla. Stat. § 874.10. By definition, then, a designated nonprofit corporation engaged in advocacy to further its mission commits a crime. So does anyone who works for, donates to, or otherwise supports the organization. Plainly, these criminal prohibitions coerce others to disassociate from designated corporations, impairing the corporations’ First Amendment rights. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024) (“A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf.”); *see* Section II, *infra*.

**Second**, once effective, designation impairs the most basic functions of U.S. corporations’ existence—including their ability to act through their employees, use their own assets, and obtain essential services.[7] No corporation can meaningfully operate under such conditions. For Plaintiffs, the overlapping criminal prohibitions

---

[7] On its face, the ban on providing “services” to designated organizations encompasses banks, phone companies, internet service providers, retirement account administrators, financial advisors, and lawyers who would advise Plaintiffs on non-litigation matters or in civil proceedings unrelated to their designation.

that will apply to them as soon as their designations become effective will prevent or curtail their exercise of the corporate powers conferred on them by state law. *See* Fla. Stat.§ 617.0302 (listing corporate powers, including rights to sue and appear and defend legal actions, enter into contracts, conduct affairs, and make donations); D.C. Code § 29-403.02 (listing similar corporate powers applicable to CAIR under D.C. law).

**Third**, designation as a "domestic terrorist organization" causes severe reputational harm. Mitchell Decl. ¶ 57; Ruiz Decl. ¶ 65. *See Latif v. Holder*, 28 F. Supp. 3d 1134, 1150 (D. Or. 2014) (placement of U.S. persons on terrorism watchlist "carries with it the stigma of being a suspected terrorist"); *cf. United States v. Briggs*, 514 F.2d 794, 799 (5th Cir. 1975) ("The government defies common sense with its theory that one's interests are not adversely affected to any extent by being publicly branded as a felon so long as he is not named as a defendant for trial."); *see also Paul v. Davis*, 424 U.S. 693, 708 (1976) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." (citation omitted)).

Together, these consequences are guaranteed "to cripple the functioning and damage the reputation[s] of" designated U.S. corporations, including Plaintiffs, "in their respective communities and in the nation." *Joint Anti-Fascist Refugee Comm.*

*v. McGrath*, 341 U.S. 123, 139 (1951); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) ("Without doubt," the term "liberty" "denotes not merely freedom from bodily restraint but also the right of the individual to contract, [and] to engage in any of the common occupations of life." (quotation omitted)); *N. Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975) (impoundment of corporation's bank account "without notice or opportunity for an early hearing and without participation by a judicial officer" violated procedural due process).

**2. The procedures established by the DTO regime and temporary rule are constitutionally inadequate.**

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). To determine whether the state's deprivation of a protected interest violates this fundamental requirement, courts weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

All three factors decisively favor Plaintiffs.

**a. The private interests at stake are immense.**

There is no question that designation implicates interests of the highest order. Plaintiffs are a case in point. On the basis of unproven accusations, the State Executive Defendants have wrongly designated Plaintiffs as "domestic terrorist organizations." Under Florida law, that designation makes Plaintiffs, by definition, "criminal gangs." And not just any criminal gangs, but criminal gangs engaged in "terrorist activity"—one of the most heinous and reviled forms of criminality. Of course, Plaintiffs are not criminal gangs, are not engaged in terrorist activity, and have never been charged with, or convicted of, any crime. But because they have been designated as DTOs, that does not matter: under the DTO regime, the State Executive Defendants' unproven accusations will subject Plaintiffs to onerous criminal prohibitions that will grievously impair Plaintiffs' operations. These accusations "are the practical equivalents of confiscation and death sentences"—"regardless of their truth or falsity." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 142 (Black, J., concurring).

**b. The risk of erroneous designation is intolerably high.**

The procedural safeguards of the DTO regime are so feeble that erroneous designations—like Plaintiffs'—are more than a risk: they are a certainty.

**First**, the DTO regime enables the State Executive Defendants to "find" that U.S. corporations are engaged in "terrorist activity" in violation of state or federal

law based on opportunistically curated evidence. *See generally* Fla. Stat. § 943.03102; 11RER26-8. Relatedly, before designating a U.S. corporation, the DTO regime does not place the burden on the State Executive Defendants to make any showing before a neutral judicial officer that their evidence—such as it is—satisfies any standard of proof. *See generally* Fla. Stat. § 943.03102; 11RER26-8. Much less does the DTO regime require the State Executive Defendants to make such a showing in an adversary proceeding. *See, e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993) (holding government's seizure of real property under federal "drug forfeiture statute" violated right to procedural due process when, to effect seizure, government was required only to make a showing of probable cause before a magistrate judge in a non-adversary hearing).

The result: the State Executive Defendants may, as in this case, find that U.S. corporations are engaging in terrorist activity based on stale speculation, hearsay, and innuendo, illustrated through clip art. Ex. D.

**Second**, the DTO regime does not require state officials either to notify U.S. corporations of the predicates for their designations or to provide them with all of the evidence—if any—underlying their designations. *See generally* Fla. Stat. § 943.03102; 11RER26-8. The Notice of Intent issued to Plaintiffs fails even to identify the criminal law that Plaintiffs have purportedly violated—much less when or how Plaintiffs violated it. Needless to say, a U.S. organization cannot

meaningfully defend itself against an accusation of criminal wrongdoing without knowing what, exactly, it is accused of. *See Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."); *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 170 (Frankfurter, J., concurring) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights.").

**Third**, prior to designation, the DTO regime affords U.S. corporations no opportunity either to call their own witnesses or to confront and cross-examine any witnesses against them. On this point, *Jenkins v. McKeithen*, 395 U.S. 411, 427-29 (1969), is particularly germane.[8] *Jenkins* involved Louisiana's "Labor-Management Commission of Inquiry." The Commission was a state administrative body with nine members, all appointed by the governor. *Id.* at 414-15. It was "empowered," under state law, to "find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.* at 427-28.

---

[8] *Jenkins* did not produce a majority opinion. Chief Justice Warren and Justice Brennan joined a plurality opinion authored by Justice Marshall. Justices Douglas and Black concurred, joining the plurality in all relevant respects. *Jenkins*, 395 U.S. at 432.

The effects of the Commission's findings were more limited than the effects of designation under the DTO regime. Notably, unlike a designation under the DTO regime, the Commission's "findings" could "not be used as prima facie or presumptive evidence of guilt or innocence in any court of law." *Id.* at 417 (citation modified); *see* Section I.A, *supra*.

Nevertheless, the Court treated "the rigorous protections relevant to criminal prosecutions" as the "controlling starting point for assessing the protection which the Commission's procedure provides," zeroing in on one: the "right to confront and cross-examine witnesses." *Id.* at 428 (citation omitted). Because the Commission was empowered to make "an actual finding that a specific individual is guilty of a crime," "due process require[d] the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights." *Id.* at 429. Due process requires no less here.

**Fourth**, the post-designation "appeal" to state court available to U.S. corporations under the DTO regime is, itself, constitutionally inadequate.

While the temporary rule remains in place, a designated corporation may file a "challenge" in state court within the 30-day window between the designation's publication and its effective date. Fla. Stat. § 943.03102(2)(f); 11RER26-8(3). But neither the temporary rule nor the statutory scheme ensures that a designated

organization will obtain a hearing—to say nothing of a judicial ruling—before the myriad criminal consequences of designation kick in. Nor does the DTO regime ensure that, in an "appeal" to state court, the findings of the State Executive Defendants will be put meaningfully to the test: it assigns no burden of proof; does not ensure that designated corporations will have access to all the evidence against them (such as it is); and does not ensure an opportunity to develop the record by calling witnesses or cross-examining the witnesses (if any) against them. Once the designation becomes effective, the DTO regime also makes it a crime for designated organizations' employees to participate in the proceedings—by, for example, coordinating with legal counsel and submitting declarations to establish basic facts about their employers' operations. *See generally* Fla. Stat. §943.03102; *see also id.* §§ 775.33(3), 874.10.

The Constitution demands more. Consider *James Daniel Good Real Property*, 510 U.S. at 55. There, the Supreme Court held that the government's seizure of real property from a homeowner, without a prior adversary hearing before a "neutral decisionmaker," violated the homeowner's right to procedural due process. *Id.* Notably, the Court rejected the proposition that the "availability of a postseizure hearing" provided all the process the homeowner was due; as the Court explained, "a claimant m[ight] not receive an adversary hearing until many months after the seizure," and even a favorable outcome for the claimant, "coming

months after the seizure, would not cure the temporary deprivation that an earlier hearing might have prevented." *Id.* at 56 (citation modified). The Court's opinion in *Barry v. Barchi*, 443 U.S. 55 (1979), is in the same vein. There, the Court held that a statute authorizing the suspension of certain horse-trainers' licenses violated the guarantee of procedural due process when the post-deprivation "administrative hearing" available under the statute did not "assure[] a prompt proceeding and prompt disposition of the outstanding issues between [a trainer] and the State," either "on its face [n]or as applied." *Id.* at 66. The DTO regime's "appeal" procedure has the same defects.

**c. Providing additional procedural protections would not undermine any legitimate state interest.**

For all these reasons, the DTO regime lacks meaningful safeguards against erroneous deprivation. Genuine procedural protections, calibrated to the all-encompassing consequences of designation for an organization's operation and existence, would, at minimum, require state officials to initiate a trial-type procedure before a neutral magistrate and prove that a U.S. corporation satisfied the prerequisites for designation under the DTO regime—all *before* the corporation could be designated.

Providing those procedures would not undermine any legitimate state interest. As a practical matter, the administrative burden of additional procedures would be slight; after all, this is exactly what the government has always had to do

when seeking to establish that an organization is a "criminal gang" under the CGPA or is engaging in "terrorist activity" within the meaning of Section 775.30(1). More fundamentally, Florida's interest in preventing actual crime—the only legitimate interest that the state's wrongful designation could even arguably serve—cannot be undermined by providing the process due under the Constitution. "Due process standards inevitably" reduce the government's leeway to do as it wishes, "but that tells us no more than that the Constitution imposes burdens on the functioning of government and especially of law enforcement institutions." *Breed v. Jones*, 421 U.S. 519, 535 n.15 (1975).

* * *

Procedure matters. Indeed, "[t]he history of American freedom is, in no small measure, the history of procedure." *In re Gault*, 387 U.S. 1, 21 (1967). This is what makes the DTO regime so dangerous. It is not only unconstitutional, but anti-constitutional: an attack on the foundational principles of justice and fair play that are indispensable to government by the consent of the governed.

## II. The DTO Regime and Plaintiffs' Designations Violate the First Amendment.

### A. The DTO Regime and Plaintiffs' Designations Violate Their Freedom of Association.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with

others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Freedom of association "is especially important in . . . shielding dissident expression from suppression by the majority." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (citation omitted). Plaintiffs engage in the type of expressive association at the heart of the First Amendment: through legal advice and representation, education, community organizing, and advocacy, they seek to promote religious tolerance and understanding, cultural education, civil rights, and public policy that protects the equal treatment of Muslims in the United States. The designation of Plaintiffs under the DTO regime, and the resulting array of penalties for protected activity, violate Plaintiffs' right to association.

Plaintiffs' designations will bring their protected activity and associations in Florida to a halt. *See* Mitchell Decl. ¶¶ 6-7, 19, 29, 52-56, 58-67, 73-75; Ruiz Decl. ¶¶ 5-6, 18, 30, 51, 69-81, 86-87; Hasan Decl. ¶¶ 2-4. Once the designations are effective, the DTO regime immediately imposes criminal liability on Plaintiffs if they "initiate[], organize[], plan[], finance[], direct[], manage[], or supervise[]" any "activity"—including protected associational activity—"committed with the intent to benefit, promote, or further the interests of" Plaintiffs. Fla. Stat. §§ 874.10, 874.03(4)(a). And it imposes liability on Plaintiffs' employees, board members, volunteers, and others who do the same, *id.*—or who provide any form of material support to CAIR or CAIR Florida, including by providing services or engaging in

work on their behalf, *id.* § 775.33(3), (5); *see also, e.g.*, Fla. Stat. § 943.03102(4)(b)-(c) (prohibiting state and municipal entities from spending appropriated funds "to support" any "member" of designated organizations). These indirect penalties—which coerce third parties into suppressing CAIR's speech and disassociating from CAIR—are just as significant. *See, e.g.*, *Vullo*, 602 U.S. at 190; *cf. CAIR I*, 822 F. Supp. 3d at 1273-79.

Given the DTO regime's burden on Plaintiffs' associational rights, at a minimum, "exacting scrutiny" applies: the burden must be "narrowly tailored to the government's asserted interest," which must be "substantial." *Ams. for Prosperity Found.*, 594 U.S. at 607-08 (citation omitted); *id.* at 609 (narrow tailoring critical because "First Amendment freedoms need breathing space to survive" (citation omitted)).

The DTO regime and the designations of Plaintiffs fail this test.[9] Even if the state may have an important interest in sanctioning and deterring violent terrorism, criminalizing Plaintiffs' expressive association in support of religious tolerance,

---

[9] Given the nature and degree of the burden the designation imposes—which far outstrips the "risk of chill" from the disclosure requirements in *Americans for Prosperity Foundation*, 594 U.S. at 617-18—Plaintiffs submit that strict scrutiny is appropriate. *See Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (election context) ("Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest." (citation omitted)). Regardless, the designation of Plaintiffs fails even exacting scrutiny.

cultural education, and civil rights bears no relationship whatsoever to that interest. Simply put, halting an expressive association's legal representations, educational programs, community organizing, and policy advocacy will not punish or prevent violent terrorist acts.

Indeed, nothing about the DTO regime or Plaintiffs' designations is narrowly tailored. The law is designed to allow Florida's executive branch to designate any organization it disfavors for destruction. Even if the organization—here, two civil rights nonprofits—eventually prevails in challenging the designation in court, it will be incapacitated for weeks or months as the organization, its employees, board members, volunteers, and others face an array of punishments for acting to advance its mission. Mitchell Decl. ¶¶ 52-56, 58-67, 73-75; Ruiz Decl. ¶¶ 51, 69-81, 86-87; Hasan Decl. ¶¶ 3-4. Moreover, Florida law *already* criminalizes terrorism, facilitating or furthering terrorism, and providing material support to a foreign terrorist group—along with aiding, abetting, and conspiring to commit those crimes. Fla. Stat. §§ 775.30, 775.31, 775.33(3), 777.011, 777.04. Because the state already "has available to it a variety of approaches that appear capable of serving its interests, without" burdening Plaintiffs' associational rights, the DTO regime and the designations of Plaintiffs are "hardly . . . narrowly tailored solution[s]." *McCullen v. Coakley*, 573 U.S. 464, 493-94 (2014).

The DTO regime and Plaintiffs' designations are also unlawful because they impose "guilt for association" on Plaintiffs' staff, board members, and donors—an "impermissible basis upon which to deny First Amendment rights." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 919-20, 925 (1982) (citation omitted). The state cannot criminally prohibit association without *proving* that (1) Plaintiffs have illegal aims and goals, and (2) Plaintiffs' staff, board members, and donors have a specific intent to further those illegal aims. *Id.* (citing *Healy v. James*, 408 U.S. 169, 186 (1972)). Although the state has not met and cannot meet this burden, executive officials have nevertheless deemed Plaintiffs guilty under the DTO regime, and people who associate with Plaintiffs face liability for their association as a result. Indeed, the DTO regime has defined crimes in such a way that the State *never* needs to prove that Plaintiffs "possess[] unlawful aims and goals." *Healy*, 408 U.S. at 186; *see* Section I.A, *supra*. This "guilt for association," in turn, profoundly impairs Plaintiffs' protected relationships in violation of the First Amendment.[10]

[10] Although 11RER26-8(4) exempts "mere membership" from the reach of the DTO regime, that is irrelevant. The DTO regime's criminalization of Plaintiffs' employees, donors, and other active associates still impermissibly imposes guilt on these individuals by virtue of their relationships with Plaintiffs, which in turn impairs Plaintiffs' First Amendment right to engage in those expressive relationships and to pursue their lawful missions through those associations.

### B. The DTO Regime and Plaintiffs' Designations Impose an Unlawful Prior Restraint on Their Speech and Association.

#### 1. Designation functions as a prior restraint.

Designation under the DTO regime functions as a prior restraint because it allows Florida's executive branch to suppress disfavored speech and association before they take place. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963); *cf. CAIR I*, 822 F. Supp. 3d at 1276-77. "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (citation omitted); *see also Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024) ("[A]lthough the term 'prior restraint' calls to mind government officials censoring newspapers and magazines . . . in fact it applies more broadly." (citation omitted)); *Healy*, 408 U.S. at 184 (holding that a college's denial of recognition of a student group was a form of prior restraint on associational rights).

Here, executive branch officials decide whether a domestic organization's constitutionally protected speech and association can continue as usual, or whether the same speech and association will, going forward, become a crime. Because the DTO regime vests power in the executive branch to *change the legal status* of protected speech and association, and because the sweep and severity of the regime's penalties force designated organizations to halt their protected activity in Florida, designation is a prior restraint. It silences Plaintiffs before their speech and

association take place. In the absence of this Court's intervention, Plaintiffs will become non-entities in Florida. Their speech will not merely be chilled; it will be frozen. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

*Bantam Books* is instructive. There, the Supreme Court held unconstitutional a Rhode Island law establishing a "Commission to Encourage Morality in Youth." 372 U.S. at 59, 71. By statute, the commission had the duty to educate the public about obscene books and to investigate and recommend prosecution for related statutory violations. After the commission unilaterally deemed a book title obscene, it would send a notice so informing the book distributor; a local police officer would typically follow up with the distributor about the notice. *Id.* at 62. The scheme predictably resulted in the distributor halting further circulation of the targeted books. *Id.* at 63-64. In practical terms, the commission wielded extraordinary discretion to suppress speech without a judicial finding of illegality. The Court held that this scheme amounted to "a system of prior administrative restraints . . . bearing a heavy presumption against its constitutional validity" because "the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned." *Id.* at 70. So too, here.

The "vice" of the system in *Bantam Books* was that the commission served as "a form of effective state regulation superimposed upon the state's criminal

regulation of obscenity," while "eliminat[ing] the safeguards of the criminal process." *Id.* at 69-70. The same vice lies at the heart of the DTO regime. The new scheme is superimposed upon the state's criminal laws concerning terrorism—allowing executive officials to freeze the speech and association of nonprofits without the safeguards of the criminal process.[11]

**2. The DTO regime is unlawful because it vests excessive discretion in Florida's executive branch to suppress disfavored speech and association.**

In imposing this prior restraint, the DTO regime violates the First Amendment because it grants executive officials unduly broad discretion to choose which speech and association to suppress. Critically, the State Executive Defendants' discretion to designate U.S. groups is entirely unlike ordinary prosecutorial discretion, where a prosecutor decides whether to bring charges concerning a completed violation of a generally applicable criminal law. Instead, under the DTO regime, executive officials' discretionary choice *changes the legal status* of otherwise lawful speech and association. That choice triggers unique,

---

[11] Even when a state regulates *unprotected* speech, "the most rigorous procedural safeguards" are of "vital necessity," because "the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books*, 372 U.S. at 65-66. Those rigorous safeguards are lacking here. As in *Bantam Books*, officials involved in the designation are "not a judicial body"; there "is no provision whatever for judicial superintendence before notices issue"; and organizations are "not even entitled to notice and hearing before [their speech is] listed by the Commission as objectionable." *Id.* at 70-71.

prospective, and debilitating liabilities for DTOs and those who associate with them. *See* Mitchell Decl. ¶¶ 52-56, 58-67; Ruiz Decl. ¶¶ 69-81; Hasan Decl. ¶¶ 2-4.

Where, as here, a statute allows an executive official to burden First Amendment-protected expression, it must provide the official with narrow, precise, and objective standards to govern the decision. *See, e.g.*, *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional."). While "some measure of discretion is acceptable," "virtually any amount of discretion beyond the merely ministerial is suspect." *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (explaining that "[s]tandards must be *precise* and *objective*," citing a "first-come, first-served" rule as an example).

The DTO regime fails this test. Through the designation power, it grants officials extraordinary discretion to silence domestic organizations' First Amendment-protected activity. Under Section 943.03102(1)(a), the Chief of Domestic Security may designate an organization as a DTO if, among other things, "[t]he terrorist activity of the organization is an ongoing threat to the security of this state or the United States," and "[t]he organization is engaging in terrorist activity as defined in [§] 775.30." As to the first of these elements, the "ongoing

threat" and "security" assessments are inherently discretionary, and the statute fails for this reason alone: it allows executive officials to pick and choose which organizations may continue with their protected expression, based on criteria that are neither precise nor objective. *See Lady J. Lingerie, Inc.*, 176 F.3d at 1362. How serious must the threat be? How probable? How imminent?

Likewise, the "terrorist activity" prong confers significant discretion on executive officials. Under Section 775.30, "terrorist activity" is defined in reference to, among other things, "a violation of the criminal laws of this state or of the United States." This allows officials to "decide which statutes or ordinances apply" and "whether the applicant has violated those laws." *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1313 (11th Cir. 2003) (holding ordinance unconstitutional). Applying Section 775.30, officials must further assess whether the activity is intended to, for example, intimidate a civilian population or influence the policy of a government. These determinations "exceed[] the limits of permissible 'ministerial discretion.'" *Id.*

Although the DTO regime contemplates that a designated group may file an "appeal" in state court, Fla. Stat. § 943.03102(2)(f), that is no substitute for precise and objective standards to govern executive discretion in the first instance, *see, e.g.*, *Bourgeois v. Peters*, 387 F.3d 1303, 1316-20 (11th Cir. 2004) (analyzing excessive discretion and inadequate judicial review as independent constitutional

violations). That is because standards serve two functions: they constrain officials ex ante, and they give a reviewing court guidance to "quickly and easily" determine whether officials are discriminating against disfavored speech. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757-72 (1988). The DTO regime vests executive officials with excessive discretion to suppress domestic organizations' speech and association, and accordingly, it violates the First Amendment.

**3. The DTO regime lacks the necessary procedural safeguards.**

Because the DTO regime and the designations of Plaintiffs present the "grave dangers of a censorship system," *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1192 (11th Cir. 2025) (cleaned up), the Supreme Court requires three procedural protections to save the statutory scheme from unconstitutionality. None of those protections are present here.

Two years after *Bantam Books*, the Supreme Court fully set out these procedural safeguards in *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965). There, the Court invalidated a statutory scheme that required film exhibitors to submit their movies to a state censorship board. *Id. Freedman* and its progeny explained that, under a prior restraint scheme: (1) the state must bear the burden of going to court and proving that the speech it seeks to prohibit is unprotected; (2) the statute must require a final judicial determination on the merits within a specified period;

and (3) the status quo should be maintained prior to judicial review, or any restraint should be limited to the shortest, "fixed" period compatible with sound judicial resolution. *See id.*; *Wacko's Too*, 134 F.4th at 1192-93 & n.7 (discussing ambiguities related to the third factor; explaining that precedent can be read to require maintenance of a speech-protecting status quo "prior to judicial review").

Here, the State Executive Defendants function effectively as a censorship board under the DTO regime. *See Bantam Books*, 372 U.S. at 67 ("We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit [speech] to warrant injunctive relief."); *see also, e.g.*, *Famine Relief Fund v. West Virginia*, 905 F.2d 747, 750-53 (4th Cir. 1990) (applying *Freedman* to law limiting percentage of charitable expenditures that can be used for fundraising). Because the DTO regime presents the precise dangers that the Supreme Court sought to address through the *Freedman* procedural safeguards, those safeguards are required here. *See Wacko's Too, Inc.*, 134 F.4th at 1192.

Under *Freedman*, the DTO regime fails. First, *Freedman* requires the state to bear the burden of going to court to impose its restraint—here, the designation—and to carry the burden of proof to establish that Plaintiffs' protected speech and association may legitimately be criminalized. *Freedman*, 380 U.S. at 58-60; *Blount v. Rizzi*, 400 U.S. 410, 417 (1971). But the DTO regime places the burden of going to court on the designated organization. Fla. Stat. § 943.03102(2)(f). Indeed, it

even *limits* the organization's rights by prescribing a 30-day window for the filing of a "challenge" to the designation. *Id.* And the statute does not specify who would bear the burden of proof in any judicial challenge, *id.*—though it is unclear how Plaintiffs could "possibly sustain the burden of proving the negative of the[] complex factual elements" for designation. *Speiser v. Randall*, 357 U.S. 513, 525-26 (1958).

Second, *Freedman* requires that the statutory scheme assure a "prompt final judicial decision." 380 U.S. at 57-60 (accepting plaintiff's argument that judicial review provision was "too little and too late"); *Blount*, 400 U.S. at 417 (requiring "a final judicial determination on the merits within a specified, brief period"). The DTO regime does not assure any decision on the merits within a specified, brief period; it simply states that a designated organization may file a challenge in court. Fla. Stat. § 943.03102(2)(f).

Third, and relatedly, under the DTO regime, there is no guarantee that a speech-protective status quo will be maintained prior to judicial review, *Wacko's Too*, 134 F.4th at 1192; nor is there any guarantee that a restraint on speech would be limited to a "fixed" period, *Freedman*, 380 U.S. at 59. The designation may become effective before any judicial review, and it may remain in effect for however long a court takes to decide the issue. *See* Fla. Stat. § 943.03102(2)(f); 11RER26-8(3).

Because the DTO regime and the designations of Plaintiffs create a system of prior restraints that censors Plaintiffs, the absence of any one of these procedural protections violates the First Amendment. The DTO regime lacks all three.

### C. The DTO Regime and Plaintiffs' Designations Unlawfully Punish Speech Based on Its Content and Viewpoint.

The DTO regime and Plaintiffs' designations are also unlawful because they burden Plaintiffs' speech and Plaintiffs' right to receive information on the basis of the speech's content and viewpoint. For example, once Plaintiffs' designations are effective, liability under Section 874.10 will turn on the message conveyed by the speech and, specifically, whether the speech is intended to further the interests of Plaintiffs. Speech advancing Plaintiffs' interests will be subject to criminal prohibition, while speech opposing those same interests will not. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (content discrimination); *Rosenberger v. Rector & Visitors of Uni. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination). Similarly, Section 775.33(3) will prohibit the provision of speech *as a service to Plaintiffs*, while the same speech provided to others is not prohibited—again, discriminating on the basis of the content and viewpoint of the speech, and burdening Plaintiffs' First Amendment right to receive information, including expert assistance. *See id.*; *see also, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762-65 (1972) (discussing right to receive information). These burdens are not

narrowly tailored to actually advance a compelling state interest. *See* Section II.A, *supra*.

Notably, the DTO regime's restrictions extend even to Plaintiffs' speech in furtherance of this litigation. Plaintiffs can act only through their employees, but if their employees act on Plaintiffs' behalf after the designations become effective—for example, by participating in discovery or drafting declarations—they face significant criminal liability under both Sections 775.33 and 874.10. Although the temporary rule (which expires on December 10, 2026) includes a carve-out for the law firms litigating this case, there is no exception for Plaintiffs to participate in this litigation or any other. 11RER26-8(5).

Even if the Court were to conclude that these restrictions are not content discriminatory, they nevertheless violate Plaintiffs' right to engage in expressive association with Plaintiffs' counsel for litigation, *NAACP v. Button*, 371 U.S. 415, 438-39 (1963), as well as Plaintiffs' right to petition the courts, *see, e.g.*, Mitchell Decl. ¶¶ 68-72; Ruiz Decl. ¶¶ 82-85; *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288-89 (11th Cir. 2019) (collecting cases concerning right to petition). For the reasons above, the DTO regime's restrictions do not actually advance any substantial (let alone compelling) state interest, and they are in no way tailored to any interest, as they will force two nonprofits engaged in First Amendment-protected activity to cease their advocacy in Florida.

## III. Plaintiffs Satisfy the Remaining Requirements for Emergency Relief.

### A. Designation Is Already Causing Irreparable Injury to Plaintiffs, and Absent the Court's Intervention, Plaintiffs' Injuries Will Only Become More Severe.

Designation is already impairing Plaintiffs' exercise of First Amendment rights. *See* Section II, *supra*. That alone constitutes irreparable injury. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1270-72 (11th Cir. 2006) ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citation omitted)). Moreover, when Plaintiffs' designations become effective, Plaintiffs will have no choice but to shutter their operations in Florida, halting their advocacy in the state and interfering with their legal representation of clients in Florida—all under threat of criminal punishment. *See* Mitchell Decl. ¶¶ 52-56, 58-75; Ruiz Decl. ¶¶ 69-87; Hasan Decl.¶¶ 2-4. These injuries are both severe and unquantifiable, making them irreparable. *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008) ("The threat of criminal prosecution also constitutes irreparable harm.").

### B. The Balance of Equities Favors Emergency Relief.

"[D]amage to the opposing party and public interest" merge in this case against the government. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). The equities favor Plaintiffs. Plaintiffs are suffering, and will continue to suffer, severe constitutional injuries and unwarranted stigma due to their

designations under the DTO regime. They pose no harm to state security; indeed, the state allowed Plaintiffs to continue speaking and associating in Florida for two months while FDLE drafted its emergency rule. Nothing appreciable weighs on the state's side of the scale. And as the Eleventh Circuit has recognized, the government has no interest in enforcing an unconstitutional law. *See KH Outdoor, LLC*, 458 F.3d at 1272 (11th Cir. 2006).

**C. Requested Relief**

Plaintiffs' requested relief is necessary to restore the status quo ante. In particular, the removal, recission, and non-publication of Plaintiffs' designation is essential to Plaintiffs' relief during the pendency of this litigation. If the Court were to enjoin only *Defendants' enforcement* of the DTO regime, it would not undo the stigmatizing effects of being designated and officially publicized as a "domestic terrorist organization," Mitchell Decl. ¶ 51; Ruiz Decl. ¶ 65, nor would it protect Plaintiffs from, *inter alia*, the irreparable harms of nuisance abatement actions by private citizens, starting November 5. Under Sections 823.05(2) and 60.05, any activity by Plaintiffs—including protected speech and association—that is intended to further their interests is per se a public nuisance, and any citizen of the county where the "nuisance" exists may sue to enjoin it. The designation's authorization of these suits will cause irreparable harm, Ruiz Decl. ¶ 81, traceable to the State Executive Defendants' designation and the Chief of Domestic Security's imminent

publication of Plaintiffs' designations. The requested relief will ensure that the DTO regime's many provisions cannot be unlawfully applied against Plaintiffs—or against third parties based on their association with Plaintiffs—while this constitutional challenge is pending.[12]

In the alternative, Plaintiffs also move to temporarily restrain and preliminarily enjoin the State Attorney Defendants and the Attorney General from enforcing the DTO regime's provisions against Plaintiffs pursuant to their designations as DTOs, and from enforcing the DTO regime's provisions against third parties in connection with the designation of Plaintiffs as DTOs.

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion.[13]

---

[12] Plaintiffs seek relief that returns the parties to the status quo ante, prior to Plaintiffs' designation, and therefore the ordinary injunction standard applies. *See, e.g.*, *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (distinguishing relief that "return[s] to the last uncontested status quo between the parties" from "a mandatory injunction"); *Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*, No. 1:19-CV-05199-RDC, 2021 WL 5029427, at *2 (N.D. Ga. June 29, 2021) (citing *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987)); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (defining the status quo for purposes of a prohibitory injunction as "the last uncontested status between the parties which preceded the controversy").

[13] Plaintiffs request that the Court waive bond or require a nominal bond. *See Scott v. City of Daytona Beach*, 689 F. Supp. 3d 1160, 1170 (M.D. Fla. 2023).

Respectfully submitted October 2, 2026,

Scott D. McCoy (FBN 1004965)
Aaron Fleisher*
Diego A. Soto*
Mary Ella W. Simmons*
**Southern Poverty Law Center**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org
aaron.fleisher@splcenter.org
arthur.ago@splcenter.org
diego.soto@splcenter.org
maryella.simmons@splcenter.org

Manoj S. "Sachin" Varghese*
Mark L. Bailey*
Kayla Polonsky Gannon*
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com
polonsky@bmelaw.com

*/s/ Daniel Tilley*
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Hina Shamsi*
Ashley Gorski*
Patrick Toomey*
Charles Hogle*
Celin Carlo-Gonzalez*
Jeffrey Stein*
Natalie Smith*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
jstein@aclu.org
n.smith@aclu.org
ptoomey@aclu.org

**Pro hac vice application forthcoming*

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I certify that this memorandum contains 10,998 words.

Dated: October 2, 2026

*/s/ Daniel Tilley*
Daniel B. Tilley
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 2, 2026, the foregoing document was served on all Defendants by emailing it to counsel for Defendants, John Ramer (jramer@cooperkirk.com). Defendants consented to this method of service in writing in accordance with Federal Rule of Civil Procedure 5(b)(2)(E).

Dated: October 2, 2026

*/s/ Daniel Tilley*
Daniel B. Tilley
*Counsel for Plaintiffs*