**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-521-MW-MAF

RON DESANTIS *et al.*,

*Defendants*.
_________________________________/

**DECLARATION OF EDWARD MITCHELL ON BEHALF OF CAIR FOUNDATION, INC.**

Pursuant to 28 U.S.C. § 1746, I, Edward Mitchell, declare as follows:

1. I am a resident of Georgia and over the age of eighteen. I have personal knowledge of the facts set forth in this declaration. If called to testify, I could and would testify competently to these facts under oath. I am providing this declaration based on my personal knowledge, my role as the National Deputy Director of CAIR-Foundation, Inc. ("CAIR"), information known to me through CAIR's regular programs, operations, and activities, and my review of CAIR's records maintained in the ordinary course of business.

2. CAIR is the largest Muslim civil rights and advocacy organization in the United States and was established in 2005. Its predecessor organization was

founded in 1994. CAIR's faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment. Our vision is to be a leading advocate for justice and mutual understanding.

3. CAIR pursues its mission nationwide, working in coordination with affiliate chapters in multiple states, including CAIR Florida, Inc. ("CAIR-Florida").

4. Since our founding, CAIR has built a reputation for tenacious efforts to combat discrimination against diverse Muslim communities in the United States through legal and public policy advocacy work, interfaith engagement, and client services. CAIR has developed a unique national infrastructure for legal, policy, public education, and civil rights advocacy on behalf of American Muslims.

5. CAIR has never been charged with, let alone convicted of, a crime. Nor has it ever been designated by the federal government under the federal terrorism sanctions regime. Indeed, ISIS, a U.S.-designated Foreign Terrorist Organization, once threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

6. If CAIR's designation as a "domestic terrorist organization" takes full effect, it will face substantial harm, both in Florida and nationwide. The impact of

such a designation—including on CAIR's reputation, operations, and ability to engage in advocacy—will be significant. We have already experienced harm to our reputation, advocacy work, and business operations as a result of Florida's initial, July 1, announcement of its intent to designate. Once the designation takes full effect, the impact on CAIR will be immediate and severe. Even if later removed, this designation will require substantial time and resources to repair, and some harm could not be fully undone. It would take us years to recover, if at all.

7. But for Florida officials' designation and the severe criminal and civil penalties associated with it for CAIR and for certain key employees and board members located in Florida (as I discuss below), CAIR would continue engaging in advocacy, public education, donor engagement, legal advocacy, civil rights intake, community outreach, and association with CAIR-Florida and Florida residents on matters of public concern, including civil rights, religious freedom, free speech, anti-Muslim discrimination, public policy, and Palestinian human rights.

**CAIR's Advocacy**

8. CAIR is a nonprofit corporation organized under the laws of the District of Columbia, with headquarters in Washington, D.C. It is tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

9. CAIR and its 16 affiliated state chapters, including CAIR-Florida, work to advance CAIR's mission through advocacy on legal, cultural, social,

policy, and civic issues of public concern to American Muslims. Issues CAIR focuses on include promoting religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States.

10. CAIR and CAIR-Florida are active in furthering their mission throughout Florida and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence, especially in the Second, Fourth, Sixth, Ninth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Seventeenth, and Eighteenth Circuits, and also in the First, Third, Fifth, Seventh, Eighth, Tenth, and Twelfth Circuits.

11. As part of CAIR's public education and advocacy efforts, CAIR employees regularly appear on or are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern, including civil rights issues. CAIR regularly issues press releases and action alerts on its website, holds press conferences, and posts on social media outlets, such as X, Instagram, Facebook, and YouTube, to communicate with members of the public and government officials. CAIR uses electronic communications to let people know about its presence in the community as a resource for information and legal services. Its employees also frequently

accept speaking engagements to discuss topics related to their work, such as Islamophobia and instances of anti-Muslim discrimination.

12. CAIR's advocacy includes commenting on proposed legislation at the federal and state level and on issues that impact Muslim communities, including matters of United States foreign policy and state government action. For example, in 2025, CAIR publicly opposed Florida House Bill 119, commonly referred to as the "No Shari'a Act," and publicly expressed disagreement with statements made by Governor Ron DeSantis in support of the bill.

13. CAIR educates people on their civil rights through presentations and advocacy materials. For example, CAIR publishes "Know Your Rights" guides and reports on incidents affecting Muslim communities nationwide, such as discrimination in the workplace, in correctional settings, at elementary and secondary schools, as well as colleges and universities. CAIR also creates and disseminates guides for Muslims who are traveling, and for those who are approached by law enforcement.

14. To further its faith-driven mission, CAIR also regularly communicates and meets with local, state, and federal government officials, other organizations, civic groups, religious and interfaith institutions, and members of the public.

15. During Ramadan, CAIR creates specialized programming that includes how to request accommodations at work and at school. CAIR shares this programming with CAIR-Florida.

16. As part of its civic engagement efforts, CAIR promotes voter participation through nonpartisan voter education and registration activities. For example, CAIR routinely participates in and supports National Muslim Voter Registration Day.

17. As part of its advocacy and public education work, CAIR engages with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to address false stereotypes, prejudices, tropes and narratives, disinformation, and misinterpretations of Islamic tenets, including with respect to Sharia, which is frequently invoked in political discourse. CAIR has repeatedly explained that Sharia is a moral and spiritual framework that guides American Muslims' ordinary, personal exercise of faith and requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws. And CAIR has issued public statements and published educational materials explaining that when Muslims pray to God five times a day, donate to charity, fast in Ramadan, or speak up against injustice, among many other practices, they are observing Sharia—just as Jews observe Halakha and Catholics abide by canon law.

18. CAIR frequently engages in advocacy activities in partnership with its affiliated chapters, including CAIR-Florida. Much of CAIR's work in Florida involves collaboration with CAIR-Florida and its affiliates, third-party organizations, and community members in the state.

19. Working in association with other faith-based and civil rights organizations, CAIR strives to build a vibrant constitutional democracy where people of all religious traditions can thrive.

20. CAIR organizes civic engagement activities that encourage participation in the democratic process, both nationwide and in Florida. For example, CAIR hosts Muslim Hill Day in Washington, D.C., which brings Muslims from across the country to meet with members of Congress. In 2026, representatives from CAIR-Florida participated in the event.

21. CAIR advocates for civil rights by providing legal representation and legal advocacy through its Legal Defense Fund. CAIR receives intakes and also represents clients from across the country, including from Florida, in litigation seeking to vindicate those clients' legal and constitutional rights.

22. CAIR's civil rights work includes advocacy and legal support related to Palestinian human rights.

23. For example, CAIR and CAIR-Florida represented and advocated on behalf of Students for Justice in Palestine ("SJP") chapters targeted with

governmental suppression of their exercise of freedom of speech and assembly, based on their speech and association in support of Palestinian human rights. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP chapter at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

24. In early 2025, CAIR and CAIR-Florida successfully advocated for the return of Mohammed Ibrahim—a 16-year-old U.S. citizen and Florida resident who was detained by Israeli authorities beginning in February 2025—including by sending a letter to U.S. Secretary of State Marco Rubio urging him to take urgent action to secure Mohammed's release from Israeli custody through lawful diplomatic channels.

25. In February 2025, CAIR also issued a press release challenging President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it."

26. In March 2025, CAIR and CAIR-Florida issued public statements condemning actions taken by the Mayor of Miami Beach to close a movie theatre that was screening an Oscar-winning Palestinian documentary.

27. In April 2025, CAIR issued a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers.

28. CAIR has consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR has also regularly condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

## CAIR's Employees and Board Members

29. CAIR's employees and board members have chosen to work for CAIR and serve on its board, respectively, because they believe in, and wish to contribute to, CAIR's policy, religious, and civil-rights advocacy, including through their provision of specialized skills and speech to the organization. In associating with CAIR and with each other, our employees and board members advance our shared organizational mission.

30. CAIR has two employees and an independent contractor who live in Florida and perform remote work for CAIR on national and interstate matters, including matters related to CAIR's work in Florida. These people are our Chief Operations Officer, our Legal Operations Manager, and our Information Technology Director. Their residence in Florida creates a substantial risk that they will be unable to continue performing their roles if the designation of CAIR becomes effective under Florida law.

31. Two members of CAIR's Board live in Florida, including the Board Chair. Both work remotely from Florida on CAIR matters, including matters relating to CAIR's work in Florida.

32. CAIR has one volunteer who lives in Florida who works as a Strategic Campaign Specialist. She works remotely on CAIR matters, including on matters related to CAIR's work in Florida based on publicly available information, such as researching and investigating events in Florida to assist in preparing CAIR's Hostile Campus Report, which discusses universities' and colleges' treatment of free speech, respect for civil rights, the right to protest, and opposition to Islamophobia in Florida's places of higher education.

**Executive Order 25-244**

33. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, which unilaterally designated CAIR as a "terrorist organization" and imposed severe punishments on CAIR and on people or entities that obtain benefits or privileges regulated by Florida and provide "material support" to CAIR.

34. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their rights under the First and Fourteenth Amendments of the U.S. Constitution. On March 4, 2026, the district court granted a preliminary injunction enjoining enforcement of the Executive Order.

**Florida Officials' Initial Intent to Designate and Its Resulting Harms**

35. On July 1, 2026, CAIR learned through a live broadcast held by Governor DeSantis that he had signed HB 1471 into law and the Florida Chief of Domestic Security had sent Governor DeSantis a Notice of Intent to designate CAIR as a "domestic terrorist organization."

36. Because Governor DeSantis said Florida officials would move quickly to ratify the Notice of Intent and because of Florida officials' pattern of targeting CAIR and CAIR-Florida through the Executive Order and public statements, we and our stakeholders in Florida fully expected state officials to use their new designation authorities against CAIR imminently. Governor DeSantis's July 1 announcement caused CAIR to implement immediate measures to protect ourselves and our Florida stakeholders from HB 1471's harsh criminal and civil penalties.

37. Starting on July 1, we implemented payment of a three-month salary advance to our employees who live in, and work remotely from, Florida so that, if the designation became effective, they could stop work. For obvious reasons, we did not want to terminate our Florida-based staff before a designation went into full effect and pending our constitutional challenge; like any nonprofit, we value our staff and these are people who are key to CAIR's operations. But we also did not want to create legal risks for staff once the designation went into effect. And we

did not want to end up in a scenario where staff, who rely on their CAIR salaries for their livelihood, had no financial buffer if the organization were forced to shut down. Due to HB 1471, we felt we had no choice but to pay this three-month advance, which diverted funds from other organizational work. In addition, the planning and compliance measures needed to implement this salary advance diverted staff time and capacity from normal CAIR advocacy and operations.

38. In response to the July 1 designation announcement, we also implemented an emergency technical sprint to configure geo-fencing across the online platforms we use for our community engagement and donor outreach. Our goal was to exclude, to the fullest extent technologically feasible, CAIR's outreach to Florida residents through CAIR feeds that advertise and promote our work (such as through Meta and Google ads), and provide search visibility. In other words, we worked to reduce the likelihood that residents of Florida would engage with promotions of CAIR's advocacy materials and civil rights work in their social media feeds and search results. These operational efforts due to HB 1471 crippled the organization's digital reach in Florida and hurt our ability to acquire new audiences for our mission. As with the other measures we took, this geo-fencing implementation diverted substantial resources and staff time from our normal advocacy and work—all in order to restrict dissemination of CAIR's advocacy to Florida residents.

39. Also on July 1, CAIR paused its donor outreach and support efforts in the state of Florida. This required us to review internal databases to identify and isolate all Florida-based contacts, to the extent it was possible to identify their location, so that they would not receive automated advocacy campaign and other outreach communications. We also implemented a cancellation of active recurring donations from residents in Florida, to the extent it was possible to identify and isolate their location. These massive efforts required a significant diversion of staff time from our advocacy work and mission; it also impaired our ability to reach new donors and audiences in the state of Florida.

40. In the few hours after Governor DeSantis' July 1 announcement, third-party contractors began to sever their ties with us.

41. On July 1, in response to Governor DeSantis's announcement, a Florida-based company that provides CAIR with crucial information-technology network services—including website-hosting, cybersecurity, and technical support—initiated a "compliance review" concerning the risk to the company if it continued to provide services to CAIR. The IT company told a CAIR employee about this matter on July 1—a discussion that diverted time from the employee's other work to advance CAIR's mission and required other employees to divert time to identify other potential IT providers. The IT company terminated its relationship with CAIR a few days later. Finding a new IT provider, not based in Florida, and

transitioning services to the new provider diverted significant staff time from other important CAIR advocacy and operational tasks. The new IT provider was also more expensive, resulting in additional expenditures by CAIR due to HB 1471.

42. As of July 1, CAIR had also accepted a proposal from this same Florida-based company to remake and relaunch one of our key civil rights advocacy tools—Islamophobia.org, a CAIR-owned website that we use and make publicly available to track, monitor and analyze anti-Muslim extremism and hate groups. The website required a complete upgrade because outdated features were severely hampering its functionality. After Governor DeSantis's July 1 announcement, the company declined to move forward with its proposal to remake and relaunch the website. CAIR has been forced to pause our plans to recreate and relaunch the website while searching for a new vendor.

**Florida Officials' Ongoing Intent to Designate**

43. On September 11, 2026, CAIR learned that Florida officials had issued a new, emergency rule to implement HB 1471.

44. We subsequently received the Florida Chief of Domestic Security's Notice of Intent to Designate CAIR and CAIR-Florida as "domestic terrorist organizations."

45. We and CAIR-Florida submitted written objections to the Notice of Intent on September 25.

46. On September 29, we learned that the Governor and Cabinet had voted to approve our designation.

47. Unless the court intervenes, the designation will become effective on November 5.

**The Harms of Designation**

48. Florida officials' targeting of CAIR under HB 1471 has already inflicted concrete harm on CAIR. Whether on July 1 or November 5 or at any other time, we do not want to break the law. We understand that continuing any of our operations in Florida after the effective date of the designation could expose our nonprofit, our staff and board, and our community stakeholders to extremely serious penalties.

49. Based on my knowledge of and familiarity with CAIR, its stakeholders, and the broader community it serves, I know that people regarded HB 1471's July 1 effective date with fear because designation of CAIR results in criminal prosecution and civil penalties for virtually anyone in Florida who associates with CAIR. They view the November effective date of designation with the same fear. CAIR is committed to protecting itself and its stakeholders from those risks.

**How the Designation is Harming CAIR Even Before the Effective Date**

50. Because we do not want to expose CAIR or our stakeholders to harsh penalties under HB 1471, we have had no choice but to wind down our operations in Florida before the effective date of designation. Shutting our operations down responsibly, with care for our employees, board members, volunteers, and community and donor relationships, takes planning and time. Once HB 1471 passed the legislature, we started planning for a wind down of our Florida operations and our planning accelerated in the weeks the initial July 1 date. This allowed us to implement core parts of that plan as soon as Governor DeSantis first announced he had received a Notice of Intent to Designate. It took a tremendous amount of staff time, capacity, and resources to implement the July 1 measures, including geofenced restrictions on advocacy and donor outreach and support in the state of Florida.

51. Being designated as a "domestic terrorist organization" and having that designation published in the Florida Administrative Register and on the Florida Department of Law Enforcement website is inherently stigmatizing; it undermines the trust and credibility that we have built over the lifetime of our existence with donors, community members, volunteers, and supporters. Our trust and credibility goes beyond monetary value and is integral to our ability to carry out our mission.

## <u>How the Designation Will Harm CAIR Once It Becomes Effective</u>

### Our Ability to Speak to, Advocate for, and Associate with Florida Communities

52. Unless the Court prevents designation from becoming fully effective, CAIR will need to maintain the restrictive geofencing and donor outreach measures it put in place on and after July 1, meaning that existing restrictions on, and suppression of, CAIR's advertising of its civil rights work (e.g. CAIR's Get Out the Vote efforts), as well as donor outreach and support to Florida residents, will continue indefinitely. We have also made our best efforts to identify Florida residents in our government advocacy and community and supporter communication lists: if designation becomes effective, we will need to stop sending press releases about CAIR's civil rights work as well as action alerts (e.g. communications asking people to sign petitions or express support or disagreement to government officials about government policies) to Florida residents.

53. Once its designation is effective, CAIR will be forced to suspend its association with CAIR-Florida, an affiliated chapter, on issues of shared public concern. To further its mission, CAIR speaks to, receives information from, and associates with CAIR-Florida to empower, educate, and defend Florida Muslims. Once CAIR's designation goes into effect, both organizations will face criminal penalties for their speech and association in support of each other's advocacy work.

54. Once the designation is effective, CAIR will not be able to bring CAIR-Florida representatives to its annual Muslim Day Event in Washington, DC.

55. Once effective, designation will also cripple CAIR's ability to discover, engage with, and comment on Florida events relevant to its mission. For example, CAIR will not be able to effectively monitor and report on free speech, respect for civil rights, the right to protest, and opposition to Islamophobia in Florida's places of higher education because our Florida-based employees and volunteers will be unable to work for CAIR and CAIR itself will be prohibited from initiating advocacy activities in Florida in furtherance of its mission and interests. CAIR also will not be able to petition or request information from government officials in Florida, including at correctional or educational facilities.

56. Once the designation is effective, CAIR's ability to provide effective legal representation to its Florida-based clients also will be impaired. CAIR currently represents several Florida residents in litigation outside of Florida. The breadth of Florida's designation regime creates a risk that CAIR or its employees may be subject to prosecution, including those who provide representation to CAIR's Florida-based clients.

**Severe Reputational Harm**

57. Even if the designation is later removed, repairing the reputational damage it inflicts will require CAIR to invest a tremendous amount of time and

resources. Governor DeSantis's July 1 designation has already strained CAIR's relationships with our donors, partner organizations, community members, volunteers, and supporters, and those harms will only deepen once the designation takes effect. It took decades for CAIR to build these relationships and there is no guarantee that CAIR will ever be able to fully rebuild them or its funding streams.

**Our Staff, Board, and Finances**

58. Unless the Court prevents designation from becoming fully effective, CAIR will also be forced to take additional steps to suspend its operations in Florida. Preparing for the effectiveness of designation has already forced CAIR to divert its senior staff and its legal, development, and information-technology resources away from ordinary mission-related work and toward the effort required to wind down that work in Florida. Those steps are necessary to protect CAIR and its Florida-based employees, board members, contractors, volunteers, donors, and other community members from harsh penalties due to HB 1471. To allow careful planning and implementation before November 5, we have determined that CAIR will need to initiate these additional steps on October 14.

59. Due to HB 1471's harsh penalties, CAIR will be forced to take protective measures regarding its Florida-based personnel: two employees; an independent contractor who plays a key operational role; two board members; and our volunteer Strategic Campaign Specialist. Once designation is effective, CAIR

will place the two Florida-based employees on administrative leave, suspend the independent contractor and volunteer Strategic Campaign Specialist, and advise its two Florida-based board members to recuse themselves from participation in any CAIR board function or activity. These people are critical to CAIR's work. Loss of the operational or board services each of these individuals provides to CAIR will have a debilitating impact on its ability to carry out our advocacy work.

60. CAIR's Chief Operating Officer ("COO") works remotely from Florida and oversees all of CAIR's operations nationwide. The functions our COO oversees include human resources, staffing, employee benefits, vendor and contract administration, information technology, accounting, fundraising, development, and insurance. As a member of the Compliance and Policy Committee, the COO provides compliance and policy support. In addition, the COO supports CAIR's Board by preparing board materials, coordinating logistics, and helping implement board-approved policies and governance decisions. The COO is critical to CAIR's functions. If we are forced to lose their institutional knowledge of CAIR's operations as well as their performance of their managerial, compliance, and oversight role, CAIR's ability to operate will be significantly impaired.

61. CAIR's Information Technology Director ("IT Director") also works remotely from Florida and oversees not only our technology infrastructure and daily needs, but also has responsibilities similar to a Chief Information Officer. Our

IT Director manages and supervises all of CAIR's information technology systems, which include email; donor management and fundraising platforms; cybersecurity programs and policies; and internet network and infrastructure. Our IT Director is integral to CAIR's operations, and if they are forced to stop working, their loss will significantly impair CAIR's operations nationwide, including our secure communications and donor and fundraising activity.

62. CAIR's Legal Operations Manager is an independent contractor who works remotely from Florida, providing support for legal compliance matters as well as CAIR's nationwide litigation and legal advocacy program. Our Legal Operations Manager is integral to our ability to ensure CAIR's compliance with federal and state laws and manage our legal program. Losing them, even temporarily, will significantly impair CAIR's legal functions.

63. CAIR's two Florida-based board members, including its Board Chair, will recuse themselves from all Board governance and decision-making activity. The Board Chair is responsible for the effective function of CAIR's Board and governance. She also chairs CAIR's Executive Committee, which addresses significant governance, policy, and other organizational matters. Both board members' recusal, and particularly the Board Chair's recusal, will cause CAIR substantial harm and interfere with our ability to operate.

64. CAIR is assessing whether it will need to request that its Florida-based employees and board members be available to provide discrete, extremely limited services that are absolutely essential to ensure CAIR's compliance with state and federal law, such as organizational tax compliance. Regardless of the outcome of that assessment, CAIR will be losing either all or nearly all of the work and services that these Florida-based employees and board members provide to advance CAIR's mission and First Amendment-protected activity.

**Loss of Key Service Providers Based in Florida and Impairment of Florida-Based Contracts**

65. A fully effective designation will also prevent CAIR and its employees from receiving or using contractual services to be performed in Florida or by Florida-based persons or entities. Designation could also cause CAIR to default on these contracts if CAIR is unable to pay under their terms.

66. For example, once CAIR's designation becomes effective, a Florida-based contractor who performs national development functions will be unable to continue providing services related to donor outreach and management, donor communications, grant-writing coordination, CAIR's mailing lists and internet advertising, and other fundraising operations. If CAIR is forced to lose the essential services of this individual, it would severely impact our donor outreach and fundraising activities, nationwide and in Florida.

67. CAIR has several contracts that involve services to be performed in Florida or by Florida-based entities. These will be impaired once CAIR's designation becomes effective. For example, CAIR has insurance policies and contracts applicable to its Florida-based board members, which, if invoked, would require payments being made in Florida. CAIR also contracts with a Florida-based vendor to provide leadership coaching services. Because of the substantial criminal and civil penalties imposed by HB 1471 on designated organizations and associated third parties, including contractors, it is not clear that the parties to these contracts could fulfill their obligations or that CAIR could pay them for doing so.

**Our Ability to Seek Justice in the Courts**

68. Once effective, the designation will seriously impede CAIR's ability to defend its rights in court. We understand that, once the designation is effective, it will be a crime for CAIR or anyone else to initiate, organize, plan, finance, direct, manage, or supervise any activities intended to further CAIR's interests in Florida. We also understand that, once the designation is effective, it will be a crime for anyone to provide material support to CAIR in Florida.

69. I understand that under the new emergency rule, if we are challenging a designation or defending ourselves against criminal charges, others can provide us with legal counsel and legal support services without being prosecuted.

70. Even though the emergency rule may protect our lawyers in this lawsuit, it does not protect CAIR, its board, or its staff. So, once the designation is effective, CAIR, its board, and its staff will be at risk of prosecution and severe punishment just for initiating conversations with our attorneys, making litigation decisions, collecting documents, and preparing discovery responses—including in this case.

71. I know CAIR employees located in Florida are concerned that their participation in our lawsuit challenging designation will violate the law. I personally am reluctant to travel to Florida to testify at a hearing because I am concerned my participation could subject me to criminal prosecution.

72. If, somehow, CAIR were able to keep pursuing its advocacy, donor outreach, and other work in Florida after designation goes into effect, I know CAIR employees would nevertheless be concerned about prosecution and would either refuse or be reluctant to contribute to our advocacy and other work in the state.

**The Cumulative Effects of Designation**

73. If the designation becomes effective, CAIR's institutional voice will be silenced in Florida and its advocacy on legal, policy, cultural, social, and civic issues of public concern will be suppressed in the state. As discussed above, CAIR will be unable to engage in advocacy and speech activities in Florida while the

designation is in effect. It also will be unable to engage in activities to further its mission in Florida, including by working with CAIR-Florida to advocate on behalf of Florida Muslims.

74. If the designation becomes effective, it will profoundly damage CAIR's reputation and relationships with stakeholders in Florida and nationwide, and it might never be able to restore them.

75. In other words, by forcing CAIR to stop any communications and work with our stakeholders in Florida, criminalizing the basic functions and transactions necessary for us to operate in the state, and silencing our ability to speak in the state from our public platforms, an effective designation will prevent us from carrying out our faith-driven mission.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on October 2, 2026.

*/s/ Edward Mitchell*
Edward Mitchell