**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISIONS**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-521-MW-MAF

RON DESANTIS *et al.*,

*Defendants*.
_____________________________________/

**DECLARATION OF WILFREDO RUIZ ON BEHALF OF CAIR FLORIDA, INC.**

Pursuant to 28 U.S.C. § 1746, I, Wilfredo Ruiz, declare as follows:

1. I am a resident of Broward County, Florida. I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration. If called to testify, I could and would testify competently to these facts under oath. I am providing this declaration in my capacity as the Communications Director of CAIR Florida, Inc. ("CAIR-Florida"). As Communications Director, I am a senior member of CAIR-Florida's management team and am familiar with CAIR-Florida's programs, operations, and activities.

2. CAIR-Florida was established in 2001 to challenge stereotypes of Islam and Muslims and defend civil rights and liberties in Florida. Our vision is to be a

leading advocate for justice and mutual understanding in our state and to empower Muslim communities, which are a vital part of civil society in Florida. To further our vision, we promote a more just and equitable society for all.

3. Since our founding over two decades ago, CAIR-Florida has built a reputation for tenacious efforts to combat discrimination against Florida's diverse Muslim communities through legal- and public-policy advocacy work, interfaith engagement, and client services. No other organization does the comprehensive, statewide work CAIR-Florida does to engage elected officials and represent the concerns of Florida's Muslim communities.

4. CAIR-Florida has never been charged with, let alone convicted of, a crime. Nor has it ever been designated by the federal government under the federal terrorism sanctions regime. As CAIR-Florida has repeatedly stated, it is not engaged in, and does not support, terrorist activity.

5. If CAIR-Foundation, Inc. ("CAIR") and CAIR-Florida's designation as a "domestic terrorist organization" takes full effect—with all the resulting criminal and civil penalties—we will be unable to operate. The impact on CAIR-Florida and its many stakeholders—board members, employees and staff, volunteers and donors, clients and community members who rely on us—will be devastating. It will take us years to recover, to the extent recovery is possible.

6. If not for the designation and the criminal and civil consequences associated with it, CAIR-Florida would continue engaging in advocacy, public education, donor engagement, legal advocacy, civil rights intake, community outreach, and association with CAIR and Florida residents on matters of public concern, including civil rights, religious freedom, free speech, anti-Muslim discrimination, public policy, and Palestinian human rights.

**CAIR-FLORIDA'S ADVOCACY**

7. CAIR-Florida is a nonprofit corporation organized under Florida law, with its headquarters in Tampa. It is recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

8. CAIR-Florida is a chapter of CAIR, which is America's largest Muslim civil rights and advocacy organization. CAIR-Florida shares CAIR's faith-driven mission to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. CAIR-Florida implements its mission through advocacy, which includes legal action in federal courts; education; community organizing; interfaith organizing; public engagement with state officials; and commentary directed at government officials and the public.

9. CAIR and CAIR-Florida further their mission throughout Florida, and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence, especially in the Second, Fourth, Sixth, Ninth,

Eleventh, Thirteenth, Fourteenth, Fifteenth, Seventeenth, and Eighteenth Circuits, and also in the First, Third, Fifth, Seventh, Eighth, Tenth, and Twelfth Circuits.

10. In many instances, CAIR-Florida works jointly with CAIR, particularly when issues arising in Florida could have a nationwide impact. In other instances, CAIR-Florida may act alone, or on behalf of itself and CAIR.

11. Often in conjunction with CAIR, CAIR-Florida regularly issues press releases and action alerts on its website, holds press conferences, and posts on social media outlets, such as X, Instagram, Facebook, and YouTube, to communicate with members of the public and government officials. Our employees also frequently accept speaking engagements to discuss topics related to their work, such as Islamophobia and instances of anti-Muslim discrimination. CAIR-Florida uses electronic communications to let people know about its presence in the community as a resource for information and legal services.

12. As part of CAIR-Florida's public education and advocacy efforts, our employees appear on, or are quoted in, national and local media outlets to provide commentary on civil rights issues.

13. CAIR-Florida also educates people about their civil rights. For example, we create and disseminate "Know Your Rights" materials related to workplace discrimination, immigrant rights, school bullying, free speech, police interactions, and travel. We visit Florida mosques and other community venues to conduct

"Know Your Rights" presentations, and we visit schools and universities to speak with students about their rights. During Ramadan, we create specialized programming and also rely on materials produced by CAIR to provide Muslims with information about how to request accommodations at work and school. We also make social media videos featuring our staff to remind community members of their rights.

14. CAIR-Florida communicates and advocates with Florida correctional facilities concerning inmate grievance matters and to remind facilities of their duty under federal and state law not to curtail the rights of Muslims in their custody.

15. CAIR-Florida also provides a range of pro bono legal services to Florida residents, including those who have suffered government and workplace discrimination in violation of their civil rights and those navigating the immigration system.

16. Individually and alongside other organizations, CAIR-Florida participates in civic engagement activities that encourage engagement in the democratic process. For example, CAIR hosts an annual Muslim Hill Day in Washington, D.C., and in 2026, representatives from CAIR-Florida traveled to Washington, D.C. to participate in the event. Ordinarily, we lead the Florida delegation to Muslim Day in Washington, D.C., mobilizing our community for the event.

17. CAIR-Florida also hosts its own Muslim Day at the state Capitol in Tallahassee, Florida. The 2026 event included more than 50 participants and addressed issues such as free speech and legislation directly harming Muslim American communities. It culminated in the passage of House Resolution 8001, which celebrated the contributions of Florida's Muslim American community and recognized February 2026 as "Muslim American Heritage Month."

18. Working in association with other faith-based and civil rights organizations, CAIR-Florida strives to build a vibrant constitutional democracy where people of all religious traditions can thrive.

19. As part of its civic engagement efforts, CAIR-Florida promotes voter participation through nonpartisan voter education and registration activities.

20. CAIR-Florida engages with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to address false stereotypes, prejudices, and disinformation about Islam.

21. For example, in meetings with Florida elected officials preceding the 2026 legislative session, CAIR-Florida addressed misinformation about Sharia, which is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of faith in furtherance of values like honesty, service, and community. CAIR-Florida also posts materials correcting misconceptions about Sharia on social media and distributes them at public events. As CAIR-Florida has explained,

Sharia requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws.

22. In 2025, CAIR-Florida publicly opposed Florida House Bill 119, commonly referred to as the "No Shari'a Act," and publicly criticized statements made by Governor Ron DeSantis in support of the bill.

23. CAIR-Florida also issued public statements urging the Florida Legislature to censure then-State Representative Randy Fine in response to statements he made on social media concerning the death of a Turkish-American human rights activist.

24. As part of its broader civil rights work, and frequently in conjunction with CAIR, CAIR-Florida engages in advocacy and legal support related to Palestinian human rights. For example, CAIR and CAIR-Florida have represented and advocated on behalf of Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, based on their disfavored viewpoints in support of Palestinian human rights. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP chapter at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

25. CAIR-Florida also helped successfully advocate for the return of Mohammed Ibrahim—a 16-year-old U.S. citizen detained by Israeli authorities beginning in February 2025. In addition, CAIR-Florida issued public statements in March 2025 condemning actions taken by the Mayor of Miami Beach to close a movie theatre that was screening an Oscar-winning Palestinian documentary.

26. CAIR-Florida's advocacy also relates to the impact of anti-Palestinian sentiment in Florida, and has included petitioning state officials. For example, in March 2025, CAIR-Florida issued a press release and action alert urging Florida residents to request that State Attorney Amira D. Fox pursue hate-crime charges in connection with vandalism of a Palestine supporter's vehicle.

27. CAIR-Florida has consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR-Florida has also condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

## CAIR-FLORIDA'S OPERATIONS

28. CAIR-Florida operates statewide, with offices located in Tampa and Sunrise. It has five board members, all of whom are based in Florida, and eleven staff members, ten of whom are based in Florida. It also works with six contractors, all of whom are based in Florida, and one subcontractor, who is not based in Florida.

29. CAIR-Florida's staff includes four licensed attorneys, advocacy specialists with prior government experience, communications personnel with extensive media and public relations expertise, and human resources personnel with institutional knowledge.

30. CAIR-Florida's employees and board members have chosen to work for CAIR-Florida and serve on its board, respectively, because they believe in, and wish to contribute to, CAIR-Florida's policy, religious, and civil-rights advocacy, including through their provision of specialized skills and speech to the organization. In associating with CAIR-Florida and with each other, our employees and board members advance our shared organizational mission.

31. CAIR-Florida has interests in properties and leases that run through July 2027, including in the building in which its Tampa office is located.

32. CAIR-Florida leases office space in Sunrise, Florida for its South Florida staff. That lease runs through September 2028.

33. CAIR-Florida has several financial accounts at multiple financial institutions.

34. To sustain its day-to-day operations, CAIR-Florida has entered numerous contracts, including for: utilities, internet access, staff cell phones, a phone system for fielding calls from community members seeking legal or advocacy support, a subscription service for managing legal files, a subscription

service for managing legal dockets, and insurance coverage for employees and board members.

35. CAIR-Florida regularly responds to requests for legal or advocacy support from Florida residents statewide. It either provides those services itself or, when it cannot do so, refers clients to other organizations that can provide adequate assistance.

**TARGETING BY FLORIDA OFFICIALS**

36. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, which unilaterally designated CAIR as a “terrorist organization,” imposing severe penalties on CAIR and on persons or entities that obtain benefits or privileges regulated by Florida and provide “material support” to CAIR. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their rights under the First and Fourteenth Amendments of the U.S. Constitution. On March 4, 2026, the district court granted a preliminary injunction enjoining enforcement of the Executive Order against CAIR. In discovery in the lawsuit, Governor DeSantis admitted that he also considers CAIR-Florida a “terrorist organization.”

37. In January 2026, through an X post, Florida Attorney General James Uthmeier put the city commission of Coral Springs, Florida, “on notice” that “state and local resources cannot be used by any organization affiliated with CAIR.”

Following Attorney General Uthmeier's post, the South Florida Muslim Federation dissociated from CAIR-Florida, which had been a member of the Federation since its inception. CAIR-Florida was unable to take part in the Federation's annual conference in Coral Springs, of which CAIR-Florida had been a sponsor. CAIR-Florida employees were also forced to withdraw from planned participation in multiple conference panels.

38. CAIR-Florida planned to use the 22nd floor of the Florida State Capitol—traditionally used by organizations hosting similar events—for its 2026 Muslim Day at the Capitol. CAIR-Florida submitted a reservation request on December 3, 2025, and subsequently followed up on it over the course of one month. CAIR-Florida received no indication that the space was reserved; on the contrary, we were told that the space was available, but that our reservation request was under review. On January 13, 2026, Capitol staff informed CAIR-Florida that the 22nd floor was no longer available.

39. On February 2, 2026, one day before Muslim Day at the Capitol, Attorney General Uthmeier again posted on X, describing CAIR-Florida's planned advocacy on behalf of Muslim Americans as a designated foreign terrorist organization "call[ing] for a presence around the Florida Capitol." He also requested that law enforcement "be on heightened alert for any possible security threats" and asked the public to alert law enforcement of "suspicious activity." An

unusually large law enforcement presence focused on the event and its attendees, causing attendees to feel stigmatized and unsafe.

**FLORIDA OFFICIALS' INITIAL INTENT TO DESIGNATE**

40. On July 1, CAIR-Florida learned that the Chief of Domestic Security had sent Governor DeSantis a notice of intent to designate CAIR as a "domestic terrorist organization." Governor DeSantis and other Florida officials had already indicated that they also considered CAIR-Florida to be a "terrorist organization."

41. Florida officials' prior statements have targeted both CAIR and CAIR-Florida, and CAIR and CAIR-Florida work closely with each other. Also, by July 1, Governor DeSantis had already admitted in a lawsuit that he considers CAIR-Florida to be a "terrorist organization." The announcement of CAIR's imminent designation required CAIR-Florida to take immediate measures to protect itself and its stakeholders from criminal and civil liability.

42. Because of the impending designation, on July 1, CAIR-Florida began cancelling its recurring donations and shutting down its payment processors. Those steps were complete on July 2. We did this to protect ourselves and our donors—who support our mission and our work—from potential criminal charges under HB 1471.

43. On July 1, due to HB 1471, we paid a one-month advance to our staff so that, if the designation became effective, they could stop work with at least a little

financial cushion—for most of our staff, their jobs are their primary source of income. For obvious reasons, we did not want to terminate all of our staff before a designation went into effect and pending a constitutional challenge; without staff, CAIR-Florida cannot function. But we also did not want to create legal risks for staff if the designation went into effect, and we did not want to end up in a scenario where staff had no financial buffer if the organization were forced to shut down. We felt we had no choice but to pay this one-month advance due to HB 1471, which diverted funds from other organizational work.

44. After we and CAIR filed a federal lawsuit to prevent our impending designation, Florida officials committed to not designating us until after they issued regulations—August 10 at the earliest.

45. At that point, we tried to reinstate our recurring donations. Our staff put considerable time into this. We were able to reinstate some of our recurring donations, but not all. We lost 19 recurring donations, amounting to approximately $2,300 per month.

## FLORIDA OFFICIALS' ONGOING INTENT TO DESIGNATE

46. On September 11, 2026, CAIR-Florida learned that Florida officials had issued a new, emergency rule to implement HB 1471.

47. On September 18, we received a notice from the Chief of Domestic Security in the mail. The notice said that the Chief of Domestic Security intended to designate us and CAIR as "domestic terrorist organizations."

48. We and CAIR submitted written objections to the notice of intent on September 25.

49. On September 29, we learned that the Governor and Cabinet had voted to approve our designation.

50. Unless the court intervenes, the designation will become effective on November 5.

**THE HARMS OF DESIGNATION**

51. Being targeted under HB 1471 is already harming CAIR-Florida. And unless the Court prevents the designation from becoming effective, we will be forced to fully suspend our operations to protect ourselves and our employees, board members, contractors, volunteers, donors, and other community members from harsh penalties.

52. The costs of even a temporary suspension of CAIR-Florida's activities will be significant, and the administrative burden of restarting CAIR-Florida's operations will be substantial.

53. From my knowledge of CAIR-Florida, its stakeholders, and the community, I know that people viewed the July 1 effective date of HB 1471 with

fear because designation results in criminal prosecution and civil penalties for virtually anyone associated with CAIR-Florida. They see the November effective date of designation the same way. We want to protect ourselves and our stakeholders from those risks.

**How Being Targeted Under HB 1471 is Already Harming CAIR-FL and Will Harm CAIR-FL Even Further Before the Designation Becomes Effective**

54. Leading up to July 1, 2026 (the effective date of HB 1471), members of our staff were gravely concerned about the risk of criminal penalties if staff continued to work for CAIR-Florida. We held several meetings to address these concerns, including with CAIR. We needed to hold these meetings to understand the risks of designation and address our staff members' concerns. We spent time securing criminal defense attorneys, in the event of investigation and prosecution. This required us to divert resources away from our other work, including advocacy work to defend civil rights and liberties in Florida, to challenge stereotypes of Islam and Muslims, and to empower Muslim communities.

55. Leading up to July 1, because of the looming threat of designation, two CAIR-Florida staff members—our Policy Director and Programs and Outreach Manager—left the organization. Their departures heavily damaged our work in support of our Florida community.

56. Also leading up to July 1, senior members of our staff devoted significant time to developing contingency plans for shutting down our operations because of a designation. We necessarily had to develop and start implementing these plans in advance of a vote on designation. Suspending our operations requires advance planning and actions, including suspension of payroll and benefits for staff; ensuring legal and financial compliance; ensuring security of legal client and donor data; suspending vendor contracts, such as for office equipment and staff work cell phones; suspension of donations and other fundraising as described further below; communications to stakeholders and community members who rely on us for legal and advocacy services. That, too, diverted resources from our normal administrative, fundraising, and advocacy work.

57. After June 10, 2026, in anticipation of our designation under HB 1471, we started turning away prospective legal clients we otherwise would have taken on, even though representing members of our community is extremely important to us. We did not feel we had any other choice, because (a) we understood that if we were designated, our attorney employees would not be able to work for us without risking severe criminal punishment, (b) if we waited until the last moment before designation, we would run the risk of being unable to secure alternative counsel for our clients, and (c) we were concerned that taking on new clients, under the circumstances, might violate the Florida Bar's ethical rules. We also did not think it

would be in any prospective client's interests to begin an attorney-client relationship with us and then have us suddenly become unable to work with them due to HB 1471.

58. After learning that Florida officials would not designate us before issuing regulations, we resumed conducting intakes and consults. But because we understood that designation was still impending, we never resumed initiating new litigation or long-term matters. Now that Florida officials have designated us, we will be forced to stop conducting intakes and consults again before the designation becomes effective.

59. We do not want to break the law. And we understand that continuing any of our operations after the effective date of the designation could expose our nonprofit, our staff and board, and our community stakeholders to extremely serious penalties. So, we have no choice but to wind down our operations before November 5. Shutting our operations down takes planning and time and we have to start implementing the wind down by October 14. This will make it impossible for us carry out our ordinary activities even before the designation becomes effective.

60. The designation is already interfering with our fundraising. We ordinarily hold three annual fundraising galas. These galas are life-sustaining for CAIR-Florida. They account for more than half of our annual fundraising and support all aspects of our work, from staff salaries and operational expenses to civil rights

advocacy, outreach, and community rights education work. All three of our galas this year were scheduled to take place between October 11 and November 8. After we received the notice of intent to designate CAIR-FL, we had to indefinitely postpone all three galas because of the likelihood the designation becomes effective, and because the threat of the designation becoming effective is already causing concern and hesitancy among our donors. As a result, we are at risk of losing thousands of dollars in deposits alone.

61. CAIR-Florida depends on donations. Postponing our galas is extremely disruptive and harmful to us.

62. Before the effective date of the designation, we will be forced to terminate communications with, and outreach to, our network of hundreds of volunteers who support and assist CAIR-Florida in our statewide work.

63. Before the effective date of the designation, we will instruct CAIR-Florida staff to remove organizational social media accounts from their devices, turn off viewers' ability to interact with our posts, and post no new content. We will also stop posting new press releases on CAIR-Florida's website, which we typically do once or twice per month.

64. Before the effective date of the designation, we will be forced to stop maintaining CAIR-Florida's community helpline, leaving members of Florida's

Muslim community who have experienced discrimination without access to our legal and advocacy support.

65. Being designated as a "domestic terrorist organization" and having that designation published in the Florida Administrative Register and on the Florida Department of Law Enforcement website is inherently stigmatizing; it undermines the trust and credibility we have built with donors, community members, volunteers, and supporters. Our trust and credibility go beyond monetary value and are integral to our ability to carry out our mission.

66. I believe that CAIR-Florida's being targeted under HB 1471 is causing community members to view CAIR-Florida and our employees with suspicion and uncertainty—and that people will cut ties with, or at least distance themselves from, CAIR-Florida.

67. Even if the designation is removed in the future, repairing the reputational damage inflicted by the designation will require an extensive investment of time and resources. Being targeted under HB 1471 is already hurting CAIR-Florida's relationships with our donors, partner organizations, and the communities we serve; once effective, the harms will be even greater. There is no guarantee that CAIR-Florida will ever be able to fully rebuild these relationships. For example, even though a court stopped CAIR's designation under Governor DeSantis's Executive Order from going into effect, CAIR-Florida has been unable

to reestablish a regular presence at some mosques, which stopped communicating and working with us when that designation was announced.

68. Similarly, even if the HB 1471 designation is removed in the future, CAIR-Florida will have to rebuild its funding streams and donor relationships. Because it will not receive any donations or grants while its designation is in effect, CAIR-Florida will have to divert substantial additional time, effort, and resources into its fundraising efforts to avoid falling into a deficit.

**How the Designation Will Harm CAIR-Florida Once It Becomes Effective**

Our Ability to Speak To, Advocate For, and Associate With Our Community

69. Once the designation is effective, we will not be able to associate with the Florida mosques, community groups, and other nonprofit organizations with whom we have built ongoing partnerships, and with the members of the Florida public we serve.

70. Once effective, the designation will prevent us from continuing our longstanding association with CAIR to empower, educate, and defend Florida Muslims. We will be forced to stop reporting to, and acting jointly with, CAIR to carry out our shared mission through policy and legal advocacy, press releases, and other public communications and social media coordination.

71. Once effective, the designation will prevent us from attending, or planning for, multiple upcoming events. One example is Muslim Day at the Capitol, a civic event currently scheduled for March 30, 2027. An event like that takes months to plan for, and the work is already underway. But once the designation is effective, we will not be able to participate in planning with our coalition partners—including at a scheduled meeting on November 11. Other examples of meetings we would otherwise attend include a December 10 meeting of Tampa Bay ABC 28's Community Advisory Committee, which we are a part of, and the weekly calls of the State Voices Voting Rights coalition.

72. Once effective, the designation will prevent us from engaging with elected officials on behalf of our community, ahead of the upcoming legislative session. Normally, we would begin scheduling meetings with elected officials immediately after the November 3 midterm elections. But when the designation becomes effective (on November 5), it will be impossible for us to attend any meetings we have scheduled.

73. Because of the risk of prosecution once the designation becomes effective, our attorneys may even need to stop providing legal services to their clients.

74. Our attorneys maintain a substantial immigration docket of more than 100 files, representing clients in Miami and Orlando immigration courts as well as

in interactions with U.S. Citizenship and Immigration Services. CAIR-Florida's immigration practice frequently involves emergency matters, such as referrals from individuals in detention or facing other serious harm.

75. CAIR-Florida also represents multiple clients across several cases related to discrimination, including cases currently pending before the Equal Employment Opportunity Commission. All communications between these clients and the federal government occur through CAIR-Florida. CAIR-Florida's clients will also require representation in an upcoming mediation. In addition, CAIR-Florida jointly represents several Florida residents alongside CAIR in an out-of-state proceeding.

76. Once effective, the designation will also hurt CAIR-Florida's ability to obtain its own counsel to represent it in current and future lawsuits. For example, CAIR-Florida is currently represented by counsel in Florida in *Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9-cv-81179 (S.D. Fla. 2019), in which it is receiving settlement payments. There is a substantial risk that either designation will force CAIR-Florida's counsel to cut ties with it, leaving it unrepresented. An effective designation may also prevent CAIR from obtaining proceeds to which it is entitled from the case.

<u>Our Staff and Finances</u>

77. Once effective, the designation will leave us unable to solicit grants and donations in any way at all. For example, we will not be able to participate in "Giving Tuesday" on December 1, a day when some companies match charitable donations. We will also be unable to launch our "End of the Year" campaign—our final fundraising push of the year.

78. CAIR-Florida is a statewide operation with multiple offices and departments, all requiring contracts and subscriptions (such as Filevine and Quickbooks) to function. If the designation becomes effective, CAIR-Florida will also be responsible for payments under any contracts it was unable to suspend before discontinuing operations, even if it is unable to use those services.

79. We understand that our bank accounts may be frozen once the designation is effective. If our bank accounts are frozen, we may not be able to fulfill our existing contractual obligations.

80. We understand that we may be unable to receive rent payments from tenants who lease properties in which CAIR-Florida has an interest. One tenant has already expressed concern to us about exposure to criminal liability for paying rent.

81. Once the designation is effective, we understand that using any location—including our own offices—to further our interests is per se a "public

nuisance," and any citizen of a county where we operate can sue to stop us from operating, claiming we are a "public nuisance." Even if the Defendants in this case were prevented from enforcing provisions of HB 1471, the threat of suits from the public will make it difficult to continue our work. At any time, a citizen of the county where we work could drag us or the owner of the building where we are working to court and force us to halt our use of that location to advance our lawful speech and advocacy.

Our Ability to Seek Justice in the Courts

82. Once effective, the designation will seriously impede CAIR-Florida's ability to defend its rights in court. We understand that, once the designation is effective, it will be a crime for CAIR-Florida or anyone else to initiate, organize, plan, finance, direct, manage, or supervise any activity intended to further CAIR-Florida's interests. We also understand that, once the designation is effective, it will be a crime for anyone to provide material support to CAIR-Florida.

83. Under the new emergency rule, if we are challenging a designation or defending ourselves against criminal charges, *others* can provide us with legal counsel and legal support services without being prosecuted.

84. Even though the emergency rule may protect our lawyers in this lawsuit, it does not protect CAIR-Florida, its board, or its staff. So, once the designation is effective, CAIR-Florida, its board, and its staff will be at risk of prosecution and

severe punishment just for initiating conversations with our attorneys, making litigation decisions, collecting documents, and preparing discovery responses—including in this case.

85. I know some of our employees are concerned that, once the designation is effective, participating in this lawsuit will violate the law. I personally am concerned that my participation would put me at risk of prosecution.

**The Cumulative Effects of Designation**

86. If the designation becomes effective, CAIR-Florida's institutional voice will be silenced, and its advocacy on legal, policy, cultural, social, and civic issues of public concern will be completely suppressed. CAIR-Florida will also be indefinitely unable to benefit from the expertise of its employees, including its attorneys, advocacy specialists, and communications experts.

87. In other words, by forcing CAIR-Florida to stop any communications and work with our stakeholders, criminalizing the basic functions and transactions necessary for us to operate, and silencing our speech across all our public platforms, an effective designation will prevent us from carrying out our faith-driven mission.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on October 2, 2026.

*/s/ Wilfredo Ruiz*
Wilfredo Ruiz