**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v. Case No. 4:26-cv-521-MW-MJF

RON DESANTIS *et al.*,

*Defendants*.
_______________________________/

# DECLARATION OF CELIN CARLO-GONZALEZ

I, Celin Carlo-Gonzalez, declare as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I am a lawyer with the American Civil Liberties Union Foundation. I represent Plaintiffs in this case.

3. Attached as exhibits are copies of the following:

   a. **Exhibit A**, Ron DeSantis, (@GovRonDeSantis), X (July 1, 2026, at 2:48 p.m.), https://perma.cc/5T5L-J8ZX.

   b. **Exhibit B**, Ron DeSantis, (@GovRonDeSantis), X, *Governor DeSantis Announces Implementation of Florida Law to Combat Terrorist Organizations* (July 1, 2026, at 1:00 p.m.), https://x.com/i/broadcasts/1oJMvvjPyjlxQ (a screenshot of the webpage on which the video appeared is attached as Exhibit B).

c. **Exhibit C**, Press Release, Executive Office of the Governor, *Governor Ron DeSantis Announces Implementation of Florida Law to Combat Terrorist Organizations* (July 1, 2026), https://perma.cc/2EDK-W3BC.

d. **Exhibit D**, Notice of Intent of Designating Council on American-Islamis Relations (CAIR), including CAIR-Florida, as a Florida Domestic Terrorist Organization, received on September 18, 2026.

e. **Exhibit E**, Plaintiffs' Objection to Designation of CAIR and CAIR-Florida as "Domestic Terrorist Organizations" under Fla. Stat. § 943.03102, dated September 25, 2026 (with attachments as Exhibits 1–5).

f. **Exhibit F**, The Florida Channel, *9/29/26 Florida Cabinet Meeting* (Sept. 29, 2026), https://thefloridachannel.org/videos/9-29-26-florida-cabinet-meeting/ (a screenshot of the webpage on which the video appears is attached as Exhibit F).

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 2, 2026.

*/s/ Celin Carlo-Gonzalez*
Celin Carlo-Gonzalez

# Exhibit A



**Ron DeSantis**
@GovRonDeSantis




2:48 PM · Jul 1, 2026

207 1K

# Exhibit B




## Governor DeSantis Announces Implementation of Florida Law to Combat Terrorist Organizations

Ron DeSantis
@GovRonDeSantis

Follow

Ended Jul 1, 2026

# Exhibit C

EXECUTIVE OFFICE OF THE GOVERNOR

# RON DESANTIS

## 46TH GOVERNOR OF FLORIDA

FLAG
STATUS:
FULL
STAFF



# NEWSROOM



**Category**
All

**Headed By**
All

**Sort**
Agency Name A → Z

Search Reset

Search

# GOVERNOR RON DESANTIS ANNOUNCES IMPLEMENTATION OF FLORIDA LAW TO COMBAT TERRORIST ORGANIZATIONS

July 1, 2026

**TAMPA, Fla.**—Today, Governor Ron DeSantis announced the State of Florida's intent to implement its new statutory authority to identify, designate, and combat terrorist organizations operating in Florida, marking the first use of powers established by HB 1471.

"Last December, I signed an Executive Order to eliminate the influence of radical terrorist ideologies and the organizations that promote them in Florida. This year, I signed legislation to strengthen those protections and give Florida permanent statutory tools to combat terrorism while defending the Constitutional rights of our citizens," **said Governor DeSantis.** "Today, we are officially designating terrorist organizations under Florida law. In addition to CAIR and the Muslim Brotherhood, we are adding Antifa to the list—along with more than 90 Foreign Terrorist Organizations, including cartels."

Since taking office, Governor DeSantis has prioritized protecting Florida's institutions, safeguarding constitutional rights, and preventing foreign and extremist influence from taking root in the state.

Last December, Governor DeSantis signed an Executive Order directing state agencies to eliminate the influence of radical terrorist ideologies and organizations operating in Florida. The order designated the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as terrorist organizations for purposes of state executive action and directed state agencies to deny taxpayer funding, contracts, employment, and other public support where authorized by law. State and local agencies were also instructed to use every lawful tool available to prevent terrorist organizations from operating or gaining a foothold in Florida.

"Keeping our community safe starts with identifying the threat," **said Florida Department of Law Enforcement Commissioner Mark Glass.** "The safety of our community is strengthened by that knowledge every day, and reinforced by the collaboration between our officers, our federal partners, and—most importantly—the people we serve."

Florida has also acted to eliminate foreign influence within public institutions. The state has prohibited colleges and universities from entering into agreements with institutions affiliated with foreign countries of concern, restricted the use of taxpayer funds for programs benefiting foreign adversaries, and taken action to prevent extremist organizations from operating on public campuses.

Earlier this year, Governor DeSantis signed HB 1471, creating a permanent statutory framework to combat terrorism while protecting the constitutional rights of Floridians.

The legislation:

- Establishes a formal terrorist designation process through the Florida Department of Law Enforcement.
- Prevents taxpayer-funded institutions from supporting or promoting designated terrorist organizations.
- Ensures foreign or religious legal codes cannot override the United States or Florida Constitutions in Florida courts.
- Creates state enforcement mechanisms and criminal penalties for providing material support to designated terrorist organizations.
- Under the new law, the Governor and Cabinet may designate terrorist organizations based upon recommendations from the Chief of Domestic
- Security within the Florida Department of Law Enforcement. The framework allows Florida to recognize federally designated Foreign
- Terrorist Organizations while also identifying additional organizations that threaten the safety and security of Floridians.

Today, based on recommendations from Florida's domestic security professionals, Governor DeSantis announced the intent to designate the following organizations under Florida law:

- Council on American-Islamic Relations (CAIR)
- Muslim Brotherhood
- Antifa

Florida has also received recommendations to designate more than 90 Foreign

Terrorist Organizations under state law, including but not limited to:

- Cartel de Sinaloa
- Tren de Aragua
- Islamic Revolutionary Guard Corps (IRGC)
- Cartel del Noreste
- Cartel del Golfo

Upon confirmation by the Florida Cabinet, these designations will carry the full force of state law. State and local governments will be prohibited from providing taxpayer funding, contracts, or other public support to designated organizations. Public colleges, universities, school districts, and other publicly funded institutions will be prohibited from using public resources to support or promote designated organizations. Organizations designated under Florida law may also be subject to dissolution as provided by statute, and individuals who knowingly provide material support or resources to designated organizations will face criminal penalties established under Florida law.

###

###

# Exhibit D

# Notice of Intent of Designating **Council on American-Islamic Relations (CAIR), including CAIR-Florida,** as a Florida Domestic Terrorist Organization

Notice To: Council on American-Islamic Relations
Address: 453 New Jersey Ave SE, Washington, DC 20003

Notice To: CAIR Florida
Address: 8076 N 56th St, Tampa, FL 33617

The Chief of Domestic Security formally issues this Notice of Intent for the purpose of designating **Council on American-Islamic Relations (CAIR), including CAIR-Florida,** as a Florida Domestic Terrorist Organization.

In accordance with CS/CS/HB 1471 (2026) and s. 943.03102, a designated domestic terrorist organization must meet the following legal criteria:

1. The organization is based or operates in this state or the United States.
2. The organization is engaging in terrorist activity as defined in s. 775.30.
3. The terrorist activity of the organization is an ongoing threat to the security of this state or the United States.

Per Section 943.03102(2) FS, please be advised that a public meeting regarding this designation will be held:

Date: September 29, 2026 Time: 09:00 EST

Location: Florida Cabinet Meeting Room, The Capitol
400 S Monroe St, Tallahassee, FL 32399

Process for Objection/Removal/Appeal:
You may, within seven days of receipt of this notice, object to the proposed designation in writing and provide any information and documentation you believe would counsel against the designation.

To object to the designation, you may submit your objection to the Florida Department of Law Enforcement via email at DesignationAppealorObjection@fdle.state.fl.us or at the following address:

Florida Department of Law Enforcement
c/o Chief of Domestic Security
Agency Clerk
PO Box 1489
Tallahassee, FL 32302-1489

In the event the Governor and Cabinet approve the designation, you may petition the Department at any time for the removal of such designation. The petition for removal may include any information and documentation you believe would support removal of the designation. You can submit your petition and documentation to the above Department addresses.

To appeal the outlined designation, you or any of your members may challenge such designation in the Circuit Court of the Second Judicial Circuit in and for Leon County.

**Part 1 – Domestic Terrorist Organization Criteria:**

☒ 1. **Observed Base or Operations Sites in this state or the United States**

- The organization is based or operates in Florida; or
- The organization is based or operates in the United States.

☒ 2. **Engaging in Terrorist Activity as Defined in s. 775.30**

Section 775.30 provides:

- (1) As used in this chapter and the Florida Criminal Code, the terms "terrorism" or "terrorist activity" mean an activity that:
  (a) Involves:
    1. A violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States; or
    2. A violation of s. 815.06; and
  (b) Is intended to:
    1. Intimidate, injure, or coerce a civilian population;
    2. Influence the policy of a government by intimidation or coercion; or
    3. Affect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy.
- (2) A person who violates s. 782.04(1)(a)1. or (2), s. 782.065, s. 782.07(1), s. 782.09, s. 784.045, s. 784.07, s. 787.01, s. 787.02, s. 787.07, s. 790.115, s. 790.15, s. 790.16, s. 790.161, s. 790.1615, s. 790.162, s. 790.166, s. 790.19, s. 806.01, s. 806.031, s. 806.111, s. 815.06, s. 815.061, s. 859.01, or s. 876.34, in furtherance of intimidating or coercing the policy of a government, or in furtherance of affecting the conduct of a government by mass destruction, assassination, or kidnapping, commits the crime of terrorism, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

☒ 3. **Ongoing threat to the security of this state or the United States**

- The terrorist activity of the organization is an ongoing threat to the security of this state or the United States.

**Part 2 – Basis Summary Findings:**

During the 2008 Holy Land Foundation (HLF) trial, the U.S.-Muslim Brotherhood's Palestine Committee (PALCOM) was revealed as a committee whose sole purpose was supporting Hamas from within the U.S. with media, money, and personnel. The HLF, Islamic Association for Palestine (IAP), United Association for Studies and Research (UASR), and CAIR were identified as PALCOM's organizational structures designated to achieve PALCOM's goals. The IAP printed the founding Hamas charter in English for wider consumption in the western hemisphere. The founding charter called for the annihilation of Israel through violent jihad, to include suicide bombings against civilian targets to be carried out by the Al-Qassam Brigades.

There is substantial evidence that CAIR is engaging in terrorist activity. CAIR's founding members have connections with Hamas leadership to include Mousa Mohammed Abu Marzook. Additionally, co-founding CAIR-TX member Ghassan Elashi, who was convicted of dealings and material support to Specially Designated Terrorists, also has ties to Hamas. Likewise, as referenced below, current CAIR members have connections with an alleged member of the Palestine Islamic Jihad (PIJ). During the October 7, 2023, terror attacks in Israel, Hamas and PIJ members brutally murdered, kidnapped and raped Israelis and foreign nationals, to include U.S. civilians. The terror attacks were accomplished utilizing a vast tunnel network built by Hamas.

This tunnel system in Gaza and Israel was built over decades and cost over $1 billion to construct. In 2014, Hamas reportedly spent $90 million to build just three dozen tunnels.

- **1928** – **Muslim Brotherhood** founded in Egypt.

- **1987** – members of the **Muslim Brotherhood** create **Hamas**.

- **1993** – Members of the Palestine Committee of the **Muslim Brotherhood** in the United States met in Philadelphia to discuss Oslo Accords and the conversation focused on how to continue to support Hamas (not yet a U.S.-designated terrorist organization). The Palestine Committee included three Hamas-supporting organizations in the United States—the IAP, the Occupied Land Fund (later named the Holy Land Foundation, or HLF), and the UASR. CAIR co-founder, Nihad Awad, and Ghassan Elashi (co-founder of CAIR-TX) were identified as presenters at a "Future of Islamic Action for Palestine in North America Seminar." Documents seized in relation to the HLF trial from these meetings suggest ties within the U.S. to support efforts by the Muslim Brotherhood and Hamas. Nihad Awad is currently CAIR's National Executive Director.

https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2025-02/philly-meeting-summary.pdf
https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2025-02/Philly%20Meeting%204.pdf
https://extremism.gwu.edu/sites/g/files/zaxdzs5746/files/2025-02/Ashqar_Search_4.pdf

- **1994** – Former IAP members Nihad Awad, Omar Ahmad and a third man founded the Council on American-Islamic Relations, or CAIR (HLF – wiretapped transcripts indicate a "front" organization would be needed to "camouflage" their actions).

- **1997** – Hamas and PIJ were designated as Foreign Terrorist Organizations (FTO).

https://www.state.gov/foreign-terrorist-organizations/

- **2001** – **HLF** was designated a Specially Designated Global Terrorist organization for funneling millions to Hamas, following the latter's designation as a terrorist group in 1997.

https://sanctionssearch.ofac.treas.gov/?SEQ=sanctions+list+search

- **2002** – Ghassan Elashi was arrested for conspiracy, money laundering, and dealing in the property of a designated terrorist with his brothers Bayan and Basman. The three brothers reportedly tried to hide Hamas official **Mousa Mohammed Abu Marzook's** $250,000 investment in their Texas-based company (Infocom). Bayan was the chief executive officer; Ghassan was the vice-president of marketing; and Basman was the logistics and credit manager.

https://www.justice.gov/archive/usao/txn/PressRel06/elashi_bayan_ghassan_basman_infocom_sent_pr.html

  - Mousa Mohammed Abu Marzook: served as the first chairman of the Hamas Political Bureau in the early 1990s.

- **2008** – **HLF** conviction of five indicted conspirators found them guilty on more than 100 counts in criminal trial. Ghassan Elashi was convicted of conspiracy to provide material

support to a foreign terrorist organization (i.e. Hamas). **CAIR** was an unindicted co-conspirator.

https://www.justice.gov/archives/opa/pr/federal-judge-hands-downs-sentences-holy-land-foundation-case

- **2014** – The United Arab Emirates (UAE) designates **CAIR** as a terrorist group due to its ties to the global **Muslim Brotherhood** which includes **Hamas**. CAIR is still listed on the "Local Terrorist List," within the "Sanctions List" as of 2026.

https://www.uaeiec.gov.ae/en-us/un-page?p=1#

- **2023** – Hamas and PIJ launched terror attacks against Israel which led to the deaths of more than 1,200 Israelis and foreign nationals (including 46 U.S. citizens in Israel). Additionally, Hamas took 254 hostages, of which 12 were U.S. citizens. In 2006, Hamas and PIJ started the Joint Operation Room (JOR) for the Palestinian Factions of Resistance, which grew to include many major and minor militant Palestinian factions in Gaza and the West Bank. This JOR hosted training operations, including drilling tactics that were later utilized in the October 7th attack.

https://www.state.gov/releases/office-of-the-spokesperson/2025/10/two-year-anniversary-of-october-7th-attack
https://ctc.westpoint.edu/the-path-to-october-7-how-iran-built-up-and-managed-a-palestinian-axis-of-resistance/

- **2025** - As head of Hamas' foreign relations office, Mousa Mohammed Abu Marzook said he would not have supported an attack on Israel had he known of the devastation it would wreak on Gaza. According to an article published on February 24, 2025, he told the New York Times "Hamas was open to releasing all hostages at the same time, if Israel was willing to free the thousands of Palestinians in its prisons, end the war and withdraw from Gaza." On May 12, 2025, U.S.-Israeli hostage Edan Alexander, thought to be the last U.S. citizen held by Hamas who was still alive, was freed.

https://www.nytimes.com/2025/02/24/world/middleeast/hamas-official-interview-attack-israel.html
https://www.bbc.com/news/articles/c4gr2qvzn0no

- **2025** – Texas designates CAIR as an FTO.

- **2026** – **Muslim Brotherhood** chapters (Lebanese Muslim Brotherhood and Sudanese Muslim Brotherhood) designated as Foreign Terrorist Organizations and a Specially Designated Global Terrorist organization by the U.S. Government.

- **2026** – Retired FBI Agent Lara Burns, Senior Litigation Counsel Arielle Klepach, and Homeland Security Senior Analyst Kyle Shideler provided testimony to the U.S. Senate Committee on the Judiciary regarding ties between the Muslim Brotherhood and PALCOM organizations, to include CAIR, titled "Hidden in Plain Sight: Confronting the Muslim Brotherhood Network in America."

https://www.judiciary.senate.gov/committee-activity/hearings/hidden-in-plain-sight-confronting-the-muslim-brotherhood-network-in-america-08-05-2026

UNCLASSIFIED






UNCLASSIFIED

1. **Historical Action Against CAIR**

In November 2014, the UAE designated CAIR as a terrorist organization due to alleged ties to the Muslim Brotherhood and concerns in promoting extremism. The UAE upheld their designation when challenged due to CAIR's honoring of convicted Palestinian Islamic Jihad terrorist Sami Al-Arian, former University of South Florida professor, with a "Promoting Justice Award." According to open-source reporting and the UAE's anti-terror legislation by the Emirates, an annual review of their terrorist organization designations must be conducted.

2. **Recent Legal or Legislative Action Against CAIR in the U.S.**

As of November 2025, CAIR is designated as a Foreign Terrorist and Transnational Criminal Organization under Texas Penal and Texas Property Codes, which led to property acquisition bans and civil enforcement authority for the Attorney General. Texas' Governor directed the Texas Department of Public Safety to launch criminal investigations into CAIR and the Muslim Brotherhood, and announced a separate investigation into 'Sharia tribunals masquerading as legal courts' in Collin and Dallas counties. In December 2025, the Governor formally requested the U.S. Treasury Department to investigate and suspend CAIR's 501(c)(3) tax-exempt status for its three entities operating in Texas. In February 2026, Texas' Attorney General filed lawsuits against CAIR and the Muslim Brotherhood, with the intent to ban them from operating in Texas, prohibit fundraising and membership solicitation, and block property ownership in the state.

Federally, on June 24, 2025, a Florida Representative introduced H.R. 4097: Designate CAIR as a Terrorist Organization Act. The bill was last referred to the House Committee on the Judiciary the same day without any additional action published by the House. The bill aimed to have a review conducted on CAIR to determine whether the organization meets criteria for designation as a FTO pursuant to section 219 of the Immigration and Nationality Act (8 U.S.C. 1189).

In August 2025, an Arkansas Senator formally requested the Internal Revenue Service investigate CAIR's 501(c)(3) compliance due to their alleged ties to Hamas and the Muslim Brotherhood. In January 2026, Chairman Cody Smith, representing Missouri, referred CAIR-California for IRS investigation and potential revocation of tax-exempt status, referencing Texas' FTO designation and alleged systematic misuse of millions in taxpayers' dollars. At this time, Texas joined a legal brief in a federal case targeting American Muslims for Palestine (AMP), whose predecessor's board members were convicted of providing material support for Hamas, with overlapping ties to the same Palestine Committee network cited in CAIR cases.

3. **CAIR's ties to persons previously convicted of terrorist financing**

CAIR California's San Francisco Bay Area (CAIR-SFBA) Executive Director Zahara Billoo is listed as a Board Member of the Coalition for Civil Freedoms Foundation, according to their last publicly published 990EZ Tax Form. Hatem Fariz is identified as the foundation's Treasurer. According to the U.S. Department of Justice, Hatem Fariz was an alleged Palestinian Islamic Jihad (PIJ) member. Hatem Fariz pleaded guilty to several charges including the intent to make or receive a contribution of funds, goods, or services, to, or for the benefit of a Specially Designated Terrorist.

<u>Convictions</u>
State/Federal Court: U.S. District Court, Northern District of Texas
Case #: CR No. 3:04-00240-P(N.D.T.X) United States v. Holy Land Foundation, et al.
Person: Ghassan Elashi

Case Summary: On May 27, 2009, five Holy Land Foundation leaders were convicted of Providing Material Support to the Hamas Terrorist Organization. One of the leaders, Ghassan Elashi, 55, of Richardson, Texas, was sentenced to a total of 65 years in prison for 10 counts of conspiracy to provide, and the provision of, material support to a designated foreign terrorist organization; 11 counts of conspiracy to provide, and the provision of, funds, goods and services to a Specially Designated Terrorist; 10 counts of conspiracy to commit, and the commission of, money laundering; and one count of conspiracy to impede and impair the Internal Revenue Service; and one count of filing a false tax return. According to the superseding indictment (pg.6) the Holy Land Foundation was created by Elashi and two others as the fundraising component of the Palestinian Committee, whose purpose was to support Hamas.

Significance: According to the U.S Department of State, Hamas is a designated foreign terrorist organization (since 1997). According to open-source news, Elashi was one of the founding members of CAIR's Texas chapter. CAIR was designated by the State of Texas as a foreign terrorist and transnational criminal organization by Governor Greg Abbott (18-Nov-2025 proclamation). Texas Attorney General Ken Paxton has filed a lawsuit (26-Feb-2026) against the Muslim Brotherhood and CAIR, which identifies CAIR as the American Chapter of the Muslim Brotherhood.

According to the U.S. Office of the Director of National Intelligence (ODNI) the Hamas charter calls for establishing an Islamic Palestinian state in place of Israel and rejects all agreements made between the Palestinian Liberation Organization and Israel. Hamas' strength is concentrated in the Gaza Strip and areas of the West Bank. Hamas has a military wing known as the Izz al-Din al-Qassam Brigades that has conducted many anti-Israel attacks in both Israel and the Palestinian territories since the 1990s. These attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, improvised roadside explosives, and rocket attacks. On October 7, 2023, Hamas launched a terrorist attack from the Gaza Strip into Israel. More than 1,200 Israelis and foreign nationals (including 46 U.S. citizens in Israel) were killed, and Hamas and other groups also seized an estimated 251 hostages.

According to government documents presented during the U.S. v. HLF trial, Nihad Awad, CAIR's current National Executive Director, was listed as a representative of CAIR during a meeting held between October 2–3, 1993, in Philadelphia. The organization is believed to have been created at this meeting where Hamas operatives – under FBI surveillance – strategized about how to support Hamas's mission while evading law enforcement detection. The wiretapped transcripts captured attendees, including Nihad Awad, discussing the need for "deception," "camouflage," and maintaining a "front" organization. One year later, Nihad Awad and Omar Ahmad officially founded CAIR. Additionally, in a 1994 forum discussion videotaped at Barry University, Awad declared: "I am in support of the Hamas movement."

# Exhibit E

ACLU AMERICAN CIVIL LIBERTIES UNION FOUNDATION

SPLC FLORIDA

Florida Department of Law Enforcement
c/o Chief of Domestic Security
Agency Clerk
PO Box 1489
Tallahassee, FL 32302-1489

**Re: Objection to Designation of CAIR and CAIR-Florida as "Domestic Terrorist Organizations" Under Fla. Stat. § 943.03102**

On September 18, 2026, CAIR and CAIR-Florida received from the Florida Department of Law Enforcement a "Notice of Intent of Designating Council on American-Islamic Relations (CAIR), including CAIR-Florida, as a Florida Domestic Terrorist Organization."[1] The Notice of Intent alleges that CAIR and CAIR-Florida are "engaging in terrorist activity" and represent "an ongoing threat to the security" of Florida or the United States. These stigmatizing state allegations are false. CAIR and CAIR-Florida reject the allegations categorically.

CAIR and its chapter CAIR-Florida are nonprofit civil rights organizations engaged in First Amendment-protected speech and advocacy. Their shared mission, rooted in faith, is to help people understand Islam, protect civil rights, promote justice, and empower American Muslims. CAIR and CAIR-Florida work daily to accomplish this goal. Like other U.S. nonprofit rights groups across the country, they hold community events, publish know-your-rights and other educational material, advocate for and against government policies, petition elected officials, and provide people with legal advice and representation. They have done this work for decades. Neither CAIR nor CAIR-Florida has ever been charged with, much less convicted of, any crime.

Yet Florida officials' Notice of Intent shockingly brands the country's leading Muslim civil rights group with an undeserved and reviled "terrorism" label. It does so by stitching together innuendo and chains of attenuated association—including often decades-old alleged speech or actions of groups and individuals that are not CAIR.[2] It provides no evidence—nor

---

[1] The Notice of Intent was issued pursuant to Florida's new "domestic terrorist organization" designation regime ("DTO regime"), enacted by HB 1471 and HB 1473, which went into effect on July 1, 2026. *See, e.g.*, Fla. Stat. § 943.03102; Fla. Admin. Code Emergency R. 11RER26-8.

As a threshold matter, the designation is invalid because the emergency rule itself is invalid: it does not contain the "specific facts and reasons for finding an immediate danger to the public health, safety, or welfare," as required under Florida law for emergency rulemaking. Fla. Stat. § 120.54(4)(a)(3). Although Florida law requires findings justifying an emergency rule, Rule 11RER26-8 merely asserts three cursory and conclusory sentences apparently cribbed from a White House strategy document. The asserted reason for concluding the emergency rule is fair is similarly flawed and conclusory, providing no analysis whatsoever and repeating language from the Florida Administrative Procedures Act instead of meeting its requirements.

[2] Bafflingly, the Notice of Intent is stamped "Unclassified," as if Florida officials had intelligence classification authority that is, in fact, reserved for the federal executive branch. Exec. Order No. 13,526,

could it—that CAIR is engaging in any violent conduct or act dangerous to human life, which is a predicate under Florida law for "domestic terrorist organization" ("DTO") designation. And although the Notice asserts that officials intend also to designate CAIR-Florida, it alleges no facts and provides no evidence specific to CAIR-Florida whatsoever. Florida officials' use of their new DTO regime to force CAIR and CAIR-Florida to shut down their activities in the state by imposing draconian criminal penalties on the nonprofits, their staff, and those who associate with them based on the pitifully inadequate "record" attached to the Notice of Intent is not only unconstitutional—it is disgraceful.

This Notice of Intent—and the existential jeopardy it creates for CAIR and CAIR-Florida—must be understood in the context of Governor DeSantis and top Florida officials' relentless campaign against the nonprofits' First Amendment-protected speech and advocacy.

Governor DeSantis and the Florida Department of Law Enforcement (FDLE) are well aware of CAIR and CAIR-Florida's civil rights activities—as demonstrated by the fact that the Governor's hostility to those activities has been public and persistent. That hostility ratcheted up on December 8, 2025, when the Governor unilaterally issued an Executive Order purporting to designate CAIR as a "terrorist organization," as defined in Fla. Stat. § 874.03, and imposing sweeping consequences on CAIR and those who had provided it "material support." That Executive Order provided no evidence of any criminal conduct by CAIR or CAIR-Florida. A federal district court already held the Governor's executive action is likely unconstitutional. *CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263 (N.D. Fla. 2026).

On April 6, 2026—after Governor DeSantis's Executive Order was preliminarily enjoined as unconstitutional—he signed HB 1471 and HB 1473 into law, establishing the DTO regime. Legislators who supported the bills made clear that, in creating the regime, they intended to endorse Governor DeSantis's actions and Executive Order targeting CAIR while adding a veneer of process and even harsher punishments.[3]

When the DTO regime went into effect on July 1, 2026, Governor DeSantis and other officials immediately announced their determination to designate CAIR as quickly as possible. After CAIR and CAIR-Florida sued the same day to enjoin a baseless and unconstitutional designation, Florida officials paused their process, later issuing an emergency rule to implement the DTO regime's broad terms. Under the DTO regime and the emergency rule interpreting and implementing it, the Notice of Intent swiftly followed.

---

§ 1.3, 3 C.F.R. 13526 (Jan. 1, 2010). To be clear: Governor DeSantis and other state officials have no information classification authority.

[3] *Fla. S. Judiciary Comm.*, 1:25:08–25:25 (Feb. 3, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6080; *Fla. H. Judiciary Comm.*, 2:28:55–29:16 (Feb. 26, 2026) (statement of Rep. Cassel) https://www.flhouse.gov/VideoPlayer.aspx?eventID=11180; *Fla. S. Session*, 3:26:43–27:04 (Mar. 5, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6273.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

SPLC FLORIDA

There should be no doubt that Governor DeSantis and the rest of the Florida Cabinet intend to vote to designate CAIR and CAIR-Florida. The "process" the DTO regime purports to provide—which allows five executive officers to serve as CAIR and CAIR-Florida's judge, jury, and executioner—is nonexistent. CAIR and CAIR-Florida are not being given a meaningful opportunity to be heard or a fair forum to vindicate their rights before they are designated and effectively shut down by the breathtaking criminal penalties imposed under the DTO regime. This violates fundamental due process. The regime also violates the First Amendment by allowing the state to target and suppress the speech of those, like CAIR and CAIR-Florida, whom state officials disfavor.

CAIR's and CAIR-Florida's filings in their two ongoing lawsuits challenging Governor DeSantis and other Florida officials' unconstitutional designation efforts—*CAIR-Foundation, Inc. v. DeSantis* (*CAIR I*), No. 4:25-cv-516-MW/MJF (N.D. Fla. *filed* Dec. 15, 2025) (executive order challenge), and *CAIR-Foundation, Inc. v. DeSantis* (*CAIR II*), No. 4:26-cv-315 (N.D. Fla. *filed* July 1, 2026) (DTO regime challenge)—extensively detail their responses to state officials' campaign of meritless accusations. CAIR and CAIR-Florida attach key filings and reports in these lawsuits as exhibits here and will not restate all of those responses.[4] They are also cognizant that this fundamentally unfair DTO regime process, in which a decision against them is virtually guaranteed, exposes the nonprofits, their Florida staff and board members, and associated third parties to an imminent risk of criminal punishment, including felony prosecution with penalties of up to lifetime imprisonment. Nevertheless, CAIR and CAIR-Florida briefly make the following points concerning the Notice of Intent, which states that it is a "summary" of "findings."

The Notice of Intent entirely fails to identify any "terrorist activity" in which CAIR and CAIR-Florida are supposedly engaged. Put another way, it does not even come close to establishing the first prong of the definition of "terrorist activity" required by Florida law: a "violent act or an act dangerous to human life which is a violation of the criminal laws of" Florida or of the United States.[5] The Notice contains no allegation or evidence identifying a single violent or dangerous act by CAIR or CAIR-Florida; it similarly fails to identify any criminal law any such act supposedly violates. That is no surprise: as CAIR and CAIR-Florida

---

[4] Compl., *CAIR II*, ECF No. 1; Decl. of Edward Mitchell, *CAIR II*, ECF No, 19-1; Decl. of Wilfredo Ruiz, *CAIR II*, ECF No. 19-2; Pls.' Expert Report of Jason Blazakis in *CAIR I* (served May 29, 2026) ("Blazakis Report"); Pls.' Expert Rebuttal Report of Jason Blazakis in *CAIR I* (served June 26, 2026) ("Blazakis Rebuttal Report").

[5] Under the statutory definition of "terrorist activity," a violation of the Florida Computer Crimes Act, Fla. Stat. § 815.06, which prohibits certain hacking crimes, need not be violent or dangerous to human life if it otherwise satisfies the statutory criteria for the term. The Notice does not allege any facts suggesting that CAIR or CAIR-Florida have violated the Florida Computer Crimes Act and it does not appear to be at issue here.

have each repeatedly publicly said, they condemn terrorism and are not engaged in terrorist activity at all.

Likewise, the Notice fails to identify any concrete way in which CAIR or CAIR-Florida constitutes an "ongoing threat to the security" of the state or nation. Again, that is only to be expected: neither CAIR nor CAIR-Florida poses a security threat to Florida or the United States—the very notion is absurd. Nor does the Notice explain how Florida officials reached the conclusion that any unlawful act—again, none is identified—could meet the remaining statutory prongs, i.e., that it was intended to intimidate, injure, or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of government through murder, assassination, or other violent methods. This Notice of Intent would be laughable if its consequences for the constitutional rights of two American nonprofits and their stakeholders—employees, board members, volunteers, allies, and community members—were not so dire.

Much of the purported "evidence" in the Notice is decades old, and the Notice's slippery use of the present tense to tie CAIR to the past activities of others cannot disguise how stale and irrelevant it is. For example, the Notice repeatedly alleges attenuated "ties" between CAIR and an individual who was convicted of providing material support to a federally-designated terrorist organizations years ago in the Holy Land Foundation case—Ghassan Elashi—yet it does not identify any CAIR conduct involving Mr. Elashi (or any other individual or group named in the Notice) that could meet the statutory criteria for "terrorist activity." Moreover, Mr. Elashi has not been associated with CAIR for over two decades. The Notice does not attempt to explain how these alleged "ties" to Mr. Elashi (or any other named individual or group) amount to terrorist activity, what statute they violate, or how they create an "ongoing" threat to the security of the state or country. It likewise fails to account for the fact that neither CAIR nor CAIR-Florida has ever been charged with or convicted of a crime.

The Notice relies on allegations going back to 1993—before CAIR's predecessor was founded—and the 2008 Holy Land Foundation case, asserting these indicate a connection to Hamas. As CAIR and CAIR-Florida's expert, Jason Blazakis, a former State Department official responsible for federal terrorism related designations has explained, stale allegations like these pre-date CAIR's incorporation or do not name CAIR, and document no criminal act by CAIR.[6]

Mr. Blazakis's experience in these matters is perhaps unparalleled. Over the course of his ten years of public service, he led efforts to designate multiple Hamas officials under the federal terrorist designation regime, explaining that "[a]t no time was the State Department's use of the federal designation authority . . . more aggressive in pursuing Hamas actors than under my direction."[7] Thus, the inadequacy of the Notice and the fallacies it advances may best be refuted by Mr. Blazakis's direct knowledge and experience: "Had credible, articulable evidence existed

---

[6] Blazakis Report at 16–17 (¶¶ 29–30); Blazakis Rebuttal Report at 7–10 (¶¶ 16–23).

[7] Blazakis Rebuttal Report at 11 (¶ 27).

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

SPLC FLORIDA

linking CAIR to Hamas financing, material support, or organizational coordination, that evidence would have been available to us and would have been actionable. It was not. The absence of such information across multiple decades of State Department Hamas designation activity, spanning administrations of both parties and comprehensive foreign terrorist organization reviews, is not a gap in the record. It is the record."[8]

In sum, nothing in the Notice of Intent meets the definition of "terrorist activity" under Florida law. Rather, the Notice demonstrates that Florida officials will not be deterred in targeting CAIR and CAIR-Florida in violation of their constitutional rights. CAIR and CAIR-Florida look forward to vindicating their constitutional rights in federal court.

September 25, 2026

Sincerely,

*/s/ Hina Shamsi*

Hina Shamsi
Ashley Gorski
Charles Hogle
Celin Carlo-Gonzalez
Jeffrey Stein
Natalie Smith
Patrick Toomey
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org

Daniel B. Tilley (FL Bar No. 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Shereef H. Akeel
Samuel Simkins

Scott D. McCoy (FL Bar No. 1004965)
Aaron Fleisher
Diego Soto
Mary Ella W. Simmons
**Southern Poverty Law Center**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org

Manoj S. "Sachin" Varghese
Mark L. Bailey
Kayla P. Gannon
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com

[8] Blazakis Rebuttal Report at 13 (¶ 33).

ACLU
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

SPLC FLORIDA

**Akeel & Valentine, PLC**
888 West Big Beaver Road, Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

RON DESANTIS, in his official capacity as Governor of Florida; MARK GLASS, in his official capacity as Florida Chief of Domestic Security; JAMES UTHMEIER, in his official capacity as Florida Attorney General; BLAISE INGOGLIA, in his official capacity as Florida Chief Financial Officer; WILTON SIMPSON, in his official capacity as Florida Commissioner of Agriculture; GINGER BOWDEN MADDEN, in her official capacity as State Attorney for the 1st Judicial Circuit; JACK CAMPBELL, in his official capacity as State Attorney for the 2nd Judicial Circuit; JOHN DURRETT, in his official capacity as State Attorney for the 3rd Judicial Circuit; MELISSA NELSON, in her official capacity as State Attorney for the 4th Judicial Circuit; BILL GLADSON, in his official capacity as State Attorney for the 5th Judicial Circuit; BRUCE BARTLETT, in his official capacity as State Attorney for the 6th Judicial Circuit; R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit; BRIAN KRAMER, in his official capacity as State Attorney for the 8th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit; BRIAN HAAS, in his official capacity as State Attorney for the 10th Judicial Circuit;

Case No. 4:26-cv-315

KATHERINE FERNANDEZ RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit; ED BRODSKY, in his official capacity as State Attorney for the 12th Judicial Circuit; SUSAN LOPEZ, in her official capacity as State Attorney for the 13th Judicial Circuit; LARRY BASFORD, in his official capacity as State Attorney for the 14th Judicial Circuit; ALEXCIA COX, in her official capacity as State Attorney for the 15th Judicial Circuit; DENNIS WARD, in his official capacity as State Attorney for the 16th Judicial Circuit; HAROLD PRYOR, in his official capacity as State Attorney for the 17th Judicial Circuit; WILLIAM SCHEINER, in his official capacity as State Attorney for the 18th Judicial Circuit; THOMAS BAKKEDAHL, in his official capacity as State Attorney for the 19th Judicial Circuit; and AMIRA FOX, in her official capacity as State Attorney for the 20th Judicial Circuit,

*Defendants.*

_______________________________________/

**COMPLAINT**

1. This lawsuit challenges Florida's unprecedented "domestic terrorist organization" designation regime. Enacted this year by HB 1471 and HB 1473, Florida's new regime gives state executive officials the unilateral power to designate any U.S. organization—including nonprofits engaged in First Amendment-protected advocacy—a "domestic terrorist organization," or "DTO." Designation immediately subjects the organization, its employees, and a wide range of others who associate

with it to severe criminal and civil penalties on the basis of nothing more than allegations.

2. There are practically no safeguards. Florida officials may designate an organization without giving it meaningful notice or a meaningful opportunity to challenge the designation before a neutral decisionmaker. In effect, the state's new designation regime empowers Governor DeSantis, the Chief of Domestic Security, and the Cabinet to play judge, jury, and nonprofit executioner.

3. The plaintiffs in this lawsuit are two U.S. nonprofits: CAIR, the largest Muslim civil rights organization in the country, and its state chapter, CAIR-Florida. Their shared mission, rooted in faith, is to help people understand Islam, protect civil rights, promote justice, and empower American Muslims. For decades, they have pursued this mission the same way as countless other nonprofits—by holding community events, publishing educational and advocacy materials, opining on government policies, petitioning elected officials, and providing legal advice and representation.

4. Today, CAIR and CAIR-Florida are in peril. Florida officials imminently intend to designate CAIR as a DTO under the state's new statutory regime, and they have indicated that they also consider CAIR-Florida to be a "terrorist organization." The effects of designation on CAIR and CAIR-Florida will be immediate and debilitating. In Florida, their speech will be silenced, their doors

will be shut, and they will be branded with the stigma of one of society's most infamous labels.

5. The state's impending designation has no legitimate basis. CAIR and CAIR-Florida are ordinary faith-driven corporations, organized under the laws of Florida and the District of Columbia. They are not engaged in terrorist activity. They serve, and employ, Floridians.

6. To Governor DeSantis and other Florida officials, none of that matters. These Florida officials see CAIR and CAIR-Florida's faith-driven advocacy as a dangerous threat.

7. This is wrong. And Florida's new statutory designation scheme is unconstitutional. *See* Fla. Stat. §§ 617.1420, 775.30, 775.33, 775.34, 874.03, 943.03102 (with respect to provisions concerning "domestic terrorist organizations" and together with the related provisions in Section 823.05 and Chapter 874, the "DTO regime").[1] The Constitution protects CAIR and CAIR-Florida just as much as it protects any other U.S. organization.

8. Plaintiffs challenge the DTO regime under the First Amendment and the due process clause of the Fourteenth Amendment. They seek a declaration that the DTO regime is unconstitutional, and an injunction to halt its enforcement.

[1] All statutory citations are to the 2025 Florida Statutes as amended by Laws of Florida chs. 2026-28 (HB 1471) and 2026-29 (HB 1473).

## JURISDICTION AND VENUE

9. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

10. Venue is proper in this district under 28 U.S.C. § 1391 because at least one Defendant resides here and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

11. Plaintiff CAIR-Foundation, Inc. ("CAIR" or "CAIR Foundation") is a District of Columbia nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Washington, D.C. CAIR's faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims. CAIR operates in Florida and nationwide.

12. Plaintiff CAIR Florida, Inc. ("CAIR-Florida") is a Florida nonprofit corporation and 501(c)(3) tax-exempt organization headquartered in Tampa. CAIR-Florida is an affiliated chapter of CAIR and works to advance CAIR's mission through advocacy on legal, cultural, social, nonpartisan political, and civic issues of public concern to American Muslims.

13. Defendant Ron DeSantis is the Governor of Florida. He is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102.

He is sued in his official capacity.

14. Defendant Mark Glass is Florida's Chief of Domestic Security and the executive director of the Florida Department of Law Enforcement ("FDLE"). Glass is one of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). He is sued in his official capacity.

15. Defendants James Uthmeier, Blaise Ingoglia, and Wilton Simpson are Florida's Attorney General, Chief Financial Officer, and Commissioner of Agriculture, respectively. Together they constitute the Florida Cabinet and are some of the officers charged with implementing Florida's DTO regime. Fla. Stat. § 943.03102(1)(a)1, (2)–(5). They are each sued in their official capacity (together, with Governor DeSantis and Defendant Glass, "State Executive Defendants"). Additionally, the Attorney General's Department of Legal Affairs, through the Office of Statewide Prosecution within it, has the power to investigate and bring criminal charges under the DTO regime for alleged multi-circuit crimes. Fla. Const. Art. IV, § 4(b); Fla. Stat. § 16.56.

16. Defendants Ginger Bowden Madden, Jack Campbell, John Durrett, Melissa Nelson, Bill Gladson, Bruce Bartlett, R.J. Larizza, Brian Kramer, Monique Worrell, Brian Haas, Katherine Fernandez Rundle, Ed Brodsky, Susan Lopez, Larry Basford, Alexcia Cox, Dennis Ward, Harold Pryor, William Scheiner, Thomas Bakkedahl, and Amira Fox are Florida's twenty state attorneys (together, "State

Attorney Defendants”). In those roles, they are each responsible for investigating and bringing criminal charges against persons under Florida’s DTO regime. Fla. Stat. §§ 775.30, 775.32–.34, 823.05, 874.01, *et seq.* They are each sued in their official capacity.

## FACTUAL BACKGROUND

### I. Florida’s Domestic Terrorist Organization Designation Regime

17. On April 6, 2026, Governor Ron DeSantis signed into law HB 1471 and HB 1473, sweeping legislation that establishes an unprecedented state “domestic terrorist organization” designation system. The legislation grants Florida’s executive branch extraordinary authority to label and punish groups, including nonprofit organizations engaged in First Amendment-protected advocacy, that it unilaterally deems to be security threats. The laws became effective on July 1, 2026.

18. HB 1471 and HB 1473 create a regime under which the state’s Chief of Domestic Security, Governor DeSantis, and the Florida Cabinet may designate groups as “domestic terrorist organizations,” imposing a debilitating classification and stigma without meaningful notice or a meaningful opportunity to challenge the designation before a neutral decisionmaker. A panoply of state authorities can then immediately silence and incapacitate the designated group, its employees, its members, and a wide range of others associated with the group through extraordinarily broad and severe criminal, civil, and administrative penalties.

### A. The State Designation Process

19. Under the DTO regime, an organization may be designated as a "domestic terrorist organization" if the Chief of Domestic Security finds that it meets three criteria: (1) the organization is based or operates in Florida or anywhere else in the United States; (2) the organization "is engaging in terrorist activity, as defined in" Florida Statutes § 775.30; and (3) "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)1.[2]

20. Florida Statutes § 775.30(1)(a) defines "terrorist activity" as any activity that involves either (a) "a violent act or an act dangerous to human life which is a violation of the criminal laws of [Florida] or of the United States" or (b) a violation of the Florida Computer Crimes Act, Fla. Stat. § 815.06, and that is intended to "[i]ntimidate, injure, or coerce a civilian population," "[i]nfluence the policy of a government by intimidation or coercion," or "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy."

---

[2] HB 1471 also allows the Chief of Domestic Security to designate entities as "foreign terrorist organizations" ("FTOs") if they have already been federally designated as an FTO "by the United States Secretary of State pursuant to § 219 of the Immigration and Nationality Act" and "[t]he terrorist activity of the organization is an ongoing threat to the security of [Florida] or the United States." Fla. Stat. § 943.03102(1)(a)2.

21. The Chief of Domestic Security must "provide written notice to the Governor and Cabinet of his or her intent to designate" a group as a terrorist organization. Fla. Stat. § 943.03102(2)(a). The written notice "must be accompanied by a summary of the basis for [the] designation." *Id.*

22. The Governor and Cabinet may approve or reject the designation by majority vote no earlier than "7 days after receipt of" the notice from the Chief of Domestic Security. Fla. Stat. § 943.03102(2)(d).

23. The State must also attempt to deliver the notice of intent to the organization being designated, but only if the organization has a readily discernable location and notice can be safely delivered. Fla. Stat. § 943.03102(2)(b). The DTO regime does not specify who determines whether the notice can safely be delivered or a deadline by when notice to the organization must be served. When the State does deliver notice, nothing in the statute prevents the Chief of Domestic Security from delivering the notice shortly before the Governor and Cabinet vote.

24. The DTO regime contains no meaningful pre-designation notice requirement, no evidentiary requirements, no standard of proof, and no requirement of a meaningful hearing before a neutral decisionmaker. It vests unbridled discretion in Florida's executive branch to punish, ostracize, and silence civil society organizations with which it disagrees, based on nothing more than allegations of wrongdoing.

25. In particular, the DTO regime contains no requirement that notice to the designated group include all the reasons for the designation and all the material evidence—inculpatory and exculpatory—that state decisionmakers may rely on to make or approve the designation. It does not require the State to prove or even provide evidence that the organization violated any law. It also does not specify any standard of proof to be applied in making the designation decision. Instead, the DTO regime states that the notice provided to the organization "need not" include even the "written findings" supporting the designation that must be provided to the Governor and Cabinet. *Id.* § 943.03102(2)(b)1.

26. The notice must state "the date, time, and location of any public meeting regarding the designation," and must "provide information on how to object to the designation or appeal a designation." *Id.* § 943.03102(2)(b)2–3. But the DTO regime does not require that "any public meeting" be held, or that any public meeting involve a meaningful opportunity for the group being designated to object to and challenge the designation before the Governor and Cabinet decide whether to approve it.

27. If the Governor and Cabinet choose to hold a public meeting, there is no requirement that the organization being designated receive all of the information that the State may be relying on. Although the DTO regime states that "meeting materials relating to the notice of intent" must be published in accordance with Fla.

Stat. § 120.525, it also explicitly vests unilateral discretion in the executive to restrict access to those materials on vague "state or national security" grounds, including under Florida's public records law. Fla. Stat. § 943.03102(2)(c), (g).

28. If the Governor and Cabinet approve a designation, the Chief of Domestic Security must publish notice of the designation in the Florida Administrative Register within seven days. Fla. Stat. § 943.03102(2)(e). The branding and designation of a domestic group as a "terrorist organization" is deemed effective upon publication in the Florida Administrative Register. Fla. Stat. § 775.30(1)(b). The Chief of Domestic Security also must "maintain and publish on [FDLE's] website a current list of organizations that" have been designated as DTOs. Fla. Stat. § 943.03102(1)(b).

29. After Florida officials publish the designation of the group as a "terrorist organization" in the Florida Administrative Register, the organization, or any member, may "challenge [its] designation in the circuit court of the Second Judicial Circuit in and for Leon County" within 30 days. Fla. Stat. § 943.03102(2)(f).

30. The statute's judicial review provision replicates the flaws of the executive designation process. It contains no requirement that both the designated group and the state court have access to all of the state's reasons for the terrorism designation and all the material evidence—inculpatory and exculpatory—that state decisionmakers relied on to make or approve the designation. Additionally, the state

court reviewing a designation challenge "may not compel the public disclosure of any document that is confidential or exempt under state law or that is confidential, restricted, or otherwise protected from public disclosure according to federal law." Fla. Stat. § 943.03102(2)(f).

31. The DTO regime does not specify what standard of review applies to the state court proceeding, which party bears the burden of proof, what procedures or rules apply to a designation challenge, or what evidence may be submitted by either the government or the designated party.

32. The DTO regime provides that a designated organization may petition FDLE "at any time, for the removal of [its] designation." Fla. Stat. § 943.03102(3)(a). Yet the statute fails to provide any procedures or criteria FDLE must use in considering such a petition, or on what grounds such a petition should be granted.

### B. The Draconian Consequences of Designation

33. In addition to the public stigma of being designated a "terrorist organization," the harms and consequences of designation under the DTO regime are severe. These consequences, which include harsh criminal and civil penalties for virtually any activity intended to further the group's mission or interests, impose punishment on the group *before* it even has the chance to challenge the factual and legal basis for its designation.

34. Immediately after a designation becomes effective, the designated organization—as well as its employees, officers, board members, and third parties —are subject to a staggering array of criminal, civil, and administrative penalties. In the case of a mission-driven nonprofit, these penalties effectively criminalize virtually all of the designated group's activities to advance its mission, including its speech. They also criminalize a wide array of third-party interactions with the designated group, which in turn limit the organization's ability to speak, to receive information, and to function. In short, the far-reaching and severe penalties make it impossible for the organization to continue operating.

35. Because the DTO regime imposes criminal and civil penalties for providing broadly-defined "material support" to a designated group, including a nonprofit, it may not employ directors or staff, coordinate or work with volunteers, receive or solicit donations, deposit or withdraw funds from its bank accounts, maintain or use social media accounts, retain legal counsel, lease or rent property or offices in Florida, receive telecommunications, internet, or utility services in Florida, or engage in any activity that is intended to further its organizational mission and interests. The DTO regime also imposes severe penalties under Florida's "criminal gang" statute, which subjects designated "domestic terrorist organizations" to civil and criminal liability simply for operating, effectively criminalizing their existence in Florida. As a result of the DTO regime, an organization that is designated simply

cannot function or exist in Florida in any meaningful sense.

36. **Material Support.** The DTO regime makes it a first-degree felony, punishable by up to 30 years in prison, for any person to "knowingly provide[] material support or resources to a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3).[3]

37. The term "material support or resources" is defined broadly to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, or transportation," but not "medicine or religious materials." Fla. Stat. § 775.33(1)(d).

38. A person is deemed to provide "personnel" to a designated DTO if the person "knowingly provides" or "attempts" or "conspires" to provide "himself or herself or another person to" either "[w]ork under the direction and control of" the designated DTO or "[o]rganize, manage, supervise, or otherwise direct the

[3] The material support provision states that "[i]t is the intent of the Legislature that subsections (2) and (3)," including the prohibition on providing material support and resources to a designated DTO, "be interpreted in a manner consistent with federal case law interpreting 18 U.S.C. §§ 2339A and 2339B." Fla. Stat. § 775.33(7). Sections 2339A and 2339B prohibit persons from providing material support and resources to aid in the commission of certain specified crimes and to aid federally designated FTOs.

operations of" the designated DTO. Fla. Stat. § 775.33(5)(a).

39. The term "expert advice or assistance" means "advice or assistance derived from scientific, technical, or other specialized knowledge." Fla. Stat. § 775.33(1)(c). The statute does not provide for any exception to this definition or specify that it does not apply to the provision of legal services or advice.

40. The material support provision's "knowing" requirement is satisfied if, among other things, a person has mere "knowledge that the organization" "is a designated . . . domestic terrorist organization." Fla. Stat. § 775.33(3). There is no requirement of an intent to engage in criminal conduct.

41. The statutory definition of "material support and resources" is extraordinarily broad. On its face, the material support provision threatens to punish:

a. Any designated organization's employees, officers, board members, and volunteers who serve as "personnel" to the designated organization or who provide it a "service" by engaging in work on the organization's behalf;

b. Any person, including members of the organization, or entity who donates or pays money to the designated organization, or who provides tangible goods to the designated organization (whether free or for payment);

c. Any person or entity providing any direct services to the designated organization, including banking, financial, administrative, professional, legal, management, communications, or advertising services;

d. Any person or entity providing a designated organization with indirect services, such as use of social media or speaking platforms or physical and digital data and information storage systems;

e. Any person or entity that rents or leases property to or from the designated organization;

f. Any person or entity who advises or provides specialized expert assistance, including legal, financial, or accounting assistance.

42. **Criminal Gang Prevention Act.** Under the DTO regime, a designated organization, such as a nonprofit, is also immediately deemed a "criminal gang" and thus subject to Florida's Criminal Gang Prevention Act (the "CGPA"). Fla. Stat. § 874.01, *et seq.*

43. The CGPA defines a "criminal gang" as "a formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations . . . ." Fla. Stat. § 874.03(1). It further defines "terrorist organizations" as including "[a] domestic terrorist organization whose designation as such has been published in the Florida Administrative Register in accordance with § 943.03102." *Id.* § 874.03(7)(a).

44. Florida's classification of a designated "terrorist organization" as a criminal gang under the CGPA immediately exposes the group and its employees to another layer of substantial criminal and civil penalties and immediate and irreparable harm.

45. **The designated group and its employees and members are at immediate risk of criminal prosecution, with harsh penalties, for engaging in virtually any activity intended to further the organization's mission, even if that mission is lawful**. The CGPA makes it a felony, punishable by up to life in prison, if "any person" knowingly "initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10. Under Florida law, "[t]he word 'person' includes . . . corporations." Fla. Stat. § 1.01(3). The term "criminal gang-related activity" is defined broadly to include, among other things, any "activity committed with the intent to benefit promote or further the interests of a criminal gang." Fla. Stat. § 874.03(4)(a).

46. The CGPA also makes it a felony of the third degree for "any person," "for the purpose of benefiting, promoting, or furthering the interests of" a DTO, to "use[] electronic communication . . . to advertise his or her presence in the community." Fla. Stat. § 874.11

47. Relatedly, Florida Statutes § 775.34 makes it a second-degree felony to willfully become a "member" of a DTO who "serves under the direction or control of that organization with the intent to further the illegal acts of the organization." Given the breadth of "illegal acts" under the CGPA, this provision effectively criminalizes membership activity and service to a DTO, as members work to further the organization's and its employees' "initiat[ion]" of "criminal gang-related

activity." Fla. Stat. § 775.34.

48. **The designated group is at immediate risk of real and personal property seizure and forfeiture.** Under the CGPA, "[a]ll profits, proceeds, and instrumentalities of criminal gang activity and all property used or intended or attempted to be used to facilitate the criminal activity of any criminal gang or of any criminal gang member; and all profits, proceeds, and instrumentalities of criminal gang recruitment and all property used or intended or attempted to be used to facilitate criminal gang recruitment are subject to seizure and forfeiture." Fla. Stat. § 874.08. Asset seizure and forfeiture are governed by the Florida Contraband Forfeiture Act. Fla. Stat. § 932.701, *et seq.* That Act authorizes immediate seizure of personal property and assets, and an organization whose assets have been seized may challenge the seizure only in a post-seizure hearing. Fla. Stat. § 932.703(3)(a)–(b).

49. **The designated group is at immediate risk of Florida state and private litigation to prevent it from operating and fulfilling its organizational mission**. Criminal gangs are considered *per se* public nuisances under Florida's nuisance statute. Fla. Stat. § 823.05(2)(b)–(c). Under that statute, either the government or private individuals may sue to "abate[] or enjoin[]" the criminal gang and prevent it from any "use of a location" for purposes of engaging in "criminal-gang activity," which is broadly defined to include any activity that furthers a criminal gang's interests. *Id.*

50. A designated group is also at immediate risk of civil liability for violating the far-reaching provisions of the CGPA. Fla. Stat. § 874.06(1), (2)(b) (authorizing the government and private actors to sue criminal gangs for CGPA violations).

51. Under the DTO regime, designated groups, their employees, board members, volunteers, and others who associate with them face even further consequences, beyond the material support prohibitions and the CGPA.

52. **Prohibition on State Contracts and Funding.** Once the designation of the domestic group has been published in the Florida Administrative Register, no "state agency, political subdivision, or public school district authorized to expend state-appropriated funds or levy ad valorem taxes" may "[e]xpend such funds or taxes to support a . . . domestic terrorist organization, or a member of such organization." Fla. Stat. § 943.03102(4)(a). Nor may any of these state and municipal entities "[c]ontract with . . . a domestic terrorist organization"; nor may they "[a]ccept any funds from a . . . domestic terrorist organization, or a member of such organization," with narrow exceptions. *Id.* § 943.03102(4)(b)–(c).

53. **Dissolution.** The Florida Department of State "may commence" an administrative proceeding "to administratively dissolve" any corporation that "has been designated as a domestic terrorist organization," after "any timely judicial challenge . . . has been resolved." Fla. Stat. § 617.1420. A dissolved corporation

"may not conduct any affairs except that necessary to wind up," including liquidating or distributing its assets. Fla. Stat. § 617.1421(3).

54. **Other Penalties for Supporting Designated Organizations.** In addition to the above penalties, Florida law imposes significant consequences on other third parties that engage in a broad range of other kinds of support to designated organizations, including students and advocacy groups. Among other things, Florida law prohibits certain private schools from contracting with people "affiliated with" a designated DTO, Fla. Stat. § 1002.421(1)(t), and restricts public school spending on activities that "[p]romote" any person or entity who has provided material support to a designated DTO, Fla. Stat. § 1003.035.

## II. CAIR and CAIR-Florida

55. CAIR is the United States's largest Muslim civil rights and advocacy organization.[4] Its faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment. CAIR pursues its mission nationwide, working in coordination with affiliate chapters in multiple states, including CAIR-Florida. CAIR has three employees who live in Florida and perform remote work for CAIR on national and interstate matters; all three work at the managerial or executive level. Two members

[4] CAIR was established in 2005. Its predecessor organization was founded in 1994.

of CAIR's Board also live in Florida, including the Board Chair. Both work remotely from Florida on CAIR Foundation matters, including matters relating to CAIR's work in Florida.

56. CAIR-Florida is an affiliated chapter of CAIR. Like CAIR, CAIR-Florida's faith-driven mission is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. In association with CAIR, CAIR-Florida engages in advocacy, education, and civic participation in Florida. CAIR-Florida operates statewide, with offices located in Tampa and Sunrise. It has six board members, all of whom are based in Florida; twelve staff members, eleven of whom are based in Florida; and four paid interns, all of whom are based in Florida. It also works with eight contractors, seven of whom are based in Florida, and two subcontractors, who are not based in Florida.

57. CAIR and its more than 20 affiliated chapters, including CAIR-Florida, work to advance CAIR's mission through advocacy on legal, cultural, social, policy, and civic issues of public concern to American Muslims. In doing so, CAIR and CAIR-Florida seek to promote religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States. Their advocacy includes legal action in state and federal courts, and public policy advocacy, training, education, community organizing, interfaith commentary, and public commentary directed at federal, state

and local executive and legislative government officials and the public.

58. CAIR and CAIR-Florida are active in furthering their mission throughout Florida and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence.

59. As part of their public education and advocacy efforts, employees of CAIR and CAIR-Florida regularly appear on and are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern. These nonprofits regularly issue press releases and action alerts and hold press conferences as a part of their advocacy and in furtherance of their mission. In addition, Plaintiffs regularly post on social media outlets, like X, Instagram, and Facebook, to communicate with the public and with government officials as part of their advocacy efforts. Plaintiffs, through their employees, use electronic communications to let people know about their presence in the community as a resource for information and legal services. These nonprofits also regularly engage in meetings with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public as part of their advocacy efforts. CAIR and CAIR-Florida engage in these activities in support of their advocacy efforts individually or jointly, and in some instances CAIR-Florida may do so alone but on behalf of itself and CAIR.

60. CAIR and CAIR-Florida's staff and board members have chosen to

work for the organizations and serve on their boards, respectively, because they believe in, and wish to contribute to, the organizations' policy, religious, and civil rights advocacy, including through their provision of specialized skills and speech to the organizations.

**A. CAIR's and CAIR-Florida's Faith-Based Speech and Advocacy**

61. In furtherance of their missions, CAIR and CAIR-Florida engage in speech to educate, empower, and defend Muslim Americans on matters of public concern.

62. For example, CAIR and CAIR-Florida create and disseminate Know Your Rights materials for Muslims who face discrimination in the workplace and at elementary, secondary, and post-secondary schools. CAIR also creates and disseminates guides for Muslims who are traveling, and for those who are approached by law enforcement.

63. CAIR-Florida visits mosques in Florida to educate Muslims about their rights.

64. CAIR advocates for civil rights by providing legal representation and legal advocacy through its Legal Defense Fund. CAIR receives intakes and also represents clients from across the country, including from Florida, in litigation seeking to vindicate legal and constitutional rights. CAIR currently jointly represents several Florida residents alongside CAIR-Florida in litigation outside of Florida.

65. CAIR-Florida provides a range of pro bono legal services to Florida residents, including those who have suffered government and workplace discrimination in violation of their civil rights and those navigating the immigration system. CAIR-Florida attorneys maintain a substantial immigration docket, representing clients in Miami and Orlando immigration courts as well as in interactions with U.S. Citizenship and Immigration Services. CAIR-Florida also represents multiple clients across several cases related to discrimination, including cases currently pending before the Equal Employment Opportunity Commission. In addition, CAIR-Florida jointly represents several Florida residents alongside CAIR in out-of-state proceedings.

66. During Ramadan, the holiest and most important month of the year for Muslims, CAIR and CAIR-Florida create specialized programing that includes how to request accommodations at work and at school. CAIR-Florida also contacts Florida correctional facilities to remind them of their duty under federal and state law not to curtail the rights of Muslims in their custody.

67. CAIR and CAIR-Florida empower and educate Muslims to be civically engaged through participation in the democratic process. CAIR hosts Muslim Hill Day at the U.S. Capitol, which brings Muslims from across the country, including from Florida, to engage in advocacy with their members of Congress. In 2026, representatives from CAIR-Florida participated in the event.

68. CAIR-Florida hosts its own Muslim Day at the state Capitol in Tallahassee, Florida. CAIR-Florida's 2026 Muslim Day addressed issues such as free speech and legislation directly harming Muslim American communities; it culminated in the passage of House Resolution 8001, which celebrated the contributions of Florida's Muslim American community and recognized February 2026 as "Muslim American Heritage Month."

69. CAIR and CAIR-Florida also encourage eligible American Muslims to register to vote and to exercise their right to vote through nonpartisan voter education and registration activities. For example, CAIR routinely participates in and supports National Muslim Voter Registration Day.

70. CAIR and CAIR-Florida's advocacy and public education also include participation in interfaith organizations and associations. CAIR and CAIR-Florida engage with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to dispel and counter false stereotypes, prejudices, disinformation, and misinterpretations of Islamic tenets, including with respect to Sharia, which is frequently invoked in political discourse.

71. As part of this work, CAIR and CAIR-Florida frequently counter disinformation about the nature of Sharia and its role in the lives of American Muslims. CAIR's public materials explain that Sharia is not a threat; instead, it is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of

faith in furtherance of values like honesty, service, and community, which they share with other Americans. CAIR and CAIR-Florida note that Sharia requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws, and that it guides ordinary people toward honesty, service, and community.

72. In 2025, CAIR and CAIR-Florida publicly opposed HB 119, commonly referred to as the "No Shari'a Act," much of which the Legislature eventually incorporated into HB 1471. CAIR-Florida publicly and sharply criticized Governor DeSantis's statements in support of the bill.

73. CAIR and CAIR-Florida's advocacy, public education, community outreach, and civil rights work depend on their employees. They also rely on ongoing association, interaction, and coordination with other faith- and non-faith-based groups, businesses, and the public as an essential predicate to engaging in protected speech, association, and petitioning activity.

### B. CAIR's and CAIR-Florida's Lawful Advocacy for Palestinian Human Rights

74. In furtherance of their missions to promote civil rights and justice, CAIR and CAIR-Florida engage in public speech, expressive association, advocacy, and litigation in support of Palestinian human rights, and in defense of the First Amendment rights of individuals and organizations advocating for Palestinian

human rights.

75. For example, CAIR's and CAIR-Florida's work includes direct legal representation of, and advocacy for, Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, including by Governor DeSantis, based on their speech, association, and viewpoints in support of Palestinian human rights.

76. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP student organization at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-281 (N.D. Fla. 2023).

77. Beyond the SJP litigation, CAIR and CAIR-Florida have played a leading role in defending the civil rights of individuals and organizations advocating for Palestinian human rights, including by challenging governmental actions, institutional bans, and discriminatory enforcement arising from criticism of Israeli government conduct.

78. For example, CAIR and CAIR-Florida engaged in an advocacy campaign to bring back Mohammed Ibrahim—a 16-year-old U.S. citizen from Florida—who has been unjustly detained by Israel since February 2025. Part of the campaign included CAIR joining an August 2025 letter with more than 100 U.S.

faith-based, human rights, and civil rights organizations to U.S. Secretary of State Marco Rubio calling for diplomatic action to secure Mohammed's release.

79. CAIR and CAIR-Florida also issued a March 2025 public statement condemning the Miami Beach mayor's effort to prevent a movie theater from showing an Oscar-winning Palestinian documentary based on its viewpoint.

80. In April 2025, CAIR sent a letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers. CAIR also issued a February 2025 press release opposing President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and "own it."

81. CAIR-Florida often petitions state officials through established legal processes to seek accountability for crimes targeting individuals based on their support for Palestinian human rights. For example, in March 2025, CAIR-Florida issued a press release and action alert urging Floridians to request that State Attorney Amira Fox pursue hate crime charges in connection with vandalism targeting pro-Palestine speech.

82. CAIR and CAIR-Florida have condemned and publicly advocated against U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR and CAIR-Florida have also condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

### C. CAIR and CAIR-Florida Do Not Engage in or Support Terrorist Activity

83. Through public education and advocacy, CAIR and its affiliates, including CAIR-Florida, address and oppose narratives that portray Islam or American Muslims with false stereotypes, such as being inherently prone to violence, authoritarianism, religious intolerance, antisemitism, or extremism. Working in association with other faith-based and civil rights organizations, CAIR and CAIR-Florida strive to build a vibrant constitutional democracy where people of all religious traditions can thrive.

84. CAIR and CAIR-Florida have never been charged with, let alone convicted of, a crime. Nor have CAIR or CAIR-Florida ever been designated by the federal government under its terrorism sanctions and designation regime.

85. CAIR and CAIR-Florida do not engage in or support terrorist activity, as they have repeatedly stated. Indeed, ISIS, a federally designated Foreign Terrorist Organization, once threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

## III. State Executive Defendants Intend to Use the DTO Regime to Punish Organizations Whose Advocacy and Ideology They Disagree with, Including CAIR and CAIR-Florida.

86. Florida officials, including Governor DeSantis and Cabinet members, have made clear that they intend to use the DTO regime to target and punish their perceived political enemies and those whose speech they disfavor, including U.S.

Muslims and organizations, such as CAIR and CAIR-Florida, that engage in civil rights advocacy on their behalf. They have specifically named CAIR as an entity that they intend to designate.

87. Governor DeSantis's and Cabinet members' hostility toward CAIR and CAIR-Florida's speech and advocacy has been public and persistent. Over the past several years, Florida officials have repeatedly attacked Muslim civil rights advocacy, including advocacy defending freedom of expression and religion. More recently, Governor DeSantis and Cabinet members have expressed increased hostility towards Muslim religious practices, falsely characterizing the Muslim religious tenets of Sharia as a threat. In fact, Sharia is not a unitary, codified legal system but a personal moral and spiritual framework that guides Muslims in their daily lives. By characterizing Sharia as a threat, Governor DeSantis and Cabinet members have made clear that observant Muslims and Muslim organizations, such as Plaintiffs, are not welcome in Florida.

88. Because CAIR and CAIR-Florida are not engaged in terrorist activity of any kind, the State Executive Defendants' only basis for designating CAIR and CAIR-Florida under the DTO regime is their hostility towards both organizations' religious missions and political advocacy. Governor DeSantis, the Chief of Domestic Security (who, as FDLE's executive director, is appointed by the Governor and

Cabinet and serves at their pleasure), and the Cabinet speak with one voice on this issue: they *will* make Plaintiffs' designation effective.

### A. Governor DeSantis's and the Cabinet's Hostility Toward Islamic Religious Practices and Muslim Civil Rights Advocacy, Including Advocacy by CAIR and CAIR-Florida

89. Since at least 2023, Florida officials, including Governor DeSantis and the Cabinet, have expressed hostility towards Islamic religious practices and Muslim civil rights advocacy. Plaintiffs' advocacy for Palestinian human rights, their speech explaining that Sharia is a moral and spiritual framework that is consistent with American values and countering disinformation about it, and their opposition to State efforts to restrict freedom of expression have placed Plaintiffs in direct and public conflict with Governor DeSantis and the Cabinet. Likewise, CAIR and CAIR-Florida's advocacy against Islamophobia and anti-Muslim discrimination have placed them in direct and public conflict with Governor DeSantis and Cabinet members, and positions they have taken regarding Muslim civil rights, religious freedom, and religious tolerance. Their hostility toward Plaintiffs' religious views, speech, and advocacy continues today.

***Hostility to Palestinian Human Rights***

90. In October 2023, Governor DeSantis publicly stated that the United States should not accept Palestinian refugees from Gaza because they were "all antisemitic." That same month, Florida officials issued a memorandum ordering the

deactivation of SJP chapters in the Florida State University System. The directive was issued by the Chancellor of the State University System in consultation with Governor DeSantis, who previously had publicly called for the student groups to be banned. As noted above, CAIR and CAIR-Florida brought a suit against Florida officials, including Governor DeSantis, challenging the directive as unconstitutional.

91. In November 2023, CFO Ingoglia, in his previous role as a state senator, introduced SB 470, a bill designed to strip postsecondary education benefits from students who were found to "promote[] a foreign terrorist organization." He introduced the bill in the wake of pro-Palestinian protests on Florida university campuses in 2023.

92. In January 2024, Governor DeSantis's presidential campaign website referred to his efforts to deactivate SJP chapters. Specifically, he stated that his administration had "directed Florida universities to enforce the law and terminate student chapters, such as National Students for Justice in Palestine (National SJP) . . . that support Hamas' terrorism." Consistent with these statements, Governor DeSantis publicly called for SJP chapters at Florida universities to be banned based on their expressive activity and viewpoints.

***Hostility to Islam and to Plaintiffs' Speech about Islam and Sharia***

93. Florida officials, including Governor DeSantis and the Cabinet, have demonstrated hostility to Islam, to Plaintiffs' speech about Islam, and to Plaintiffs'

speech about Sharia in particular. CAIR's public materials explain that Sharia is not a threat; instead, it is a moral and spiritual framework that guides Muslims' ordinary, personal exercise of faith in furtherance of values like honesty, service, and community, which they share with other Americans. In its educational materials, CAIR explains that when Muslims pray to God five times a day, donate to charity, fast in Ramadan, or speak up against injustice, among many other practices, they are observing Sharia—just as Jews observe Halakha and Catholics abide by canon law. Yet Florida officials, including Governor DeSantis and the Cabinet, have sought to falsely portray Sharia as a dire threat to Floridians that must be suppressed.

94. In November 2023, during a nationally televised presidential debate, Governor DeSantis referred to efforts to combat Islamophobia as addressing "so-called Islamophobia" and stated that harassment of Muslims in the United States was not a real issue. That is false, as CAIR has explained in its public advocacy materials.

95. On October 8, 2025, in a post on X (formerly known as Twitter), Governor DeSantis endorsed HB 119 (the "No Shari'a Act"), which had been filed that same day. HB 119's sponsor, Representative Hillary Cassel (who also sponsored HB 1471 and HB 1473), stated that "Sharia law is incompatible with our values and our principles here in the United States."

96. On October 14, 2025, CAIR and CAIR-Florida in a joint press release publicly opposed the "No Shari'a Act" and Governor DeSantis's endorsement of it.

In that release, both organizations sharply criticized Governor DeSantis's support for the bill, including by characterizing HB 119 as a discriminatory and anti-Muslim measure, condemning Governor DeSantis's endorsement as harmful to religious freedom, and calling on Florida lawmakers and the public to reject the bill. The release expressly criticized Governor DeSantis personally and politically, challenged his priorities and leadership, and urged continued public opposition.[5]

97. According to an October 27, 2025 Florida Phoenix article, all three members of the Cabinet—Attorney General Uthmeier, CFO Ingoglia, and Commissioner Simpson—questioned the legality of "steer[ing] taxpayer-funded scholarships to private Islamic schools that they contend undermine 'Western' values." Their criticisms rested on the schools' alleged connection to Sharia law. For example, Uthmeier stated that "Sharia law seeks to destroy and supplant the pillars of our republican form of government and is incompatible with the Western tradition." Simpson amplified Uthmeier's post on X. Ingoglia also announced that he was "looking into" a basis to conduct an audit against the schools.

98. However, as Plaintiffs explain in their public advocacy, Governor DeSantis's and the Cabinet's assertions rest on false stereotypes about Islam and

---

[5] CAIR & CAIR-Florida Press Release (Oct. 14, 2025) (describing HB 119 as "disgraceful and bigoted," rooted in "lies, fearmongering, and political distraction," calling Governor DeSantis's endorsement "political cowardice and moral failure," and urging public opposition).

Sharia. In particular, Plaintiffs have emphasized that Sharia requires Muslims to comply with the laws of the country in which they reside.

99. On December 1, 2025, through a post on X, Governor DeSantis shared a Fox News article about the death of a Muslim woman in the Netherlands, which suggested that her family allegedly targeted her for not wearing a hijab (or headscarf). Governor DeSantis's comment accompanying the article was, "The wages of sharia…," despite the article itself not referencing Sharia. As CAIR has explained in its public educational materials, Islam does not allow honor killings.

100. In March 2026, as part of HB 1471, the Legislature passed a prohibition on the judicial application of religious law and what it refers to as Sharia law in particular. *See* Fla. Stat. § 2.05. No other religious law was identified by name in the bill, and Governor DeSantis publicly championed the legislation as an "anti-Sharia" law.

101. On April 6, 2026, at a press conference held after Governor DeSantis signed HB 1471, he stood behind a podium bearing a "no" symbol superimposed over the words "SHARIA LAW"—reflecting Islamophobia, hostility to Plaintiffs' views, and opposition to the values of religious freedom and tolerance advocated by Plaintiffs. Months earlier, on December 8, 2025, Governor DeSantis explicitly tied CAIR to a Sharia threat, saying that the Legislature was working "to stop the creep of Sharia law, and I hope that they codify these protections for Floridians against

Case 4:26-cv-00521-AW-MJF Document 1 Filed 07/01/26 Page 36 of 49

CAIR and the Muslim Brotherhood in their legislation." On June 16, 2026, he described the bill as an "anti-Sharia bill . . . that allows law enforcement to identify and then we can ratify, the Governor and the Cabinet, designated terror organizations," such as the "Council of [sic] American Islamic Relations."

102. Attorney General Uthmeier has also made clear that practicing Muslims are not welcome in Florida. Appearing on Newsmax on April 8, 2026, Uthmeier said that he viewed HB 1471 as a response to "a surge of Muslims in this country that are pushing Sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." Even if "we're not Dearborn, Michigan," he said—referring to the American city with the largest share of Muslim residents—"it's important here for us to always be proactive."

103. Governor DeSantis and the Cabinet have knowledge of, disagree with, disapprove of, and are hostile to Plaintiffs' religious views and advocacy for religious freedom and tolerance; Plaintiffs' efforts to educate the public on the meaning of Sharia and its compatibility with American values; Plaintiffs' pro-Palestinian political advocacy; and Plaintiffs' public expression and dissemination of those views through speech, association, and petitioning activity. Governor DeSantis and Cabinet members have further demonstrated this hostility through the promulgation of Executive Order 25-244, their endorsement of the DTO regime, and their related

Case 4:26-cv-00021-MW-MJF Document 1 Filed 01/02/26 Page 37 of 46

statements targeting Plaintiffs' speech and advocacy, as discussed below. Those statements make clear that Governor DeSantis, the Chief of Domestic Security (who, as FDLE's executive director, is appointed by the Governor and Cabinet and serves at their pleasure), and the Cabinet speak with one voice on this issue: they *will* make Plaintiffs' designation effective.

**B. Executive Order 25-244**

104. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, titled "Protecting Floridians from Radical Islamic Terrorist Organizations."

105. In a post on X the same day, Governor DeSantis announced that "Florida is designating the Muslim Brotherhood and the Council on American-Islamic Relations (CAIR) as foreign terrorist organizations. Florida agencies are hereby directed to undertake all lawful measures to prevent unlawful activities by these organizations, including denying privileges or resources to anyone providing material support."

106. The Executive Order purported to designate CAIR as a "terrorist organization," as defined in Fla. Stat. § 874.03, and to impose sweeping consequences on CAIR and those who had provided it "material support."

107. For example, the Executive Order prohibited CAIR, solely based on its supposed designation, from receiving any contract, employment, funds, or other benefit or privilege from any county or municipality, as well as all state executive

and cabinet agencies (except FDLE and the Florida Highway Patrol) and all the entities regulated by them. The Executive Order claimed to impose these restrictions not only on CAIR but also on any person "known to have provided material support or resources to" CAIR.

108. The Executive Order cited four allegations as supposedly justifying its designation of CAIR: (1) CAIR was founded by the "Palestine Committee" in 1994; (2) in the words of unspecified "persons affiliated with CAIR," CAIR was "founded by persons connected to the Muslim Brotherhood" as "an official U.S. cover" to "conceal ties to Islamic extremist groups"; (3) CAIR was named as an unindicted coconspirator (but never charged) in a terrorism-financing case involving the Holy Land Foundation that concluded nearly two decades ago; and (4) "individuals associated with CAIR have been convicted of providing, and conspiring to provide, material support to designated terrorist organizations."

109. The Executive Order failed to identify a single violent or dangerous act allegedly committed by CAIR.

110. The Executive Order failed to acknowledge that CAIR has never been charged with or convicted of any crime, let alone one related to terrorism.

111. The Executive Order failed to acknowledge that a federal court ruled that CAIR's public naming as an unindicted coconspirator in the Holy Land Foundation prosecution violated its Fifth Amendment rights because it was

"unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion" and "[n]either CAIR nor the other unindicted co-conspirators ha[d] been charged with a crime and" so "ha[d] no judicial forum in which to defend against the accusation." *United States v. Holy Land Found. for Relief & Dev.*, 2009 WL 10680203, at *5 (N.D. Tex. July 1, 2009), *aff'd in part, rev'd in part on other grounds*, 624 F.3d 685 (5th Cir. 2010).

112. The Executive Order's purported justification for designating CAIR as a "terrorist organization" relies entirely on guilt-by-association allegations.

113. The Executive Order's purported designation of CAIR as a terrorist organization within the meaning of Fla. Stat. § 874.03 lacks a factual basis. CAIR has not engaged in and does not engage in "terrorism" or "terrorist activity."

114. The allegations asserted against CAIR in Executive Order 25-244 could not justify criminal charges, much less a criminal conviction, of any state or federal terrorism or terrorism-financing laws. Indeed, despite accusing CAIR of engaging in criminal conduct and falsely labeling it as a "terrorist organization," Defendants have not sought to charge CAIR with a crime—nor could they, in good faith.

115. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their constitutional rights under the First and Fourteenth Amendments. *CAIR-Found., Inc. v. DeSantis*, No. 4:25-cv-516

(N.D. Fla.). On March 4, 2026, the district court preliminarily enjoined enforcement of the Executive Order against CAIR, holding that CAIR was likely to succeed in establishing that the Executive Order impermissibly attempted to coerce third parties into suppressing CAIR's speech, in violation of the First Amendment. *CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1279 (N.D. Fla. 2026) ("Defendant [DeSantis]'s EO amounts to unconstitutional First Amendment coercion and Defendant has provided nothing to overcome the presumption of unconstitutionality.").

116. Governor DeSantis also has publicly revealed that, in addition to punishing CAIR and CAIR-Florida for their protected speech and advocacy, one of the purposes of the Executive Order was to obtain and access CAIR's financial records and internal information through discovery in a lawsuit by CAIR challenging the Executive Order. For example, after CAIR announced its intent to respond to the Executive Order, Governor DeSantis posted on X that "I look forward to discovery — especially the CAIR finances. Should be illuminating!"

117. On December 9, 2025, when asked by reporters about Plaintiffs' anticipated lawsuit, Governor DeSantis again stated that he welcomed the litigation not to defend the Executive Order's legality, but because it would allow the State to obtain CAIR's financial records through discovery. He repeatedly emphasized that CAIR's finances were, in his view, "really significant." He also asserted that "a lot

of it is financial" and expressed that a lawsuit would enable the State to "get a lot of information" it does not have and otherwise could not obtain.

118. Governor DeSantis's public statements and actions confirm that the Executive Order was issued for retaliatory and improper purposes: to penalize Plaintiffs because he disapproves of the content and viewpoint of their religious and pro-Palestinian advocacy; to chill and deter constitutionally protected speech, association, and petitioning activity; to coerce third parties into suppressing Plaintiffs' advocacy by deterring them from associating or cooperating with Plaintiffs; to impair the exercise of Plaintiffs' other constitutional rights; and to attempt to justify intrusive government surveillance and investigation of Plaintiffs that would be otherwise improper and unavailable to Defendants and the State.

119. Governor DeSantis's public statements and actions further establish that he has pre-judged the decision regarding CAIR and CAIR-Florida's designations under the DTO regime and intends to approve them.

### C. The State Executive Defendants' Intent to Use the DTO Regime to Punish Plaintiffs for their Speech and Religious Advocacy

120. On April 6, 2026—after the Executive Order was preliminarily enjoined as unconstitutional—Governor DeSantis signed HB 1471 and HB 1473 into law, establishing the DTO regime. Statements from legislators who supported the bills make clear that, in creating the DTO regime, the Legislature intended to endorse

Governor DeSantis's actions and Executive Order targeting Plaintiffs while adding a veneer of process and even harsher punishments. For example, Representative Cassel, the bills' sponsor, explained that she supported the Executive Order designating CAIR and the Muslim Brotherhood as terrorist organizations. HB 1471, in her view, would "create a due process"—albeit "not a judicial process"—"for these organizations" to be designated.[6] Similarly, Senator Erin Grall, the sponsor of the companion Senate bill, characterized it as "seek[ing] to bring a process" to Governor DeSantis's Executive Order designations.[7] Senator Grall also acknowledged that, in light of the preliminary injunction, "there's an open question about what our governor will be able to do through executive order."[8]

121. In the weeks leading up to the passage of HB 1471 and HB 1473, and in the months afterward, Governor DeSantis's and Cabinet members' public statements demonstrate that they view the DTO regime's components as a means to target groups whose viewpoints they disfavor, including CAIR and CAIR-Florida.

122. Governor DeSantis and Attorney General Uthmeier's public statements further confirm that they have pre-judged CAIR and CAIR-Florida as

---

[6] *Fla. H. Judiciary Comm.*, 2:28:55–29:16 (Feb. 26, 2026) (statement of Rep. Cassel) https://www.flhouse.gov/VideoPlayer.aspx?eventID=11180.

[7] *Fla. S. Judiciary Comm.*, 1:25:08–25:25 (Feb. 3, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6080.

[8] *Fla. S. Session*, 3:26:43–27:04 (Mar. 5, 2026) (statement of Sen. Grall), https://www.flsenate.gov/media/VideoPlayer/6273.

"terrorist organizations" and intend to approve their designations.

123. On December 8, 2025, the same day he signed the Executive Order, Governor DeSantis foreshadowed Florida's DTO regime, making clear that he intended it to reinforce his designation of CAIR under the Executive Order and tying the organization to a Sharia "threat." In a post on X, he remarked, "Members of the FL Legislature are crafting legislation to stop the creep of sharia law, and I hope that they codify these protections for Floridians against CAIR and the Muslim Brotherhood in their legislation."

124. What Governor DeSantis did not publicly disclose is that, according to emails obtained by the Miami Herald, his office had produced the original draft of SB 1632, HB 1471's Senate companion, which proposed the creation of the DTO designation regime.

125. In January 2026, through an X post, Florida Attorney General James Uthmeier put the city commission of Coral Springs, Florida, "on notice" that "state and local resources cannot be used by any organization affiliated with CAIR." Following Attorney General Uthmeier's post, the South Florida Muslim Federation dissociated from CAIR-Florida, which had been a member of the Federation since its inception. CAIR-Florida was unable to take part in the Federation's annual conference in Coral Springs, of which CAIR-Florida had been a sponsor. CAIR-

Florida employees were also forced to withdraw from planned participation in multiple conference panels.

126. On February 1, 2026, Uthmeier publicly commented on CAIR's designation under the Executive Order, posting: "In Florida, we take action! We will always oppose terrorist organizations. Thanks to [Governor DeSantis] for designating CAIR and the Muslim Brotherhood as foreign terrorist organizations under state law."

127. One day later, Uthmeier "requested law enforcement to be on heightened alert for any possible security threats" related to CAIR's appearance at Muslim Day at the Florida Capitol, an annual civic engagement event. He wrote on X: "CAIR, a designated foreign terrorist organization under state law, has called for a presence around the Florida Capitol today . . . [T]errorist organizations are barred from using any and all state resources, and we expect the governor's executive order to be upheld."

128. Even after the Executive Order was preliminarily enjoined, Governor DeSantis has continued to refer to CAIR publicly as a designated terrorist organization.

129. At Governor DeSantis's April 6, 2026, press conference on HB 1471, Governor DeSantis referenced CAIR's supposed designation as a foreign terrorist organization under the Executive Order and reiterated that "CAIR was an unindicted

coconspirator in the largest terror financing trial in American history, the Holy Land Foundation"—repeating the Executive Order's misleading justification for CAIR's designation. Governor DeSantis also suggested that CAIR's affiliates should not benefit from public funds: "If there's a school that's allied with CAIR, should you have any of your money going to things like that?"

130. At the same event, Lieutenant Governor Jay Collins acknowledged that HB 1471 and 1473 are designed to discriminate on the basis of ideology: "[W]e will designate, defund, and dissolve people who don't stand for our values," Collins said. "To the ACLU, Equality Florida, CAIR and others who scream overreach because this law cuts off taxpayer cash to groups aligned with ideologies that are not commensurate or consistent with our Constitution and way of life, I hope you never have to hear screams of women, children and innocent."

131. In an April 6, 2026, post on X announcing his signing of HB 1471, Governor DeSantis shared a graphic with the header, "BANNING SHARIA LAW." Underneath the header, the text identified CAIR's designation under the Executive Order as part of "Florida's record" on the issues the law was meant to advance. Reposting the graphic from his personal X account, Governor DeSantis echoed his December 9, 2025, post that anticipated legislative ratification of CAIR's designation: "We have a responsibility to defend and reinvigorate Western Civilization and that means protecting against creeping sharia in all its forms."

132. During an April 7, 2026, interview with Sean Hannity on Fox News, Governor DeSantis described HB 1471 as a solution to "the broader issue of not allowing Islamist groups to get public money from things in Florida." He framed the purpose of the DTO regime as "identify[ing] groups that are supporting these [Islamist] organizations" so as not to spend "one cent for jihad."

133. On April 8, 2026, Attorney General Uthmeier discussed HB 1471 during a Newsmax interview. As justification for the law, he stated, "[I]t's important here for us . . . to recognize that we do have a surge of Muslims in this country that are pushing sharia law, trying to influence our kids, and trying to educate the undermining of our republican ideals, trying to attack western civilization." With respect to the DTO regime, Attorney General Uthmeier claimed:

> We have heard reports of different Islamic groups working with foreign terrorist organizations and trying to build communities and infiltrate schools here in the state of Florida, especially in the Tampa area. . . . [W]e're going to investigate and where the state identifies that nonprofit groups and schools might be tied to terrorist organizations, we're going to shut down their opportunity to get many privileges here in the state of Florida.

134. At an April 24, 2026, press conference discussing HB 1471 and 1473, Governor DeSantis affirmed that the bills will target and apply to CAIR. Governor DeSantis stated that he "had signed some very important legislation recently banning any imposition of Sharia law," and "we're not doing that—no use of state funds to go to any entity that is affiliated with groups like CAIR or the Muslim Brotherhood.

We have designated them as foreign terrorist organizations."

135. On April 6, 2026, and again on June 16, 2026, Governor DeSantis publicly confirmed that he intended to ensure that CAIR would be designated once the DTO regime goes into effect on July 1, 2026. In June, he stated:

> I signed the . . . anti-Sharia bill earlier this year that allows law enforcement to identify and then we can ratify, the governor and cabinet, designated terror organizations. And so you have some of these like the Muslim Brotherhood, the Council of [sic] American Islamic Relations, like that, no doubt . . . we'll be doing that after July 1 when that legislation takes effect.

136. As Governor DeSantis's statements make plain, he, the Chief of Domestic Security, and the Cabinet speak with one voice on this issue: they treat Plaintiffs as enemies on the basis of their protected speech and advocacy, conflate Plaintiffs with a Sharia "threat," and intend to designate Plaintiffs as domestic terrorist organizations now that the DTO regime has taken effect.

## IV. CAIR and CAIR-Florida's Impending Designation Under the DTO Regime

137. On July 1, 2026, Governor DeSantis's office issued a press release in which he "announced the intent to designate" three "organizations" under HB 1471, including the "Council on American-Islamic Relations (CAIR)." "Upon confirmation by the Florida Cabinet," said the press release, "these designations will carry the full force of state law. State and local governments will be prohibited from providing taxpayer funding, contracts, or other public support to designated

organizations. Public colleges, universities, school districts, and other publicly funded institutions will be prohibited from using public resources to support or promote designated organizations. Organizations designated under Florida law may also be subject to dissolution as provided by statute, and individuals who knowingly provide material support or resources to designated organizations will face criminal penalties established under Florida law."

138. That same day, Governor DeSantis held a press conference with other Florida executive officials regarding the DTO regime.

139. During the press conference, Governor DeSantis noted that he had designated CAIR as a "terror organization" under the Executive Order. He then explained, referring to the DTO regime, "We did need to have more of a legal structure to be able to add teeth to these designations, and the Legislature responded, and I signed that legislation earlier this year." The purpose of the DTO regime, the Governor said, was to "prevent any creep of Sharia law" and "put the state on the offense against terrorist organizations," which "span a variety of ideologies."

140. "We're going to move forward," Governor DeSantis said, "and we're going to make sure that we're very robust in doing this." He added, "My office and the Cabinet are poised to officially designate the first slew of terrorist organizations under the new law."

141. The forthcoming designations, the Governor said, would constitute "a

reaffirmation of my prior executive order for the Muslim Brotherhood and the Council of [sic] American-Islamic Relations."

142. The Governor noted that designation under the DTO regime "requires ratification by the Cabinet," and he promised to "get that done very, very quickly." "We don't have a regularly scheduled cabinet meeting in July," said the Governor, "but I think we're going to be able to . . . jump on a call and do an emergency meeting to be able to ratify this, and then, you know, off to the races."

143. On July 1, 2026, at approximately 10 a.m., Plaintiffs' counsel contacted attorneys from the Florida Attorney General's Office who represent Governor DeSantis in the pending litigation over Executive Order 25-244. Plaintiffs' counsel asked that, if the government intended to issue a notice to designate CAIR or CAIR-Florida, that the notice be provided to counsel by email. As of the time of filing this complaint, Plaintiffs' counsel had not received a response to their request.

144. On July 1, 2026, at 2:48 p.m., Governor DeSantis posted a graphic on X. "Today," the graphic said, "Governor DeSantis announced the first terrorist organization designations under Florida law. The notices of intent include: Council on American-Islamic Relations (CAIR) . . . ."

145. In discovery in *CAIR-Foundation, Inc. v. DeSantis,* No. 4:25-cv-516-MW/MJF (filed December 15, 2025), Governor DeSantis admitted that he also considers CAIR-Florida a "terrorist organization." Accordingly, there is a substantial

risk that CAIR-Florida will imminently be designated as well, and there is a substantial risk that CAIR-Florida, its staff, board members, supporters, and other third parties will be subject to the DTO regime's array of criminal and civil penalties.

146. Plaintiffs face a substantial risk that, when their designations are approved and become effective, the State Attorney Defendants and Office of Statewide Prosecution will seek to enforce the myriad criminal, civil, and administrative penalties under the DTO regime against Plaintiffs. For example, at the Governor's July 1 press conference, Brad McVay (Florida's statewide prosecutor) said, "We stand here committed to . . . prosecute any individual or group associated with terrorist activity."

147. Designation will debilitate Plaintiffs' political advocacy, charitable giving, provision of legal services, and other organizational activity in Florida, including but not limited to their speech and association. For example:

a. Immediately upon designation, Plaintiffs will be unable, within Florida, to further engage in transactions fundamental to their operations—*e.g.*, withdrawing funds from, and depositing funds in, bank accounts; renting office space; and organizing public events.

b. Immediately upon designation, any employee, officer, or director of either Plaintiff who reports to work or otherwise knowingly contributes to either entity's operation, and who is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

c. Likewise, upon designation, Plaintiffs, any employee, officer, or

director of either Plaintiff, and any third party who knowingly "initiates, organizes, plans, finances, directs, manages, or supervises" activity with the intent to further Plaintiffs' interests, and is subject to Florida's criminal jurisdiction, will face a substantial risk of severe criminal punishment, including life in prison, under Florida's Criminal Gang Prevention Act. Fla. Stat. § 874.10.

d. Immediately upon designation, Plaintiffs will be unable, within Florida, to provide legal services and advice to members of their communities.

e. Immediately upon designation, persons or entities providing services to CAIR or CAIR-Florida—such as banks and other financial institutions; internet, telephone, and technology service providers (including email and data storage providers); vendors; retirement and other benefit administrators; accountants; financial advisors; and legal counsel—will face a substantial risk of severe criminal punishment under Florida law for providing "material support" to a "designated terrorist organization." Fla. Stat. § 775.33(3).

148. Designation will prevent CAIR-Florida from exercising the corporate powers conferred on not-for-profit organizations by Florida law. These include, among other things, the power to: "[m]ake contracts and guaranties"; "[c]onduct its affairs, carry on its operations, and have offices and exercise the powers granted by this act in any state, territory, district, or possession of the United States or any foreign country"; "[m]ake donations for the public welfare or for religious, charitable, scientific, educational, or other similar purposes"; and "exercise all powers necessary or convenient to effect any or all of the purposes for which the corporation is organized." Fla. Stat. § 617.0302.

149. Designation will significantly interfere with CAIR's exercise of the

corporate powers conferred on not-for-profit corporations under D.C. law, including, among other things, the power to "[c]onduct its activities, locate offices, and exercise the powers granted by this chapter within or without the District." D.C. Code § 29–403.02(10).

150. Designation will, at minimum, substantially hinder Plaintiffs' attempts to seek judicial relief and clear their names.

a. The DTO regime (i) criminalizes the knowing provision of material support to designated organizations and (ii) does not expressly exempt the provision of legal services and advice to designated organizations seeking to pursue their rights and clear their names in federal or state court.

b. The DTO regime (i) criminalizes the knowing provision of material support to designated organizations and (ii) does not expressly exempt employees, directors, or other personnel who act on behalf of their organizations for the purpose of pursuing the organizations' rights and clearing their names in federal or state court—by, for example, providing sworn declarations or other factual testimony.

151. CAIR and CAIR-Florida associate with one another and work together and independently to fulfill their mission by engaging in advocacy on cultural, social, nonpartisan political, and civic issues of public concern to American Muslims. This advocacy includes initiating and representing clients in litigation, engaging in public policy advocacy, conducting trainings, creating and publishing educational materials and hosting educational events, and leading community organizing efforts.

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the First Amendment—Right to Free Speech (in violation of 42 U.S.C. § 1983, against all Defendants)

152. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

153. The First Amendment protects Plaintiffs' speech and advocacy on matters of public concern, including faith and religion, government affairs, civil rights, and public policy.

154. The DTO regime is unlawful because it imposes an unconstitutional prior restraint. An organization designated as a DTO is immediately subject to severe restrictions on its speech—as well as its ability to receive speech from members, supporters, and others—before the speech occurs and before any judicial review.

155. The DTO regime is unlawful because it vests unbridled and excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to silence, debilitate, and blacklist domestic advocacy organizations engaged in First Amendment-protected activity, such as CAIR and CAIR-Florida, by designating them as "domestic terrorist organizations." The statute does not require that the designation be based on evidence; does not require State officials to satisfy any burden of proof; does not allow for review by a neutral decisionmaker prior to designation; and at no point requires disclosure of the State's evidence (if any) to the

designated organization.

156. The DTO regime is unlawful because it is a substantially overbroad restriction on a designated organization's right to engage in and receive speech.

157. The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful. By effectively shutting down CAIR-Florida and substantially impairing CAIR's ability to pursue its mission and engage in advocacy, designation suppresses Plaintiffs' speech to their supporters, to government, and to the public, and it suppresses speech from Plaintiffs' employees and other supporters, as set forth above.

158. The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because Defendants' designation discriminates against Plaintiffs on the basis of their viewpoints, is not narrowly tailored, and does not actually advance a compelling government interest.

159. The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it directly suppresses Plaintiffs' speech and coerces third parties to unlawfully suppress Plaintiffs' speech, as set forth above.

160. The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it burdens Plaintiffs' right to receive information, and it does so on the basis of the content of that information. The DTO regime prevents people from providing, among other things, expert assistance in the form of speech

to CAIR and CAIR-Florida. These burdens are not narrowly tailored to actually advance a compelling state interest.

**COUNT TWO**

**Violation of the First Amendment—Right to Association (in violation of 42 U.S.C. § 1983, against all Defendants)**

161. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

162. The First Amendment guarantees freedom of association as an indispensable means of preserving other individual liberties. The right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion—constitutes expressive association and receives heightened constitutional protection.

163. In pursuing their faith-based mission, Plaintiffs' protected advocacy necessarily involves association, interaction, and coordination with each other, members of the public, and other organizations and businesses as an essential predicate to public education, interfaith work, and legal, civil rights, and public policy advocacy.

164. The DTO regime is unlawful because it vests unbridled and excessive discretion in the Chief of Domestic Security, the Governor, and the Cabinet to paralyze and debilitate the expressive associations of domestic advocacy organizations, such as CAIR and CAIR-Florida, by designating them as "domestic

terrorist organizations."

165. The DTO regime is unlawful because it authorizes State Defendants to impair organizations' ability to engage in expressive association and advocacy, as set forth above. It does so both directly and indirectly, through the array of criminal, civil, and administrative penalties for individuals who associate with designated organizations in various respects. There is no substantial relationship between the DTO regime and a sufficiently important government interest, and the DTO regime is not narrowly tailored to achieve any such interest.

166. The impending designation of Plaintiffs as DTOs under the DTO regime is unlawful because it profoundly impairs their ability to engage in expressive association and advocacy in Florida, as set forth above. It does so both directly and indirectly, through the array of criminal, civil, and administrative penalties for individuals who associate with Plaintiffs in various respects. There is no substantial relationship between the State Executive Defendants' designation of Plaintiffs and a sufficiently important government interest, and the designation under the DTO regime is not narrowly tailored to achieve any such interest.

## COUNT THREE

### Violation of the First Amendment—Retaliation (in violation of 42 U.S.C. § 1983, against all Defendants)

167. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151.

168. The impending designation of Plaintiffs under the DTO regime is unlawful because it constitutes government retaliation against them in violation of the First Amendment.

169. Plaintiffs' speech is constitutionally protected, as set forth above.

170. The impending designation of Plaintiffs under the DTO regime is an adverse action that materially harms Plaintiffs, as set forth above. It would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

171. Plaintiffs' protected speech and association are substantial or motivating factors in the State's challenged conduct, thus establishing a causal connection between the State's retaliatory actions and the protected activity, as set forth above.

## COUNT FOUR

### Violation of the First Amendment—Right to Petition (in violation of 42 U.S.C. § 1983, against all Defendants)

172. Plaintiffs realleged and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

173. The First Amendment protects the right of the people to petition the government for a redress of grievances. The right to petition includes the ability of citizens and groups of them to approach the legislature, the executive branch, and the courts. The DTO regime and Plaintiffs' impending designation directly and indirectly substantially impairs Plaintiffs' right to petition, and is not narrowly

tailored to actually advance a compelling state interest, nor is there a substantial relationship between the impairment and a sufficiently important government interest.

**COUNT FIVE**

**Violation of the Fourteenth Amendment—Procedural Due Process**
**(in violation of 42 U.S.C. § 1983, against all Defendants)**

174. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

175. The DTO regime violates the Fourteenth Amendment's guarantee of procedural due process as applied to domestic corporations, including nonprofits like Plaintiffs.

176. Designation under the DTO regime deprives U.S. corporations, including Plaintiffs, of constitutionally protected interests in liberty and property, as set forth above.

177. The procedures prescribed by the DTO regime, as set forth above, create an extraordinarily high risk that the state will erroneously deprive U.S. corporations, including Plaintiffs, of constitutionally protected interests in liberty and property.

178. The State could feasibly provide significantly more robust procedural protections to U.S. corporations it seeks to designate, including Plaintiffs—and it has no legitimate interest in denying them such protections.

179. Consequently, the State's current procedures for designating U.S. organizations as "domestic terrorist organizations" are constitutionally inadequate; the DTO regime denies U.S. corporations, including Plaintiffs, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

## COUNT SIX

### Violation of the Fourteenth Amendment—Right to Counsel (in violation of 42 U.S.C. § 1983, against all Defendants)

180. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 86 and 137 to 151.

181. The Fourteenth Amendment protects and guarantees litigants the right to retain and be represented by counsel in their legal proceedings, including the right to choose counsel free from arbitrary or unjustified governmental interference.

182. Plaintiffs' impending designation violates CAIR and CAIR-Florida's Fourteenth Amendment right to counsel.

183. Under the DTO regime, it is a felony, punishable by up to thirty years in prison, to provide any designated DTO with "material support or resources," which includes any "service" or "expert advice or assistance." Fla. Stat. § 775.33(1)(d). Further, it is a felony, punishable by up to life in prison, if any person knowingly "initiates, organizes, plans, finances, directs, manages, or supervises criminal gang-related activity." Fla. Stat. § 874.10.

184. The DTO regime does not exempt the provision of legal services, representation, and advice from these or any other prohibitions imposed under the DTO regime.

185. Once CAIR and CAIR-Florida's designations are approved and published in the Florida Administrative Register, any lawyer or legal organization that provides or attempts to provide legal services or representation to CAIR or CAIR-Florida faces a credible threat of criminal prosecution under the DTO regime, including under Fla. Stat. §§ 775.33(1)(d) and 874.10.

186. Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to CAIR and CAIR-Florida under the DTO regime, designation creates a substantial risk that CAIR and CAIR-Florida will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime. Further, even where CAIR or CAIR-Florida can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes CAIR and CAIR-Florida concrete harm.

187. CAIR and CAIR-Florida face a substantial risk that they will be denied their right to counsel under the Fourteenth Amendment and that this violation will cause CAIR and CAIR-Florida ongoing, irreparable harm.

## COUNT SEVEN

### Violation of the First Amendment—Right to Counsel (in violation of 42 U.S.C. § 1983, against all Defendants)

188. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 to 151 above.

189. The First Amendment protects and guarantees litigants the right to retain and associate with counsel in their legal proceedings and to petition the government for redress of grievances.

190. Plaintiffs' impending designation violates CAIR and CAIR-Florida's First Amendment rights to retain and associate with counsel in their legal proceedings and to petition the government by exposing any person who provides CAIR or CAIR-Florida with legal services or representation to severe criminal penalties. Persons who provide legal services or representation to CAIR or CAIR-Florida face a credible threat that they will be prosecuted under the DTO regime, including under Fla. Stat. §§ 775.33(1)(d) and 874.10.

191. Because lawyers and legal organizations face a credible threat of prosecution for providing legal services or representation to CAIR and CAIR-Florida under the DTO regime, designation creates a substantial risk that CAIR and CAIR-Florida will be unable to obtain counsel to represent them in pending and future legal proceedings, including in future legal proceedings brought to challenge their designation under the DTO regime. Further, even where CAIR or CAIR-Florida

can retain counsel, requiring them to proceed while their counsel face a credible threat of prosecution under the DTO regime itself causes CAIR and CAIR-Florida concrete harm.

192. The DTO regime's restrictions on the ability of Plaintiffs to obtain legal services and representation violate the First Amendment because the State has no compelling or even legitimate interest in restricting Plaintiffs' access to counsel, and the restrictions not closely drawn or narrowly tailored to further any interest.

193. CAIR and CAIR-Florida face a substantial risk that they will be denied their rights under the First Amendment and that this violation will cause CAIR and CAIR-Florida ongoing, irreparable harm.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A. Enjoin Defendants DeSantis, Glass, Uthmeier, Ingoglia, and Simpson from designating any group, including Plaintiffs, as "domestic terrorist organizations;" enjoin Defendant Glass from publishing the designation of any group, including Plaintiffs, as "domestic terrorist organizations" in the Florida Administrative Register; and enjoin all Defendants from otherwise taking steps to make any designation of "domestic terrorist organizations," including Plaintiffs' designation, effective.

B. Enjoin all Defendants from enforcing any penalties against any group, including Plaintiffs, pursuant to their designation as DTOs under the DTO regime; and from enforcing any penalties against third parties in connection with the designation of any group, including Plaintiffs, under the DTO regime.

C. Enjoin all Defendants from enforcing any prohibition on provision of legal services to or by Plaintiffs in connection with any civil or criminal proceedings involving Plaintiffs as a party or counsel, pursuant to their designation as DTOs under the DTO regime.

D. Declare that the DTO regime and designation of Plaintiffs as DTOs pursuant to the DTO regime violates the First and Fourteenth Amendments.

E. Award reasonable attorneys' fees and costs.

F. Grant such other and further relief as the Court deems proper.

Respectfully submitted July 1, 2026,

*/s/ Daniel B. Tilley*

Scott D. McCoy (FBN 1004965)
**Southern Poverty Law Center**
2 South Biscayne Blvd., Ste. 3200
Miami, FL 33131
(786) 347-2056
scott.mccoy@splcenter.org

Hina Shamsi*
Ashley Gorski*
Charles Hogle*
Celin Carlo-Gonzalez*
Natalie Smith*
Patrick Toomey*
**American Civil Liberties Union Foundation**

Aaron S. Fleisher*
*Not licensed in DC*
**Southern Poverty Law Center**
1101 17th Street NW, Ste. 550
Washington, DC 20036
(202) 945-7904
aaron.fleisher@splcenter.org

Diego A. Soto*
**Southern Poverty Law Center**
150 E. Ponce De Leon Ave., Ste. 340
Decatur, GA 30030
(404) 521-6700
diego.soto@splcenter.org

Mary Ella W. Simmons*
**Southern Poverty Law Center**
201 St. Charles Ave., Ste. 2000
New Orleans, LA 70170
(504) 486-8982
maryella.simmons@splcenter.org

Manoj S. "Sachin" Varghese*
Mark L. Bailey*
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hshamsi@aclu.org
agorski@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
n.smith@aclu.org
ptoomey@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Shereef H. Akeel*
Samuel Simkins*
**Akeel & Valentine, PLC**
888 West Big Beaver Road, Ste. 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
sam@akeelvalentine.com

* *Pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-315-MW-MJF

RON DESANTIS *et al.*,

*Defendants*.

_________________________________/

**DECLARATION OF EDWARD MITCHELL ON BEHALF OF CAIR FOUNDATION, INC.**

Pursuant to 28 U.S.C. § 1746, I, Edward Mitchell, declare as follows:

1. I am a resident of Georgia and over the age of eighteen. I have personal knowledge of the facts set forth in this declaration. If called to testify, I could and would testify competently to these facts under oath. I am providing this declaration based on my personal knowledge, my role as the National Deputy Director of CAIR-Foundation, Inc. ("CAIR"), information known to me through CAIR's regular programs, operations, and activities, and my review of CAIR's records maintained in the ordinary course of business.

2. CAIR is the largest Muslim civil rights and advocacy organization in the United States and was established in 2005. Its predecessor organization was

founded in 1994. CAIR's faith-driven mission is to enhance the public's understanding of Islam, protect and vindicate civil rights, promote justice, and empower American Muslims through lawful advocacy and expressive activity protected by the First Amendment. Our vision is to be a leading advocate for justice and mutual understanding.

3. CAIR pursues its mission nationwide, working in coordination with affiliate chapters in multiple states, including CAIR Florida, Inc. ("CAIR-Florida").

4. Since our founding, CAIR has built a reputation for tenacious efforts to combat discrimination against diverse Muslim communities in the United States through legal and public policy advocacy work, interfaith engagement, and client services. CAIR has developed a unique national infrastructure for legal, policy, public education, and civil rights advocacy on behalf of American Muslims.

5. On July 1, 2026, CAIR learned through a live broadcast held by Governor DeSantis that the Florida Chief of Domestic Security intended to designate CAIR as a "domestic terrorist organization" under Florida's new designation regime.

6. As of the time of filing this declaration, CAIR has not received any written notice or communication from any Florida official explaining the reason for its designation or any evidence supporting any such reason.

7. CAIR has never been charged with, let alone convicted of, a crime. Nor has it ever been designated by the federal government under the federal terrorism sanctions and designation regime. And as CAIR has repeatedly stated, it does not engage in or support terrorist activity. Indeed, ISIS, a U.S.-designated Foreign Terrorist Organization, once threatened to assassinate CAIR's leadership because of CAIR's outspoken opposition to violence and terrorism.

8. If CAIR is designated as a "domestic terrorist organization," it will face substantial harm, both in Florida and nationwide. The impact of such a designation—including on CAIR's reputation, operations, and ability to engage in advocacy—will be significant.

9. The harm would be immediate, severe, and not readily quantifiable. Even if later set aside, designation would require substantial time and resources to repair, and some harm could not be fully undone. It would take us years to recover, if at all.

10. But for Florida's threatened designation and the criminal and civil consequences associated with that designation, CAIR would continue engaging in advocacy, public education, donor engagement, legal advocacy, civil rights intake, community outreach, and association with CAIR-Florida and Florida residents on matters of public concern, including civil rights, religious freedom, free speech, anti-Muslim discrimination, public policy, and Palestinian human rights.

**CAIR's Advocacy**

11. CAIR is a nonprofit corporation organized under the laws of the District of Columbia, with headquarters in Washington, D.C. It is tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

12. CAIR and its more than 20 affiliated chapters, including CAIR-Florida, work to advance CAIR's mission through advocacy on legal, cultural, social, policy, and civic issues of public concern to American Muslims. Issues CAIR focuses on include promoting religious tolerance and understanding, cultural education, civil rights, and public policy that protects and enhances the equal treatment of Muslims in the United States.

13. CAIR and CAIR-Florida are active in furthering their mission throughout Florida and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence, especially in the Second, Fourth, Sixth, Ninth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Seventeenth, and Eighteenth Circuits, and also in the First, Third, Fifth, Seventh, Eighth, Tenth, and Twelfth Circuits.

14. As part of CAIR's public education and advocacy efforts, CAIR employees regularly appear on or are quoted in national and local broadcast, print, and digital media outlets to discuss, debate, inform, and provide commentary on issues of public concern, including civil rights issues. CAIR regularly issues press

Case 4:26-cv-00015-AW-MJF Document 1-5 Filed 01/02/26 Page 5 of 16

releases and action alerts on its website, holds press conferences, and posts on social media outlets, such as X, Instagram, Facebook, and YouTube, to communicate with members of the public and government officials. CAIR uses electronic communications to let people know about its presence in the community as a resource for information and legal services. Its employees also frequently accept speaking engagements to discuss topics related to their work, such as Islamophobia and instances of anti-Muslim discrimination.

15. CAIR's advocacy includes commenting on proposed legislation at the federal and state level and on issues that impact Muslim communities, including matters of United States foreign policy and state government action. For example, in 2025, CAIR publicly opposed Florida House Bill 119, commonly referred to as the "No Shari'a Act," and publicly expressed disagreement with statements made by Governor Ron DeSantis in support of the bill.

16. CAIR educates people on their civil rights through presentations and advocacy materials. For example, CAIR publishes "Know Your Rights" guides and reports on incidents affecting Muslim communities nationwide, such as discrimination in the workplace, in correctional settings, at elementary and secondary schools, as well as colleges and universities. CAIR also creates and disseminates guides for Muslims who are traveling, and for those who are approached by law enforcement.

17. To further its faith-driven mission, CAIR also regularly communicates and meets with local, state, and federal government officials, other organizations, civic groups, and religious institutions, and members of the public.

18. During Ramadan, CAIR creates specialized programming that includes how to request accommodations at work and at school. CAIR shares this programming with CAIR-Florida.

19. As part of its civic engagement efforts, CAIR promotes voter participation through nonpartisan voter education and registration activities. For example, CAIR routinely participates in and supports National Muslim Voter Registration Day.

20. As part of its advocacy and public education work, CAIR engages with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to address false stereotypes, prejudices, tropes and narratives, disinformation, and misinterpretations of Islamic tenets, including with respect to Sharia, which is frequently invoked in political discourse. CAIR has repeatedly explained that Sharia is a moral and spiritual framework that guides American Muslims' ordinary, personal exercise of faith and requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws. And CAIR has issued public statements and published educational materials explaining that when Muslims pray

to God five times a day, donate to charity, fast in Ramadan, or speak up against injustice, among many other practices, they are observing Sharia—just as Jews observe Halakha and Catholics abide by canon law.

21. CAIR frequently engages in advocacy activities in partnership with its affiliated chapters, including CAIR-Florida. Much of CAIR's work in Florida involves collaboration with CAIR-Florida and its affiliates, third-party organizations, and community members in the state.

22. Working in association with other faith-based and civil rights organizations, CAIR strives to build a vibrant constitutional democracy where people of all religious traditions can thrive.

23. CAIR organizes civic engagement activities that encourage participation in the democratic process, both nationwide and in Florida. For example, CAIR hosts Muslim Hill Day in Washington, D.C., which brings Muslims from across the country to meet with members of Congress. In 2026, representatives from CAIR-Florida participated in the event.

24. CAIR advocates for civil rights by providing legal representation and legal advocacy through its Legal Defense Fund. CAIR receives intakes and also represents clients from across the country, including from Florida, in litigation seeking to vindicate legal and constitutional rights.

Case 4:26-cv-00315-AW-MJF Document 619-1 Filed 10/02/25 Page 9 of 196

25. CAIR's civil rights work includes advocacy and legal support related to Palestinian human rights.

26. For example, CAIR and CAIR-Florida represented and advocated on behalf of Students for Justice in Palestine ("SJP") chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, based on their speech and association in support of Palestinian human rights. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP chapter at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

27. In early 2025, CAIR and CAIR-Florida successfully advocated for the return of Mohammed Ibrahim—a 16-year-old U.S. citizen and Florida resident who was detained by Israeli authorities beginning in February 2025—including by sending a letter to U.S. Secretary of State Marco Rubio urging him to take urgent action to secure Mohammed's release from Israeli custody through lawful diplomatic channels.

28. CAIR also issued a February 2025 press release challenging President Donald Trump's assertion that the "U.S. will take over the Gaza Strip" and 'own

it." CAIR also issued an April 2025 letter to the U.S. Department of Justice calling on it to prosecute the murder of an American citizen by Israeli settlers.

29. In March 2025, CAIR and CAIR-Florida issued public statements condemning actions taken by the Mayor of Miami Beach to close a movie theatre that was screening an Oscar-winning Palestinian documentary.

30. CAIR has consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR has also regularly condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

**<u>CAIR's Employees and Board Members</u>**

31. CAIR's employees and board members have chosen to work for CAIR and serve on its board, respectively, because they believe in, and wish to contribute to, its policy, religious, and civil-rights advocacy, including through their provision of specialized skills and speech to the organization.

32. CAIR has three employees who live in Florida and perform remote work for CAIR on national and interstate matters, including its Chief Operations Officer, its Legal Operations Manager, and its Information Technology Director. Their residence in Florida creates a substantial risk that they could be unable to continue performing their roles if CAIR is designated under Florida law.

33. Two members of CAIR's Board live in Florida, including the Board Chair. Both work remotely from Florida on CAIR matters, including matters relating to CAIR's work in Florida.

34. CAIR has one volunteer who lives in Florida who works as a Strategic Campaign Specialist. She works remotely on CAIR matters, including on matters related to CAIR's work in Florida based on publicly available information, such as researching and investigating events in Florida to assist in preparing CAIR's Hostile Campus Report, which discusses universities' and colleges' treatment of free speech, respect for civil rights, the right to protest and opposition to Islamophobia in Florida's places of higher education.

**Executive Order 25-244**

35. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, which unilaterally designated CAIR as a "terrorist organization" and imposed severe punishments on CAIR and on people or entities that obtain benefits or privileges regulated by Florida and provide "material support" to CAIR.

36. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their rights under the First and Fourteenth Amendments of the U.S. Constitution. On March 4, 2026, the district court granted a preliminary injunction enjoining enforcement of the Executive Order.

## <u>Consequences of Designation</u>

37. If CAIR is designated as a "domestic terrorist organization"—with all the criminal and civil penalties that will result—it will experience significant harm, both in Florida and in its nationwide operations.

38. Immediately upon CAIR's designation becoming effective, CAIR will suffer substantial reputational harm. Further, in the event CAIR is designated, and unless the Court grants relief, CAIR will be forced to immediately suspend any operations it identifies as based in Florida, such as advocacy and fundraising activities, donor communications, public outreach, and other operational activity in the state. CAIR would also be forced to take protective measures regarding Florida-based employees and board members, including placing Florida-based employees on administrative leave and directing all Florida-based board members to recuse themselves from CAIR board activity. CAIR intends to take these steps solely to reduce the risk that CAIR and people who work for, associate with, donate to, receive services from, or provide services to CAIR could face severe criminal penalties under Florida law.

**Impairment of Advocacy and Fundraising Activity in Florida**

39. If its designation becomes effective, CAIR will also be forced to suspend its advocacy work in Florida, including association with CAIR-Florida, an affiliated chapter.

40. For example, CAIR will not be able to bring CAIR-Florida representatives to its annual Muslim Day Event in Washington, DC.

41. Designation will also hinder CAIR's ability to discover, engage with, and comment on Florida events relevant to its mission. For example, CAIR will not be able to monitor and report on free speech, respect for civil rights, the right to protest, and opposition to Islamophobia in Florida's places of higher education. CAIR also will not be able to petition or request information from government officials in Florida, including at correctional or educational facilities.

42. Neither will CAIR be able to support CAIR-Florida in its advocacy on issues of shared public concern. To further its mission, CAIR speaks to, receives information from, and associates with CAIR-Florida to empower, educate, and defend Florida Muslims. If CAIR's designation goes into effect, both organizations will face criminal penalties for their speech and association in support of each other's advocacy work.

43. CAIR's ability to provide legal representation to its Florida-based clients also may be impaired if its designation becomes effective. CAIR currently represents several Florida residents in litigation outside of Florida. The breadth of Florida's designation regime creates a risk that CAIR or its employees may be subject to prosecution, including those who provide representation to CAIR's Florida-based clients.

44. In anticipation of its designation going into effect, CAIR is also taking steps to prevent any advocacy action communications—concerning topics of nationwide and state importance to CAIR's stakeholders—from being sent to Florida residents.

45. In addition, in preparation for its anticipated designation, CAIR is taking steps to stop donor solicitations and community and public outreach to Florida residents, to the extent CAIR has information identifying them as residents of Florida. For example, CAIR intends to geographically limit its internet advertising, SMS mobile messaging, and emails sent to Florida residents. CAIR also intends to stop all in-person fundraising activity in Florida, as well as fundraising activities conducted through webinars and other programs that cultivate donors by educating them about CAIR's advocacy and work on behalf of Muslim communities in Florida.

46. Preparing for the threatened designation has already required CAIR to divert senior staff, legal, development, and information technology resources from ordinary mission work to efforts necessary to shut down that work in Florida.

**Severe Reputational Harm**

47. If Florida state officials designate CAIR as a "domestic terrorist organization," CAIR will suffer reputational harm, both in Florida and across the country. Being labeled as a "domestic terrorist organization" is inherently

stigmatizing and undermines the trust and credibility that CAIR has built over the lifetime of its existence with donors, community members, volunteers, and supporters. This goes beyond a monetary value and is integral to CAIR's ability to carry out its mission. Being falsely labeled as a "domestic terrorist organization" will irreparably harm CAIR's reputation and its civil rights work on behalf of Muslims across the country

**Loss of Critical Executive Employees and Board Members**

48. If its designation becomes effective, CAIR will be forced to take protective measures regarding its Florida-based employees and board members, including placing its three Florida-based employees on administrative leave and directing its two Florida-based board members to recuse themselves from participation in any CAIR board function or activity. Loss of the operational or board services each of these individuals provides to CAIR will have a debilitating impact on its ability to carry out its work.

49. CAIR's Chief Operating Officer ("COO") works remotely from Florida and oversees all of CAIR's operations nationwide. The functions our COO oversees include human resources, staffing, employee benefits, vendor and contract administration, information technology, accounting, fundraising, development, and insurance. As a member of the Compliance and Policy Committee, they provide compliance and policy support. In addition, the COO supports CAIR's Board by

preparing board materials, coordinating logistics, and helping implement board-approved policies and governance decisions. The COO is critical to CAIR's functions. If we are forced to lose their institutional knowledge of CAIR's operations as well as their performance of their managerial, compliance, and oversight role, even temporarily, CAIR's ability to operate will be significantly impaired.

50. CAIR's Information Technology Director ("IT Director") works remotely from Florida and oversees not only our technology infrastructure and daily needs, but also has responsibilities similar to a Chief Information Officer. Our IT Director manages and supervises all of CAIR's information technology systems, which include email, and donor management and fundraising platforms; cybersecurity programs and policies; and internet network and infrastructure. The IT Director is integral to CAIR's operations, and if they are forced to stop working, their loss will significantly impair CAIR's operations nationwide, including its secure communications and donor and fundraising activity.

51. CAIR's Legal Operations Manager works remotely from Florida, providing support for legal compliance matters as well as CAIR's nationwide litigation and legal advocacy program. Our Legal Operations Manager is integral to our ability to ensure CAIR's compliance with federal and state laws and manage

our legal program and losing them, even temporarily, will significantly impair CAIR's legal functions.

52. If its designation becomes effective, CAIR's two Florida-based board members, including its Board Chair, will recuse themselves from all Board governance and decision-making activity. The Board Chair is responsible for the effective function of CAIR's Board and governance. She also chairs CAIR's Executive Committee, which addresses significant governance, policy, and other organizational matters. Both board members' recusal, and particularly the Board Chair's recusal, will cause CAIR substantial harm and interfere with its ability to operate.

**Loss of Key Service Providers Based in Florida and Potential Impairment of Florida-Based Contracts**

53. Designation could prevent CAIR and its employees from receiving or using contractual services to be performed in Florida or by Florida-based persons or entities. Designation also could cause CAIR to default on these contracts if CAIR is unable to pay under their terms.

54. For example, if CAIR's designation becomes effective, a Florida-based contractor who performs national development functions would be unable to continue providing services related to donor outreach and management, donor communications, grant-writing coordination, CAIR's mailing lists and internet advertising, and other fundraising operations. If CAIR is forced to lose the

essential services of this individual, it would severely impact our donor outreach and fundraising activities, nationwide and in Florida.

55. CAIR also has a contract with a telecommunication service provider for telephone service to one of CAIR's Florida-based employees. The designation regime's prohibition on providing services to designated organizations could frustrate this contract should the telecommunication service provider decide not to continue providing services to a CAIR employee based in Florida.

56. CAIR has several other contracts that involve services to be performed in Florida or by Florida-based entities. These could be impaired if CAIR's designation becomes effective. For example, CAIR has insurance policies and contracts applicable to its Florida-based board members, which, if invoked, would require payments being made in Florida. CAIR also contracts with Florida-based vendors to maintain and operate one of its websites and to provide leadership coaching services. Because of the substantial criminal and civil penalties imposed on designated organizations and associated third parties, including contractors, it is not clear whether the parties to these contracts could fulfill their obligations or that CAIR could pay them for doing so.

**The Harm of Designation Cannot Easily, If At All, Be Reversed**

57. CAIR will suffer substantial harm if the designation becomes effective, even if the designation is later overturned.

58. As discussed above, CAIR will be unable to engage in advocacy and speech activities in Florida while the designation is effective. It also will be unable to engage in activities to further its mission in Florida, including by working with CAIR-Florida to advocate on behalf of Florida Muslims.

59. If the designation becomes effective, it will profoundly damage CAIR's reputation. Even if the designation is later overturned, repairing the reputational damage it inflicts will require a tremendous amount of time and resources. CAIR will need to rebuild and reestablish its relationships with donors, community members, volunteers, and supporters. It took decades for CAIR to build these relationships, and it might never be able to restore them.

60. If its designation becomes effective, CAIR's staff who work remotely from Florida may need to secure other jobs to support themselves, or they may leave because of professional concerns about affiliation with an organization that state officials have chosen to label "terrorist." The loss of staff members with expertise and deep institutional knowledge about CAIR would damage the organization's ability to further its mission. In addition, CAIR would be required to delay its work while it hires and trains new personnel.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on July 2, 2026.

*/s/ Edward Mitchell*
Edward Mitchell

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-315-MW-MJF

RON DESANTIS *et al.*,

*Defendants*.
_________________________________/

**DECLARATION OF WILFREDO RUIZ ON BEHALF OF CAIR FLORIDA, INC.**

Pursuant to 28 U.S.C. § 1746, I, Wilfredo Ruiz, declare as follows:

1. I am a resident of Broward County, Florida. I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration. If called to testify, I could and would testify competently to these facts under oath. I am providing this declaration in my capacity as the Communications Director of CAIR Florida, Inc. ("CAIR-Florida"). As Communications Director, I am a senior member of CAIR-Florida's management team and am familiar with CAIR-Florida's programs, operations, and activities.

2. CAIR-Florida was established in 2001 to challenge stereotypes of Islam and Muslims and defend civil rights and liberties in Florida. Our vision is to

be a leading advocate for justice and mutual understanding in our state and to empower Muslim communities, which are a vital part of civil society in Florida. In furtherance of our mission and vision, we promote a more just and equitable society for all. Since our founding over two decades ago, CAIR-Florida has built a reputation for tenacious efforts to combat discrimination against Florida's diverse Muslim communities through legal- and public-policy advocacy work, interfaith engagement, and client services. No other organization does the comprehensive, statewide work CAIR-Florida does to engage elected officials and represent the concerns of Florida's Muslim communities.

3. If CAIR-Foundation, Inc. ("CAIR") or CAIR-Florida is designated as a "domestic terrorist organization"—with all the criminal and civil penalties that result from designation—we will be unable to operate. The impact on CAIR-Florida and its many stakeholders—board members, employees and staff, volunteers and donors, clients and community members who rely on us—will be devastating. It will take us years to recover, to the extent recovery is possible.

4. If not for the impending designation and the criminal and civil consequences associated with it, CAIR-Florida would continue engaging in advocacy, public education, donor engagement, legal advocacy, civil rights intake, community outreach, and association with CAIR and Florida residents on matters

of public concern, including civil rights, religious freedom, free speech, anti-Muslim discrimination, public policy, and Palestinian human rights.

**CAIR-Florida's Advocacy**

5. CAIR-Florida is a nonprofit corporation organized under Florida law, with its headquarters in Tampa. It is recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

6. CAIR-Florida is a chapter of CAIR, which is America's largest Muslim civil rights and advocacy organization. CAIR-Florida shares CAIR's faith-driven mission to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims. CAIR-Florida implements its mission through advocacy, which includes legal action in federal courts; education; community organizing; interfaith organizing; public engagement with state officials; and commentary directed at government officials and the public.

7. CAIR and CAIR-Florida further their mission throughout Florida, and together have a footprint in nearly every Judicial Circuit through their advocacy work and/or staff presence, especially in the Second, Fourth, Sixth, Ninth, Eleventh, Thirteenth, Fourteenth, Fifteenth, Seventeenth, and Eighteenth Circuits, and also in the First, Third, Fifth, Seventh, Eighth, Tenth, and Twelfth Circuits.

8. In many instances, CAIR-Florida engages in these activities jointly with CAIR, particularly when issues arising in Florida could have nationwide

impact. In other instances, CAIR-Florida may act alone, or on behalf of itself and CAIR.

9. Often in conjunction with CAIR, CAIR-Florida regularly issues press releases and action alerts on its website, holds press conferences, and posts on social media outlets, such as X, Instagram, Facebook, and YouTube, to communicate with members of the public and government officials. Its employees also frequently accept speaking engagements to discuss topics related to their work, such as Islamophobia and instances of anti-Muslim discrimination. CAIR-Florida uses electronic communications to let people know about its presence in the community as a resource for information and legal services.

10. As part of CAIR-Florida's public education and advocacy efforts, its employees appear on or are quoted in national and local media outlets to provide commentary on civil rights issues.

11. CAIR-Florida also educates people about their civil rights. For example, CAIR-Florida creates and disseminates "Know Your Rights" materials related to workplace discrimination, immigrant rights, school bullying, free speech, police interactions, and travel. CAIR-Florida visits Florida mosques and other community venues to conduct "Know Your Rights" presentations, and it visits schools and universities to speak with students about their rights. During Ramadan, CAIR-Florida creates specialized programming and also relies on materials

Case 4:26-cv-00515-AW-MJF Document 15-2 Filed 10/07/26 Page 115 of 196

produced by CAIR to provide Muslims with information about how to request accommodations at work and school. CAIR-Florida also makes social media videos featuring its staff to remind community members of their rights.

12. CAIR-Florida communicates and advocates with Florida correctional facilities concerning inmate grievance matters and to remind facilities of their duty under federal and state law not to curtail the rights of Muslims in their custody.

13. CAIR-Florida also provides a range of pro bono legal services to Florida residents, including those who have suffered government and workplace discrimination in violation of their civil rights and those navigating the immigration system.

14. Individually and alongside other organizations, CAIR-Florida participates in civic engagement activities that encourage engagement in the democratic process. For example, CAIR hosts an annual Muslim Hill Day in Washington, D.C., and in 2026, representatives from CAIR-Florida traveled to Washington, D.C. to participate in the event. CAIR-Florida also hosts its own Muslim Day at the state Capitol in Tallahassee, Florida. The 2026 event included more than 50 participants and addressed issues such as free speech and legislation directly harming Muslim American communities. It culminated in the passage of House Resolution 8001, which celebrated the contributions of Florida's Muslim

American community and recognized February 2026 as "Muslim American Heritage Month."

15. Working in association with other faith-based and civil rights organizations, CAIR-Florida strives to build a vibrant constitutional democracy where people of all religious traditions can thrive.

16. As part of its civic engagement efforts, CAIR-Florida promotes voter participation through nonpartisan voter education and registration activities.

17. CAIR-Florida also engages with members of the public, the media, government officials, and leaders of other faiths to educate them about Islam and to address false stereotypes, prejudices, and disinformation about Islam.

18. For example, in meetings with Florida elected officials preceding the 2026 legislative session, CAIR-Florida addressed misinformation about Sharia, a moral and spiritual framework that guides Muslims' ordinary, personal exercise of faith in furtherance of values like honesty, service, and community. CAIR-Florida also posts materials correcting misconceptions about Sharia on social media and distributes them at public events. As CAIR-Florida has explained, Sharia requires Muslims to comply with the laws of the land in which they reside, including the U.S. Constitution and other federal and state laws.

19. In 2025, CAIR-Florida publicly opposed Florida House Bill 119, commonly referred to as the “No Shari’a Act,” and publicly criticized statements made by Governor Ron DeSantis in support of the bill.

20. CAIR-Florida also issued public statements urging the Florida Legislature to censure then-State Representative Randy Fine in response to statements he made on social media concerning the death of a Turkish-American human rights activist.

21. As part of its broader civil rights work, and frequently in conjunction with CAIR, CAIR-Florida engages in advocacy and legal support related to Palestinian human rights. For example, CAIR and CAIR-Florida have represented and advocated on behalf of Students for Justice in Palestine (“SJP”) chapters targeted with governmental suppression of their exercise of freedom of speech and assembly, based on their disfavored viewpoints in support of Palestinian human rights. In November 2023, CAIR and CAIR-Florida sued Florida officials, including Governor DeSantis, on behalf of a local SJP chapter at the University of South Florida, challenging a state directive concluding that SJP chapters at Florida public universities must be deactivated. *See Students for Justice in Palestine at the Univ. of So. Fla. v. DeSantis*, No. 1:23-cv-00281 (N.D. Fla. 2023).

22. CAIR-Florida also helped successfully advocate for the return of Mohammed Ibrahim—a 16-year-old U.S. citizen detained by Israeli authorities

beginning in February 2025. In addition, CAIR-Florida issued public statements in March 2025 condemning actions taken by the Mayor of Miami Beach to close a movie theatre that was screening an Oscar-winning Palestinian documentary.

23. CAIR-Florida's advocacy also relates to the impact of anti-Palestinian sentiment in Florida, and has included petitioning state officials. For example, in March 2025, CAIR-Florida issued a press release and action alert urging Florida residents to request that State Attorney Amira D. Fox pursue hate-crime charges in connection with vandalism of a Palestine supporter's vehicle.

24. CAIR-Florida has consistently condemned U.S. support for the Israeli government's human rights abuses against the Palestinian people as a matter of public policy advocacy. CAIR-Florida has also condemned Hamas violence against Israeli civilians, including Hamas's attacks on October 7, 2023.

**CAIR-Florida's Operations**

25. CAIR-Florida operates statewide, with offices located in Tampa and Sunrise. It has six board members, all of whom are based in Florida; twelve staff members, eleven of whom are based in Florida; and four paid interns, all of whom are based in Florida. It also works with eight contractors, seven of whom are based in Florida, and two subcontractors, who are not based in Florida.

26. CAIR-Florida's staff includes four licensed attorneys, advocacy specialists with prior government experience, communications personnel with

extensive media and public relations expertise, and human resources personnel with institutional knowledge.

27. CAIR-Florida's staff and board members have chosen to work for the organization and serve on its board, respectively, because they believe in, and wish to contribute to, its policy, religious, and civil rights advocacy, including through their provision of specialized skills and speech to the organization.

28. CAIR-Florida has interests in properties and leases that run through July 2027, including in the building in which its Tampa office is located.

29. CAIR-Florida leases office space in Sunrise, Florida for its South Florida staff. That lease runs through September 2028.

30. CAIR-Florida has several financial accounts at multiple financial institutions.

31. To sustain its day-to-day operations, CAIR-Florida has entered numerous contracts, including for: utilities, internet access, staff cell phones, a phone system for fielding calls from community members seeking legal or advocacy support, a subscription service for managing legal files, a subscription service for managing legal dockets, and insurance coverage for employees and board members.

32. On a daily basis, CAIR-Florida responds to requests for legal or advocacy support from Florida residents statewide. It either provides those services

itself or, when it cannot do so, refers clients to other organizations that can provide adequate assistance.

**Targeting by Florida Officials**

33. On December 8, 2025, Governor DeSantis issued Executive Order 25-244, which unilaterally designated CAIR as a "terrorist organization," imposing severe penalties on CAIR and on persons or entities that obtain benefits or privileges regulated by Florida and provide "material support" to CAIR. On December 15, 2025, CAIR and CAIR-Florida filed a lawsuit challenging Executive Order 25-244 as violating their rights under the First and Fourteenth Amendments of the U.S. Constitution. On March 4, 2026, the district court granted a preliminary injunction enjoining enforcement of the Executive Order against CAIR. In discovery in the lawsuit, Governor DeSantis admitted that he also considers CAIR-Florida a "terrorist organization."

34. In January 2026, through an X post, Florida Attorney General James Uthmeier put the city commission of Coral Springs, Florida, "on notice" that "state and local resources cannot be used by any organization affiliated with CAIR." Following Attorney General Uthmeier's post, the South Florida Muslim Federation dissociated from CAIR-Florida, which had been a member of the Federation since its inception. CAIR-Florida was unable to take part in the Federation's annual conference in Coral Springs, of which CAIR-Florida had been a sponsor. CAIR-

Florida employees were also forced to withdraw from planned participation in multiple conference panels.

35. CAIR-Florida planned to use the 22nd floor of the Florida State Capitol—traditionally used by organizations hosting similar events—for its 2026 Muslim Day at the Capitol. CAIR-Florida submitted a reservation request on December 3, 2025, and subsequently followed up on it over the course of one month. CAIR-Florida received no indication that the space was reserved, merely being told that it was under review. On January 13, 2026, Capitol staff informed CAIR-Florida that the 22nd floor was no longer available.

36. On February 2, 2026, one day before Muslim Day at the Capitol, Attorney General Uthmeier again posted on X, describing CAIR-Florida's planned advocacy on behalf of Muslim Americans as a designated foreign terrorist organization "call[ing] for a presence around the Florida Capitol." He also requested that law enforcement "be on heightened alert for any possible security threats" and asked the public to alert law enforcement of "suspicious activity." An unusually large law enforcement presence focused on the event and its attendees, causing attendees to feel stigmatized and unsafe.

37. CAIR-Florida has never been charged with, let alone convicted of, a crime. Nor has it ever been designated by the federal government under the federal

terrorism sanctions and designation regime. As CAIR-Florida has repeatedly stated, it does not engage in or support terrorist activity.

**Consequences of Designation**

38. On July 1, CAIR-Florida learned that the Chief of Domestic Security had sent Governor DeSantis a notice of intent to designate CAIR as a "domestic terrorist organization." Governor DeSantis and other Florida officials have already indicated that they also consider CAIR-Florida to be a "terrorist organization."

39. Florida officials' prior statements have targeted both CAIR and CAIR-Florida, and CAIR and CAIR-Florida work closely with each other. The announcement of CAIR's imminent designation requires CAIR-Florida to take immediate measures to protect itself and its stakeholders from criminal and civil liability.

40. Unless the court prevents the impending designation of CAIR and the substantially likely designation of CAIR-Florida, CAIR-Florida will be forced to fully suspend its operations to protect itself and its employees, board members, contractors, volunteers, donors, and other community members from harsh criminal, civil, and administrative penalties. From my knowledge of CAIR-Florida, its stakeholders, and the community, I know that people have viewed the July 1 effective date of the law with fear already because of the criminal prosecution and

civil penalties risks it carries. CAIR-Florida also wants to protect its stakeholders from that risk.

41. CAIR-Florida wants to reduce the risk of liability to itself and its personnel, but winding down its operations will take time. CAIR-Florida is putting all staff on one month's paid administrative leave before July 8, 2026, the anticipated date designation will become effective. This will render CAIR-Florida unable to carry out its ordinary activities.

42. An effective designation (one published in the Florida Administrative Register) will force CAIR-Florida to terminate communications with, and outreach to, its network of hundreds of volunteers who support and assist CAIR-Florida in its statewide work.

43. Based on Florida officials' intended designation, CAIR-Florida has placed staff on standby to immediately shut down its social media presence. This means CAIR-Florida's staff will remove organizational social media accounts from their devices, turn off viewers' ability to interact with its posts, and post no new content. CAIR-Florida will also stop posting new press releases on its website, which it typically does once or twice per month.

44. An effective designation will prevent CAIR-Florida from continuing its longstanding association with CAIR to empower, educate, and defend Florida Muslims. CAIR-Florida will be forced to stop reporting to, and acting jointly with,

CAIR to carry out the organizations' shared mission through policy and legal advocacy, press releases, and other public communications and social media coordination. In addition, within Florida, CAIR-Florida will be unable to continue to associate with the mosques, community groups, and other nonprofit organizations with whom it has built ongoing partnerships, and with the members of the Florida public it serves.

45. An effective designation will leave CAIR-Florida unable to maintain its community helpline, leaving members of Florida's Muslim community who have experienced discrimination without access to its legal and advocacy support.

46. An effective designation will also prevent CAIR-Florida's attorneys from continuing to provide their clients with effective counsel. CAIR-Florida attorneys maintain a substantial immigration docket of more than 100 files, representing clients in Miami and Orlando immigration courts as well as in interactions with U.S. Citizenship and Immigration Services. CAIR-Florida's immigration practice frequently involves emergency matters, such as referrals from individuals in detention or facing other serious harm. CAIR-Florida also represents multiple clients across several cases related to discrimination, including cases currently pending before the Equal Employment Opportunity Commission. All communications between these clients and the federal government occur through CAIR-Florida. CAIR-Florida's clients will also require representation in two

upcoming mediations. In addition, CAIR-Florida jointly represents several Florida residents alongside CAIR in an out-of-state proceeding.

47. An effective designation will also force CAIR-Florida to suspend its community education work. For example, between July and October 2026, CAIR-Florida will have to cancel approximately ten planned trainings. During that period, its legal team is planning four Know Your Rights trainings for community members, and its communications staff have organized a series of media trainings for journalists and leaders of nonprofit organizations.

48. The cumulative effect of these consequences of designation is that CAIR-Florida's institutional voice will be silenced, and its advocacy on legal, policy, cultural, social, and civic issues of public concern will be completely suppressed. CAIR-Florida will also be indefinitely unable to benefit from the expertise of its employees, including its attorneys, advocacy specialists, and communications experts.

49. An effective designation will also jeopardize CAIR-Florida's fundraising, which will have a debilitating effect on the organization. CAIR-Florida depends entirely on grants and donations, neither of which it will be able to solicit once it suspends its operations.

50. Three annual fundraising galas are life-sustaining for CAIR-Florida because they account for more than half of its annual fundraising and support all

Case 4:25-cv-00515-AW-MJF Document 1-9 Filed 10/02/25 Page 16 of 19

aspects of the organization's work, from staff salaries and operational expenses to civil rights work, advocacy, outreach, and trainings. All three of CAIR-Florida's galas would typically be held from September to November. If CAIR-Florida were forced to cancel or postpone these events, it would significantly impair the organization's ability to fund its work.

51. CAIR-Florida is also concerned that its bank accounts will be frozen once a designation is effective , making it unable to fulfill its existing contractual obligations.

52. CAIR-Florida is also concerned that it will be unable to receive rent payments from tenants who lease properties in which CAIR-Florida has an interest. One tenant has already expressed concern to CAIR-Florida about exposure to criminal liability for paying rent.

53. By forcing CAIR-Florida to stop any communications and work with its stakeholders, criminalizing the basic functions and transactions it requires to operate, and silencing its speech across all its public platforms, an effective designation would effectively shut down the organization and prevent it from carrying out its faith-driven mission.

54. An effective designation will profoundly damage CAIR-Florida's standing in the community and its reputation. I believe it will cause community members to view CAIR-Florida and its employees with suspicion and

uncertainty—and people will cut ties or at least distance themselves from CAIR-Florida.

55. An effective designation will also hurt CAIR-Florida's ability to obtain its own counsel to represent it in current and future lawsuits. For example, CAIR-Florida is currently represented by counsel in Florida in *Illoominate Media, Inc. v. CAIR Florida, Inc.*, No. 9-cv-81179 (S.D. Fla. 2019), in which it is receiving settlement payments. There is a substantial risk that either designation will force CAIR-Florida's counsel to cut ties with it, leaving it unrepresented. An effective designation may also prevent CAIR from obtaining proceeds to which it is entitled from the case.

56. The costs of even a temporary suspension of CAIR-Florida's activities will be catastrophic, and the administrative burden of restarting CAIR-Florida's operations will be substantial. CAIR-Florida is a statewide operation with multiple offices and departments, all requiring contracts and subscriptions (such as Filevine and Quickbooks) to function.

57. If the designation becomes effective, CAIR-Florida will also be responsible for payments under any contracts it was unable to suspend before discontinuing operations, even if it is unable to use those services.

58. If the designation becomes effective, CAIR-Florida's staff may need to secure other jobs to support themselves or they may leave because of

professional concerns about affiliation with an organization that state officials have chosen to label "terrorist." The loss of any staff members with institutional knowledge and expertise from their tenure with CAIR-Florida would hurt the organization's ability to further its mission. In addition, CAIR-Florida would be required to delay its work while it hires and trains new personnel.

59. If the designation becomes effective, CAIR-Florida knows that repairing the reputational damage inflicted by the designation would require an extensive investment of time and resources. If CAIR or CAIR-Florida is designated as a "domestic terrorist organization," it will severely hurt CAIR-Florida's relationships with its donors, its partner organizations, and the communities it serves.

60. Further, following an effective designation, there is no guarantee that CAIR-Florida will ever be able to fully rebuild these relationships. For example, even though a court stopped CAIR's designation under Governor DeSantis's Executive Order from going into effect, CAIR-Florida has been unable to reestablish a regular presence at some mosques that stopped communicating with it when that designation was announced.

61. Similarly, an effective designation would force CAIR-Florida to rebuild its funding streams and donor relationships. Because it will not receive any donations or grants during the period for which its designation is in effect, CAIR-

Florida would have to divert substantial additional time, effort, and resources into its fundraising efforts to avoid falling into a deficit.

I declare under penalty of perjury that the foregoing is true and correct. This declaration is executed on July 2, 2026.

*/s/Wilfredo Ruiz*
Wilfredo Ruiz

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:25-cv-00516-MW-MJF

RONALD DESANTIS, in his official capacity
as Governor, State of Florida,

*Defendant*.

**PLAINTIFFS' EXPERT REPORT OF JASON BLAZAKIS**

## I. Introduction

**Qualifications and Background**

1. My name is Jason Blazakis. I am a Professor of the Practice at the Middlebury Institute of International Studies, where I also serve as the Executive Director of the Center on Terrorism, Extremism, and Counterterrorism. Prior to joining the Middlebury Institute in the summer of 2018, I served for more than a decade as the Director of the Office of Counterterrorism Finance and Designations within the U.S. Department of State's Counterterrorism Bureau (CT/CTFD). In that role, I led a team responsible for identifying, evaluating, and recommending whether to designate organizations or individuals as terrorists under the federal designation and sanctions framework. I have more than 25 years of experience in the counterterrorism, foreign policy, threat finance, sanctions, proliferation financing, and intelligence fields.[1] My professional background and qualifications, together with publications, are also set forth in my Curriculum Vitae, attached as **Exhibit A**. I am being paid $300 an hour for my work in this case, plus any travel expenses.

2. The Office of Counterterrorism Finance and Designations at the Counterterrorism Bureau was the State Department component with primary responsibility for evaluating and recommending designations of groups as Foreign Terrorist Organizations (FTOs) under Section 219 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1189. The office also led the evaluation and recommendation process for designations of entities and individuals as Specially Designated Global Terrorists (SDGTs) under Executive Order 13224, an authority that assigns designation

[1] The views expressed in this submission are solely those of the author and do not represent the views of the Middlebury Institute of International Studies, the Center on Terrorism, Extremism, and Counterterrorism, or any other institutions with which I am affiliated.

responsibilities to the Secretary of State and the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of Homeland Security.[2]

3. From early 2008 until July 2018, I estimate that I reviewed several hundred State Department and Treasury Department designation proposals. The vast majority of those proposals resulted in a designation. Over more than ten years of leading this work, however, there were also many occasions on which my office set a proposed designation aside because we did not have evidence sufficient to meet the legal requirements, or because we did not have intelligence reporting that we judged credible enough to support a designation. Those negative decisions were as much a part of the work as the affirmative recommendations. The federal designations description that follows reflects my own experience as Director of the Office of Counterterrorism Finance and Designations between 2008 and 2018, and the practices that prevailed during that period.

4. The team that performed this work was made up of professionals with substantial subject-matter expertise. Senior Office of Counterterrorism Finance and Designation analysts during my tenure typically held graduate degrees in relevant fields such as international relations, foreign regional studies, or law, and most had between five and twenty years of prior Office of Counterterrorism Finance and Designations within the U.S. Department of State's Counterterrorism Bureau in the U.S. government, the intelligence community, or specialized research institutions (such as think tanks) before joining the office. All held Top Secret/Sensitive Compartmented Information clearances and were trained to evaluate human-intelligence and signals-intelligence reporting, with particular attention to source credibility, source proximity to the underlying information, and the reporting record of individual sources over time. Our counterparts at the

[2] Throughout this submission, I use the terms entity, organization, and person, consistent with how those terms are used in the federal designation statutes and Executive Order 13224.

Department of the Treasury's Office of Foreign Assets Control (OFAC) and the Department of Justice's National Security Division included similarly experienced analysts and lawyers, many of whom had spent the majority of their careers working on terrorism designations or related sanctions matters. The interagency review process I describe below relied on that combined expertise at every stage. Today, I am a professor of the practice and have engaged with professionals in an academic context. I will say—squarely—the people I worked with as director of the Office of Counterterrorism Finance and Designations are among the very best professionals I've had the privilege to work with.

**Summary of Opinions**

5. Plaintiffs' counsel have asked me to provide my opinion about Governor DeSantis's process and justifications for designation of CAIR as a "terrorist organization" in light of my experience leading designations under the federal terrorism sanctions regimes.

6. Federal terrorism designation is a serious instrument. The designation criteria require findings of *conduct*—terrorist activity, or, in the case of SDGT designation, conduct meeting the standards set forth in Executive Order 13224—and not findings of ideology, religious affiliation, advocacy, or association alone. Designation under either FTO or SDGT authority carries severe legal consequences. A designated entity loses access to the U.S. financial system. Persons who provide material support to a designated foreign group, or for specific federal terrorism-related crimes, can face substantial prison sentences and civil penalties. Aliens associated with designated foreign groups are inadmissible to the United States.

7. The deliberative nature of the process my office and our interagency partners maintained reflects the gravity of those consequences. As I describe below, the federal designation process during my tenure was structured around three reinforcing requirements: a high evidentiary

threshold tied to conduct, an interagency review designed to surface operational and intelligence concerns before a designation was issued, and a layered legal review designed to ensure that the underlying record could withstand scrutiny by an Article III court. Each of those requirements served a distinct purpose: ensuring that designations were operationally sound and intelligence-driven, ensuring that they were legally defensible, and ensuring that they preserved the credibility of the designation regime itself.

8. During my tenure, the prospect of designating a U.S. person—whether an individual U.S. citizen or a U.S.-incorporated entity—was treated with substantially greater caution than the designation of a foreign person. There were two reasons for that caution.

9. First, U.S. persons retain constitutional rights, including under the First, Fourth, and Fifth Amendments, that the federal designation regime must accommodate. Federal courts have made clear that the procedural shortcuts the executive branch may take with respect to wholly foreign actors are unavailable when U.S. persons are involved. For example, in *Kindhearts for Charitable Humanitarian Development, Inc. v. Geithner* and *Al Haramain Islamic Foundation, Inc. v. U.S. Department of the Treasury*, federal courts held that the SDGT regime as applied to U.S. nonprofit organizations failed to satisfy the Fourth and Fifth Amendments in important respects. The constitutional violations included blocking assets pending investigation without a warrant supported by probable cause, and failing to provide the affected organization with adequate notice of the basis for action and a meaningful opportunity to respond before a neutral decisionmaker.[3] Those decisions were known to government lawyers and analysts working on

[3] *Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012).

designations during my tenure, and they shaped the procedural care taken when a U.S. person was even potentially within the scope of a proposed designation.

10. Second, in my experience, the universe of U.S. persons engaged in conduct rising to the threshold required for designation has been very small, and the universe of U.S.-incorporated nonprofit organizations engaged in such conduct has been smaller still. Executive Order 13224, the operative authority for SDGT designations, may authorize the designation of U.S.-based entities in limited circumstances. In my experience, those U.S.-person authorities were exercised sparingly and always against entities with a documented operational nexus to a foreign designated organization, rather than as freestanding instruments to designate domestic civil-society groups. Throughout my tenure, State and Treasury Department application of Executive Order 13224 always required a predicate evidentiary finding tied to specific wrongful conduct and did not provide a procedural shortcut around the heightened evidentiary expectations that apply to U.S. persons.[4] Over my decade as Director, no SDGT designation of a U.S.-incorporated nonprofit organization was ever recommended out of my office.

11. Another preliminary point is worth emphasizing. Judicial review of federal designations is meant to be meaningful and is a feature of the system rather than an afterthought. SDGT designations under Executive Order 13224 are reviewable in U.S. district court under the Administrative Procedure Act, and FTO designations under 8 U.S.C. § 1189 are reviewable in the U.S. Court of Appeals for the District of Columbia Circuit on the basis of the administrative record compiled by the Secretary of State. The rigor I describe below is calibrated in part to that judicial

---

[4] While Executive Order 13224 was amended in September 2019 by Executive Order 13886, those amendments did not relax the underlying evidentiary requirements I describe in this submission. Executive Order 13224, as amended, remains the operative SDGT authority today, and the predicate findings it requires continue to demand a rigorous conduct-based, primary-source administrative record that the federal designation process was built to produce.

review, but it is not driven by it. The same rigor served operational, intelligence, and institutional-credibility purposes that I will return to throughout this submission.

12. For the reasons set forth below, Governor DeSantis's Executive Order lacks any of the criteria or procedural protections required for a sound, credible, and lawful terrorism designation. The Executive Order's procedural architecture lacks carefully calibrated protections to guard against the grave consequences of applying the terrorism label to a U.S. nonprofit. The Governor has not relied upon the type, quality, or rigor of evidence that the federal designation regime required during my tenure. The evidence the Governor has relied on is grossly insufficient to justify the designation. When these fundamental safeguards are abandoned, terrorism designation becomes an instrument of harsh political pressure and punishment rather than a defensible finding based on lawful criteria and fact. Even worse, an unfounded terrorism designation can spell the demise of a lawful organization, subjecting it and those who associate with it to crippling reputational and financial loss, among other harms.

## II. The Federal Process for Designating Terrorist Entities

13. In the section that follows, I describe the process used by the State Department from 2008 through 2018 to designate Foreign Terrorist Organizations under 8 U.S.C. § 1189. With a few exceptions, one of which I will address below, all of the State Department's FTO and Executive Order 13224 designations during my tenure were initiated by an analyst with relevant subject-matter expertise. The process for SDGT designations under Executive Order 13224 paralleled the FTO process in most material respects, with certain important differences that I describe in a separate subsection at the end of this section.

14. **First—Identification.** Although my office pursued third-party designation requests originating from other U.S. government agencies, and on occasion from foreign government

counterparts, the vast majority of designations during my tenure originated from my office's own careful review of credible reporting and reliable information. An analyst on my team, or, in some cases, I myself, would identify a candidate group through review of classified intelligence reporting—including human-intelligence and signals-intelligence reporting—or, less commonly, through review of credible open-source information, such as confirmed claims of responsibility for violence published in established newspapers of record. What mattered at this stage was that the driver of the inquiry was the prohibited conduct of a group being considered for designation, the threat the group posed, and the strength of the underlying reporting. The driver was never the political profile of the group, the religion or ideology of its members, or the policy preferences of any particular administration.

15. **Second—Interagency Equity Check.** Once an analyst identified a candidate group, my office prepared a brief *equity check* document, typically one to two pages in length, summarizing the basis for considering the group for designation. The document drew on the available classified reporting and credible primary-source open-source information, and described the group's identity, wrongful conduct, structure, and the threat it posed. The equity check was then transmitted from my office, on my authority, to designated recipients across the U.S. government's national-security apparatus. The transmission was carried over a federal system designed to handle Top Secret information.[5] The recipients included subject-matter experts at the Central Intelligence Agency and other elements of the federal Intelligence Community, the Federal Bureau of Investigation, the National Security Council staff, the relevant policy bureaus at the Department of State, the Department of the Treasury, the Department of Defense, the Department of Homeland

[5] The information was transmitted over the Joint Worldwide Intelligence Communications System (JWICS), a federal system designed to handle information classified at the Top Secret/Sensitive Compartmented Information level.

Security, and the U.S. Agency for International Development, among others. The purpose of the equity check was twofold. It ensured that a proposed designation was operationally and legally sound from the outset, and it surfaced any objections or concerns from across the government before the more substantial work of compiling an administrative record was undertaken. Geographic policy bureaus at the State Department, in particular, often raised on-the-ground considerations, including objections grounded in diplomatic equities, ongoing operations, or country-specific intelligence sensitivities. Recipients had two weeks to evaluate the proposal. If no objections were received within that window, the Office of Counterterrorism Finance and Designations moved to the next step. If objections were received, the process paused for further review and, in some cases, for resolution at higher levels of the interagency review and consultation process. This was the most common stage at which a proposed designation was deferred or set aside. The consultation process provides an avenue for agencies to express concern to the agency proposing the designation. It is often a back-and-forth process where information is shared between agencies that allow for an informed decision to move forward.

16. **Third—Compilation of the Administrative Record.** Once the equity check process concluded without objection, an Office of Counterterrorism Finance and Designations analyst was assigned to compile the administrative record—the underlying legal and evidentiary basis for the designation. This was the most labor-intensive phase of the process. Compilation typically took several months, and in more complex cases substantially longer. The administrative record served two purposes. First, it documented the executive branch's evidentiary basis for concluding that the candidate group satisfied each of the statutory criteria. Second, it provided the record on which any subsequent judicial review would proceed. Both purposes, the executive branch's own need

for accuracy and reliability, and the need to construct a record capable of withstanding judicial scrutiny, disciplined the work.

17. The administrative record addressed each of the three statutory criteria for FTO designation: that the group is *foreign*; that the group engages in *terrorist activity or terrorism* within the meaning of the INA; and that the group's terrorist activity or terrorism *threatens the security of United States nationals or the national security of the United States*, which in practice is shown through evidence that the group threatens U.S. foreign-policy, defense, or economic interests. The first criterion, foreignness, is significant for the issues addressed in this submission. By statute, the State Department can only designate as an FTO a group that is not a U.S. entity. As of the date of this submission, no domestic group has ever been placed on the State Department's FTO list.

18. Each assertion in the administrative record relevant to a statutory criterion was supported by a citation to an *exhibit*, which is the term our office used for the underlying source document supporting that assertion. Exhibits were drawn primarily from classified intelligence reporting and from primary-source unclassified information. Our office's general principles for sourcing the administrative record can be summarized as follows. Primary sources were strongly preferred over secondary sources. Open-source material was used only where it was first-hand and credible, such as a verified claim of responsibility published in an established newspaper of record, or video evidence in which the leader of a group took responsibility for an attack on an authenticated platform. In my experience, unclassified primary-source material was almost always required to be corroborated by classified intelligence reporting from the U.S. Intelligence Community before being relied upon as a basis for designation, and that corroborating reporting was itself cited in the record. We did not rely on secondary sources, academic monographs, policy reports,

or finished intelligence products[6] as the evidentiary backbone of the record. At most, secondary materials provided contextual background, and even in that limited role they were subject to credibility review and were given little or no weight if they could not be reliably sourced.

19. A brief illustration may be useful. Suppose an administrative record needed to establish that a candidate group operated a training facility in a foreign country and was preparing an attack on a U.S. diplomatic facility. A typical exhibit drawn from CIA reporting might be characterized in the administrative record by reference to the source's reporting record, proximity to the information, and credibility—for example, by noting that the source had a multi-year reporting record and direct first-hand access to the underlying information. The substance of the reporting would then be summarized, with attention to specificity: the name and location of the facility, the nature of the training, the identity of the target. That description would allow the analyst, the agency lawyers, and ultimately a reviewing court to evaluate the strength of the underlying source. Federal intelligence agencies maintain their own internal tradecraft for evaluating sources before reporting is disseminated, and Office of Counterterrorism Finance and Designations analysts and agency lawyers were trained to read source descriptors with attention to that tradecraft.[7] The same exhibit, drawn from a single piece of CIA reporting, could in this hypothetical contribute to all three statutory prongs: foreignness, in that the facility is overseas; terrorist activity, in that the

---

[6] Finished intelligence products are themselves analyses prepared from underlying source reporting. CT/CTFD relied on the underlying primary-source reporting rather than the finished product, because the analysts in my office, working with agency lawyers, needed to evaluate the credibility, recency, and proximity of the original source directly, rather than rely on another analyst's interpretive judgment about it.

[7] The reliability of CIA reporting depends not only on the proximity and track record of the human source but also on the source-evaluation tradecraft applied by the collecting officer, which is itself an institutional practice subject to internal review. CT/CTFD analysts were trained to read those source descriptors with attention to that tradecraft, and agency lawyers reviewing the administrative record applied the same scrutiny.

group is preparing an attack; and threat to U.S. interests, in that the target is a U.S. diplomatic facility.

20. Administrative records are not short. In my experience they were routinely several hundred pages in length, and the compilation process was iterative. Office of Counterterrorism Finance and Designations analysts revised drafts in response to internal review, additional reporting, and the application of source-credibility judgments. The length and labor reflected the gravity of the underlying decision: each citation, each exhibit, and each judgment about the weight of a particular piece of reporting was made with the understanding that the final record would be reviewed not only by lawyers across multiple federal agencies, but also, in the event of judicial challenge, by a federal court.

21. **Fourth—Interagency Legal Review.** Once the analyst had completed a working draft of the administrative record, the Office of Counterterrorism Finance and Designations transmitted the record to lawyers at the State Department's Office of the Legal Adviser, the Department of Justice's National Security Division, and the Department of the Treasury (OFAC). The interagency lawyers reviewed the substance of the record and every exhibit. This phase routinely took several months, and in more complex cases more than a year. Lawyers reviewing the record were attentive both to the Executive Branch's own need for accuracy and reliability and to the prospect of judicial review. In my experience, the legal review was often iterative: lawyers raised questions about specific exhibits, asked for additional corroboration, or pressed the analyst to address potential weaknesses in the reasoning chain. That iterative process reflected the seriousness with which the Executive Branch treated the designation decision.

22. **Fifth—Action Memo and Federal Register Notice.** Once legal review was complete, the Office of Counterterrorism Finance and Designations assembled the final package of

decisional documents, which included an action memo to the Secretary of State, a draft Federal Register notice, and the administrative record. The action memo was a relatively short document summarizing the basis for the proposed designation and seeking the Secretary's decision. It included a line on which the Secretary indicated whether to approve or reject the proposed designation. If the Secretary approved, the Secretary signed the Federal Register notice, which is a statutory prerequisite for an FTO designation.

23. **Sixth—Congressional Notification.** Federal law requires the State Department to provide Congress at least seven days' advance classified notice of an FTO designation. During my tenure that notification was made through classified correspondence to designated leadership and committees of jurisdiction in the Senate and the House. The advance-notice requirement reflects an important element of legislative oversight. It allows members of Congress with national-security and foreign-policy responsibilities, and their professionally cleared staff, to review the designation determination before it takes legal effect. That review is itself a meaningful check on executive-branch designation authority.

24. **Seventh—Public Announcement.** Once the seven-day notification window elapsed, the State Department announced the designation publicly. Public announcements served two purposes. It put the designated entity on notice of the action against it, allowing it to invoke whatever procedural rights it had under the governing statute, including the right to seek judicial review. And it put the public on notice of the basis for the action, which is essential to the credibility of the designation system as an instrument of public policy. The public announcement consisted of three coordinated steps: publication of the Federal Register notice, an update to the Treasury Department's Specially Designated Nationals (SDN) list (which includes all groups and individuals subject to designations or other sanctions) to add the relevant identifiers, and a State

Department media note. To accomplish the SDN update, I sent Treasury's Office of Foreign Assets Control's director a short memorandum identifying the bio-identifiers to be added. Inclusion on the SDN list is the operative trigger for the financial-system consequences of designation: U.S. financial institutions screen against the SDN list, and a designated entity loses access to the U.S. formal financial system as a direct consequence of being added. The State Department coordinated the publication of the Federal Register notice, the SDN list update, and the media note as closely as possible in time.

**Specially Designated Global Terrorist designations under Executive Order 13224.**

25. The process I have just described tracks the FTO designation process. SDGT designations under Executive Order 13224 followed a closely analogous process, with certain differences that are worth identifying. First, designation authority under Executive Order 13224 is held by the Secretary of State and the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of Homeland Security. Designations originating from my State Department office followed essentially the same equity-check, administrative-record, and legal-review steps described above, but Treasury Department lawyers played a central role in legal review, and Treasury's Office of Foreign Assets Control played the operational role in implementing the designation through the SDN list. Second, the substantive criteria differ: Executive Order 13224 reaches a somewhat broader set of conduct than the statutory FTO criteria, including conduct supporting acts of terrorism or persons who commit acts of terrorism. Third, SDGT designations are not subject to the seven-day congressional pre-notification requirement that applies to FTO designations under § 1189(d), although Congress is regularly notified of SDGT actions through other channels. Fourth, judicial review of an SDGT designation lies initially in the U.S. district court rather than in the D.C. Circuit. And fifth, Treasury Department Office of Foreign Assets Control administers

a more developed reconsideration and licensing regime than the State Department maintains for FTOs, including the procedures set forth in 31 C.F.R. Part 501. These differences matter for the comparative analysis below, because the procedural protections that apply at the federal level—even those, like the SDGT regime's, that federal courts have already found constitutionally inadequate as applied to U.S. nonprofits—are substantially more robust than anything the Florida Executive Order against CAIR provides.

26. The federal designation process I have described was deliberative and time-intensive. It was, in my experience, the most rigorous designation process I have encountered, including in comparison with the analogous processes maintained by allied governments. It was and is not perfect. It can be slow—intentionally so to ensure accuracy, verification, and credibility. The standard we used for designation, a reasonable basis to conclude that the statutory criteria are met, is not the standard that applies to a criminal prosecution; it was not intended to be, and we were aware that as applied to U.S. entities, at least, the standard could raise constitutional concerns. But the process was built around procedural and evidentiary disciplines that, taken together, were designed to ensure that designations are accurate, defensible, and credible. Those are the disciplines I now compare to the process used by the Governor of Florida in his Executive Order designating CAIR a terrorist organization.

## III. The Florida Executive Order Is Lacking Procedural Safeguards

27. Under applicable federal law and throughout my time in practice, the federal designation regime contained procedural protections that the Florida Executive Order does not contain. Section 219 of the INA entitles a designated organization to seek judicial review of the Secretary of State's designation in the D.C. Circuit on the basis of an administrative record that the Secretary compiled, that includes both classified and unclassified material, and that is subject to

review by an Article III court. Designations under Executive Order 13224 are subject to reconsideration procedures under 31 C.F.R. Part 501 and to judicial review under the APA, with the executive branch obligated to furnish the designated party with an unclassified evidentiary summary and an opportunity to submit rebuttal information. These provisions are separate from any constitutional challenges that may be raised.

28. The Governor's Executive Order designating CAIR provides none of this. There is no administrative record. There is no reconsideration mechanism. There is no statement of reasons or evidence or even an unclassified summary furnished to the affected party. There is no opportunity for the affected party to be heard before the designation issues. There is no court that has been provided a record to review at the time of the designation. The affected party learns of the designation in the same way the public does: from a press release. As I noted in Section I, federal courts have already held that even the federal SDGT regime, which provides at least the unclassified-summary procedure and the post-deprivation reconsideration mechanism just described, failed to satisfy the Fourth and Fifth Amendments as applied to U.S. nonprofit organizations. The Florida Executive Order, which provides none of those protections, does not even reach the procedural floor that federal courts have already found constitutionally inadequate.

29. The evidentiary predicates the Governor has cited are also weaker than the Executive Order suggests.

30. The Governor has relied substantially on the naming of CAIR on a list of 246 groups and individuals labelled as unindicted co-conspirators in the 2008 Holy Land Foundation (HLF) prosecution. But the unindicted-co-conspirator mechanism is not an adjudication of guilt. It is an evidentiary predicate under Federal Rule of Evidence 801(d)(2)(E) for potential admission of statements against indicted defendants. The public listing was, by the Department of Justice's

own characterization to the Fifth Circuit, an unfortunate oversight: the list was supposed to have been filed under seal. In 2010, the Fifth Circuit noted a federal district court's finding that the public filing of that list violated the Fifth Amendment due-process rights of the named organizations, subjecting them to the loss of reputation without being afforded a forum in which to contest their listing.[8] Moreover, the listing of CAIR in the Holy Land Foundation case is more than 17 years old and the underlying information in that case is even older. A stale document that the federal district court and Fifth Circuit held had been improperly disseminated in violation of due process is, in my professional judgment, an exceptionally thin basis on which to ground a state-level terrorism designation in 2025 or 2026. It is, instead, more telling that CAIR has never been indicted, never been charged, never been convicted—then or since.

31. The Governor's own discovery campaign in this litigation reveals the depth of the evidentiary gap. On April 17, 2026, the Governor served three discovery instruments on CAIR: interrogatories, requests for admission, and requests for production. Together, they seek CAIR's donor records from foreign sources dating to 1993, every communication since 1993 touching on a wide range of subjects related to the conflict in the Middle East, every foreign or foreign-funded trip taken by any executive since 2023, and every communication between CAIR and a sprawling list of foreign entities and individuals including purported donors in Qatar, Kuwait, the United Arab Emirates, and Saudi Arabia. The requests reach back more than three decades, substantially predating the Executive Order itself.

32. In the federal system in which I worked, the administrative record is compiled *before* the designation issues. The record is the basis for the designation, not its product. A federal terrorism designation that issued first and then attempted, through litigation discovery, to assemble

---

[8] *United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 688 (5th Cir. 2010).

the evidentiary record that should have preceded it would have been recognized at every stage of the interagency process I have described—the equity-check, the analyst's compilation of the administrative record, the lawyers' review, the action memo to the Secretary—as procedurally and substantively defective. It would never have been permitted. The federal designation architecture was built, over decades and across administrations, precisely to ensure that the gravity of the official terrorism label followed after a substantiated and credible evidentiary record rather than asserting the authority to demand or create one. The Governor's Executive Order approach inverts that sequencing. The Executive Order labels CAIR a terrorist organization first, and the Governor now tries, through attempted discovery into three decades of a nonprofit's records, to substantiate the label retroactively.

33. That inversion is not a minor procedural irregularity. It is a fundamental departure from the design of the federal designation system that I knew and implemented. A designation regime in which the label precedes the record is not a designation regime as I understand and have practiced that term. It is, instead, a mechanism that relies on the consequences of the label—third-party disassociation, financial pressure, reputational harm—to conjure up an evidentiary basis the Governor did not possess at the moment the label was affixed. None of the procedural and evidentiary disciplines I described in Section II is present here.

**IV. The Evidence Cited by the Governor is Insufficient**

34. In examining the materials[9] relied upon by the Governor of Florida to justify the designation of the Council on American-Islamic Relations as a terrorist organization, I have concluded that the Governor has not relied upon the type, quality, or rigor of evidence that the federal

[9] Declaration of Jay K. Arnold, Jr., *CAIR-Foundation, Inc. v. DeSantis*, No. 4:25-cv-516-MW-MJF (N.D. Fla. Feb. 11, 2026), Dkt. No. 37-1; Defendants' Responses to Plaintiffs' First Set of Interrogatories (Apr. 22, 2026).

designation framework would require. The materials cited consist primarily of policy reports, academic analyses, and secondary-source compilations. Even setting aside the question whether such materials might have probative value in some other context, they are not of the type that the State Department Office of Counterterrorism Finance and Designations would have relied upon as the evidentiary backbone of a designation administrative record, let alone a record supporting the designation of a U.S.-incorporated nonprofit.

35. The sources referenced include works such as *The Muslim Brotherhood's U.S. Network* by Zeyno Baran, *The Muslim Brotherhood in America: A Brief History* by Lorenzo Vidino, and several publications affiliated with the George Washington University Program on Extremism. These works purport to map historical relationships, ideological affinities, and institutional developments within a broader system of organizations. They do not establish, and they do not purport to establish, that CAIR itself has engaged in terrorist activity, provided material support to terrorism, or operated under the direction or control of a federally designated terrorist organization.

36. This distinction is foundational to the designation work I led. As I described in Section II, the federal designation framework requires that every assertion supporting a designation be grounded in reliable, primary-source evidence, in my experience usually classified intelligence reporting, corroborated credible primary-source open-source reporting, or first-hand documentation, and that the entire record be subject to rigorous interagency legal review. In my experience, secondary materials such as academic studies and policy reports were not relied upon as the evidentiary backbone of an administrative record. They were used, if at all, to provide contextual background, and even in that limited role they were subject to credibility review and given little or no weight where their reliability could not be tested. A determination that an organization is a terrorist entity, with the grave consequences such a determination carries, should, at bare

minimum, rest on a demonstrated factual showing, with specificity, that the organization has engaged in or materially supported *terrorist conduct of a particularly serious nature*: planning, directing, or carrying out attacks; financing, equipping, or providing operational support to those who do; or otherwise meeting the conduct-based designation criteria. The works the Governor relies upon do not make that showing.

37. The materials relied on by the Governor fall short of the federal evidentiary standard in several distinct and important ways.

38. **First, the materials rely heavily on association-based reasoning.** A substantial portion of the Governor's materials turn on alleged historical or ideological connections between CAIR and elements associated with the Muslim Brotherhood. Even if such connections in fact existed—which the materials do not establish in a manner consistent with federal evidentiary discipline—in my experience, mere association has not been a sufficient basis for designation under the federal framework. Throughout my tenure, our application of the federal regime required demonstrable conduct: participation in terrorist acts, facilitation of terrorist operations, or knowing and intentional provision of material support to a federally- designated organization. Association-based designation is particularly dangerous in a U.S. domestic context because it could convert the serious terrorism label into one that reaches advocacy, religious affiliation, and other constitutionally protected activity. In my experience, that is precisely what federal designation policy and practice has been carefully designed to avoid.

39. **Second, the materials do not establish any operational involvement in terrorism.** There is no evidence in any of the materials I have reviewed that CAIR has planned, directed, or carried out terrorist activity. There is no substantiated showing that CAIR has knowingly and intentionally provided financial, logistical, or other material support to a designated terrorist

organization. The absence of operational evidence would, in my experience, be dispositive against designation under the federal framework. My office at the State Department did not recommend designations on records that lacked operational evidence, and the lawyers reviewing those records would not have approved them if it had.

40. **Third, the materials are methodologically unsuited to serve as a legal basis for designation.** They are not evidentiary records. They were not assembled with the intent of meeting any statutory criterion. Their conclusions are interpretive rather than dispositive. They do not include the kind of source-credibility evaluation that I and my colleagues relied upon and required in federal intelligence reporting, and they do not lend themselves to the kind of exhibit-by-exhibit corroboration that a sound and credible administrative record requires. In contrast, throughout my time in federal service, the administrative record was constructed with attention to anticipated judicial review and was therefore built upon verifiable, attributable, and corroborated sources. The materials cited by the Governor were not constructed for that purpose.

41. **Fourth, the Governor's reliance on these materials underscores the absence of evidentiary discipline in the designation.** As I described in Section III, the Governor's Executive Order does not require the creation of an administrative record, does not mandate interagency vetting, and does not define what constitutes sufficient proof. The result is that the Governor made dispositive decisions based on materials that would not have formed the basis for a terrorism designation during my tenure in federal government.

42. **Fifth, several of the cited materials are stale, and others raise independent concerns of bias.** These are two distinct problems and they should be addressed separately. *Staleness* is a problem because the relevant question for any terrorism designation, federal or otherwise, is whether the entity is engaged in qualifying and prohibited conduct now. Reporting from many

years ago, even if it were probative when produced, may have been overtaken by subsequent events, and its evidentiary value diminishes accordingly. The Hudson Institute report by Zeyno Baran dates to 2008, as does the congressional hearing titled *The Muslim Brotherhood's Global Threat*. A subsequent hearing in 2018 covered similar ground but does not contain the kind of contemporary primary-source material that a designation record would require. The Office of Counterterrorism Finance and Designations general practice was to disfavor reliance on stale reporting where more recent corroborating material was unavailable.

43. More recent George Washington University Program on Extremism reports, including those issued in 2024 and 2025, present a related but distinct concern. As a substantive matter, these reports do not contain primary-source documentation of CAIR's involvement in support of terrorism; they assemble interpretive arguments from publicly available materials and prior secondary scholarship. That alone would have sharply limited their evidentiary value in the federal designation context during my tenure. Independent of that substantive limitation, however, these reports raise concerns of *bias*. As an expert in the terrorism designation and sanctions field, I have followed credible reporting in *The New Yorker* and other mainstream outlets which indicates that the Program on Extremism's director, Lorenzo Vidino, entered into a paid contractual relationship in 2018 with a private intelligence firm executing a foreign-government influence operation whose explicit aim was to brand Muslim organizations in certain countries as Muslim Brotherhood fronts.[10] For example, an analytical report produced in that period by Mr. Vidino was used by Austrian police as a basis for Austria's Operation Luxor, a series of raids on Muslim homes. An Austrian appellate court subsequently ruled those raids unlawful. That record raises serious

[10] David D. Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, New Yorker (Mar. 27, 2023), https://www.newyorker.com/magazine/2023/04/03/the-dirty-secrets-of-a-smear-campaign.

concerns about the independence of certain analytical outputs from the Program on Extremism and Mr. Vidino, and would warrant substantial caution in relying on such materials in any designation context.

44. In my time at the Office of Counterterrorism Finance and Designations, I would not have advanced to the Secretary of State a designation record that rested in material part on outputs derived from a documented foreign-influence operation. Doing so, simply put, would have invited a legal risk to the designation and potentially undermined the credibility of the federal terrorist designations regime.

45. **Sixth, the Governor's evidentiary case leans disproportionately on the work of a single scholar.** The Governor relies on two publications by Lorenzo Vidino, including a recent 2025 monograph.[11]

46. In addition to the concern about bias above, reliance on a single author's interpretive framework, however credentialed, is methodologically unsound. The 2025 Vidino monograph illustrates why. I have reviewed the Vidino monograph, which rests on a smattering of historical assertions about associations and ideological lineage, much of which is stale. The monograph does not document terrorist activity, operational planning, or material support to designated terrorist organizations by CAIR. It is not, in other words, the kind of evidentiary work that a federal designation record requires.

47. Sound designation practice requires triangulation across independent governmental, intelligence-community, judicial, and primary-source materials. It does not consist of layering a single analyst's conclusions atop derivative, secondary, and dated citations.

---

[11] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* (Geo. Wash. Univ. Program on Extremism, July 2025), https://extremism.gwu.edu/muslim-brotherhood-america-brief-history.

48. **Seventh, any invocation of foreign designations as corroboration for the designation of CAIR would be misplaced.** Based on my work in this field, I know that the United Arab Emirates' 2014 listing of CAIR[12] is sometimes invoked as if it conferred substantive validity. It does not. During my tenure, the federal government did not treat another sovereign's terrorist listing as a substitute for the independent statutory and evidentiary processes that govern FTO designations under 8 U.S.C. § 1189 or SDGT designations under Executive Order 13224. Foreign designations were sometimes useful as leads or as sources of additional reporting, but they were not themselves evidentiary substitutes for the administrative record. The UAE listing in particular is poorly suited to serve as justification or corroboration of a terrorism designation. The Emirati government has a documented political and ideological hostility toward the Muslim Brotherhood and toward organizations it perceives as ideologically adjacent. That hostility dates to the Emirati government's domestic crackdown, following the 2011 Arab Spring uprisings, on local civil-society, democracy-promoting, and human-rights groups. The UAE's subsequent 2014 terrorist designation list swept in dozens of mainstream civil-society and advocacy organizations across the West with little or no transparent evidentiary foundation or basis. Citing the UAE list as corroboration would import a foreign government's politically motivated framing and bias rather than supplying the independent proof that the federal constitutional and statutory framework requires.

49. **Eighth, the absence of any prior federal designation of CAIR is itself probative.** Despite the longstanding public availability of the materials the Governor cites, and many similar materials, the federal government never designated CAIR or any of its chapters as a terrorist entity under either the FTO or the SDGT regimes. This is not for lack of awareness of these

[12] VOA News, *UAE Includes 2 US Muslim Groups on Terror List,* Voice of Am. (Nov. 17, 2014), https://perma.cc/3KBX-J94Y.

materials or consideration. I was well aware as office director that there was political interest, including from members of Congress, in seeing CAIR designated. The federal government has had ample opportunity, over multiple administrations and across the full weight of the intelligence and law enforcement apparatus, to evaluate the available information. In my opinion, the fact that CAIR has never been federally-designated reflects the disciplined application of the federal designation criteria and evidentiary framework to that information. The Governor also cites a recent Executive Order by the President directing the State Department to consider designations of certain Muslim Brotherhood chapters as Foreign Terrorist Organizations, and the State Department has taken action against a few such groups. But none of those federally designated foreign groups is CAIR. Based on my experience in government, there has been no basis, let alone one that would survive judicial scrutiny required under the designation criteria and law applicable to U.S. organizations, for designating CAIR.

50. In sum, the materials cited by the Governor do not satisfy the evidentiary requirements that govern federal terrorism designations. They are interpretive rather than evidentiary, association-based rather than operational, and contextual rather than probative. During my tenure, these materials certainly would not have played a foundational role—if any role at all—in an administrative record. My colleagues and I would have considered them non-probative, unreliable, and incapable of surviving judicial scrutiny. The Governor's reliance on them reflects a fundamental deficiency in approach: the substitution of inference for evidence.

## V. Conclusion

51. The federal terrorism designation framework was built, over decades and across administrations, around a coherent set of disciplines: an evidentiary threshold tied to demonstrable and serious conduct rather than ideology or association, an interagency review process designed

to surface operational and intelligence concerns before designation, layered legal review designed to ensure the record could withstand judicial scrutiny, and heightened procedural and substantive care where U.S. persons are even potentially within the scope of the action. I saw firsthand that those disciplines exist for good reasons. My colleagues and I implemented them to protect the integrity of the designation tool itself. We sought to ensure that designations were accurate, defensible, and credible. We respected and aimed to preserve the constitutional rights of U.S. persons. And we worked to sustain public confidence in the designation regime as an instrument of national-security policy rather than political action.

52. The Florida Executive Order does not contain those disciplines. Based on my review, it seems that the Governor has not assembled an administrative record before designating CAIR. The Governor has not conducted an interagency process, with officials possessing relevant expertise, before labeling CAIR a terrorist entity. The Governor did not provide CAIR with notice of the basis for the action or an opportunity to respond before the designation issued. The Governor has relied on materials—interpretive scholarship, stale reporting, and outputs from sources whose independence is in serious question—which would not satisfy the evidentiary requirements of a federal administrative record. The Governor's own ongoing discovery demands in this litigation confirm that the evidentiary record the state now seeks to assemble was not in hand at the moment the Governor branded CAIR a terrorist organization.

53. In my experience, the absence of a federal designation of CAIR, despite many years of consideration across multiple administrations, reflects the rigorous application of the federal designation criteria and evidentiary framework to the same broad universe of information on which the Governor now relies. The procedural and evidentiary architecture of the Governor's Executive

Order does not approach the kind of rigor and analysis I observed, applied, and upheld in federal government service.

54. During my State Department tenure, the federal terrorism designation framework was carefully calibrated to ensure that the grave consequences of applying the terrorism label—financial exclusion, criminal exposure for those who engage with the designated entity, severe reputational harm—were solidly grounded in an evidentiary determination that was made with discipline. When that calibration is abandoned, designation becomes an instrument of harsh political pressure and punishment rather than a defensible finding based on fact. For the reasons set forth in this submission, the Governor's Executive Order does not reflect the application of a calibrated process. It reflects its absence.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of May, 2026.

Jason Blazakis

Jason Blazakis

## Exhibit A

# Jason M. Blazakis

**Contact Information: 202-215-5807** **jblazakis@middlebury.edu**
**https://www.linkedin.com/in/jason-blazakis-ba9034139/**

## Executive Profile

I am a national security professional with 25+ years of experience spanning counterterrorism, foreign policy, threat finance, sanctions, proliferation financing, and intelligence. I have helped shape U.S. counterterrorism policy and partnered with governments, international organizations, and the private sector to translate complex threats into actionable strategy.

I am a Professor at the Middlebury Institute of International studies where I also currently serve as Executive Director of the Center on Terrorism, Extremism, and Counterterrorism. At Middlebury, my work focuses on the evolving threat landscape at the intersection of terrorism, illicit finance, emerging technology, and geopolitical risk. In recent years, a growing share of my research and client work has centered on AI and security.

## Experience and Key Accomplishments

**Professor of the Practice**
**Middlebury Institute of International Studies (MIIS)**
**July 2018 – Present**
Permanent faculty (full professorship) member teaching courses on economic warfare, preventing/countering violent extremism, terrorism, counterterrorism, sanctions, and intelligence. Two peer-reviewed academic books published. In 2024 (Lynne Rienner Publishers): The Mediterranean Connection, which explores illicit activity in North Africa and Europe. In 2026 (Cambridge University Press): Terror Disrupted: Countering the Financing of Terrorism.

**Scholarly Metrics** *(Google Scholar, as of May 2026)*
Total citations: 1,256 (1,157 since 2021); h-index: 7; i10-index: 4 - produced in less than seven years, following transition from federal government service to academia in late 2018. The corpus spans counterterrorism financing, sanctions policies, terrorist designations policy, the financing of the radical right, private military companies, and the social impacts of large language models, and includes two scholarly books (Cambridge University Press, 2026; Lynne Rienner, 2024), peer-reviewed articles and chapters, policy monographs for RUSI, the Soufan Center, the Global Center on Cooperative Security, the Resolve Network, and CTEC, and commentary in *Foreign Affairs*, *Foreign Policy*, *Lawfare*, the *Georgetown Journal of International Affairs*, and the *International Journal of Intelligence and Counterintelligence*.

Citation profile includes a 2019 co-authored study on the release strategies and social impacts of language models, cited more than 1,100 times and now a foundational reference in AI safety, a research stream extended through subsequent work on the industrialization of terrorist propaganda and on large language models and terrorist financing.

**Executive Director**
**Center on Terrorism, Extremism, and Counterterrorism (CTEC)**
**July 2018 – Present**
Directs research and education efforts related to the study of terrorism, extremism, and counterterrorism. Managed multi-million-dollar program between 2018–present.

**Independent Consultant**
**January 2023 – Present**
Led multiple workshops in 2023 and 2024 to build the capacity of the Nigerian Government in the area of targeted financial sanctions — specifically assisting in the areas of FATF Recommendations 6 and 7. Between 2020-2024 led multiple workshops in Jordan, North Macedonia, and Albania in the area of proliferation financing, sanctions evasion, terrorism financing, financial investigations, and targeted financial sanctions. In July 2023, deployed to Malaysia to provide capacity building training for multiple southeast Asian countries in the area of proliferation financing and targeted financial sanctions. In 2023, working with the Council of Europe, I delivered a training for the Government of Ukraine in the area of targeted financial sanctions. Between 2018–2024 deployed on multiple occasions for various components of UNODC (GPML and TPB) to provide training in the areas of terrorism financing, targeted financial sanctions, and proliferation financing. Also, on behalf of the UN, I developed SOPS and e-learning course modules on the topics of UN sanctions, domestic sanctions, relevancy of FATF recommendations, terrorism financing, and proliferation financing. In 2025, I worked on an operational frameworks project, related to EU-based Financial Intelligence Units, on behalf of the Council of Europe.

**President and CEO**
**Riptide Threat Mitigation Group (RTMG)**
**July 2018 – December 2022**
Founder, President, and CEO of a geopolitical risk consultancy group that specialized in identifying and analyzing threat information to protect business interests and minimize reputational risks. Provided specialized training and capacity building services in the area of terrorist finance, P/CVE, proliferation finance, and sanctions.

**Senior Advisor**
**The Soufan Group**
**November 2019 – August 2023**
Carried out all source investigations for various private clients regarding threats to business interests. Provided all-source analytical support on hostage recovery/kidnapping cases.

**Senior Research Fellow**
**The Soufan Center**
**November 2019 – August 2023**
Authored reports and daily intelligence briefings for the Soufan Center's public facing enterprise.

**Editorial Advisory Board**
**Journal of Intelligence and Counterintelligence**
**January 2020 – August 2022**
Served as an advisor on the editorial board for an academic journal that publishes peer-reviewed articles on issues within the field of intelligence and counterintelligence.

**Director, Office of Counterterrorism Finance**
**Bureau of Counterterrorism, U.S. Department of State, Washington, DC**
**June 2008 – July 2018**
Led team of Foreign and Civil Service officers, U.S. federal agency representatives (OFAC, FinCEN, Intelligence Community), and contractors. Advised the Secretary of State to sanction individuals and entities as terrorists, ensuring recommendations are legally defensible and persuasive. Briefed Congressional Members and Staff, describing the process and rationale for the Secretary's actions. Worked directly with foreign partners to ensure they carry out parallel actions with the United States. Led U.S. Government delegations to foreign-hosted events discussing terrorism and the financial activities of terrorists. Represented the Department of State at National Security Staff-chaired meetings on terrorist activities. Formulated and coordinated counterterrorism policies with other U.S. Government departments and agencies. Expert on terrorism, criminal, and proliferation financing.

Top Secret clearance with access to Sensitive Compartmented Information. Single Scope Background Investigation.

Key Accomplishments:

- Secretary of State designated over 500 terrorist organizations and individuals since 2008, denying access to financial assets and other property, prohibiting travel to the United States, and establishing a basis for legal action against these entities.

- Managed the State Sponsor of Terrorism portfolio. Regularly led State Department efforts related to sanctions of Iran, North Korea, Sudan, and Syria. Office was the lead on Cuba's delisting as a State Sponsor of Terrorism.

- Ensured international counterpart compliance with Departmental sanction-related activities. Worked on daily basis with OFAC, FINCEN, and other Treasury Offices on sanctions issues.

- Managed evaluation and award of multimillion-dollar proposals and grants for anti-money laundering and counterterrorism finance programs.

- Worked closely with multiple foreign governments to include but not limited to: United Kingdom, France, Canada, Australia, New Zealand, India, Singapore, and Russian Federation.

- Conducted multiple on-ground training of foreign government personnel in the area of terrorism sanctions and finance. Developed modules and content for the training of foreign government personnel.

- Led U.S. efforts in nomination of individuals and organizations for listing at multiple UN sanctions committees. Worked regularly with UN and maintained strong personal contacts with UN counterparts. In tandem with UN experts, trained foreign governments on matters related to implementation of UN sanctions.

- Served as the Head of Delegation for the U.S. Government at multilateral counterterrorism meetings. Advocated for United States Government counterterrorism policy positions and views, leading to increased collaboration with foreign governments to enhance worldwide counterterrorism efforts.

- Delivered speeches to audiences as varied as the Vatican, Portugal's national security establishment, and the University of Lisbon on terrorism and terrorism finance. Regularly delivered speeches on sanctions.

- Evaluated all-source intelligence information to detect which threats the Secretary of State should sanction as terrorists. State Department's resident expert on sanctions and terrorism.

- Outstanding staff retention rates are a result of fostering a collaborative, objective, and creative office atmosphere, leading to increased productivity.

**Intelligence Operations Specialist**
**Bureau of Intelligence and Research, U.S. Department of State, Washington, DC**
**July 2005 – June 2008**
Identified new resources, business practices, and technologies that were used to improve intelligence support to Ambassadors and other senior diplomats. Coordinated proposals from the National Security Agency with Department offices and lawyers to ensure signals intelligence activities are consistent with foreign policy objectives, a key tenet of Executive Order governing intelligence activities.

**Presidential Management Fellow**
**Bureau of Political Military Affairs, U.S. Department of State, Washington, DC**
**January 2004 – July 2005**
Implemented Presidential directive, certifying foreign policy interests are considered before the Defense Department conducts exercises in politically sensitive geographic locations. Ensured that U.S. military units complied with Congressionally mandated human rights restrictions on military assistance and training activities with foreign forces.

**Head of Narcotics Affairs Section, U.S. Embassy Kabul**
**U.S. Department of State, Washington, DC**
**2004**
Frequent and extended travel to Afghanistan provided real-time management of counternarcotics programs. In-country experience increased credibility with senior Afghan and U.S. Government officials. Managed multimillion-dollar budget, ensuring funds for projects designed to reduce narcotics production in Afghanistan were efficiently administered. Represented State Department at Afghanistan Interagency Operations Group meetings chaired by the National Security Council.

**Congressional Research Service**
**Library of Congress, Washington, DC (Domestic Intelligence Analyst)**
**October 2003 – January 2004**
Authored first ever Congressional Research Service report on unmanned vehicles, “Border Security and Unmanned Aerial Vehicles.”

**Legislative Assistant**
**Congressman Jim Saxton (Retired-Republican-NJ), Washington, DC**
**November 1997 – June 2001**
Advised nine-term Congressman on foreign policy, national security, judiciary, counterterrorism, WMD and non-proliferation, telecommunications, intelligence, and cyber issues. Legislation enacted by drafting bills, building bipartisan coalitions, and obtaining co-sponsors. Appointed by Chair, House Armed Services Committee Special Oversight Panel on Terrorism to serve as liaison to the Oversight panel.

## Academic Experience

**Adjunct Lecturer**
**Johns Hopkins University**
**August 2016 – Present**
Currently teaching a course on Terrorist Financing and Sanctions

**Adjunct Lecturer**
**University of Maryland**
**January 2012 – Present**
Developed and taught courses on terrorist finance, the rise of ISIL, and terrorist motivations, and “From Theory to Practice.”

## Education

**Columbia University, School of International and Public Affairs, New York, NY**
Master of International Affairs, May 2003.

**Johns Hopkins University, School of Arts and Sciences, Washington, DC**
Master of Government, May 2001.

**University of Mississippi, School of Liberal Arts, Oxford, MS**
Bachelor of Arts, May 1997.

## Honors and Awards

**Sanctions Designation by the Government of the Russian Federation** (2022)
Designated by the Russian Federation under retaliatory sanctions imposed in response to US support for Ukraine, in recognition of public criticism of the Russian Federation and analytical work on the Wagner Group, the Russian Imperial Movement, and Russia's status as a state sponsor of terrorism.

**Superior Honor Award**, Bureau of Counterterrorism, U.S. Department of State (October 2012) *"For outstanding sustained level of high performance in managing the Counterterrorism Bureau's Office of Terrorist Designations and Sanctions."*

**Quality Step Increase**, Bureau of Counterterrorism, U.S. Department of State (July 2011) *"Quality Step Increase In Recognition of Outstanding Performance."*

**Meritorious Honor Award (Team)**, Bureau of Counterterrorism, U.S. Department of State (December 2010) *"For superior performance and dedication to strengthening the effectiveness of terrorist designation regimes and pursuing new designations of terrorist groups, individuals and entities during 2010, including four new Foreign Terrorist Organizations."*

**Meritorious Honor Award**, Bureau of Counterterrorism, U.S. Department of State (April 2010) *"In recognition of extraordinary performance and accomplishments in support of U.S. Counterterrorism policy during 2009 in his regular duties as the Designations Unit Chief for the U.S. Coordinator for Counterterrorism, and his outstanding coverage as the Acting Director of Trans-Regional Affairs and Multilateral Affairs Unit Chief to strengthen U.S. multilateral counterterrorism engagement."*

**Quality Step Increase**, Office of the Coordinator for Counterterrorism, U.S. Department of State (April 2009) *"In recognition of Outstanding Performance."*

**Meritorious Honor Award (Team)**, Bureau of Counterterrorism, U.S. Department of State (December 2008) *"S/CT Designations Unit — For outstanding teamwork and dedication in conducting 29 statutorily required five-year reviews of Foreign Terrorist Organizations and directly supporting the war on terrorism by curtailing support for terrorist activities."*

**Meritorious Honor Award**, Bureau of Intelligence and Research, U.S. Department of State (May 2007) *"For sustained outstanding performance in the Office of Intelligence Resources. You have demonstrated a high degree of writing ability, strong interpersonal skills, and a great willingness to take on new tasks while serving as the action officer responsible for INR's interaction with technical collection agencies on sensitive coordination issues."*

**Meritorious Honor Award**, Bureau of Political and Military Affairs, U.S. Department of State (June 2005) *"In recognition of outstanding leadership in the development of new procedures for the Department's process for issuing diplomatic clearances for foreign government aircraft to enter U.S. airspace, thereby enhancing U.S. homeland security while providing improved efficiency of communication with over 172 foreign embassies and missions."*

**Presidential Management Fellowship**, U.S. Office of Personnel Management (December 2005) Awarded to fellows selected through a competitive, government-wide process for outstanding leadership potential and commitment to public service; assigned to the U.S. Department of State, Bureau of Political-Military Affairs.

**Certificate of Appreciation**, Bureau of International Narcotics and Law Enforcement Affairs, U.S. Embassy Kabul (September 2004) *"For your outstanding contributions to U.S. counter-narcotics programs in Afghanistan during your tenure with the Bureau of International Narcotics and Law Enforcement Affairs."*

## Publications

### Books

Blazakis, Jason M. *Terror Disrupted: Countering the Financing of Terrorism*. Cambridge: Cambridge University Press, 2026. https://www.cambridge.org/core/books/terror-disrupted/908B65AC2BF8F6490B85B58CFC062D46

Williams, Phil, Jason M. Blazakis & Colin P. Clarke, *The Mediterranean Connection: Criminal Networks and Illicit Economies in North Africa*. Boulder, CO: Lynne Rienner Publishers, 2024. https://www.rienner.com/title/The_Mediterranean_Connection_Criminal_Networks_and_Illicit_Economies_in_North_Africa

### Peer-Reviewed Articles and Book Chapters

Blazakis, Jason M. "Colombia." In *The Handbook of Latin American and Caribbean Intelligence Cultures*, edited by Florina Cristiana Matei, Carolyn Halladay, & Eduardo E. Estévez. Lanham, MD: Rowman & Littlefield, 2024. https://www.bloomsbury.com/us/handbook-of-latin-american-and-caribbean-intelligence-cultures-9781538197691/

Blazakis, Jason M. "Triad of Far Right Extremism." *International Journal of Intelligence and CounterIntelligence* 36, no. 1 (2023): 292–295. https://www.tandfonline.com/doi/full/10.1080/08850607.2021.1975202

Blazakis, Jason M. "Reexamining Counterterrorism Approaches." *International Journal of Intelligence and CounterIntelligence* 35, no. 1 (2022): 188–190. https://www.tandfonline.com/doi/abs/10.1080/08850607.2020.1870343

Blazakis, Jason M. "The Intangible Benefits of a Domestic Terrorism Statute." *Georgetown Journal of International Affairs*, June 24, 2021. https://gjia.georgetown.edu/2021/06/24/the-intangible-benefits-of-a-domestic-terrorism-statute/

Blazakis, Jason M. "Deadly Prayers." *International Journal of Intelligence and CounterIntelligence* 33, no. 4 (2020): 823–826. https://www.tandfonline.com/doi/full/10.1080/08850607.2020.1759303

Blazakis, Jason M. "Privacy in the Age of High Technology." *International Journal of Intelligence and CounterIntelligence* 33, no. 1 (2020): 189–192. https://www.tandfonline.com/doi/full/10.1080/08850607.2019.1668244

Blazakis, Jason M. "Border Security and Unmanned Aerial Vehicles." *Connections: The Quarterly Journal* 5, no. 2 (2006): 154–159. https://connections-qj.org/article/border-security-and-unmanned-aerial-vehicles

**Policy Monographs and Research Reports**

Blazakis, Jason M. *Terrorist Financing in the Age of Large Language Models*. Project CRAAFT, Research Briefing no. 4, Royal United Services Institute, February 11, 2026. https://www.rusi.org/explore-our-research/publications/external-publications/terrorist-financing-age-large-language-models

Blazakis, Jason M., et al. *Wagner Group: The Evolution of P Private Army*. The Soufan Center, June 25, 2023. https://thesoufancenter.org/research/wagner-group-the-evolution-of-a-private-army/

Blazakis, Jason M, Kojin Glick & Alice Shepard. *The Changing Face of the Wagner Group: From Military Adventurism to Venture Capitalism*. Center on Terrorism, Extremism, and Counterterrorism, Middlebury Institute of International Studies at Monterey, March 3, 2023. https://www.middlebury.edu/institute/academics/centers-initiatives/ctec/ctec-publications/changing-face-wagner-group-military

Blazakis, Jason M, Kojin Glick & Alice Shepard. *The Wagner Group's Social Footprint: A Time-Series Analysis of PMC World*. Center on Terrorism, Extremism, and Counterterrorism, Middlebury Institute of International Studies at Monterey, March 3, 2023. https://www.middlebury.edu/institute/academics/centers-initiatives/ctec/ctec-publications/wagner-groups-social-footprint-time-series

Blazakis, Jason M. *Sanctions: Bringing the Wagner Group and State Proxies into the CTF Fold*. Royal United Services Institute, March 2023. https://www.projectcraaft.eu/s/CRAAFT_RB12_final-web.pdf

Blazakis, Jason M. *Far-Right Online Financing and How to Counter It*. Global Center on Cooperative Security, August 2022. https://www.globalcenter.org/publications/far-right-online-financing-and-how-to-counter-it/

Blazakis, Jason M. *Comparing Violent Far-Right Terrorist Designations Among Five Eyes Countries*. The Soufan Center, July 28, 2022. https://thesoufancenter.org/research/comparing-violent-far-right-terrorist-designations-among-five-eyes-countries/

Blazakis, Jason M., et al. *Foreign Fighters, Volunteers, and Mercenaries: Non-State Actors and Narratives in Ukraine*. The Soufan Center, April 4, 2022. https://thesoufancenter.org/research/foreign-fighters-volunteers-and-mercenaries-non-state-actors-and-narratives-in-ukraine/

Blazakis, Jason M., and Colin P. Clarke. *From Paramilitaries to Parliamentarians: Disaggregating Radical Right-Wing Extremist Movements*. Resolve Network, December 10, 2021. https://discovery.researcher.life/article/from-paramilitaries-to-parliamentarians-disaggregating-radical-right-wing-extremist-movements/bd061d1338ce3e7481726a1f6504b3da

Blazakis, Jason M., et al. *A Way Forward with Iran? Options for Crafting a U.S. Strategy*. The Soufan Center, February 18, 2021. https://thesoufancenter.org/research/a-way-forward-with-iran-options-for-crafting-a-u-s-strategy/

Blazakis, Jason M., et al. *Countering QAnon: Understanding the Role of Human Trafficking in the Disinformation-Extremist Nexus*. Polaris Project and The Soufan Center, February 2021. https://polarisproject.org/resources/countering-qanon-understanding-the-role-of-human-trafficking-in-the-disinformation-extremist-nexus/

Blazakis, Jason M., et al. *The Atomwaffen Division: The Evolution of the White Supremacy Threat*. The Soufan Center, August 12, 2020. https://thesoufancenter.org/research/the-atomwaffen-division-the-evolution-of-the-white-supremacy-threat/

Blazakis, Jason M., et al. *Inside the Russian Imperial Movement: Practical Implications of U.S. Sanctions*. The Soufan Center, April 23, 2020. https://thesoufancenter.org/research/inside-the-russian-imperial-movement-practical-implications-of-u-s-sanctions/

Blazakis, Jason M., et al. *Release Strategies and the Social Impacts of Language Models.* arXiv, November 2019. https://arxiv.org/abs/1908.09203

Jason M. Blazakis, Newhouse, Alex, and Kris McGuffie. *The Industrialization of Terrorist Propaganda: Neural Language Models and the Threat of Fake Content Generation*. Center on Terrorism, Extremism, and Counterterrorism, Middlebury Institute of International Studies at Monterey, November 2019.

Blazakis, Jason M. *White Supremacy Extremism: The Transnational Rise of the Violent White Supremacist Movement*. The Soufan Center, September 27, 2019. https://thesoufancenter.org/research/white-supremacy-extremism-the-transnational-rise-of-the-violent-white-supremacist-movement/

Blazakis, Jason M., et al. *Quantifying the Q Conspiracy: A Data-Driven Approach to Understanding the Threat Posed by QAnon*. The Soufan Center, April 19, 2021. https://thesoufancenter.org/research/quantifying-the-q-conspiracy-a-data-driven-approach-to-understanding-the-threat-posed-by-qanon/

Blazakis, Jason M. *Border Security and Unmanned Aerial Vehicles*. Connections, 2006. https://www.jstor.org/stable/26323244?seq=1

**Public Writing (Op-Eds and Essays)**

**2025**

Blazakis, Jason M. "Trump's New Order Could Redefine Protests as Domestic Terrorism" *Los Angeles Times*, October 13, 2025. https://www.latimes.com/opinion/story/2025-10-13/trump-domestic-terror-order

Blazakis, Jason M. "There Are Many Things Wrong with Trump Calling Antifa a Terror Group. Here Are a Few of Them." *Philadelphia Inquirer*, October 2, 2025. https://www.inquirer.com/opinion/commentary/trump-antifa-terror-group-executive-order-flawed-20251002.html

Blazakis, Jason M. "Understanding the Trump Administration's Delisting of Hay'at Tahrir al-Sham." *Just Security*, July 18, 2025. https://www.justsecurity.org/117191/trump-administrations-delisting-hts/

Blazakis, Jason M. "The Case Against Designating Cartels as Terrorists." *Wall Street Journal*, February 19, 2025. https://www.wsj.com/opinion/the-case-against-designating-cartels-as-terrorists-90c6c44f

Blazakis, Jason M. "Biden Targeted the Online Right-Wing Terrorism Threat—Now It's Up to Trump." *The Conversation*, January 30, 2025. https://theconversation.com/biden-targeted-the-online-right-wing-terrorism-threat-now-its-up-to-trump-247977

Blazakis, Jason M. "Biden's Move to Remove Cuba from Terror List Continues Yo-Yo Policy Likely to Be Reversed by Trump." *The Conversation*, January 15, 2025. https://theconversation.com/bidens-move-to-remove-cuba-from-terror-list-continues-yo-yo-policy-likely-to-be-reversed-by-trump-247440

**2024**

Blazakis, Jason M. "U.S.'s Terrorist Listing of European Far-Right Group Signals Fears of Rising Threat—Both Abroad and at Home." *The Conversation*, July 1, 2024. https://theconversation.com/uss-terrorist-listing-of-european-far-right-group-signals-fears-of-rising-threat-both-abroad-and-at-home-232794

Blazakis, Jason M. "Understanding the State Department's Latest Far-Right Terrorist Designation." *Lawfare*, June 30, 2024. https://www.lawfaremedia.org/article/understanding-the-state-department-s-latest-far-right-terrorist-designation

Blazakis, Jason M. "Removing Cuba from List of Countries Not Fully Cooperating Over Terrorism May Presage Wider Rapprochement—If Politics Allows." *The Conversation*, June 5, 2024. https://theconversation.com/removing-cuba-from-list-of-countries-not-fully-cooperating-over-terrorism-may-presage-wider-rapprochement-if-politics-allows-230830

Blazakis, Jason M. "The Post-January 6 Far Right Poses an Increasingly Severe Threat to the LGBTQ Community." *Talking Points Memo*, January 26, 2024. https://talkingpointsmemo.com/cafe/the-post-jan-6-far-right-poses-an-increasingly-severe-threat-to-the-lgbtq-community

**2023**

Blazakis, Jason M. "Bad Charity." *eJewish Philanthropy*, November 22, 2023. https://ejewishphilanthropy.com/bad-charity/

Blazakis, Jason M. "Hamas, Terrorism, and the October 7 Attack on Israel." *The Messenger*, November 9, 2023.

Blazakis, Jason M. "Don't Blur the Lines by Calling Mexican Drug Cartels Terrorist Organizations." *Los Angeles Times*, March 17, 2023. https://www.latimes.com/opinion/story/2023-03-17/dont-designate-mexican-drug-cartels-as-foreign-terrorist-organizations

Blazakis, Jason M. "Here's Why Russia's Wagner Group Is Worse Than You Think." *Newsweek*, February 1, 2023. https://www.newsweek.com/heres-why-russias-wagner-group-worse-you-think-opinion-1777994

**2022**

Blazakis, Jason M. "Russia's Wagner Group Is About More Than Mercenaries." *Newsweek*, December 9, 2022. https://www.newsweek.com/russias-wagner-group-about-more-mercenaries-opinion-1766048

Blazakis, Jason M. "Should the U.S. Declare Russia a Sponsor of Terrorism?" *Los Angeles Times*, September 20, 2022. https://www.latimes.com/opinion/story/2022-09-20/russia-state-sponsored-terrorism-biden

Blazakis, Jason M. "The Gender Pay Gap Is a National Security Threat." *Lawfare*, August 21, 2022. https://www.lawfareblog.com/gender-pay-gap-national-security-threat

Blazakis, Jason M., and Anjana Rajan. "Protect Our Nonprofits from Domestic Terrorism." *The Hill*, July 20, 2022. https://thehill.com/opinion/criminal-justice/3564956-protect-our-nonprofits-from-domestic-terrorism/

Benjamin, Daniel, and Jason M. Blazakis. "On Iran, Biden Should Reverse Trump's Imaginary Statecraft." *Washington Post*, May 24, 2022. https://www.washingtonpost.com/opinions/2022/05/24/iran-nuclear-deal-irgc/

Blazakis, Jason M. "Biden Should Swiftly Put Russia on the Terror List." *The Hill*, May 3, 2022. https://thehill.com/opinion/national-security/3474481-biden-should-swiftly-put-russia-on-terror-list/

Blazakis, Jason M. "Ukraine's Future: Civil Society Groups Are Key." Global Best Practices Group, March 25, 2022. https://globalbestpracticegroup.com/ukraines-future-civil-society-groups-are-key/

Blazakis, Jason M. "The Ultimate Sanction: Listing Russia as a State Sponsor of Terrorism." *Los Angeles Times*, March 1, 2022. https://www.latimes.com/opinion/story/2022-03-01/russia-state-sponsor-terrorism-ukraine-invasion

Blazakis, Jason M. "U.S. Has Taken FARC Off Its Terrorist List, Giving Insight into Biden's Foreign Policy." *The Conversation*, January 26, 2022. https://theconversation.com/us-has-taken-farc-off-its-terrorist-list-giving-insight-into-bidens-foreign-policy-174667

**2021**

Blazakis, Jason M. "America Is a Safe Haven for Domestic Terrorists. What Can We Do About It?" *Los Angeles Times*, December 5, 2021. https://www.latimes.com/opinion/story/2021-12-05/america-safe-haven-domestic-terrorists-guns

Blazakis, Jason M. "Keep Your Eyes on Afghanistan's ISIS-K." *Defense One*, October 12, 2021. https://www.defenseone.com/ideas/2021/10/keep-your-eyes-afghanistans-isis-k/186031/

Blazakis, Jason M. "It's a Real Possibility That Our Next 9/11 Could Arrive Within." *Washington Post*, September 6, 2021. https://www.washingtonpost.com/opinions/2021/09/06/its-real-possibility-that-our-next-911-could-arrive-within/

Blazakis, Jason M., and Naureen Chowdhury Fink. "The International Far-Right Terrorist Threat Requires a Multilateral Response." *Lawfare*, April 4, 2021. https://www.lawfareblog.com/international-far-right-terrorist-threat-requires-multilateral-response

Blazakis, Jason M. & Nate Rosenblatt. "How New Is the New Extremist Threat? Preliminary Conclusions from the U.S. Capitol Arrests Data." *War on the Rocks*, March 16, 2021. https://warontherocks.com/2021/03/how-new-is-the-new-extremist-threat-preliminary-conclusions-from-the-u-s-capitol-arrests-data/

Blazakis, Jason M. "Lack of Federal Domestic Terrorism Law Creates Imbalance." *USA Today*, February 22, 2021. https://www.usatoday.com/story/opinion/todaysdebate/2021/02/22/lack-federal-domestic-terrorism-law-creates-imbalance-editorials-debates/4536196001/

Blazakis, Jason M. "Why QAnon's Similarity to Other Cults Makes It a Significant National Security Threat." *Los Angeles Times*, February 21, 2021. https://www.latimes.com/opinion/story/2021-02-21/qanon-cults-capitol-attack-trump-threat

Blazakis, Jason M. "Can We Call the Proud Boys Terrorists?" *Slate*, February 4, 2021. https://slate.com/news-and-politics/2021/02/proud-boys-terrorists-canada.html

**2020**

Blazakis, Jason M. "How the U.S. Could Respond to Russia's Support of the Taliban." *The Hill*, July 1, 2020. https://thehill.com/opinion/international/505313-how-the-us-could-respond-to-russias-support-of-the-taliban

Blazakis, Jason M. "The U.S. Has Become the World's Top Exporter of White Extremism." *Talking Points Memo*, June 17, 2020. https://talkingpointsmemo.com/cafe/the-us-has-become-the-worlds-top-exporter-of-white-extremism

Blazakis, Jason M. "The Growing Irrelevance of State's List of Countries Not Cooperating on Counterterrorism." *Just Security*, June 4, 2020. https://www.justsecurity.org/70529/the-growing-irrelevance-of-of-states-list-of-countries-not-cooperating-on-counterterrorism/

Blazakis, Jason M. & Colin P. Clarke. "Why Trump Can't Designate Antifa as a Terrorist Organization." *Slate*, June 1, 2020. https://slate.com/news-and-politics/2020/06/antifa-terrorist-organization-designation-trump.html

Blazakis, Jason M. "Using a Terrorism List to Squeeze Cuba and Venezuela." *Lawfare*, May 31, 2020. https://www.lawfareblog.com/using-terrorism-list-squeeze-cuba-and-venezuela

Blazakis, Jason M. "Is the Threat from ISIS Really More Significant Because of COVID-19?" *The Hill*, May 13, 2020. https://thehill.com/opinion/national-security/497261-is-the-threat-from-isis-really-more-significant-because-of-covid-19

Blazakis, Jason M. "Coronavirus Social Distancing Presents Special Challenges to Spies." *The Hill*, April 8, 2020. https://thehill.com/opinion/national-security/491371-coronavirus-social-distancing-presents-special-challenges-to-spies

Blazakis, Jason M. "Better Intel Could Help the U.S. Designate White Supremacist Groups as Terrorists." *The Hill*, March 25, 2020. https://thehill.com/opinion/national-security/488571-better-intel-could-help-the-us-designate-white-supremacist-groups

Blazakis, Jason M. & Ariel Cohen. "The Trump-Netanyahu Alliance Is Endangering Americans and Israelis." *Foreign Policy*, February 3, 2020. https://foreignpolicy.com/2020/02/03/trump-netanyahu-alliance-peace-plan-dangerous-americans-israelis/

Blazakis, Jason M. & Colin P. Clarke. "Brexit Could Spark a Return to Violence in Northern Ireland." *Foreign Policy*, January 22, 2020. https://foreignpolicy.com/2020/01/22/northern-ireland-paramilitary-violence-brexit/

Blazakis, Jason M. "The U.S. Recently Made a Smart Move Toward Iran. Killing Soleimani Wasn't It." *Defense One*, January 3, 2020. https://www.defenseone.com/ideas/2020/01/us-recently-made-smart-move-toward-iran-killing-soleimani-wasnt-it/162197/

**2019**

Blazakis, Jason M. "Declaring Mexican Drug Cartels 'Terrorists' Is a Bad Old Idea." *Defense One*, December 1, 2019. https://www.defenseone.com/ideas/2019/12/declaring-mexican-drug-cartels-terrorists-bad-old-idea/

Blazakis, Jason M. & Conner Freeman. "How Hate Groups Abuse the Tax Code to Fund Their Activities." *Talking Points Memo*, October 15, 2019. https://talkingpointsmemo.com/cafe/hate-groups-funding-tax-code

Blazakis, Jason M. "What's the New Terror Financing Executive Order All About?" *Just Security*, September 17, 2019. https://www.justsecurity.org/66206/whats-the-new-terror-financing-executive-order-all-about/

Blazakis, Jason M. "Domestic Terrorism Is Fueled by Paranoid Delusions." *Philadelphia Inquirer*, August 18, 2019. https://www.inquirer.com/opinion/commentary/domestic-terrorism-white-supremacy-us-government-strategy-20190818.html

Blazakis, Jason M. "Hamza bin Laden's Reported Death Is Not the Death of al-Qaeda." *The Hill*, August 2, 2019. https://thehill.com/opinion/national-security/455915-hamza-bin-ladens-reported-death-is-not-the-death-of-al-qaeda/

Blazakis, Jason M., Paula Granger, and Anas Elallame. "The Logistics of Terror: The Islamic State's Immigration and Logistics Committee." *The Strategy Bridge*, June 18, 2019. https://www.realcleardefense.com/articles/2019/06/18/the_logistics_of_terror_the_islamic_states_immigration__logistics_committee_114510.html

Blazakis, Jason M. "Sudan at a Crossroads: Rethinking U.S. Policy." *Lawfare*, June 9, 2019. https://www.lawfaremedia.org/article/sudan-crossroads-rethinking-us-policy

Benjamin, Daniel, and Jason M. Blazakis. "The Muslim Brotherhood Is Not a Terrorist Organization." *Foreign Affairs*, May 17, 2019. https://www.foreignaffairs.com/articles/2019-05-17/muslim-brotherhood-not-terrorist-organization

Blazakis, Jason M. "The Reappearance of Abu Bakr al-Baghdadi." *The Hill*, May 2, 2019. https://thehill.com/opinion/national-security/441644-the-reappearance-of-abu-bakr-al-baghdadi/

Blazakis, Jason M. & Daniel Benjamin. "Why Trump's Latest Move Against Iran Was Pointless—And Dangerous." *Time*, April 9, 2019. https://time.com/5566817/iran-terrorist-designation-irgc-trump/

Blazakis, Jason M. & Mary B. McCord. "A Road Map for Congress to Address Domestic Terrorism." *Lawfare*, February 27, 2019. https://www.lawfaremedia.org/article/road-map-congress-address-domestic-terrorism

Blazakis, Jason M. "Pakistan's Proxies." *Lawfare*, February 24, 2019. https://www.lawfaremedia.org/article/pakistans-proxies-kashmir-attack-and-us-policy-response

Blazakis, Jason M. "Walls Don't Work in Isolation; First End the Shutdown." *The Hill*, January 9, 2019. https://thehill.com/opinion/immigration/424457-walls-dont-work-in-isolation-first-end-the-shutdown/

**2018**

Blazakis, Jason M. "Leaving Syria Shrinks U.S. Influence in the Levant." *The Hill*, December 27, 2018. https://thehill.com/opinion/national-security/422793-leaving-syria-shrinks-us-influence-in-the-levant/

Blazakis, Jason M. "Labeling Venezuela a Terror-Supporting State Doesn't Fit." *The Hill*, December 3, 2018. https://thehill.com/opinion/international/418984-labeling-venezuela-a-terror-supporting-state-doesnt-fit/

Blazakis, Jason M. "American Terrorists: Why Current Laws Are Inadequate for Violent Extremists at Home." *Lawfare*, December 2, 2018. https://www.lawfaremedia.org/article/american-terrorists-why-current-laws-are-inadequate-violent-extremists-home

Blazakis, Jason M. "Ten Years After Mumbai Attacks, Where Are They Now?" *The Hill*, November 9, 2018. https://thehill.com/opinion/international/415126-10-years-after-mumbai-attacks-where-are-they-now/

**Book Reviews**

Blazakis, Jason M. Review of *Hate in the Homeland: The New Global Far Right*, by Cynthia Miller-Idriss. *International Journal of Intelligence and Counterintelligence* 36, no. 1 (2023): 292–295.

Blazakis, Jason M. Review of Daniel Byman, *White Supremacy, Terrorism, and the Failure of Reconstruction in the United States*. H-Diplo/ISSF, April 5, 2022. https://issforum.org/articlereviews/156

---

## Public Engagement and Media

Since 2018, my analysis of terrorism, terrorist financing, sanctions, and the radical right has been cited or featured in more than 350 news outlets across more than twenty

countries. I have appeared as an on-camera or on-air expert on the major US cable and network news outlets, including CNN, MSNBC, MS NOW, CBS News, NBC News, Fox News, NPR, and Voice of America, and on leading international broadcasters including the BBC, Sky News, Al Jazeera, Australian Broadcasting Corporation, and Univision. The list below is selective.

## Selected Broadcast Television

### United States, Network and Cable

MS NOW, on the November 26, 2025 shooting of two West Virginia National Guard members near the White House by an Afghan national who entered the United States through Operation Allies Welcome, and the implications for U.S. refugee vetting policy (late November 2025).

Fox News, on the proposed designation of Mexican drug cartels as Foreign Terrorist Organizations (February 19, 2025).

News Nation, *Rush Hour*, on the New Year's Eve machete attack in New York City (January 2, 2023).

MSNBC, on domestic extremism (August 13, 2022).

CNN, with Jim Sciutto, on Russia sanctions and the war in Ukraine (May 9, 2022).

NBC News Now, with Morgan Radford, on the case for designating Russia a state sponsor of terrorism (May 6, 2022).

Law & Crime Network, with Brian Ross, on the Wagner Group (April 28, 2022).

MSNBC, *All In with Chris Hayes*, on Russia, Ukraine, and the case for designating Russia a state sponsor of terrorism (April 20, 2022).

CNBC, citation in television segment on Russia and President Zelensky's request to designate Russia a state sponsor of terrorism (April 15, 2022).

Newsmax, on Russia sanctions and the war in Ukraine (March 14, 2022).

MSNBC, with Craig Melvin, on gas prices and the impact of Russia sanctions (March 7, 2022).

Straight Arrow News, on the one-year anniversary of the January 6 Capitol attack (January 5, 2022).

MSNBC, on the domestic far-right threat (December 24, 2021).

CNN, with Michael Holmes, on the situation in Afghanistan following the US withdrawal (August 27, 2021).

Newsy (Scripps), on international white-supremacist terrorist networks (February 11, 2021) and on the case for designating Russia a state sponsor of terrorism (April 19, 2022).

MSNBC, *The Week with Joshua Johnson*, on domestic terrorism following the January 6 Capitol attack (January 31, 2021).

CBS News, with Lana Zak, on the FBI disruption of the plot to kidnap Michigan Governor Gretchen Whitmer (October 8, 2020).

KION CBS, KSBW NBC, and other regional broadcast affiliates, recurring expert source on terrorism and political violence (2019–2025).

**International broadcasters**

RTVI, on the trial of Sayfullo Saipov (January 11, 2023) and on the violent online network 764 (February 12, 2026).

Al Jazeera, *The Take*, on the radical right and political violence in the United States (October 22, 2025).

Australian Broadcasting Corporation, *Late Night Live*, on Cuba and the State Sponsor of Terrorism list (August 16, 2024).

Al Jazeera, on the 2022 US midterm elections and election-security concerns (November 6, 2022).

BBC News, on the prosecution of the so-called ISIS Beatles and the sentencing of El Shafee Elsheikh (August 19, 2022).

BBC News, on the Wagner Group (March 13, 2022).

BBC, on the situation in Afghanistan and ISIS-K following the US withdrawal (August 31, 2021).

Sky News (London), live appearance on the situation in Afghanistan (August 28, 2021).

Vice News, on-camera documentary feature on the Azov movement in Ukraine (May 14, 2021).

Latvian Public Television, on the challenge of domestic terrorism in the United States (March 10, 2021).

Al Jazeera English, *The Stream*, on Iran sanctions and the Joint Comprehensive Plan of Action (February 23, 2021).

Univision, recurring expert on domestic terrorism, the January 6 Capitol attack, and the September 11 anniversary (multiple live appearances, January–September 2021).

Danish Public Broadcasting (DR), documentary feature on Basil Hassan and the ISIS drone program (April 2019).

Voice of America, recurring on-camera and on-air expert across English, Persian, Russian, and Dari language services, on the Russian Imperial Movement designation, the Iranian foreign minister's designation, ISIS-K, the war in Afghanistan, the Wagner Group, Prigozhin's death, and the Crocus City Hall attack (multiple appearances, 2019–2025).

Italian documentary on the 1985 hijacking of the *Achille Lauro* (2025).

**Selected Print and Online Press**

*The Sydney Morning Herald*, on the Bondi Beach attack and lessons from US designation practice (December 17, 2025).

*The Guardian*, on the Trump administration's approach to the far-right threat and the State Department's shift in domestic-extremism language (May 24, 2025).

*BBC Mundo*, on the proposed designation of Mexican drug cartels as Foreign Terrorist Organizations (January 22, 2025).

*The New York Times*, on the proposed designation of Mexican drug cartels as Foreign Terrorist Organizations (January 21, 2025) and on the Trump administration's cartel designation policy (November 27, 2019).

*The Economist*, on the New Orleans New Year's Day attack and the persistence of ISIS-inspired plotting in the United States (January 2, 2025).

*ProPublica*, lead expert source for major investigative features including "Global Right-Wing Extremism Networks Are Growing. The U.S. Is Just Now Catching Up" (January 22, 2021) and stories on the Pakistan–Mumbai prosecution (July 17, 2019).

*The Atlantic*, on the evolution of the Islamic State (November 22, 2019).

*Reuters*, on the proposed designation of the Muslim Brotherhood (April 30, 2019), the cabinet's opposition to the Mexican cartel terrorist policy (December 26, 2019), and additional stories on counterterrorism finance.

*The Wall Street Journal*, on the proposed designation of the Muslim Brotherhood as a Foreign Terrorist Organization (April 30, 2019) and on the Iranian Revolutionary Guard Corps designation (April 5, 2019).

*Politico*, expert source on multiple stories including the Biden administration's domestic terrorism strategy and the Trump administration's State Sponsor of Terrorism list policy (2021–2025).

*The Washington Post*, expert source on more than a dozen stories spanning Iran and the killing of Qasem Soleimani, the Houthi designation, the January 6 Capitol attack, antifa, ISIS, the Wagner Group, the impact of Russia sanctions, and the November 2025 designation of four European far-left groups as Foreign Terrorist Organizations (2019–2025).

*Foreign Policy*, *Time*, *Newsweek*, *Forbes*, *Vanity Fair*, *Bloomberg Government*, *The Hill*, *USA Today*, and the *Los Angeles Times*, expert source on terrorism, sanctions, the radical right, the Wagner Group, and counterterrorism finance (2019–2025).

*Vice News*, lead expert source on multiple investigative features on the Boogaloo movement, far-right networks, and Azov in Ukraine (2019–2021).

*The Washington Post*, expert source on more than a dozen stories spanning Iran and the killing of Qasem Soleimani, the Houthi designation, the January 6 Capitol attack, antifa, ISIS, the Wagner Group, the impact of Russia sanctions, and the November 2025 designation of four European far-left groups as Foreign Terrorist Organizations (2019–2025).

International press in twenty-plus countries, including *Le Monde*, *El País*, *Asahi Shimbun*, *Yomiuri Shimbun*, *Jyllands-Posten*, *L'Espresso*, *Publico* (Portugal), *NRC* (Netherlands), *T Online* (Germany), *Crusoe* (Brazil), *La Repubblica*, and *Middle East Eye*, expert source on US counterterrorism policy and the global radical right (2019–2026).

**Selected Radio and Podcasts**

ACAMS, feature interview, "Disrupting Terror Finance: Middlebury Institute's Jason Blazakis" (2026).

ACAMS, *Financial Crime Matters*, podcast interview on terrorist financing (April 27, 2026).

Middlebury Rohatyn Center, *New Frontiers*, season 4 episode 5, "US Terrorist Lists: Who Decides and Why It Matters" (March 15, 2026).

NPR, *Morning Edition*, on the designation of four European leftist groups as Foreign Terrorist Organizations (November 21, 2025).

NPR, *All Things Considered*, on the Trump administration's designation of antifa as a domestic terrorist organization (October 28, 2025).

Al Jazeera, *The Take*, on political violence and the Trump administration's domestic terrorism agenda (October 22, 2025).

*The Bunker*, on domestic terrorism in the United States (October 7, 2025).

NPR, *All Things Considered*, on what designating cartels as terrorist organizations means in practice (January 23, 2025).

NPR, on political violence and the 2024 election (September 17, 2024).

Australian Broadcasting Corporation, *Late Night Live*, on the Cuba State Sponsor of Terrorism designation (August 16, 2024).

ACAMS *Sanctions Space*, hosted by Justine Walker, "Jason Blazakis on the Future of the Wagner Group" (January 18, 2024).

BBC Radio, podcast feature on the role of private military companies in the war in Ukraine (March 10, 2022).

*This American Life*, episode 736, "The Herd," on COVID-19 and the medical community (April 26, 2021).

LBC London (Leading Britain's Conversation), on the ISIS Beatles court case (October 7, 2020).

BBC, *Sunday Times Radio* (London), on the prosecution of the so-called ISIS Beatles (August 28, 2020).

*Cash Only* podcast, on right-wing extremism (February 5, 2020).

Spycast, International Spy Museum, hosted by Vincent Houghton, "Rethinking CT: A Conversation with Jason Blazakis" (March 19, 2019).

*The Lawfare Podcast*, hosted by Benjamin Wittes and Mary McCord, on domestic terrorism (January 2019).

KQED San Francisco, KCBS, WWL New Orleans (recurring on the Tommy Tucker show), KNPR Nevada, KGO ABC San Francisco (Pat Thurston show), and other US public radio and major-market commercial radio, recurring expert source (2019–2025).

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:25-cv-00516-MW-MJF

RONALD DESANTIS, in his official capacity
as Governor, State of Florida,

*Defendant*.

**PLAINTIFFS' EXPERT REBUTTAL REPORT OF JASON BLAZAKIS**

## I. Introduction and Methodology

1. For more than ten years, I directed the Department of State office responsible for terrorism-related designations, including designations of foreign terrorist organizations under Section 219 of the Immigration and Nationality Act and designations under Executive Order 13224.

2. Had an interagency colleague or FBI Special Agent brought me Ms. Burns's report[1] as the basis for federal designation of CAIR, I would not have advanced it through our process for terrorism designations, which I described in my prior report.

3. In reviewing Ms. Burns's report, I applied the same methodological and evidentiary tests I would have applied to any designation justification package I created or reviewed as Director. I considered the methodological discipline of her opinion and the evidence on which she relies—i.e., whether the evidence is stale or current; any indications of bias; and, most importantly, whether the evidence establishes any operational involvement in or actual material support for terrorism.

4. As a State Department official tasked with applying terrorism designation criteria, I considered these tests necessary to ensure that the high-stakes decision to label anyone—let alone a United States nonprofit organization—a terrorist was sound, meaningfully justified, defensible in court, and worthy of this country as a democracy. Measured against every one of them, Ms. Burns's opinion fails.

5. In my experience, a sound terrorist designation rests on a simple premise. The identification of a target begins with credible threat-related information such as intelligence and proceeds to a high-level determination signed off on by a senior government official, rather than

[1] Expert Report of Lara Burns, *CAIR-Foundation, Inc. v. DeSantis*, No. 4:25-cv-516-MW-MJF (N.D. Fla. May 27, 2026) ("Burns Report").

beginning with a conclusion and assembling facts to support it. When I directed the State Department's designations office between 2008 and 2018, the threshold we applied was deliberately indifferent to the identity, faith, or politics of the target. An entity could be designated because of what it did, not because of what it believed. That neutrality was not a courtesy. It was what gave our terrorist designations legitimacy and durability; a designation built on ideology or expression rather than conduct will not, and should not, survive scrutiny. In my direct experience, this is one of the most important ways the United States separates itself from authoritarian regimes that affix the terrorist label to their actual or perceived enemies for holding a different belief system. This is what gives me pause, to say the least, about Ms. Burns's expert report: It focuses on speech, religion, and belief.

6. Simply put, in my experience, Ms. Burns's report falls well below the established federal standards that I implemented and observed for over ten years as an expert in the designation of terrorist organizations. Her report inverts the methodological discipline that I and my colleagues at the State Department followed. Ms. Burns begins from the premise that CAIR is a front for terrorist groups and then reads the evidence to confirm that premise. My concern is with the direction of her analytical reasoning. When the conclusion precedes the evidence, ambiguous facts are resolved to conform with that conclusion, association is treated as participation, and speech is treated as proof of conduct. Each of those flaws appears in her report, and each reflects exactly the analytical posture the federal designations process was designed to guard against.

## II. Opinion[2]

7. This rebuttal report addresses four points. First, and most important, Ms. Burns's report establishes no operational involvement in, or material support for, terrorism by CAIR, which is the controlling question for any designation. Second, the evidence on which Ms. Burns relies is stale. Third, Ms. Burns's conclusions rest on inference rather than conduct. Fourth, the concrete terrorist designations my former office led against Hamas and Hamas members between 2008 and 2018 are a sharp contrast to the case her report assembles against CAIR. I also address the apparent advocacy posture that shapes Ms. Burns's analysis.

### A. Ms. Burns's Report Establishes No Operational Role or Material Support for Terrorism by CAIR.

8. Ms. Burns cites no evidence that CAIR has ever financed or otherwise materially supported Hamas. That absence is dispositive. Under the authorities I administered, an entity is designable for what it does—for committing, attempting, or providing material support or resources to terrorism—and the threshold question is always whether the record establishes such conduct. Ms. Burns's report does not.

9. Her report does not, in fact, claim that CAIR commits terrorism. By Ms. Burns's own account, CAIR's role is to defend the other elements of a purported network and to pressure or intimidate critics. Even if true, that is a description of speech and advocacy, not of violence.

10. To support the claim that the conspiracy Ms. Burns posits is ongoing, she leans on citations dated 2020 through 2026. None involves a terrorist act carried out by CAIR. They fall into three categories.

---

[2] It is important to reiterate that the contents of this report in no way represent Middlebury College or the Middlebury Institute of International Studies in Monterey. Nor do they represent the opinion of the Center on Terrorism, Extremism, and Counterterrorism.

11. The first category is the speech of current or former CAIR officials and chapter affiliates. The most prominent recent items Ms. Burns cites are statements: Nihad Awad's November 2023 remark about being glad to see Gazans break the siege; Hussam Ayloush's characterization of the October 7 attacks as self-defense; Zahra Billoo's eulogy describing Ismail Haniyeh as a martyr; and a CAIR-Florida official's social media post on the day of the attack. Of these individuals, only Mr. Awad is an official of CAIR National. Mr. Ayloush and Ms. Billoo serve independent CAIR chapters outside Florida. With respect to the social media post of the CAIR-Florida official, a former executive director, Ms. Burns acknowledges, as she must, the tenuous nature of her characterization of his pro-Palestinian speech as "seemingly in subtle support of the attack." Whatever one makes of these statements, they are expression. The report does not allege that any of these individuals directed, financed, or coordinated an act of violence, or that any CAIR official crossed from advocacy into prohibited material support for a designated terrorist organization. Ms. Burns's report offers the statements as evidence of sympathy. Sympathy is not criminal conduct.

12. The second category is CAIR's institutional advocacy. Ms. Burns's report points to CAIR statements criticizing specific terrorism prosecutions as unjust and as reflecting anti-Muslim bias, the labeling of specific universities as hostile to Muslims or to pro-Palestinian advocacy, the co-sponsorship of rallies and marches, and the funding or legal defense of students disciplined for campus protest. This is political organizing, public relations, and litigation, the ordinary work of a United States advocacy organization. However much Ms. Burns disapproves of the content of CAIR's advocacy, none of it is the planning, financing, or commission of terrorism.

13. The third category, which accounts for the largest share of the recent citations, does not concern CAIR at all. Ms. Burns's discussion of the federal designation of the Popular Conference for Palestinians Abroad, the fatwas and personnel of the International Union of Muslim

Scholars, the federal designations of Majeed al-Zeer, Marwan Abu Ras, and Hisham Abu Mahfuz, a National Students for Justice in Palestine toolkit, a search warrant on two George Mason University students for alleged campus vandalism, and the speeches of current or former American Muslims for Palestine officials and director Osama Abu Irshaid all describe expression or conduct by other organizations and individuals. Where CAIR appears in this material at all, it appears by remote proximity rather than by any action it has taken. The clearest instance of Ms. Burns's guilt by association methodology is a 2025 online event at which a CAIR-Ohio official appeared as a panel moderator and at which a federally-designated individual also spoke.[3] Notably, Ms. Burns says nothing in her report about CAIR-Ohio and its official's public explanation that the official participated in the event in an individual capacity, did not know a designated person was participating in the event, had no interaction with that person, and moderated a panel with completely different speakers.[4] Unknowing adjacency is not evidence of a terrorist act.

14. As I explained in my original report, in my experience in federal government service, designating a U.S. person requires substantially greater caution because U.S. persons have constitutional rights, including the First Amendment right to free speech and expression. By contrast, Ms. Burns's report strikingly ignores or disregards these vital constitutional values and protections.

---

[3] Lahav Harkov, *CAIR-Ohio Leader Moderated Event Featuring Designated Terrorist*, Jewish Insider (Oct. 27, 2025), https://jewishinsider.com/2025/10/cair-hamas-member-majed-al-zeer-web-conference-speakers/; Maya Sulkin, *CAIR Official Joins Hamas Leader at 'Al-Aqsa Flood' Event*, The Free Press (Oct. 28, 2025), https://www.thefp.com/p/cair-official-joins-hamas-leader-al-aqsa-flood-event (reporting the CAIR-Ohio official's statement that he never participated in any panels with, or interacted with, the designated individual).

[4] *CAIR-Ohio Addressing Oversight by Employee After Personal Participation in Think-Tank Event Featuring Sanctioned Individual*, CAIR-Ohio (Oct. 28, 2025), https://cair-ohio.com/cair-ohio-addressing-oversight-by-employee-after-personal-participation-in-think-tank-event-featuring-sanctioned-individual/.

15. In sum, nowhere in Ms. Burns's report does she allege or substantiate that CAIR itself carries out acts of terrorism. To the extent her theory is that CAIR is intertwined with other organizations that do engage in criminal conduct, and that CAIR must therefore be prohibited from providing material support to them, that theory still requires evidence, and that evidence must be current. There is none. Nothing in Ms. Burns's report establishes that today CAIR is intertwined with Hamas, that it materially supports Hamas, or that it coordinates with Hamas in any way. As I explain below, the record she assembles is decades old, and my own office's sustained pursuit of Hamas found no link to CAIR at all.

**B. Ms. Burns Relies on Stale Information.**

16. The timeliness or currency of evidence matters because, as I explained in my report, a designation can rest only on a record that reflects prohibited conduct now, not what some of its eventual founders may have said years before the entity existed. During my tenure, experts in the designation of terrorist organizations would not have relied on the documents Ms. Burns cites to compile an administrative record or to conclude that an organization met the criteria for designation. The evidentiary foundation of her opinions is both narrow and remarkably dated.

17. Ms. Burns cites fifteen trial exhibits from the record of *United States v. Holy Land Foundation*, a terrorism financing prosecution that concluded in 2008. The exhibits span just six years: 1988, 1991, 1993, 1994, 1999, and 2008.[5] Twelve consist of documents the FBI seized and conversations it recorded, and Ms. Burns uses them in her report to purportedly establish facts

---

[5] Through CAIR's counsel, I asked for copies of all exhibits because some are not publicly accessible. Counsel informed me they made that request to Governor DeSantis's counsel on June 4, 2026. Governor DeSantis's counsel provided copies of the non-publicly available exhibits on June 25, the day before this report is due. I am unable to review the non-public exhibits by the deadline for submission of this rebuttal report, but if those exhibits substantially affect my opinions, I will supplement this report.

about CAIR's origins and support for terrorism. But eleven of the twelve documentary and wiretap exhibits predate Hamas's 1995 designation under Executive Order 12947[6] as a Specially Designated Terrorist, and all but the 1999 wiretap predate its 1997 designation as a foreign terrorist organization.

18. None of this underlying evidence dates from the past five years, and none of it dates even from the past two decades. The only exhibits postdating 2000 are the three products of the 2008 trial itself, namely: Ms. Burns's own testimony, the testimony of a second government witness, and a demonstrative chart prepared for the jury. Even measured against that newest material, her own account of documents that are themselves decades old, nothing in her exhibit list is less than eighteen years old.

19. The age of these materials is not a technicality. Even on Ms. Burns's own theory, that these documents explain how and why CAIR was founded as part of a conspiracy to support Hamas, they cannot bear the weight she places on them. The seized documents and recordings either predate CAIR's incorporation or do not name CAIR, and none of them document any criminal act by CAIR. It is telling that despite the long federal law enforcement and public awareness of these materials, CAIR has never been charged, let alone convicted, with a federal crime. Moreover, as I discussed above, the materials Ms. Burns cites from 2023 through 2026 are news articles, press releases, social media posts, and designations of other people and organizations. None of them bears on how or why CAIR was founded, much less on any current criminal conduct by CAIR.

---

[6] This Executive Order was terminated in 2019 with the Trump Administration's adoption of Executive Order 13886, which, as noted in my previous expert report, modernized the executive order regime targeting terrorist activity.

20. A record this thin would not have survived even the first stage of the terrorist designations process I once directed.

## C. Ms. Burns Relies on Inferences, not Evidence.

21. Because Ms. Burns cites no evidence that CAIR financed or otherwise materially supported Hamas, her opinions rest on inference. During my tenure, experts in the designation of terrorist organizations would not have drawn the inferences she draws from the evidentiary record on which she relies.

22. Two of Ms. Burns's load-bearing opinions illustrate the problem. The first is that CAIR was created at the 1993 Philadelphia Meeting to shield other purported elements of a Hamas-support network.[7] The wiretap transcripts she cites for this proposition record no decision to create CAIR.[8] The transcripts do not name CAIR. They do reference a participant identified only by the first name Nihad, possibly Nihad Awad, who later helped found CAIR. That detail does not rescue the inference. A first-name reference to a person who would go on to co-found an organization does not constitute a decision to create that organization for an unlawful purpose, nor is it evidence that CAIR was formed to support Hamas. Ms. Burns's theory requires that CAIR must have been created to further the purported goals of the 1993 meeting because two attendees were later involved in forming CAIR. That is a *possibility* that fits Ms. Burns's theory, but it is not evidence that supports her theory.

---

[7] Burns Report, at Opinions § III(a) (the Philadelphia Meeting attendees "agreed to create an additional front organization in Washington D.C. … and that new organization was the Council on American Islamic Relations (CAIR)"); *id.* at Factual Basis § V(d)(3).

[8] Government Exhibits Philly Meeting 1-16, *United States v. Holy Land Foundation*, No. 3:04-CR-240-G (N.D. Tex. 2008), https://extremism.gwu.edu/legal-documents (Geo. Wash. U. Program on Extremism, Legal Documents: HLF Exhibits, Jan. 30, 2025). The transcripts do not name CAIR, which was not incorporated until 1994. CAIR, *Certificate of Articles of Incorporation of Council on American-Islamic Relations, Inc.* (Wash., D.C. Sept. 15, 1994).

23. The second is Ms. Burns's opinion that CAIR has never withdrawn from a conspiracy to support Hamas.[9] But here, too, there is an analytical fallacy: That opinion presupposes the very conspiracy it purports to prove. And, as I have explained, Ms. Burns's evidentiary basis for the conspiracy suffers from fatal flaws; it would have been rejected were it to cross my desk in federal government service. The support Ms. Burns offers for an ongoing conspiracy consists of statements by CAIR or CAIR-affiliated individuals after October 7, 2023; CAIR's advocacy and press releases; and CAIR's remote proximity to designated third parties. Again, the most proximate example Ms. Burns offers is the 2025 online event noted above, at which a CAIR-Ohio official spoke at an event in his personal capacity on a panel entirely separately from a designated individual, and did not even know that individual's designated status. Inferring continued membership in a criminal conspiracy from political advocacy and a brief and unknowingly shared virtual venue is, in my experience, untenable.

**D. Ms. Burns Analysis Reflects Advocacy, Not Neutral Assessment.**

24. One further matter bears on the weight Ms. Burns's opinions can carry. Ms. Burns is employed by George Washington University's Program on Extremism. As I previously observed, credible reporting indicates that the George Washington Program on Extremism has received direct funding from the United Arab Emirates as part of a political effort to connect CAIR—and other Muslim groups in the west—to Hamas. Ms. Burns and the Program with which she is affiliated have a sustained body of public advocacy against CAIR and related organizations, and that advocacy reaches conclusions consistent with the opinions offered in her report. I do not suggest bad faith. I note only that a report submitted to me by an analyst with this record of advocacy would have received correspondingly less weight. The direction of Ms. Burns's analysis is

[9] Burns Report, at Opinions § III(c)-(d), Conclusion § IX.

consistent with a conclusion fixed in advance, with purported evidence retrofitted to support the conclusion.

**E. My Experience with Hamas-Specific Terrorist Designations.**

25. While serving as the Director of the State Department's Office of Counterterrorism Finance and Terrorist Designations, among my most important duties was to ensure that the State Department used its terrorist designation authorities[10] effectively against Hamas.

26. To that end, my office led the efforts to designate: Ismail Haniyeh on January 31, 2018; Abu Anas al-Ghandour on April 6, 2017; Fathi Hammad on September 16, 2016; Muhammad Deif on September 8, 2015; Rawhi Mushtaha on September 8, 2015; Yahya Sinwar on September 8, 2015; and Muhammad Hisham Muhammad Isma'il Abu Ghazala on September 22, 2011.[11] In addition to these seven Hamas-related designations pursuant to authority under Executive Order 13224, my office reviewed and approved every Hamas-related designation proposal put forward by my colleagues at the Treasury Department.

27. At no time was the State Department's use of the federal designation authority under Executive Order 13224 more aggressive in pursuing Hamas actors than under my direction. Before my arrival, the State Department had designated Hamas but no individuals affiliated with it under Executive Order 13224. Since my departure, and over the course of subsequent Republican and Democratic administrations, the State Department has designated one individual, Marwan

[10] In the case of Hamas, I allude here to the Foreign Terrorist Organization and Executive Order 13224-related legal authorities that the State Department possesses.

[11] *See* U.S. Dep't of State Bureau of Counterterrorism, *Individuals and Entities Designated by the State Department Under E.O. 13224,* U.S. Dep't of State: Executive Order 13224, https://www.state.gov/executive-order-13224#state (last visited June 16, 2026) (State Department Executive Order 13224 designations).

Issa, under Executive Order 13224.[12] During my time at the State Department, my office also carried out multiple mandatory reviews of Hamas's status as a designated Foreign Terrorist Organization under the Immigration and Nationality Act.

28. This work was carried out by an exceptionally well-trained team applying rigorous, evidence-based methods. The staff who worked on designations for me trained at the State Department's Foreign Service Institute, and I completed coursework there and at the Central Intelligence Agency's Sherman Kent School. Several staff received training from the Financial Crimes Enforcement Network. Our team was sufficiently expert that several members were selected to train foreign governments on designations tradecraft, including deployments to Lebanon to instruct Lebanese officials. Every person who worked on designations for me held access to intelligence and law enforcement information at three classification levels: unclassified and law enforcement sensitive; secret, through SIPRNet (the Secret Internet Protocol Router Network, which is the federal government and military's classified intranet); and top secret through JWICS (the federal government's Joint Worldwide Intelligence Communications System, which is the most secure Intelligence Community network). We could draw raw intelligence from every major Intelligence Community agency, as well as diplomatic reporting, from the desktop in our analysis and decision-making.

29. In carrying out my State Department counterterrorism office's aggressive pursuit of Hamas-related designations, we never identified credible information indicating a connection between Hamas and CAIR, much less information specific to CAIR's involvement in financing terrorism.

[12] This count is current as of June 16, 2026.

30. Designation packages under Executive Order 13224 require an administrative record sufficient to satisfy both the legal standard and interagency scrutiny, and foreign terrorist organization reviews under the Immigration and Nationality Act require a comprehensive reassessment of a group's activities, financing networks, and organizational relationships. My office coordinated these processes across the Intelligence Community, the Department of Justice, the Department of the Treasury, the Federal Bureau of Investigation, and other agencies. We were not working in isolation, and we were not working from incomplete information. The interagency process is specifically designed to surface connections between designated entities and other actors in their orbit.

31. Had credible, articulable evidence existed linking CAIR to Hamas financing, material support, or organizational coordination, that evidence would have been available to us and would have been actionable. It was not. The absence of such information across multiple decades of State Department Hamas designation activity, spanning administrations of both parties and comprehensive foreign terrorist organization reviews, is not a gap in the record. It is the record.

**III. Conclusion**

32. I have four points to emphasize in summary.

33. First, and most importantly, Ms. Burns's report establishes no operational role in, and no material support for, terrorism by CAIR. It identifies no terrorist act, no act of financing, and no provision of material support by CAIR to Hamas or to any other designated entity. That is the question a designation package or justification must answer, and Ms. Burns's report does not answer it.

34. Second, the evidentiary record behind Ms. Burns's report is stale. Every exhibit comes from the record of the *Holy Land Foundation* prosecution. The newest is eighteen years

old. None documents a terrorist act by CAIR. The recent material she cites in support of her theory of an ongoing material support conspiracy by CAIR is pure speech, institutional advocacy, or, at worst, conduct by people and organizations other than CAIR.

35. Third, Ms. Burns's opinions rest on flawed inferences that experts in the field would not and did not draw, rather than criminal conduct. The report draws conclusions based on a very thin evidentiary record that would have been unacceptable in the federal designation process I led. It relitigates a case to which CAIR was not a party, *Holy Land Foundation*, which the United States closed more than two decades ago, against an organization that no longer exists, without ever showing that CAIR financed, attempted to finance, or otherwise materially supported Hamas.

36. Finally, it bears noting that Ms. Burns held the opinions reflected in her report during her years as an FBI agent, when she had access to the very materials she now cites. Whatever she believed then, or believes now, those opinions did not result in any criminal charges against CAIR arising out of *Holy Land Foundation* or any other matter. CAIR was never prosecuted.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2026.

Jason Blazakis

Jason Blazakis

# Exhibit F

THE FLORIDA CHANNEL

Home / Video Archive / 9/29/26 Florida Cabinet Meeting - The Flo...

# 9/29/26 Florida Cabinet Meeting




**Tags:** Blaise Ingoglia, James Uthmeier, Ron DeSantis, Wilton Simpson

SEE WHAT'S ON ...

TODAY'S SCHEDULE

ALL TV 24/7 LIVE STREAMS ?

↑ HIDE EARLIER EVENTS

TV 24/7 ENDED

TV 24/7 ENDED

TV 24/7 ENDED

TV 24/7 ENDED

TV 24/7 ENDED

## Capitol Update

A full half-hour review of developments in state government, including Florida's legislative, judicial and executive branches

VIEW CAPITOL UPDATE ARCHIVES

## Florida Crossroads

Florida Crossroads takes viewers on a journey of our state – exploring issues of state-wide interest in each half hour program.

VIEW FLORIDA CROSSROADS ARCHIVES

THE FLORIDA CHANNEL

***Committed to bringing people closer to their government.***

Suite 901, the Capitol Bldg | 402 South Monroe Street | Tallahassee, FL 32399

**Phone:** (850) 645-9030

© Copyright 2011 – 2026 The Florida Channel. All Rights Reserved. | Privacy Policy