**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR-FLORIDA, INC.,

*Plaintiffs*,

v.

RON DESANTIS, *et al.*,

*Defendants*.
______________________________/

Case No. 4:26-cv-521-MW-MAF

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

I. CAIR's Well-Documented History of Terrorism .......... 3

II. The State of Florida Designates CAIR as a Domestic Terrorist Organization .......... 6

A. The terrorist-designation process .......... 6

B. Florida designates CAIR as a domestic terrorist organization .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 9

I. CAIR Is Unlikely To Succeed on the Merits of Its Due Process Claim. .......... 9

A. CAIR has received all the process it is due. .......... 10

B. The designation is not a criminal prosecution. .......... 12

C. CAIR demands more process than the Constitution requires. .......... 20

II. CAIR Is Unlikely To Succeed on the Merits of Its First Amendment Claims. .......... 23

A. The State's regulation of conduct does not trigger First Amendment scrutiny. .......... 24

B. The designation and DTO framework do not implicate, much less violate, CAIR's freedom of association. .......... 28

C. The designation is not a prior restraint, so CAIR's unbridled-discretion argument fails. .......... 33

D. The designation and DTO framework do not regulate speech based on its content. .......... 37

III. Equitable Factors Do Not Support a Preliminary Injunction. .......... 44

IV. CAIR's Requested Relief Would Exceed the Court's Equitable Authority. .......... 45

CONCLUSION .......... 46

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Al Haramain Islamic Found., Inc. v. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2012) ........................................ 14, 15, 17, 29, 40, 44

*Alexander v. United States*,
509 U.S. 544 (1993)..........................................................................33, 34, 35

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)..................................................................................31

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986).................................... 26, 27, 28, 29, 31, 33, 34, 35, 36

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011)..................................................................................45

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)............................................................................29, 30, 35

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ..................................................................34

*Barry v. Barchi*,
443 U.S. 55 (1979)....................................................................................22

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) ...........................................................44, 45

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ..................................................................25, 41

*CAIR-Found., Inc. v. DeSantis*,
822 F. Supp. 3d 1263 (N.D. Fla. 2026) ...................................................30, 31

*California v. Texas*,
593 U.S. 659 (2021)...................................................................................45

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022)....................................................................................40

*City of Deerfield Beach v. Vaillant*,
419 So. 2d 624 (Fla. 1982) ........................................................................22

*Cotton v. Jackson*,
216 F.3d 1328 (11th Cir. 2000) .......................................................................21

*Fed. Mar. Comm'n v. S.C. Ports Auth.*,
535 U.S. 743 (2002)......................................................................................21

*Gomez v. United States*,
490 U.S. 858 (1989)......................................................................................22

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010).................................................... 32, 39, 40, 41, 42, 43, 44

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003).............................................11, 15, 20, 26, 29

*Hudson v. United States*,
522 U.S. 93 (1997).........................................................................16, 17, 18, 19

*Humanitarian L. Project v. Reno*,
205 F.3d 1130 (9th Cir. 2000) ....................................................32, 33, 36, 37

*In re Gateway Radiology Consultants, P.A.*,
983 F.3d 1239 (11th Cir. 2020) .........................................................................9

*Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007)...............................................................26, 29

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024) ............................................................33, 34

*Kansas v. Hendricks*,
521 U.S. 346 (1997)...............................................................................16, 18

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)......................................................................................46

*Mathews v. Eldridge*,
424 U.S. 319 (1976)......................................................................................10

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982)......................................................................................21

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)......................................................................23, 38, 39

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)......................................................................................31

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)....................31, 32

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001)....................10, 11, 14, 15, 17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....................29

*Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,
50 F.4th 1126 (11th Cir. 2022)....................24, 26

*Novak v. City of Parma*,
932 F.3d 421 (6th Cir. 2019)....................35

*People's Mojahedin Org. of Iran v. Dep't of State*,
327 F.3d 1238 (D.C. Cir. 2003)....................11, 15, 21, 26

*Reed v. Goertz*,
598 U.S. 230 (2023)....................21

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................37

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014)....................28, 29

*Set Enters., Inc. v. City of Hallandale Beach*,
No. 09-61405-CIV, 2010 WL 11549707 (S.D. Fla. Dec. 30, 2010)....................33

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969)....................33

*Smith v. Doe*,
538 U.S. 84 (2003)....................16, 17, 18, 19

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................45, 46

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997)....................39, 40, 41, 42

*United States v. Hammoud*,
381 F.3d 316 (4th Cir. 2004)....................13

*United States v. Hammoud*,
543 U.S. 1097 (2005)....................13

*United States v. Hammoud*,
405 F.3d 1034 (4th Cir. 2005) .....13

*United States v. Holy Land Found. for Relief & Dev.*,
2009 WL 10680203 (N.D. Tex. July 1, 2009).....4, 5

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993).....22

*United States v. O'Brien*,
391 U.S. 367 (1968).....39, 40

*United States v. Ursery*,
518 U.S. 267 (1996).....18

*United States v. Ward*,
448 U.S. 242 (1980).....15, 16, 18

*Vital Pharms., Inc. v. Alfieri*,
23 F.4th 1282 (11th Cir. 2022) .....9

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).....33, 42

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021).....45

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015).....44

**Statutes, Rules and Regulations**

8 U.S.C. § 1189 .....10, 14, 17

18 U.S.C. § 2339B .....14, 17, 18

50 U.S.C. § 1705(c) .....14

FLA. STAT.
§ 617.1420 ....................................................................................8, 13, 38
§ 775.30 ..........................................................................................24, 25
§ 775.33 .................................................... 8, 12, 28, 32, 38, 39, 41, 44
§ 775.34 ..........................................................................................32, 38
§ 823.05 .................................................................................................38
§ 874.03 ..................................................................................8, 19, 28, 32
§ 874.10 ..................................................................................8, 28, 32, 38
§ 943.03102 ...................................... 7, 8, 12, 16, 17, 18, 19, 24, 31, 44
§ 1002.421 ...............................................................................................46
§ 1003.035 ...............................................................................................46

Emergency Rule 11RER26-8,
52 Fla. Admin. Reg. 3963 (Sep. 14, 2026)..........................7, 8, 12, 22, 31, 32

Exec. Order No. 13224, 66 Fed. Reg. 49,079 (Sep. 23, 2001)...............................14

FLA. R. APP. P. 9.030(c)(1)(C) ...............................................................................22

**Other Authorities**

CAIR-LA, Special Dispatch No. 11238, MEMRI (Mar. 28, 2024),
https://tinyurl.com/4tx9bt3t .........................................................................6

Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024
Sess. (2024), https://perma.cc/FZ9E-X2DT ....................................................6

FDLE Cabinet Packages (Sep. 29, 2026), https://tinyurl.com/bd9xd9bh .............8, 9

H.R. Rep. No. 383, 104th Cong., 1st Sess. (1995) ................................................43

Image posted by Abdullah Jaber of CAIR-Florida (@iamabdullahjaber),
INSTAGRAM (Oct. 7, 2023), https://archive.ph/ju7eJ ......................................6

Jason Trahan, *Judge due to rule on Holy Land defense challenge*, DALLAS
MORNING NEWS, Oct. 14, 2008, 2008 WLNR 19527769,
https://tinyurl.com/58ef2pbj ..........................................................................5

M. LEVITT, HAMAS: POLITICS, CHARITY, AND TERRORISM IN THE SERVICE OF JIHAD
(2006)...........................................................................................................43

Meeting Agenda for the Palestine Committee, July 30, 1994, Government Exhibit
Elbarasse Search-19, *United States v. Holy Land Found. for Relief & Dev.*,
No. 3:04-CR-240-G (N.D. Tex.), https://perma.cc/EC7A-BHTR .................5

Review of FBI Interactions with the Council on American-Islamic Relations, U.S. Dep't of Justice, Off. of the Inspector Gen. (2013), https://perma.cc/2EHW-H8EF ....... 6

## INTRODUCTION

The Council on American-Islamic Relations was founded as a front for Hamas and the Muslim Brotherhood—a role it continues to serve today. CAIR emerged from a 1993 meeting among members of the Muslim Brotherhood's U.S.-based network, a meeting convened to conspire over how to support Hamas while avoiding scrutiny from U.S. law enforcement. CAIR's part in the conspiracy: provide political cover to other front groups and pressure the American public to either adopt their false narratives or remain silent, all while masquerading as a run-of-the-mill civil rights organization.

But the mask is off. In the late 2000s, the U.S. Department of Justice concluded that CAIR provided material support to Hamas and listed CAIR as an unindicted co-conspirator in the largest terrorism-financing prosecution in American history. In that monumental case, several entities and individuals were convicted for supporting Hamas, and a federal court agreed there was "ample evidence" of CAIR's involvement. Since then, numerous officials, employees, and affiliates of CAIR have been arrested or deported for, and even convicted of, terrorist activities. And despite years of attempting to project a different image, in November 2023 CAIR's Executive Director, Nihad Awad, betrayed CAIR's true purpose by saying he was "happy to see" the October 7th terrorist attacks, in which Hamas brutally murdered not just 1,200 Israelis, but also 46 American citizens.

In response to CAIR's well-documented, extensive, and ongoing terror-related conduct, the State of Florida designated CAIR and its local affiliate, CAIR-Florida (collectively, "CAIR"), as domestic terrorist organizations under Florida law. The designation followed an administrative process in which CAIR had an opportunity to object before the designation and still has an opportunity to appeal the designation to state court before it becomes effective on November 5, 2026. CAIR has not filed such an appeal. It instead filed this action, raising a bevy of constitutional claims and echoing the same false narrative it was founded to propagate: that it is an ordinary civil rights organization and that any claim otherwise is rank "Islamophobia," *see* Compl. ¶ 120, ECF 1—a signature term of CAIR's that the organization has weaponized against critics for decades.

Worn-out rhetoric aside, CAIR's legal claims have no merit. CAIR leads with an extraordinary argument that no court has ever endorsed: that a terrorist designation is criminal in nature and cannot be imposed without the full benefits of the criminal process. That is not how terrorist designations work at the federal level, nor is it consistent with decades of precedent distinguishing criminal and civil remedies. As with federal designations, Florida's designation of CAIR as a domestic terrorist organization is simply an administrative classification that, though it may be a relevant *fact* in future criminal prosecutions, is *not* a prosecution itself.

CAIR's fallback due-process argument fares no better because CAIR has been

afforded all the pre- and post-designation process it is due under the Constitution. In arguing otherwise, CAIR completely ignores longstanding federal caselaw establishing what due process does and does not require in the terrorist-designation context.

Equally unavailing is CAIR's argument that the designation violates the First Amendment. The designation does not implicate the First Amendment at all because it targets non-expressive conduct (*i.e.*, terrorism), not speech or association, and any downstream, incidental effect on speech and association does not trigger First Amendment scrutiny under well-established precedent. Simply put, CAIR's speech does not shield it from the consequences of its choice to involve itself in terrorism. At any rate, the designation and related statutes would survive any level of First Amendment scrutiny.

The Court should deny the motion.

## BACKGROUND

### I. CAIR's Well-Documented History of Terrorism

CAIR purports to be "the United States' largest Muslim civil rights and advocacy organization." *Id.* ¶ 73. That is the same false cover the organization was founded to hide behind. The truth is much darker.

CAIR was conceived as a front group for Hamas and the Muslim Brotherhood. The Muslim Brotherhood is a radical transnational Islamist organization that seeks

to impose Islamic, or "Sharia," law through violent means, including terrorism. Craine Decl., App'x (Ex. 18) at 256–57.[1] In the late 1980s, the Muslim Brotherhood created Hamas, a terrorist group dedicated to destroying the state of Israel. App'x (Ex. 16) at 171–72. Beyond Hamas, the Muslim Brotherhood boasts a vast support apparatus, with a presence in the United States, that works to further the Brotherhood's vision of a "grand Jihad . . . destroying the Western civilization from within and sabotaging its miserable house by their hands and the hands of the believers so that it is eliminated." *United States v. Holy Land Found. for Relief & Dev.*, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009) (quoting 1991 Shura Council Memo).

To that end, in 1993, a coalition of entities under the Muslim Brotherhood's umbrella, known collectively as the "Palestine Committee," met in Philadelphia to plot how to advance the Brotherhood's goals in America and support Hamas through front organizations. *Id.* at *8–9; App'x (Ex. 16) at 177. During the meeting, which was wiretapped by the FBI, the Palestine Committee agreed to create another front organization based in Washington, D.C.—one that would appear to be an independent and legitimate representative of the Islamic community in the United States but would work covertly with the Committee to support Hamas and serve as

[1] The materials cited in the declaration and appendix are accessible through links in the notice of intent that was provided to CAIR. *See* App'x (Ex. 1).

a cover for the existing organizations. App'x (Ex. 16) at 177–80. Months later, two participants at the Philadelphia meeting—including Nihad Awad, who still serves as CAIR's Executive Director—formally established CAIR. *Id.* at 180. In its own words, the Palestine Committee, which now included CAIR, tied itself "in a clear manner with the Muslim Brothers" and agreed to operate in "complete coordination" rather than as "a separate movement from the mother Group."[2]

The late-2000s' prosecution of the Holy Land Foundation for Relief and Development ("HLF")—the largest terrorism-financing prosecution in American history—further confirmed CAIR's role in the U.S.-based Hamas network. In that prosecution, the Texas-based HLF and five of its officials were convicted of funneling millions of dollars to Hamas through purported charities. At trial, the FBI testified that CAIR is a "front group for Hamas."[3] The Department of Justice went so far as to name CAIR as an unindicted co-conspirator in the scheme, and the trial court found "ample evidence to establish the association[] of CAIR . . . with HLF, the Islamic Association for Palestine ('IAP'), and with Hamas." *Holy Land Found.,* 2009 WL 10680203, at *7–9 (detailing evidence that CAIR conspired with HLF,

---

[2] Meeting Agenda for the Palestine Committee, July 30, 1994, Government Exhibit Elbarasse Search-19 at 6, 8, *United States v. Holy Land Found. for Relief & Dev.,* No. 3:04-CR-240-G (N.D. Tex.), https://perma.cc/EC7A-BHTR.

[3] Jason Trahan, *Judge due to rule on Holy Land defense challenge*, DALLAS MORNING NEWS, Oct. 14, 2008, 2008 WLNR 19527769, https://tinyurl.com/58ef2pbj.

IAP, and Hamas).

In turn, the FBI cut ties with CAIR by ending all "non-investigative outreach . . . to ensure that the FBI is not supporting individuals who support extremist or terrorist ideologies."[4] In the ensuing years, myriad individuals associated with CAIR have been convicted of terrorism and related crimes.[5] And CAIR is still very much part of the conspiracy it was founded to perpetuate, as evidenced by the sordid responses of Awad and other leaders to October 7th, which parroted Hamas's efforts to legitimize the atrocities. App'x (Ex. 16) at 198–99.[6]

## II. The State of Florida Designates CAIR as a Domestic Terrorist Organization.

In April 2026, Governor DeSantis signed HBs 1471 and 1473 (collectively, the "designation statute") into law. The statute took effect on July 1, 2026.

### A. The terrorist-designation process

Florida's designation statute creates a multi-step process for designating foreign and domestic terrorist organizations ("FTOs" and "DTOs"). First, for

[4] Review of FBI Interactions with the Council on American-Islamic Relations, U.S. Dep't of Justice, Off. of the Inspector Gen. 1 (2013), https://perma.cc/2EHW-H8EF.

[5] Disassociation from Council on American-Islamic Relations, H.R. 1209, 2024 Sess. at 4 (2024), https://perma.cc/FZ9E-X2DT.

[6] *See also* Image posted by Abdullah Jaber of CAIR-Florida (@iamabdullahjaber), Instagram (Oct. 7, 2023), https://archive.ph/ju7eJ; CAIR-LA, Special Dispatch No. 11238, MEMRI (Mar. 28, 2024), https://tinyurl.com/4tx9bt3t.

domestic organizations, the Chief of Domestic Security (the "Chief") of the Florida Department of Law Enforcement ("FDLE") must find that (a) the "organization is based or operates in [Florida] or the United States," (b) the "organization is engaging in terrorist activity as defined in [Fla. Stat. §] 775.30," and (c) the "terrorist activity of the organization is an ongoing threat to the security of this state or the United States." FLA. STAT. § 943.03102(1).

Second, the Chief "must provide written notice to the Governor and Cabinet of his or her intent to designate an organization." *Id.* § 943.03102(2)(a). That notice "must be accompanied by a summary of the basis for such designation," *id.*, and "any materials relating to the notice of intent that are not confidential, exempt, or otherwise protected from disclosure," Emergency Rule 11RER26-8, 52 Fla. Admin. Reg. 3963, 3967 (Sep. 14, 2026). The Chief must also provide notice to the organization itself if possible. FLA. STAT. § 943.03102(2)(b)(1).

Third, the Governor and Cabinet may hold a meeting to vote on whether to approve the proposed designation. *Id.* § 943.03102(2)(d). If they approve, the Chief "must publish notice of the designation in the Florida Administrative Register." *Id.* § 943.03102(2)(e). A designation takes effect 30 days after publication, *see* 52 Fla. Admin. Reg. at 3967–68, and during those 30 days the organization may appeal the designation to "the circuit court of the Second Judicial Circuit in and for Leon County," FLA. STAT. § 943.03102(2)(f). An organization may also petition FDLE

"at any time" for removal of the designation. *Id.* § 943.03102(3)(a).

Designation may serve as a factual predicate for further action. For example, it is a crime for a person to "knowingly provide[] material support or resources to a . . . domestic terrorist organization." *Id.* § 775.33(3). In certain circumstances, a DTO may also qualify as a "criminal gang," and it is a crime to "knowingly initiate[], organize[], plan[], finance[], direct[], manage[], or supervise[] criminal gang-related activity." *Id.* §§ 874.03(1), (4)(a), (7)(a), 874.10. And, among other things, DTOs are subject to administrative dissolution. *See id.* § 617.1420(1)(f).

### B. Florida designates CAIR as a domestic terrorist organization.

CAIR first sued on July 1, the day the designation statute took effect. The Court denied a temporary restraining order, and CAIR withdrew its preliminary-injunction motion while the State finalized the implementing emergency rule. *See* 52 Fla. Admin. Reg. at 3967–68.

On September 18, after the emergency rule was published, the Chief provided CAIR an official notice of intent to designate it as a DTO, which listed decades-worth of publicly available evidence that CAIR is a front for, and materially supports, Hamas and terrorism. *See* App'x (Ex. 1). In response, CAIR submitted written objections to the proposed designation, which were reviewed and added to the Cabinet meeting agenda and package. *See* ECF 6-5 (Ex. E).[7] On September 29,

[7] *See* FDLE Cabinet Packages (Sep. 29, 2026), https://tinyurl.com/bd9xd9bh.

the Governor and Cabinet voted to approve designations of CAIR and other well-established terrorist organizations, including Antifa and the Muslim Brotherhood.[8] On October 1, CAIR filed this action after the Court dismissed its original suit for lack of standing. FDLE published notice of the approved designation in the Florida Administrative Register on October 6, triggering CAIR's opportunity for judicial review in state court. The designation takes effect on November 5.

## LEGAL STANDARD

A party seeking a preliminary injunction "must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (cleaned up). "If there is no substantial likelihood of success on the merits, no injunction may be issued." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1254 (11th Cir. 2020).

## ARGUMENT

### I. CAIR Is Unlikely To Succeed on the Merits of Its Due Process Claim.

Both the pre- and post-designation procedures afforded to CAIR fully satisfy the requirements of due process. CAIR's demand for more—a full-blown criminal

[8] *See id.*

trial, or at the very least a trial-type proceeding—is not constitutionally required before a designation is made. Accepting CAIR's arguments would condemn not only Florida's terrorist-designation statute, but also the *federal* designation regime.

### A. CAIR has received all the process it is due.

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (cleaned up). CAIR's motion reads as if courts have never considered what due process requires in the context of governmental designation of terrorist organizations, but this is not uncharted territory. The D.C. Circuit, applying *Mathews*, has explained what process is required before designating an entity as a terrorist organization. *See Nat'l Council of Resistance of Iran (NCRI) v. Dep't of State*, 251 F.3d 192, 208–09 (D.C. Cir. 2001).

*NCRI* involved a challenge to the Secretary of State's designation of an FTO under 8 U.S.C. § 1189. *Id.* at 195–96. Although the challengers were foreign entities, the court held that they were fully entitled to due process protections because they had "entered the territory of the United States and established substantial connections with this country." *Id.* at 203. The court then explained what "process" is "due" before an entity may be designated as a terrorist organization. *Id.* at 208–09.

First, the government "must afford to the entities under consideration notice that the designation is impending." *Id.* at 208. That notice must include "those

unclassified items upon which [the government] proposes to rely." *Id.* at 209. Second, while such entities must be granted "the opportunity to be heard at a meaningful time and in a meaningful manner," this does not mean "that a hearing closely approximating a judicial trial is necessary." *Id.* Nor are entities even entitled to present oral argument or testimony. *Id.* Instead, the government need only afford an "opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." *Id.*

Florida complied with these requirements in designating CAIR. The Chief provided CAIR with a notice of intent to designate it as a DTO. *See* App'x (Ex. 1). That notice informed CAIR of the evidence on which the designation was based and of CAIR's right to file written objections, which CAIR did. *See* ECF 6-5 (Ex. E). CAIR was thus given all the pre-designation process it was due. *See NCRI*, 251 F.3d at 208–09; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (no due process violation because HLF received notice of proposed redesignation along with the evidence and had an opportunity to respond); *cf. People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (no due process violation even though the government relied on secret, classified information to redesignate).

The post-designation process available to CAIR likewise comports with the

Constitution. The publication of the designation on October 6 triggered a 30-day window for CAIR to appeal the designation to the state circuit court. *See* FLA. STAT. § 943.03102(2)(f). Because the designation will not become effective during this time, *see* 52 Fla. Admin. Reg. at 3968, CAIR has an opportunity to secure preliminary relief before the designation takes effect. And even after it takes effect and CAIR exhausts its appellate rights, CAIR may petition to remove the designation "at any time." FLA. STAT. § 943.03102(3)(a). In sum, CAIR's motion fails to acknowledge, much less engage with, the precedent demonstrating that Florida's statutory and regulatory scheme satisfies the Due Process Clause.

### B. The designation is not a criminal prosecution.

CAIR is instead asking for the unprecedented: a ruling that the designation is a criminal adjudication and punishment, such that CAIR could not be designated without the full panoply of procedural protections that attach to criminal prosecutions, including indictment by a grand jury, the right to confront all witnesses and evidence against it, and a jury verdict of "guilty" beyond a reasonable doubt. *See* Pls.' Emergency Mot. for TRO and Prelim. Inj., ECF 6, at 20–21, 24–25 ("Mot.").

But designation as a terrorist organization does not itself convict the organization of a crime or otherwise impose criminal punishment. As in the federal system, a terrorist designation in Florida is simply a fact that serves as an element of

a crime, such as materially supporting terrorism, *see* FLA. STAT. § 775.33, or as a condition for further civil action, such as an administrative dissolution, *see id.* § 617.1420. The point is explained in *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc), *vacated*, 543 U.S. 1097 (2005), *reinstated in relevant part*, 405 F.3d 1034 (4th Cir. 2005). There, the court held that "the *fact* of an organization's designation as an FTO is an element of" the federal material-support statute, "but the *validity* of the designation is not," so a defendant's "inability to challenge the designation" in a material-support prosecution "is not a violation of his constitutional rights." *Id.*

Under Florida law, in both the criminal and civil scenarios described above, additional procedural protections would attach before the legal remedy is imposed. And in the criminal example, the person could not be convicted of and punished for the crime without first receiving all the constitutionally mandated safeguards for criminal prosecutions, including confrontation, trial by jury, and the State's burden to prove guilt beyond a reasonable doubt. CAIR's separate point that it is "a crime for a designated organization to continue functioning in Florida," Mot. at 22–23, is not a *procedural* complaint, but a *substantive* one about whether it should be unlawful to support a DTO. The fact remains that no person or entity, CAIR included, may be convicted and punished for a crime without full criminal process.

But if more were needed, the non-criminal nature of CAIR's designation is

confirmed by longstanding precedent on (1) the federal designation process and (2) the distinction between civil and criminal remedies.

**1.** At the federal level, terrorist designations are also imposed by the Executive Branch without criminal indictments or trials, notwithstanding potential criminal implications and shuttered business operations. *See* 8 U.S.C. § 1189; Exec. Order No. 13224, 66 Fed. Reg. 49,079 (Sep. 23, 2001); 18 U.S.C. § 2339B; 50 U.S.C. § 1705(c). Yet CAIR cites no case invalidating a federal designation for lack of criminal process. Nor could it—federal courts have made clear that the Constitution does not require anything close to criminal process before designating an entity. *See NCRI*, 251 F.3d at 208–09. And that is true even in cases that have found due process violations for other reasons. *See id.*; *see also Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 979–90 (9th Cir. 2012).

Indeed, in reviewing a challenge to the designation of a domestic organization as a "specially designated global terrorist," the Ninth Circuit in *Al Haramain* explained that "this is not a criminal case," described the proceedings as arising in the "*civil* context," and rejected the organization's analogy to a hypothetical defendant convicted of a charge not included in the indictment because "there are significant differences between criminal and civil proceedings." 686 F.3d at 988–89. The court said as much even though the designation criminalized conducting business with the organization and effectively forced it to shut down. *Id.* at 979–80.

Courts have likewise upheld designations made without trials or cross-examination, and based on undisclosed classified evidence—none of which would be permissible if a designation itself carried criminal penalties. *See Holy Land Found.*, 333 F.3d at 164; *People's Mojahedin Org. of Iran*, 327 F.3d at 1242; *Al Haramain*, 686 F.3d at 982.

There is no basis for applying a different standard to Florida's designation process. Designation at the federal level has the same "dire" consequences, including the criminalization of material support and the blocking of assets and business operations. *See NCRI*, 251 F.3d at 196, 209; *see also Holy Land Found.*, 333 F.3d at 159; *Al Haramain*, 686 F.3d at 979–80. Nor does it matter that CAIR is a domestic organization. HLF was too, *see Holy Land Found.*, 333 F.3d at 160, as was Al Haramain Islamic Foundation, Oregon, *see Al Haramain*, 686 F.3d at 970. And though *NCRI* involved foreign groups, the court held that they were fully entitled to due process. *See* 251 F.3d at 202–03.

Accordingly, on the question whether a terrorist designation amounts to criminal punishment, the federal process rises or falls with Florida's. If Florida's designation statute is unconstitutional because it lacks criminal process, then the federal designation statutes and regulations are unconstitutional for the same reason. But as precedent establishes, both satisfy the Constitution.

**2.** If that were not enough, Supreme Court precedent makes clear that

distinguishing between civil and criminal penalties "is a matter of statutory construction." *United States v. Ward*, 448 U.S. 242, 248 (1980). If "the legislature meant the statute to establish civil proceedings," then the Court should "defer to the legislature's stated intent" unless CAIR "provides the *clearest of proof* that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (emphasis added) (cleaned up).

Here, the Florida Legislature "expressed the objective of the law in the statutory text itself." *Smith v. Doe*, 538 U.S. 84, 93 (2003). Specifically, the statute provides that, "[i]n order to ensure the safety of this state, and the safety of the residents of this state," the Chief may designate an entity as a DTO if that entity's "terrorist activity" constitutes an "ongoing threat" to Florida or the United States. FLA. STAT. § 943.03102(1)(a). This statutory focus on preventing *present and future* public harm, instead of seeking punishment for *past* harm, makes clear that a designation "is an incident of the State's power to protect the health and safety of its citizens," and thus "evidence[es] an intent to exercise that regulatory power, and not a purpose to" impose criminal punishment. *Smith*, 538 U.S. at 93–94.

Two other features of the statute reflect a civil, rather than criminal, purpose. First, the statute confers part of the designation authority on an "administrative agenc[y]," which "is prima facie evidence that [the legislature] intended to provide

for a civil sanction." *Hudson v. United States*, 522 U.S. 93, 103 (1997). Second, the statute requires FDLE "to promulgate implementing regulations" and "does not require the procedures adopted to contain any safeguards associated with the criminal process," which strongly suggests a "civil and administrative" remedy. *Smith*, 538 U.S. at 96; *see* FLA. STAT. § 943.03102(5).

Because it "is evident that" the Florida Legislature "intended" the designation "to be civil in nature," "only the clearest proof will suffice to override legislative intent and transform" the designation "into a criminal penalty." *Hudson*, 522 U.S. at 100, 103 (cleaned up).

But the "most relevant" factors for determining whether a nominally civil remedy is really a criminal punishment support the civil label here. *Smith*, 538 U.S. at 97. Designations have not historically been viewed as criminal punishment. *See, e.g.*, 8 U.S.C. § 1189; *NCRI*, 251 F.3d at 208–09; *Al Haramain*, 686 F.3d at 988–89. Nor does CAIR's designation impose "affirmative disability or restraint," because it "imposes no physical restraint," and it does not "resemble the punishment of imprisonment." *Smith*, 538 U.S. at 99–100. True, designation may indirectly result in shuttering operations, but that is "certainly nothing approaching the infamous punishment of imprisonment." *Hudson*, 522 U.S. at 104 (cleaned up) (holding that persons prohibited "from further participating in the banking industry" did not suffer an "affirmative disability or restraint"). Designation is likewise not excessive in

relation to its purpose—the consequences of designation are similar to those of a federal designation, *see* 18 U.S.C. § 2339B, and the designation is narrowly tailored to further the State's interests, *see infra* Part II.D. Finally, and "most significant[ly]," designation serves a "nonpunitive purpose"—"public safety"—rather than the traditional criminal purpose of punishment for prior culpable conduct. *Smith*, 538 U.S. at 102–03 (cleaned up); *Hendricks*, 521 U.S. at 362.

CAIR's effort to prove otherwise is meritless. CAIR first argues that the designation is a criminal penalty because officials look at criminal conduct (terrorist activity) to determine whether a designation is warranted. Mot. at 21. But the fact that the designation is "tied to criminal activity . . . is insufficient to render [it criminally] punitive." *United States v. Ursery*, 518 U.S. 267, 292 (1996). The Supreme Court has reaffirmed time and again that sanctions are not criminally punitive simply because the conduct for which they are imposed is criminal in nature. *See, e.g.*, *Hudson*, 522 U.S. at 105; *Hendricks*, 521 U.S. at 361–62; *Ward*, 448 U.S. at 250. This is especially true when the government considers criminal conduct for "evidentiary purposes"—such as to determine whether an organization poses an "ongoing threat" to public safety, FLA. STAT. § 943.03102(1)(a)(1)(c)—rather than "to punish past misdeeds," *Hendricks*, 521 U.S. at 362.

CAIR next contends that the designation is "inherently criminal" because it automatically makes CAIR a "criminal gang" and is codified in the criminal code.

Mot. at 21–22. But CAIR overreads the relevant statute. Although the statutory definition of a "criminal gang" under Florida law includes "terrorist organizations," FLA. STAT. § 874.03(1), designation does not *automatically* make an organization a criminal gang. In all cases, a "criminal gang" still must have "as one of its *primary activities* the commission of criminal or delinquent acts," *id.* (emphasis added), and "primary activities" means that the "criminal gang spends a *substantial* amount of time engaged in such activity," *id.* § 874.03(1)(b) (emphasis added). Because that same finding is not required to designate a terrorist organization, *see id.* § 943.03102(1)(a), status as a terrorist organization does not lead inexorably to status as a criminal gang. Further fact-finding is required to charge separately and prosecute a DTO as a criminal gang—fact-finding that would occur with *all* the criminal process required by the Constitution.

As for CAIR's focus on the designation statute's placement in the criminal code, the "location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Smith*, 538 U.S. at 94–95 (citing case which "held a forfeiture provision to be a civil sanction even though the authorizing statute was in the criminal code").

In short, CAIR has not assembled the "clearest of proof" necessary to override legislative intent. *Hudson*, 522 U.S. at 100 (cleaned up). That fact, combined with practice and precedent from the parallel designation regime at the federal level,

refutes CAIR's novel attempt to subject its designation to the rigors of criminal procedure.

### C. CAIR demands more process than the Constitution requires.

Alternatively, CAIR insists that, even if criminal process is not required to designate a DTO, the process it received is still constitutionally inadequate. But as detailed above, CAIR received all the process that federal law requires. Here too, CAIR's argument is a frontal assault on well-established precedent for federal designations.

CAIR demands more process here by plucking various procedures from other contexts, *see* Mot. at 30–35, but federal courts have already applied the *Mathews* factors and deemed each of them unnecessary in the specific context of terrorist designations. *See supra* Part I.A. For example, before designating CAIR, the State was not, contrary to CAIR's suggestion, required to "make any showing before a neutral judicial officer" "in an adversary proceeding" with witness testimony and cross-examination. Mot. at 31–32; *see, e.g.*, *Holy Land Found.*, 333 F.3d at 164 (rejecting need for trial or cross-examination).

Nor is there anything to CAIR's complaint that the notice lacked enough information for CAIR to "meaningfully defend itself." Mot. at 31–32. The D.C. Circuit found no due process violation in a case where the Secretary of State "relied on secret information to which" the organizations "were not afforded access,"

*People's Mojahedin Org. of Iran*, 327 F.3d at 1242, and here the notice provided a detailed basis for the designation, including findings that CAIR exists as a front for Hamas and played a central role in a sweeping conspiracy to finance terrorism. *See* App'x (Ex. 1).

Finally, CAIR hypothesizes that any post-designation appeal to the Florida circuit court—a right that CAIR conveniently fails to acknowledge for most of its argument—would be inadequate because it is uncertain whether relief could be obtained in time or whether the proceeding itself would result in meaningful review. *See* Mot. at 33–34. But CAIR cannot claim a due process violation based on a theoretical concern about a judicial review provision of which CAIR has not even availed itself. *See Reed v. Goertz*, 598 U.S. 230, 236 (2023) (a "procedural due process claim . . . is complete only when the State fails to provide due process" (cleaned up)); *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000) ("If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process."). CAIR has effectively predetermined that the statutory judicial review process is not good enough and launched a facial attack against it.[9]

[9] In other words, CAIR presumes that Florida courts will not safeguard federal constitutional rights, but basic principles of federalism assume the opposite. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (explaining a "strong federal policy against federal-court interference with pending state judicial proceedings"); *Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743,

But the 30-day window to appeal before the designation takes effect gives CAIR sufficient time to, at the very least, obtain preliminary relief. *See* 52 Fla. Admin. Reg. at 3968. That distinguishes the cases on which CAIR relies. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55–56 (1993) (no hearing until *after* a seizure); *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (no hearing until *after* person "suffered the full penalty imposed"). Nor is the statute's silence on the standard of review a problem: the statute gives CAIR the right to "appeal" the designation to the Second Judicial Circuit in Leon County, which comports with the well-established procedure for appellate review of administrative action by circuit courts. FLA. R. APP. P. 9.030(c)(1)(C). And the circuit court would accordingly review for procedural due process, essential requirements of law, and competent substantial evidence. *See City of Deerfield Beach v. Vaillant*, 419 So. 2d 624, 626 (Fla. 1982). As for CAIR's unfounded fear that the State might prosecute CAIR employees who participate in the state court proceeding, that is an implausible reading of Florida law—the statutory scheme would not provide for a challenge process and, simultaneously, make it unlawful to participate in the process. The canon of constitutional avoidance reinforces this interpretation, *see Gomez v. United States*, 490 U.S. 858, 864 (1989), and if CAIR were still prevented from mounting a

---

751 (2002) ("Dual sovereignty is a defining feature of our Nation's constitutional blueprint.").

legal defense, it could assert an as-applied due process argument at that time.

* * *

CAIR has decided to levy a facial due-process challenge against the entire designation process, "and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). A ruling for CAIR would be a windfall for Antifa, the Ku Klux Klan, and other odious domestic groups—and, because CAIR's arguments apply equally to the *federal* designation process, for al-Qaeda, ISIS, and Tren de Aragua as well. To the extent CAIR wishes to distinguish itself from these heinous groups, its legal arguments do not.

## II. CAIR Is Unlikely To Succeed on the Merits of Its First Amendment Claims.

CAIR contends that the designation and related statutory framework ("DTO framework") (1) suppress CAIR's associational rights by effectively forcing the closure of the organization in Florida; (2) operate as a prior restraint on CAIR's speech, a problem exacerbated by the Executive Branch's allegedly unbridled discretion to designate; and (3) are facially invalid because certain (but not all) applications of the material-support and criminal-gang statutes *could* regulate a hypothetical person's speech based on its content. None of this has merit.

### A. The State's regulation of conduct does not trigger First Amendment scrutiny.

As an initial matter, the State's regulation of conduct does not implicate the First Amendment at all. Through designation and the enforcement of related statutes, the State regulates conduct—terrorism—not First Amendment speech or association. Indeed, aside from one conclusory statement, CAIR does *not* argue in its preliminary-injunction motion that the designation itself was based on the content of CAIR's speech or political views. For good reason: The designation is based on what CAIR has done and will do, not on what it has said. And "[s]tatutes that regulate non-expressive conduct do not implicate the First Amendment at all even if they incidentally burden speech." *Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) (cleaned up).[10]

That Florida is regulating CAIR's conduct, rather than its speech, is evident from both the text of the designation statute and the record. The statute requires findings that an "organization is engaging in terrorist *activity*," and that the "terrorist *activity* of the organization is an ongoing threat to the security of this state or the United States." FLA. STAT. § 943.03102(1)(a)(1) (emphasis added). "Terrorist activity," in turn, is not defined in terms of speech—it instead means "an *activity*"

[10] The arguments in this Part II.A apply to the designation itself and nearly all applications of the related statutory provisions. CAIR's claim that certain applications of Sections 874.10 and 775.33(3) amount to content-based restrictions on speech, *see* Mot. at 49–50, is addressed in Part II.D below.

that involves "[a] violent *act* or an *act* dangerous to human life which is a violation of the criminal laws of this state or of the United States." *Id.* § 775.30(1)(a) (emphasis added). Designation therefore turns on the commission of specific *acts* and a threat to public security.

And that is precisely why CAIR was designated. As the notice of intent recounts in detail, CAIR has been engaged in "terrorist activity" from its inception. It was conceived as a front for Hamas, a known terrorist organization whose decades-long campaign of monstrous violence reached its darkest moment of depravity on October 7, 2023, when it slaughtered over a thousand people, including 46 American citizens, and took hundreds more hostage. As the terror group's public-relations arm in the United States, CAIR cannot wash its hands of Hamas's atrocities by hiding behind a corporate shield that was concocted to disguise the organization's true identity.

CAIR's long history of support for terrorism is also "terrorist activity" under Florida law and supplies a separate basis for the designation. As the en banc Seventh Circuit recognized, "[g]iving money to Hamas, like giving a loaded gun to a child," is "an 'act dangerous to human life'" in violation of federal criminal law and thus satisfies the federal definition of terrorism, which mirrors Florida's definition. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).

In short, Florida designated CAIR based on its terrorism—its *acts*—not its

protected First Amendment activities. CAIR's First Amendment claims thus "lose their footing," as "there is no First Amendment right nor any other constitutional right to support terrorists." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (quoting *Holy Land Found.*, 333 F.3d at 166); *see also id.* at 736–37 (holding that blocking assets of a group found to support terrorism "does not implicate [the group's] First Amendment right of association"). When "an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional." *Id.* at 735.

And that is true even if the regulation "incidentally burden[s]" First Amendment activity, *Norwegian Cruise*, 50 F.4th at 1135, such as when "the consequences of the [terrorist] designation" burden protected speech and association, *People's Mojahedin Org. of Iran*, 327 F.3d at 1244. What matters is that "[i]t is conduct and not communication that the statute controls." *Id.*

The Supreme Court proved the point in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), when it held that "the First Amendment [wa]s not implicated" by the forced closure of a bookstore whose premises were used for prostitution, even though the bookstore also engaged in protected speech. *Id.* at 707. In that case, the Supreme Court declined to apply even intermediate scrutiny—despite the forced closure's effect on protected speech (bookselling)—because the closure had nothing to do with that speech; it was based on "sexual activity" that "manifest[ed] absolutely

no element of protected expression." *Id.* at 705. So too here—the designation and DTO framework have nothing to do with CAIR's protected speech or association but with its terrorist activity that, like prostitution, "manifests absolutely no element of protected expression." *Id.*

It made no difference in *Arcara* that "the effect of the statutory closure remedy" stifled the bookstore's "First Amendment protected bookselling activities." *Id.* As the Court put it, to hold that such an effect implicates the First Amendment "proves too much," as "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.* at 705–06 (noting that "a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement"). What mattered was that "[t]he legislation providing the closure sanction was directed at unlawful conduct having nothing to do with books or other expressive activity," so it did not trigger First Amendment scrutiny. *Id.* at 707. The same result follows here because the terrorist designation, and the consequences that flow from it, are "directed at unlawful conduct"—terrorism—"having nothing to do with [CAIR's] expressive activity." *Id.*

CAIR therefore whiffs at the applicable legal framework by assuming that the designation implicates the First Amendment. Because that assumption is wrong, so too are CAIR's remaining arguments.

### B. The designation and DTO framework do not implicate, much less violate, CAIR's freedom of association.

CAIR's freedom-of-association claim fails to clear the starting blocks. To support the claim, CAIR argues that the criminal-gang statute violates the First Amendment because it grinds CAIR's Florida-based associations "to a halt." Mot. at 37 (citing FLA. STAT. §§ 874.10, 874.03(4)(a)).

But the lesson from *Arcara* and *Norwegian Cruise* is that the government can incidentally burden First Amendment activity—even if that activity is cut off entirely—without implicating the First Amendment, as long as the government is targeting non-expressive conduct. And again, although CAIR disputes that it *is* engaged in terrorism, its preliminary-injunction motion does not dispute that Florida designated it *for* terrorism, rather than for its expressive activity. So the First Amendment is not implicated by the incidental burden on CAIR's operations, just as it would not be implicated by "closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment." *Arcara*, 478 U.S. at 705.

CAIR also cites the material-support statute and gestures at coercion by stating that the statute causes third parties to suppress CAIR's speech and disassociate from it. *See* Mot. at 37–38 (citing FLA. STAT. § 775.33(3), (5)). But CAIR relegates this drive-by point to a single sentence without developing it. That is not enough to preserve the argument. *See Sapuppo v. Allstate Floridian Ins. Co.*,

739 F.3d 678, 681 (11th Cir. 2014).

Regardless, the anti-coercion principle is no help to CAIR. That principle simply prohibits the government from doing "indirectly what [it] is barred from doing directly: . . . coerc[ing] a private party to punish or suppress disfavored speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Yet as explained above, the government *can* directly regulate organizations engaged in terrorism without implicating the First Amendment, even if doing so shutters their operations. *See Holy Land Found.*, 333 F.3d at 165–66; *Islamic Am. Relief Agency*, 477 F.3d at 735–37; *see also Arcara*, 478 U.S. at 707. Thus, the government can also prohibit third parties from materially supporting such organizations, regardless of the impact on the deserted organization's operations. *See Al Haramain*, 686 F.3d at 979–80 (noting that federal designation prohibits all persons from doing business with the designated entity). If prohibiting material support constituted unlawful coercion, then the government would, bizarrely, be barred from doing indirectly what it *can do* directly.

Nor can CAIR rely on coercion without establishing that the State is using the material-support statute for the *specific purpose* of suppressing CAIR's First Amendment activity. For example, in the Supreme Court's leading coercion precedent, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), publishers challenged a state commission created *specifically* to censor objectionable books and

publications. *Id.* at 60–61. The commission did so indirectly, by pressuring distributors to cease circulation, *id.* at 61–63, but it was still deliberately regulating *expressive* activity by stopping specific speech before it occurred, which implicates the First Amendment regardless whether the government regulates directly or indirectly, *id.* at 67.

Not so here. As detailed above, and as CAIR does not dispute, the terrorist designation—unlike the censorship in *Bantam Books*—targets CAIR's *conduct*, not its expression, which is why courts routinely uphold terrorist designations and related action against First Amendment attack.

To be sure, in enjoining the Governor's executive order withholding certain benefits from those providing material support to CAIR, the Court described as "disingenuous" the argument that the executive order regulated conduct, not speech. *CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1276 n.12 (N.D. Fla. 2026). But the Court's reasoning, responding to an argument made by Defendants, focused on whether the executive order touched the speech of the *third parties* allegedly being coerced, rather than the speech of *CAIR*—then the Court concluded that "the suppressed speech . . . belongs to CAIR." *Id.* Respectfully, Defendants disagree with the Court's conclusion, but in any event, there is no coercion here because the State can regulate *CAIR's* conduct, directly or indirectly, even if it incidentally burdens CAIR's speech or association, and the State is not pressuring third parties for the

specific purpose of suppressing *CAIR's* speech or association.

Separately, in enjoining the executive order, the Court emphasized that the Governor acted unilaterally, without legislative involvement or any mechanism for judicial review. *Id.* at 1277. Those concerns no longer exist: the Legislature enacted the DTO framework; designations require findings by the Chief and approval by the Governor and Cabinet after notice and an opportunity to object; and judicial review and removal petitions are available. *See* FLA. STAT. § 943.03102; 52 Fla. Admin. Reg. at 3967–68.

CAIR also wrongly relies on *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021). That case involved what the Supreme Court has long held is a direct burden on association: compelled disclosure of donors' identities. *Id.* at 602–03, 606–07 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). But nothing like that is at play here—at most, the designation *indirectly* burdens associational rights by, yes, precluding CAIR's operations in Florida. And that indirect burden does not implicate the First Amendment because, again, the designation is "directed at unlawful conduct." *Arcara*, 478 U.S. at 705–07.

Rounding out its errors, CAIR argues that the designation imposes "guilt for association" on its staff, board members, and donors without proof that they specifically intend to further any illegal aims. Mot. at 40 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 925 (1982)). "But *Claiborne Hardware* and

similar cases address situations where people are punished 'by reason of association alone.'" *Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000) (quoting *Claiborne Hardware*, 458 U.S. at 920). And CAIR fails to cite a single Florida statutory or regulatory provision that punishes mere association with a DTO.

To the contrary, Section 775.34(2) incorporates *Claiborne Hardware* by criminalizing membership in a DTO *only* when the person "willfully becomes a member . . . and serves under the direction or control of that organization with the intent to further the illegal acts of the organization." FLA. STAT. § 775.34(2); 52 Fla. Admin. Reg. at 3968 (no cause for prosecution "based solely on membership in the organization"). Nor do other statutes punish mere association—they prohibit the *act* of giving material support to a DTO, FLA. STAT. § 775.33(3), and the *act* of directing an organization's conduct with the intent to further its interests, *id.* §§ 874.03(4)(a), 874.10. Criminalizing such acts does not violate CAIR's freedom of association. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 40 (2010).[11]

Even if the designation burdened CAIR's associational rights in a manner that triggered First Amendment scrutiny, *see* Mot. at 38–39, the designation would survive any level of scrutiny, *see infra* Part II.D.

[11] Although *Holder* reserved whether "Congress could extend the same prohibition on material support at issue [there] to domestic organizations," that reservation was limited to *Holder*'s free-speech analysis. 561 U.S. at 39. It is not relevant to the Court's freedom-of-association analysis in the next part of its opinion, which simply noted that the statute did not penalize mere association. *See id.*

**C. The designation is not a prior restraint, so CAIR's unbridled-discretion argument fails.**

CAIR's next two arguments—that the designation is a prior restraint, and that the statute vests unbridled discretion in Florida's Executive Branch—collapse into a single question: Is the designation a prior restraint? That is because unbridled governmental discretion is a First Amendment problem *only* in the context of prior restraints, such as "licensing schemes," which "directly govern[] activities protected by the First Amendment." *Humanitarian L. Project*, 205 F.3d at 1136; *see also Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024) ("Our precedents recognize that the unbridled-discretion doctrine applies to prior restraints."); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989). Every case relied on by CAIR for its "unbridled discretion" argument involved a prior restraint such as a licensing scheme or the functional equivalent. *See* Mot. at 44–46.

The designation is not a prior restraint for two reasons. First, it does not directly govern activity protected by the First Amendment. *See supra* Part II.A. It therefore cannot be a prior restraint on protected speech. *Humanitarian L. Project*, 205 F.3d at 1136–37; *Arcara*, 478 U.S. at 705 n.2.

Second, "not every governmental action that may affect future protected expression is . . . [a] prior restraint." *Set Enters., Inc. v. City of Hallandale Beach*, 2010 WL 11549707, at *12 (S.D. Fla. Dec. 30, 2010). The term "prior restraint"

describes something more specific; namely, "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). Said differently, a prior restraint prevents specific speech until certain requirements are met. *See Jarrard*, 115 F.4th at 1321; *see also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1214, 1223 (11th Cir. 2017) (policy that required person to complete "several step[]" process before speaking at a school board meeting was a "prior restraint").

CAIR does not argue, nor could it, that the State is forcing it to comply with any requirements before speaking. It instead argues that the designation "functions as a prior restraint because it allows Florida's executive branch to suppress disfavored speech and association before they take place." Mot. at 41. By labeling the designation a prior restraint simply because it may burden future speech and association, CAIR "stretches the term 'prior restraint' well beyond the limits established by [the Supreme Court's] cases" and would "virtually obliterate the distinction . . . between prior restraints and subsequent punishments." *Alexander*, 509 U.S. at 549–50. Under CAIR's logic, any civil or criminal remedy that burdens future speech would be a prior restraint, such that a thief sent to prison suffers a prior restraint on his ability to speak in public places. *See Arcara*, 478 U.S. at 706. That is not the law.

Instead, the law distinguishes between prohibiting future speech (a prior restraint) and penalizing past speech (not a prior restraint). *See Alexander*, 509 U.S. at 550; *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) ("punishment for disfavored speech . . . is not a prior restraint"). And this case is easier still, because the designation does not penalize past speech at all, but rather imposes a regulatory classification on CAIR based on past and present *conduct* that poses a threat to public safety. In this way, the case is once again like *Arcara*, where the Supreme Court held that the forced closure of the bookstore was *not* a "prior restraint" because "the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order has nothing to do with any expressive conduct at all." 478 U.S. at 705 n.2.

*Bantam Books* does not counsel otherwise. There, a state commission was set up for the purpose of suppressing specific "obscene" speech before it occurred, and the commission carried out that task by effectively approving or vetoing specific publications before they could reach the public. *Bantam Books*, 372 U.S. at 59–63. That is the functional equivalent of a licensing scheme—it was as if the commission had required publishers to submit books to it for approval before publication. Florida's designation statute lacks this essential similarity with the censorship regime in *Bantam Books* because it does not empower the Executive Branch to

review specific expression for approval before it occurs. It simply authorizes the Executive Branch to designate organizations based on specific unlawful conduct and public-safety risks, not based on "an advance determination that [specific speech] is prohibited." *Arcara*, 478 U.S. at 705 n.2.

CAIR glosses over this fundamental distinction, seizing on language about the lack of judicial process or sufficient procedural safeguards. *See* Mot. at 42–43 & n.11. But the absence of procedural protections in *Bantam Books* cannot be divorced from what the commission was doing—reviewing specific speech before it occurred and deciding whether to permit or proscribe it. What is more, CAIR's complaints about procedure merely rehash its failed due process argument. If CAIR were right, then the federal designation regime, though it passes muster under the Due Process Clause, would likewise function as an unconstitutional prior restraint.

Because the designation is not a prior restraint, CAIR's fixation on the Governor and Cabinet's alleged "excessive discretion" in designating DTOs is misplaced. Moreover, it is simply false that they can designate any organization merely on their say-so, without any meaningful checks on their power. As the Ninth Circuit explained in rejecting a similar challenge to the similarly worded federal designation statute, "[t]he statute authorizes the [Executive Branch] to designate only those groups that engage in terrorist activities," which "is not so vague or indeterminate" a standard "as to give the [Executive Branch] unfettered discretion."

*Humanitarian L. Project*, 205 F.3d at 1137. Here too, Florida could not "designate the International Red Cross or the International Olympic Committee as terrorist organizations." *Id.* And as explained above, Florida law establishes meaningful checks on the designation authority. *See supra* Part I.A. Again, if those checks are insufficient, then the federal designation scheme would likewise be infected by "unbridled discretion" and thus fall with Florida's framework.[12]

### D. The designation and DTO framework do not regulate speech based on its content.

CAIR's final argument is that its designation and the "DTO regime" burden speech "on the basis of the speech's content and viewpoint." Mot. at 49. To obtain its requested injunctive relief for this claim, CAIR would need to show that the designation itself, as well as the "DTO regime"—which CAIR has defined to include 16 different sections of the Florida Statutes and the emergency rule, *see id.* at 2 n.1—target "particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

[12] Because the designation is not a prior restraint, the "three procedural protections" that CAIR seeks do not fit. Mot. at 46. For example, it makes no sense to force the State to prove in court "that the speech it seeks to prohibit is unprotected" because the designation does not seek to "prohibit" speech in the first place. *Id.* And besides, CAIR's attempt to route terrorist designations through a judicial proceeding *before* they are imposed is simply a backdoor attempt to rehabilitate its meritless due process argument.

CAIR does not even try to make that showing. It instead addresses just *two* statutory provisions that make up part of the "DTO regime": (1) the prohibition in Section 874.10 on "knowingly initiat[ing], organiz[ing], plan[ning], financ[ing], direct[ing], manag[ing], or supervis[ing] criminal gang-related activity," FLA. STAT. § 874.10, and (2) the prohibition in Section 775.33(3) on "knowingly provid[ing] material support or resources to a designated . . . domestic terrorist organization," *id.* § 775.33(3); *see* Mot. at 49. This narrow focus necessarily narrows the scope of relief that CAIR can obtain on this claim.

**1.** As an initial matter, CAIR provides no basis—and indeed makes no argument—for classifying the designation itself and the other statutory provisions as content based. As discussed in Part II.A above, the State designated CAIR based on its conduct, not the content of its speech. Other statutory provisions unchallenged here likewise cannot plausibly be characterized as content based. *See* FLA. STAT. § 617.1420(1)(f) (dissolution); *id.* § 775.34(2) (membership with intent to further illegal acts); *id.* § 823.05(2)(b) (nuisance abatement). Accordingly, the designation and these provisions would remain in effect no matter the outcome of CAIR's challenge to Sections 874.10 and 775.33(3).

And even as to Sections 874.10 and 775.33(3), CAIR argues only that they unlawfully restrict speech in *some* applications. It has not carried its burden to show that "a substantial number of [the laws'] applications are unconstitutional, judged in

relation to [their] plainly legitimate sweep." *NetChoice*, 603 U.S. at 723 (cleaned up). For example, Section 775.33(3) defines "[m]aterial support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, or transportation." FLA. STAT. § 775.33(1)(d). As this list makes clear, material support "most often does not take the form of speech at all," *Holder*, 561 U.S. at 26, so even if CAIR could show that the provision may conceivably be applied to speech in an unlawful manner, CAIR still would not be entitled to an injunction that enjoins *all* enforcement.[13]

**2.** All that said, Sections 874.10 and 775.33(3), like the designation and other statutory provisions, are facially content-neutral regulations of conduct that, at most, only incidentally burden expressive activity. So even if intermediate scrutiny applied under *United States v. O'Brien*, 391 U.S. 367 (1968), they "will be sustained under the First Amendment if [they] advance[] important governmental interests unrelated to the suppression of free speech and do[] not burden substantially more speech than

[13] The designation statute creates a scheme of judicial review and thus cannot plausibly be construed to authorize the prosecution of CAIR employees who participate in judicial review. *See* Mot. at 50. As noted earlier, if there were any doubt, constitutional avoidance would resolve it, given the serious constitutional implications of denying a party the ability to mount a legal defense.

necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, 189 (1997).

On their face, Sections 874.10 and 775.33(3) are content neutral because they regulate specific activities in aid of DTOs, without regard to the motives or beliefs of the person rendering the aid, or to whether the aid is accompanied by any expression at all. A law is not content based whenever there is "*any* examination of speech or expression," but only when the law "discriminate[s] based on the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022) (cleaned up). Neither provision discriminates in that way. Any burden that the provisions impose on speech is also incidental, because "there is nothing *necessarily* expressive about [the] conduct" they prohibit. *O'Brien*, 391 U.S. at 375 (emphasis added).

*Holder* does not compel a different result. There, the Court held that the federal material-support statute was content-based "*as applied* to plaintiffs" because they specifically sought to "provide material support . . . in the form of speech." 561 U.S. at 28, 36–37 (emphasis added) (noting that the plaintiffs sought to offer training on international law and petitioning the United Nations); *see also Al Haramain*, 686 F.3d at 997–98, 1001 (holding that content-based restriction *as applied to pure speech* violated First Amendment). CAIR has not brought an as-applied challenge to Sections 874.10 and 775.33(3), nor offered any details about how these provisions

would apply to a particular course of activity. In "entirely hypothetical" fashion, *Holder*, 561 U.S. at 24–25, CAIR simply posits that any "[s]peech advancing [its] interests" or provided "as a service to" it will be subject to criminal prohibition, without identifying who the hypothetical speaker even is or why that person's speech would constitute "material support," Mot. at 49 (emphasis omitted); *see Holder*, 561 U.S. at 37–38 (holding that the plaintiffs' desire to "engage in political advocacy," without "specify[ing] their expected level of coordination" with the terrorist group, was "phrased at such a high level of generality that they cannot prevail in [a] pre-enforcement challenge"). Speech "intended to further the interests" of CAIR may also qualify as independent advocacy, which is not prohibited. *See* FLA. STAT. § 775.33(5)(b); *cf. Boim*, 549 F.3d at 700 (explaining that the federal material-support provision does not reach "moral rather than material support," such as "a speech in praise of Hamas for firing rockets at Israel").

Because every aspect of the "DTO regime" is content neutral and, at most, only incidentally burdens free expression as part of regulating harmful conduct, it is valid so long as it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner,* 520 U.S. at 189. That bar is cleared with ease.

The State's interest here—combatting terrorism—is not just an "important governmental interest"; it is "an urgent objective of the highest order." *Holder*, 561 U.S. at 28. That interest, moreover, "is unrelated to the suppression of free speech," *Turner,* 520 U.S. at 189, for all the reasons given above, *see supra* Part II.A.

CAIR complains that the designation and DTO framework are not sufficiently tailored to Florida's interest in combatting terrorism. *See* Mot. at 38–39. But CAIR applies the wrong standard. Under intermediate scrutiny, the government has "latitude in designing a regulatory solution." *Turner*, 520 U.S. at 213. It "may employ the means of its choosing so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further that interest." *Id.* at 213–14 (cleaned up). Unlike with strict scrutiny, a "less-restrictive-alternative analysis" is not "part of the inquiry." *Id.* at 217–18 (cleaned up). Courts instead "defer to [the government's] reasonable determination" of how "its interest[s] . . . would be best served," *Ward*, 491 U.S. at 800, without second-guessing the government's chosen "method," *Turner*, 520 U.S. at 218 (cleaned up).

The State of Florida has reasonably determined, much like the federal government, that a designation scheme is an appropriate means to combat terrorist organizations. As *Holder* recognized, "terrorist groups systematically conceal their

activities behind charitable, social, and political fronts." 561 U.S. at 30 (quoting M. LEVITT, HAMAS: POLITICS, CHARITY, AND TERRORISM IN THE SERVICE OF JIHAD 2–3 (2006)). And "Hamas" in particular "use[s] its overt political and charitable organizations as a financial and logistical support network for its terrorist operations." *Id.* at 31 (quoting Levitt, *supra*, at 2); *see also* H.R. Rep. No. 383, 104th Cong., 1st Sess. 43 (1995) (finding that terrorist organizations often "operate under the cloak of a humanitarian or charitable exercise"). For this reason, resort to ordinary criminal law—as CAIR proposes—is not an effective remedy when dealing with front groups that, like CAIR, conceal nefarious conduct behind the façade of civil rights advocacy and charitable activities.

Relatedly, "[i]t is not difficult to conclude" that the "taint" of a terrorist organization's activities "is so great" that Florida's designation scheme is a reasonable response. *Holder*, 561 U.S. at 30 (cleaned up). That CAIR or any other group operates under a seemingly innocuous name, rather than "Hamas USA" or "Hamas Florida," does not dictate what measures Florida may take against it. Nor should CAIR's claim that it engages in many peaceful, legitimate charitable activities. After all, the line between a terrorist organization's legitimate and illegitimate activities is illusory. Even seemingly benign services "lend legitimacy" to the organization, "legitimacy that makes it easier for [it] to persist, to recruit members, and to raise funds—all of which facilitate more terrorist" activity. *Id.* In

short, because even "lawful activity promotes the terrorist organization as a whole," *id.* at 31, Florida reasonably determined that CAIR and other designated terrorist organizations should not operate in the State.

Finally, that *Holder* reserved whether the government may bar material support in the form of speech to domestic organizations does not change the analysis here: *Holder*'s legitimacy concerns "appl[y] with almost equal force" to domestic entities. *Al Haramain*, 686 F.3d at 1000.

**3.** The same result would follow under strict scrutiny, which requires that government action be "narrowly tailored to serve a compelling interest." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). As noted, combatting terrorism is a textbook compelling interest. *Holder*, 561 U.S. at 28. And the DTO framework is narrowly tailored to that end—it is triggered by an individualized determination that an entity is engaged in terrorism, FLA. STAT. § 943.03102(1)(a); the criminal prohibitions carry scienter requirements, *see id.* § 775.33(3); judicial review exists for any designation, *id.* § 943.03102(2)(f); and "most importantly," Florida "has avoided any restriction on independent advocacy," *Holder*, 561 U.S. at 36; FLA. STAT. § 775.33(5)(b). Moreover, Florida has adopted the least restrictive means of furthering its interests, for all the reasons given above.

## III. Equitable Factors Do Not Support a Preliminary Injunction.

CAIR's failure to establish a substantial likelihood of success on the merits

defeats its motion for a preliminary injunction. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). But the public interest and balance of the equities—which merge here—cut the same way. After all, states have a constitutionally compelling interest in combatting terrorist organizations bent on "destroying" and "eliminat[ing]" "Western Civilization." *Supra* at 4.

## IV. CAIR's Requested Relief Would Exceed the Court's Equitable Authority.

Assuming that CAIR is entitled to relief, it asks that the Court do more than "enjoin only *Defendants' enforcement* of the DTO regime." Mot. at 52. It also requests the complete "removal" and "recission" of the published designation from the Florida Administrative Register. *Id.* For two reasons, that request disregards the limits on the Court's equitable authority.

First, such authority is limited to "enjoin[ing] *state officials* from *enforcing* state laws." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021) (emphasis added). It does not extend to relief against the "challenged" provisions "themselves," because injunctions enjoin persons, not provisions. *Id.* at 44; *see also California v. Texas*, 593 U.S. 659, 671–72 (2021). CAIR's argument is no different than saying that a person's injury is "traceable to" (Mot. at 52) the statute creating the private right of action against him, and thus the statute must be erased from the law books—which would "cast[] the Court in the role of a Council of Revision." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011). Put simply, CAIR's desire for

"complete relief" does not justify shedding traditional limits on the judiciary's equitable authority. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851, 858 (2025).

Second, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Here, that would mean enjoining enforcement only of the provisions of Florida law that CAIR actually challenges. CAIR's rescission request is broader than necessary because it would effectively nullify provisions of Florida law incorporating a DTO designation that CAIR does not challenge, such as Sections 1002.421 and 1003.035 of the Florida Early Learning-20 Education Code. *See* FLA. STAT. §§ 1002.421(1)(t)(3)(c), (d), 1003.035; Mot. at 2–3 & n.1 (requesting injunction against enforcement of the "DTO regime," which is not defined to include these provisions).

## CONCLUSION

The Court should deny CAIR's motion for a preliminary injunction.

DATED: October 12, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General*

/s/ David M.S. Dewhirst
DAVID M.S. DEWHIRST (FBN 1076928)
*Solicitor General*
Jason J. Muehlhoff (FBN 1076410)
*Chief Deputy Solicitor General*
TYLER E. GUSTAFSON (FBN 1049292)
*Assistant Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
david.dewhirst@myfloridalegal.com

/s/ Charles J. Cooper
CHARLES J. COOPER (NO. 248070DC)
JOHN D. RAMER*
NICOLE J. MOSS*
RILEY W. WALTERS*
JESSICA CRAINE*

**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
ccooper@cooperkirk.com

*Appeared *Pro Hac Vice*

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Charles J. Cooper, hereby certify that this memorandum complies with Local Rule 7.1(F), as modified by the Court's order enlarging the word count, because it contains 10,973 words, as measured by the word-processing system used to prepare it.

Dated: October 12, 2026

*/s/ Charles J. Cooper*

Charles J. Cooper
COOPER & KIRK, PLLC
Telephone: (202) 220-9600
ccooper@cooperkirk.com

**CERTIFICATE OF SERVICE**

I, Charles J. Cooper, hereby certify that a true and correct copy of the foregoing document was sent via CM/ECF on October 12, 2026 to all counsel of record.

Dated: October 12, 2026

*/s/ Charles J. Cooper*
Charles J. Cooper
COOPER & KIRK, PLLC
Telephone: (202) 220-9600
ccooper@cooperkirk.com