**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CAIR-FOUNDATION, INC. and
CAIR FLORIDA, INC.,

*Plaintiffs*,

v.

Case No. 4:26-cv-521-AW/MAF

RON DESANTIS, *et al.*,

*Defendants*.

______________________________/

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The DTO Regime and Plaintiffs' Designations Violate Due Process. .......... 3

A. The federal terrorist designation programs, rooted in exclusively federal powers, cannot save Florida's DTO regime. .......... 3

B. The DTO regime imposes criminal punishment without criminal process. .......... 5

C. The DTO regime fails the *Mathews* balancing test. .......... 9

II. The DTO Regime and Plaintiffs' Designations Violate the First Amendment. .......... 13

A. The DTO regime and Plaintiffs' designations substantially burden First Amendment-protected speech and association. .......... 13

B. The DTO regime and Plaintiffs' designations violate their freedom of association. .......... 16

C. The DTO regime and Plaintiffs' designations impose an unlawful prior restraint. .......... 19

D. The DTO regime and Plaintiffs' designations punish speech based on content and viewpoint. .......... 21

E. The DTO regime and Plaintiffs' designations fail First Amendment scrutiny. .......... 22

III. The Court Should Grant Plaintiffs' Requested Relief. .......... 24

CONCLUSION .......... 25

CERTIFICATE OF WORD COUNT .......... 27

## INTRODUCTION

Defendants advance a remarkable proposition: state officials may designate a U.S. civil rights organization a "domestic terrorist organization," subject it and those who associate with it to sweeping criminal prohibitions, and effectively shutter its operations in Florida—without judicial approval, without proof beyond a reasonable doubt, and without even implicating the First Amendment. If Defendants were correct, *any* state could single out and silence disfavored nonprofits. The Constitution does not permit that result.

Two additional points bear emphasis. First, Defendants' dramatic claim that Florida's "DTO regime" and the federal designation programs rise or fall together, ECF No. 55 ("Opp.") 15, 23, is false. The overwhelming majority of organizations subject to federal designation as "foreign terrorist organizations" ("FTOs") or "specially designated global terrorists" ("SDGTs") lack U.S. constitutional rights. A ruling for Plaintiffs thus has no bearing on the vast majority of federal designations. And legally, the federal programs are based on uniquely *federal* powers: foreign policy, international commerce, and immigration, to name a few. Those federal powers have informed every judicial evaluation of the federal programs' constitutionality. They are entirely absent here. That is why *Holder v. Humanitarian Law Project* could not have been clearer: its ruling on the federal regime did "not suggest that Congress could extend the same prohibition on

material support at issue here to domestic organizations." 561 U.S. 1, 39 (2010) ("*HLP*").

Second, despite Defendants' inflammatory and baseless accusations, Plaintiffs do not engage in any terrorist activity. ECF No. 6-1 ¶ 5; ECF No. 6-2 ¶ 4; Mitchell Supp. Decl. ¶ 2; Ruiz Supp. Decl. ¶ 2. Incredibly, Defendants have *never* identified the specific law they "determined" Plaintiffs violated. But the crux of Defendants' assertion appears to be that CAIR's existence reflects a three-decade conspiracy—which somehow escaped the attention of all federal law enforcement agencies—to serve as a front for Hamas and the Muslim Brotherhood. Unsurprisingly, Defendants muster no actual evidentiary support. Instead, they claim that the Department of Justice "concluded" CAIR provided material support to Hamas. Opp. 1. DOJ has done no such thing. *See* Hogle Decl., Ex. A. Defendants' other "evidence" consists primarily of alleged associations from over thirty years ago or statements that, even cast in Defendants' tendentious light, are protected by the First Amendment.

The fact remains: Plaintiffs have never been charged with, let alone convicted of, any crime. And nothing Defendants allege establishes that CAIR and CAIR-Florida are "engaging in terrorist activity," as required to justify their designation as "domestic terrorist organizations" under the DTO regime. Fla. Stat. § 943.03102. The absence of evidence proves Plaintiffs' point: the DTO regime is

designed to allow the state to punish and silence organizations without having to prove their guilt in a court of law.

## ARGUMENT

### I. The DTO Regime and Plaintiffs' Designations Violate Due Process.

#### A. The federal terrorist designation programs, rooted in exclusively federal powers, cannot save Florida's DTO regime.

Defendants suggest that Florida's DTO regime stands on the same constitutional footing as the federal FTO and SDGT designation programs. Opp. 10-15, 20, 42-44. It does not.

The FTO and SDGT designation programs are rooted in powers the Constitution grants to Congress, not the states. Congress created the FTO program in the Antiterrorism and Effective Death Penalty Act of 1996, explicitly relying on its Article I powers to "punish crimes against the law of nations," "carry out the treaty obligations of the United States," and regulate "immigration and naturalization." PL 104-132 § 301(a)(1)-(3), April 24, 1996, 110 Stat. 1214. The FTO program allows the government to designate *foreign* entities as FTOs. 8 U.S.C. § 1189(a)(1)(A).

The SDGT program relies on the International Emergency Economic Powers Act ("IEEPA"), which "grants to the President the power to exercise certain authorities relating to commerce with foreign nations." H.R. Rep. 107-236, pt. 1, at 62 (2001). To exercise the powers delegated by IEEPA, "the President must

identify an 'unusual and extraordinary threat' to American national security, foreign policy, or the economy, originating primarily 'outside the United States.'" *Learning Res., Inc. v. Trump*, 607 U.S. 229, 237 (2026) (quoting 50 U.S.C. § 1701(a)). In keeping with these powers, the SDGT program permits the federal government to designate groups based on their foreign activities or foreign relationships. Neither program allows the federal government to designate U.S. groups as "domestic terrorists."

In the rare cases where federally designated organizations can assert constitutional rights due to U.S. ties, courts have been acutely sensitive to the fact that federal designation implicates the foreign-affairs powers of the federal political branches. *E.g.*, *HLP*, 561 U.S. at 36 (rejecting First Amendment challenge to prohibitions imposed by FTO program based, in part, on recognition of "the sensitive interests in national security and foreign affairs at stake"); *HLP v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) ("*Reno*") (when government regulation of speech and association "involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context"); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) (similar). Courts have also been sensitive to the ways in which "[i]ndividuals are subject to limitations in their relations with foreign governments and entities that differ from any found in the domestic setting." Gov't Reply, *HLP*, 2010 WL

565212, at *40–41 (U.S. Feb. 16, 2010) (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981)).

Defendants try to graft case law regarding federal designation—which is grounded in federal powers concerning *foreign* affairs and almost exclusively targets *foreign* organizations—onto Florida's novel regime targeting *domestic* groups. But the Constitution does not grant Florida authority over the law of nations, immigration, or commerce with foreign nations. And while courts have permitted the federal government to impose certain limits on Americans' associations with foreign entities, Florida lacks the authority to impose the same limits on Americans' associations with one another. The SDGT and FTO cases do not control the outcome of this case, and vice versa.

### B. The DTO regime imposes criminal punishment without criminal process.

Florida's DTO regime—which requires an executive "finding" of criminal wrongdoing and defines a designated organization as a "criminal gang"—imposes criminal punishment. Defendants concede, as they must, that designation under the DTO regime is "a fact that serves as an element of a crime," yet insist that the state need never establish the validity of the designation in a criminal proceeding. Opp. 12-13.

Therein lies the problem. The Constitution does not permit a state to eliminate its burden of proof by "redefin[ing] the elements that constitute different

crimes" and delegating criminal fact-finding duties to an executive body. *Mullaney v. Wilbur*, 421 U.S. 684, 698–99 & n.25 (1975). The state cannot assign its officials the job of designating "people who have killed," and leave a jury to determine only whether they killed with intent to murder.

Defendants seek support in *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004). But *Hammoud* relied on *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), which was "expressly overruled," *United States v. Haymond*, 588 U.S. 634, 645 (2019). Moreover, *Hammoud* addressed a question not presented here: whether the Constitution requires that a defendant charged with providing material support to an FTO have the opportunity to challenge the FTO's designation. 381 F.3d at 331. The issue here is whether state-designated nonprofits can insist that the factual basis for their designation—engaging in criminal "terrorist activity"—be proven beyond a reasonable doubt in court *before* they are designated. On this issue, *Hammoud* is silent.[1]

As Plaintiffs explained, designation satisfies all the criteria for criminal punishment. ECF No. 6 ("Mot.") 20-26.

To start, Defendants ignore the statutory text: to designate an organization, executive officers must find that it is violating criminal law. Fla. Stat.

---

[1] In *Al Haramain*, 686 F.3d at 988-90 (Opp. 14-15), the court referred to federal designation as civil but did not analyze it.

§ 943.03102(1)(a)1. Similarly, while Defendants claim that the DTO regime "confers part of the designation authority on an 'administrative agenc[y],'" Opp. 16, they omit that the primary agency is a *law enforcement* one, and the statute vests authority to initiate the designation in the state's chief law enforcement officer. Fla. Stat. § 943.03102(1)(a), (1)(b)-(c), (2)(a)-(b), (e), (3)(a).

Designation also, by definition, makes the organization a "criminal gang." Fla. Stat. § 874.03(1), (8). Defendants resist this argument by offering a novel interpretation of the CGPA's definition of "criminal gang"—one at odds with the text. Opp. 19. Section 874.03(1) defines a "criminal gang" as a group that engages in particular activities, "including, but not limited to, terrorist organizations." That concluding phrase modifies the preceding text as a whole, not simply the last clause. In other words, "terrorist organizations" are a type of organization *constituting* a "criminal gang"; they are not merely a group of "three or more persons." Fla. Stat. § 874.03(1); *see Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1257 (11th Cir. 2014) ("[W]here the modifier is set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent."). Regardless, even under Defendants' interpretation, the Florida legislature has concluded that DTOs, by definition, satisfy the "three or more

persons" element of a "criminal gang," *id.*—underscoring that designation is inherently criminal.[2]

Defendants frame the DTO regime as "regulatory" because it "focuses on "preventing *present and future* public harm" and ensuring public safety. Opp. 16. They stretch the concept too far. Indeed, Florida's "criminal" gang prohibitions are focused on ensuring public safety, and those prohibitions are obviously criminal. *See, e.g.*, Fla. Stat. § 874.02(2) (legislative finding that the CGPA is "essential to maintain public order and safety").

Because the statutory text is clear, the Court's analysis may end there. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169 (1963). Regardless, the other *Mendoza-Martinez* factors establish that designation is criminal punishment.

The DTO regime imposes "an affirmative disability or restraint." *Id.* at 168. As Defendants concede, designation has "dire" consequences, including "blocking [an organization's] assets and business operations." Opp. 15. Moreover, it requires a finding of criminal scienter, Fla. Stat. § 775.30(1)(a)(2)—"an important element in distinguishing criminal from civil statutes," *Kansas v. Hendricks*, 521 U.S. 346,

[2] Insofar as Defendants argue that the state must still prove *all* of the "criminal gang" elements for a "terrorist organization," that makes even less sense: the statute's reference to "terrorist organizations" would be unnecessary, and there would have been no reason for the legislature to specifically define "terrorist organizations" as including DTOs. Fla. Stat. § 874.03(1), (8).

362 (1997). The effects of designation—declaring a group guilty of heinous criminal acts and expelling it "from the community"—also resemble traditional punishments of "public shaming, humiliation, and banishment." *Smith v. Doe*, 538 U.S. 84, 98 (2003).

Finally, the DTO regime promotes "retribution and deterrence," and the sweeping punishment it metes out is plainly "excessive." *Mendoza-Martinez*, 372 U.S. at 168-69. The regime's punitive features go far beyond the sex-offender registration laws Defendants cite. *See, e.g.*, *Smith*, 538 U.S. at 102-03. It blocks designated nonprofit corporations from operating in the state, a punishment not even imposed on organizations that have been *convicted* of providing material support to federally designated terrorist groups.[3]

### C. The DTO regime fails the *Mathews* balancing test.

**1.** Defendants' brief underscores that the DTO regime denies U.S. corporations, including Plaintiffs, "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Defendants do not contest that: (1) The DTO regime imposes no evidentiary standards. (2) The DTO regime authorizes state officials to unilaterally withhold portions of the evidence underlying designation. (3) The DTO regime provides

---

[3] *See, e.g.*, Chiquita Brands International Pleads Guilty to Making Payments to a Designated Terrorist Organization, DOJ (Mar. 19, 2007), https://perma.cc/U7PN-GWAY.

U.S. corporations, including Plaintiffs, with no opportunity to obtain discovery, present live testimony, or cross-examine the witnesses against them. (4) Designation, once effective, forces U.S. corporations to shutter their operations in Florida. (5) The Notice of Intent provided to Plaintiffs does not identify the criminal law that the State Executive Defendants accuse Plaintiffs of violating. Mot. 8; ECF No. 6-5 (Ex. D). (6) Plaintiffs' counsel attempted to present argument during the public meeting at which state officials approved Plaintiffs' designations, but were ignored. Mot. 16-17.

*Mathews* requires more. Rather than engage with *Mathews*, Defendants rely on *National Council of Resistance of Iran (NCRI) v. Department of State*, 251 F.3d 192, 208–09 (D.C. Cir. 2001). Opp. 10. That opinion, they say, "explained" what process Florida must provide before designating a U.S. corporation under the DTO regime. *Id.*

Not so. In *NCRI*, the court determined what process the Constitution required before the federal government deprived a foreign organization of a "small bank account" by designating it as an FTO. *NCRI*, 251 F.3d at 201. *NCRI* did not hold that the same requirements would apply to all *future* designations of "terrorist organizations"—let alone *state* designations of *domestic corporations*. Rather, the court recognized that "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 205 (citation omitted).

The two other opinions Defendants passingly cite, Opp. 10-12, are equally inapposite. *People's Mojahedin Org. of Iran v. Department of State*, 327 F.3d 1238, 1243 (D.C. Cir. 2003) (due process did not require federal government to disclose classified information to FTO); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) ("*HLF*") (no due process violation when district court dismissed SDGT-designated organization's APA claim without "the opportunity for discovery," because case involved "sensitive issues of national security and foreign policy").

A far better fit is *Jenkins v. McKeithen*, 395 U.S. 411, 427-29 (1969). *See* Mot. 32-33. Defendants do not so much as attempt to distinguish *Jenkins*—nor could they.

**2.** Defendants fault Plaintiffs for "hypothesiz[ing]" that the post-designation appeal available to U.S. corporations under the DTO regime will not give them the process they are due. Opp. 21. But according to Defendants, the DTO regime's post-designation appeal is governed by Florida Rule of Appellate Procedure 9.030(c)(1)(C). Opp. 22. Under that rule, the appellate record "must not contain any matter not made part of the record in the lower tribunal," Fla. R. App. P. 9.190, and the court is confined to a highly deferential standard of review.

Thus, the DTO regime's judicial "appeal" gives U.S. corporations, including Plaintiffs, no opportunity to further develop the evidentiary record. Nor does it

ensure that the truncated judicial review will occur before the consequences of their designations kick in. Br. 33-35; *cf. Reno*, 205 F.3d at 1137 (limitations on judicial review in federal regime are "necessary concomitant of the foreign affairs power").

Defendants' other cases are inapplicable. The state has already failed to provide due process; Plaintiffs' claim is "complete." Opp. 21 (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). Plaintiffs' claim is based on the *inadequacy* of state remedies, not Plaintiffs' "fail[ure] to take advantage" of them. *Id.* (citation omitted).

Plaintiffs need not pursue the inadequate state remedies available to them under the DTO regime before bringing their federal due process claim. Opp. 21 n.9. It is well-established that a litigant need not "exhaust available state court remedies before seeking to vindicate its federal constitutional rights in federal court under § 1983." *First Choice Women's Res. Ctr., Inc. v. Davenport*, 146 S. Ct. 1114, 1129 (2026).

**3.** Finally, Defendants contend that a ruling for Plaintiffs "would be a windfall for Antifa, the Ku Klux Klan, and other odious domestic groups."[4] Opp. 23. Their hyperbole is unconvincing. Plaintiffs are U.S. nonprofits that have

---

[4] Defendants have not designated the Ku Klux Klan.

operated for decades. They are entitled to the same due process rights as any other U.S. corporation—*e.g.*, the National Rifle Association, The New York Times, and the Trump Organization. A ruling for Plaintiffs would not be a "windfall" for groups engaged in illegal activity; it would be a death knell for lawful U.S. corporations that, like Plaintiffs, incur the animus of Florida's Governor and Cabinet.

## II. The DTO Regime and Plaintiffs' Designations Violate the First Amendment.

### A. The DTO regime and Plaintiffs' designations substantially burden First Amendment-protected speech and association.

Defendants' threshold argument—that the DTO regime does not implicate the First Amendment because it regulates Plaintiffs' "conduct," not their "speech," Opp. 24—is wrong. *See CAIR-Found., Inc. v. DeSantis*, 822 F. Supp. 3d 1263, 1276 n.12 (N.D. Fla. 2026) (rejecting similar argument).

To start, Defendants' argument is foreclosed by the Supreme Court's expressive-association cases. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). State action substantially burdening the right to association triggers First Amendment scrutiny, even when the state regulates only conduct. *See, e.g.*, *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960) (applying heightened scrutiny to a municipal tax ordinance requiring disclosure of the NAACP's membership information); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (applying

heightened scrutiny to public accommodations law because it "directly and immediately affect[ed]" the associational rights of the Boy Scouts, who wished to disassociate from a gay scout).

Defendants' argument is just as wrong with respect to Plaintiffs' right to speak and receive information. A statute implicates the First Amendment when it is "directed at" speech, either "on its face" or "in its practical operation." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The DTO regime is "directed at" silencing domestic advocacy organizations, like Plaintiffs, by preventing them from speaking, advocating, and otherwise operating in Florida.

Yet Defendants assert that "[s]tatutes that regulate non-expressive conduct do not implicate the First Amendment at all even if they incidentally burden speech." Opp. 24 (quoting *Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022)). That argument fails for at least two reasons.

First, even assuming the DTO regime regulates only non-expressive activity, it *disproportionately burdens* expressive activity. *Norwegian Cruise* did not address that category of regulation, and Defendants' argument is at odds with Supreme Court precedent applying First Amendment scrutiny to those burdens. *See, e.g.*, *TikTok Inc. v. Garland*, 604 U.S. 56, 67-69 (2025). Although Defendants rely heavily on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), *see* Opp. 26-27,

that case supports Plaintiffs. As *Arcara* explained, First Amendment scrutiny applies to, inter alia: (1) statutes that, "although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities"; and (2) "statute[s] regulating conduct which has the incidental effect of burdening the expression of a particular political opinion." 478 U.S. at 702-04.[5] Here, the DTO regime and Plaintiffs' designation will force Plaintiffs to close their doors in Florida, halting their lawful advocacy. Thus, the DTO regime plainly imposes a "disproportionate burden" on Plaintiffs' speech. *Arcara*, 478 U.S. at 704.

Second, unlike the statute in *Norwegian Cruise*, the DTO regime is *aimed* at burdening protected expression and association, even if it does so by regulating non-expressive conduct. The regime is designed to silence and shutter disfavored domestic organizations, many or all of whom are engaged in expressive activity and protected speech. And here, it was "conduct with a significant expressive element that drew the legal remedy in the first place," *Arcara.*, 478 U.S. at 706; Mot. 8; *see also* Compl. ¶¶ 73-138; ECF No. 6-5 (Ex. D, Notice of Intent) at 7 (protected speech); ECF No. 6-5 (Ex. E) (notice relies on "chains of attenuated

[5] *Arcara*'s facts do not help Defendants. There was no dispute that prostitution occurred on the premises; the "severity" of the First Amendment burden was "dubious at best"; and "the sexual activity … manifest[ed] absolutely no element of protected expression." 478 U.S. at 705.

association”). Contrary to Defendants’ argument, Plaintiffs disputed that “Florida designated it *for* terrorism, rather than for its expressive activity.” Opp. 28, 30. Plaintiffs argued that they are not engaged in terrorist activity, and that Governor DeSantis and Florida Cabinet officials harbored animus against Plaintiffs’ mission and advocacy. Mot. 7-8, 25, 30.

**B. The DTO regime and Plaintiffs’ designations violate their freedom of association.**

Defendants have no meaningful response to the Supreme Court’s express recognition in *HLP* that designating and prohibiting material support to “domestic organizations”—as Florida has done—would raise different, more severe First Amendment problems than the federal government’s designation of foreign organizations. *HLP*, 561 U.S. at 39 (“We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations.”). Defendants try to confine that observation to the Court’s “free-speech analysis,” asserting it has no bearing on Plaintiffs’ associational claims, but offer no logic for that theory. Opp. 32 n.11. And they ignore that the Court relied on “the same reasons” in resolving the plaintiffs’ speech *and* association claims. *HLP*, 561 U.S. at 40.

Those reasons include specific factual findings by Congress and the Executive Branch that, for FTOs with lawful and unlawful aims, any support to the FTOs was “fungible,” such that it would benefit unlawful activity. *HLP*, 561 U.S.

at 30-34. But there are no such factual findings here (nor would they be worthy of the same deference). Plaintiffs, of course, have no illegal aims. But even for domestic organizations that do, Florida's suppression of association runs headlong into *Scales v. United States*, 367 U.S. 203, 229 (1961), which recognized that a prohibition on all association with a group "having both legal and illegal aims" would create "real danger" that legitimate association would be impaired.

Defendants argue that shutting down a domestic organization by criminalizing all material support raises no associational issues, Opp. 29, but their cases do not examine that question. Most of them pre-date, and thus do not grapple with, *HLP*. *See HLF*, 333 F.3d 156; *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007). Insofar as the cases address associational claims, they focus on the right to associate with and fund *foreign* organizations in the face of the federal government's *foreign affairs* powers. *See HLF*, 333 F.3d at 164, 166; *Islamic Am.*, 477 F.3d at 734-35. Plaintiffs here do not argue that they have a First Amendment right to associate with foreign terrorists; they argue that Defendants' attempt to manufacture far-reaching criminal liability out of unproven accusations and innuendo violates their right to associate with people in Florida and the United States. Mot. 36-49.

*Al Haramain*, which Defendants also cite, does not discuss First Amendment association. But it held—in keeping with *HLP*'s warning—that the government's

restrictions on coordinated advocacy involving a *domestic* organization designated as an SDGT violated the plaintiffs' First Amendment speech rights. *Al Haramain*, 686 F.3d at 995-1001. Coordinated advocacy, of course, is not only speech, but also association.

Contrary to Defendants' assertion, Opp. 28-29, Plaintiffs more than adequately developed their argument that the DTO regime, including the material-support statute, coerces third parties to suppress CAIR's speech and disassociate from it, Mot. 27, 37-38 (citing *NRA v. Vullo*, 602 U.S. 175 (2024)); Mot. 13-14, 19, 22-23, 27, 37-39 (discussing consequences of not having employees because they face prosecution); Mot. 18-19, 37, 39, 43-44, 51 (citing declarations discussing third parties disassociating from Plaintiffs). As in *CAIR-Foundation*, 822 F. Supp. 3d at 1279, Plaintiffs are substantially likely to succeed on the merits of their coercion argument.

Defendants try to wave away the DTO regime's burdens on active association by claiming that they do not burden "mere association." Opp. 32. But the First Amendment protects more than mere membership in an organization: it protects, among other things, the ability of people to associate for expressive purposes through their donations. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021) ("*AFP*"). The "*act* of giving material support to a DTO," Opp. 32, is the constitutional equivalent of the protected donation in *AFP*; the only

difference is that Florida officials have chosen to impose a debilitating designation on the designated organization.

Finally, under *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *Healy v. James*, 408 U.S. 169 (1972), the state cannot criminally prohibit association unless it *proves* that Plaintiffs have illegal aims and goals, and that Plaintiffs' associates have a specific intent to further those illegal aims. Mot. 40. Defendants are wrong to argue that this principle applies only to passive association, Opp. 31-32—as opposed to active association with employees and others who have no intent to further any illegal aim.[6]

### C. The DTO regime and Plaintiffs' designations impose an unlawful prior restraint.

The DTO regime and Plaintiffs' designations function as a prior restraint. Mot. 41-49; *cf. CAIR-Found.*, 822 F. Supp. 3d at 1270-71 (defendant's coercion of third parties created a "prior restraint"). Defendants do not dispute that, if the Court agrees, that fact is fatal to the DTO regime because the necessary procedural protections are absent. Opp. 37 n.12.

Defendants' crabbed definition of a "prior restraint"—one that "prevents specific speech until certain requirements are met," Opp. 34—fails to account for *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The commission there did

---

[6] Defendants' reliance on *Reno*, 205 F.3d at 1133, is misplaced. Opp. 31-32. The court there misread *Claiborne Hardware* and failed to engage with *Healy* at all.

not require distributors to meet certain requirements to sell books. Nevertheless, the Court held that the scheme was a prior restraint because: (1) the commission pressured distributors to stop distributing speech; (2) it was "not a judicial body"; and (3) its decisions did not "follow judicial determinations that such publications may lawfully be banned." 372 U.S. at 70. Thus, the problem was not that the state's scheme operated as a licensing regime, *contra* Opp. 29-30, 35; the problems were excessive state discretion and the end-run around the criminal process, *Bantam Books*, 372 U.S. at 69-70.

Defendants are also wrong that Plaintiffs' logic means that any civil or criminal punishment functions as a prior restraint. Opp. 34. Ordinary civil and criminal punishments do not involve the executive branch *changing the legal status* of protected speech and association. Mot. 41-42. The lesson of *Bantam Books* is that empowering state officials to unilaterally halt speech and association—to pick and choose disfavored speech to silence, without meaningful judicial process—is a prior restraint. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (where "peaceful enjoyment of freedoms" is "contingent upon the uncontrolled will of an official," this is an "unconstitutional censorship or prior restraint").

Separately, and regardless of whether the Court applies the "prior restraint" label here, the DTO regime also violates the First Amendment because of the

unbridled discretion it vests in executive officers to suppress speech and association. Mot. 43-46. The doctrine often applies in licensing cases, which are a relevant analogue to the DTO regime. But contrary to Defendants' argument, Opp. 33, 36-37, the Eleventh Circuit has applied the doctrine more broadly. *See Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (police decision about whether protesters must submit to searches); *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310-11 (11th Cir. 2003) (city charging vendors for airport news racks); *Bell v. City of Winter Park*, 745 F.3d 1318, 1324-25 (11th Cir. 2014) (ordinance allowing any citizen to prohibit speech within 50 feet of property, akin to DTO regime's public nuisance provision, Fla. Stat. §§ 874.03(1), (7)(a); 823.05(2)(b)–(c)).

Finally, Plaintiffs' argument would not spell the end of the federal designation programs, as Defendants' fearmongering suggests. Opp. 36-37; Section I.A *supra*.

**D. The DTO regime and Plaintiffs' designations punish speech based on content and viewpoint.**

As Plaintiffs have explained, Sections 874.10 and 775.33(3) punish speech based on its content and viewpoint. Mot. 49-50. Defendants assert that Plaintiffs have not brought an "as-applied" challenge to those provisions, Opp. 40, but that is incorrect. Plaintiffs challenge those provisions as they apply to Plaintiffs' ability to speak and receive information. Plaintiffs wish to engage in speech that will soon be

foreclosed under the DTO regime—including speech in furtherance of this litigation—and they have, for example, employees with specialized skills who wish to communicate with them. ECF No. 6-1 ¶¶ 6-32, 48-75; ECF No. 6-2 ¶¶ 5-27, 51-87; Fla. Stat. §§ 775.33(1)(c); 874.10. In evaluating these restrictions on speech, the Court should apply strict scrutiny. Mot. 49; *HLP*, 561 U.S. at 27.

In response to Plaintiffs' argument that the DTO regime restricts Plaintiffs' speech in furtherance of this litigation, Mot. 50, Defendants offer little comfort, Opp. 39 n.13. Plaintiffs should not be forced to stake their freedom from life imprisonment on the canon of constitutional avoidance.

### E. The DTO regime and Plaintiffs' designations fail First Amendment scrutiny.

Defendants spend pages discussing intermediate scrutiny, Opp. 41-44, which is not the relevant test. Plaintiffs' associational claim triggers at least exacting scrutiny, *supra* Section II.B; Plaintiffs' guilt-by-association and prior restraint arguments are simply fatal to the DTO regime, *supra* Section II.B-C; and the content-discriminatory portions of the DTO regime are subject to strict scrutiny, *supra* Section II.D.

In the alternative, the Court should, at minimum, apply intermediate scrutiny to the entire DTO regime, because it "incidentally burdens free expression as part of regulating harmful conduct." Opp. 41. Even under intermediate scrutiny, Defendants fail to show that the DTO regime and Plaintiffs' designation do not

"burden substantially more speech than necessary" to further the state's interests. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

As Plaintiffs have shown, designation suppresses an immense amount of protected speech by effectively shutting down both organizations in Florida, including their policy advocacy, litigation, training, education, community organizing, and public commentary. Mot. 17-19. It also suppresses the speech of all those who wish to engage in expressive conduct with Plaintiffs in Florida, including donors, volunteers, and other supporters. *Id.* Florida's scheme suppresses far more speech than the "specified activities" at issue in *HLP*. 561 U.S. at 14-15.

On the other side of the ledger, Defendants' "evidence" for why shutting down all this speech is "necessary" is entirely inadequate. Defendants say they seek to halt ongoing criminal activity, but for all their handwaving about hidden "nefarious conduct," Opp. 43, they offer no explanation why they could not criminally prosecute Plaintiffs for the alleged "crimes" officials have "determined" Plaintiffs committed.

Defendants parrot *HLP* without acknowledging the stark differences between thwarting foreign terrorist organizations—where the federal government's tools are often blunt and limited—and policing domestic organizations, where the state can rely on legal process to investigate and prosecute those who violate the law. Opp. 42-44. Whereas foreign terrorist groups may "conceal their activities

behind charitable, social, and political fronts" *abroad*, *id.* (citing *HLP*, 561 U.S. at 30), domestic organizations are subject to ordinary legal processes like subpoenas, search warrants, grand juries, and criminal prosecutions. Investigating suspected criminal activity is exactly what those processes, and their longstanding protections, are designed for. *See McCullen v. Coakley*, 573 U.S. 464, 492 (2014) (discussing availability of "criminal statutes" prohibiting the same conduct in holding that law failed narrow-tailoring).

Significantly, *HLP* also relied on the premise that providing foreign terrorist groups with material support in any form "strain[s] the United States' relationships with its allies." 561 U.S. at 32-33. That factor is inapplicable here.

Finally, Defendants argue that "[e]ven seemingly benign services 'lend legitimacy' to the organization" and "promote[] the terrorist organization as a whole." Opp. 43-44 (citing *HLP*, 561 U.S. at 30-31). While the Supreme Court accepted Congress's and the Executive Branch's factual finding on that question given the federal government's foreign affairs expertise, *HLP*, 561 U.S. at 29-30, Defendants have no comparable authority or expertise. For all these reasons, the DTO regime fails even intermediate scrutiny.

## III. The Court Should Grant Plaintiffs' Requested Relief.

The Court can and should order the removal and recission of Plaintiffs' designations as DTOs. Opp. 45-46. In *Whole Woman's Health v. Jackson*, 595 U.S.

30, 43 (2021), plaintiffs sought to enjoin a state official who had no power to enforce the challenged statute. Here, Defendants are statutorily authorized to "publish" and "remove" Plaintiffs' designations. Fla. Stat. § 943.03102(1)(b), 2(e), (3)(a)-(b). The relief Plaintiffs seek runs directly to the officials with relevant enforcement authority, "fit[ting] neatly within" the Court's equitable power. *Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 720 (11th Cir. 1998).

Defendants' assertion that recission and removal are not "necessary" to provide complete relief, Opp. 46, is wrong. In addition to the far-reaching harms Plaintiffs have already described, Mot. 52-53; *see generally* ECF No. 6-1 ¶¶ 6-7, 48-75; ECF No. 6-2 ¶¶ 5-6, 51-87, Defendants' designation of CAIR-FL recently caused a student group to cancel a November 9 event on Islamophobia featuring CAIR-FL. Ruiz Supp. Decl. ¶ 3. Removal and recission are necessary to redress the stigma and harm of designation and to allow the event to proceed. This Court should return the parties to the status quo ante.

## CONCLUSION

The Court should grant Plaintiffs' motion.

Respectfully submitted October 16, 2026,

Scott D. McCoy (FBN 1004965)
Aaron Fleisher*
Diego A. Soto*
Mary Ella W. Simmons*
**Southern Poverty Law Center**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org
aaron.fleisher@splcenter.org
arthur.ago@splcenter.org
diego.soto@splcenter.org
maryella.simmons@splcenter.org

Manoj S. "Sachin" Varghese*
Mark L. Bailey*
Kayla Polonsky Gannon*
**Bondurant, Mixson & Elmore, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com
bailey@bmelaw.com
polonsky@bmelaw.com

*/s/ Ashley Gorski*
Ashley Gorski*
Hina Shamsi*
Patrick Toomey*
Charles Hogle*
Celin Carlo-Gonzalez*
Jeffrey Stein*
Natalie Smith*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
charlie.hogle@aclu.org
ccarlo-gonzalez@aclu.org
jstein@aclu.org
n.smith@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

**Pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I certify that this memorandum contains 5,500 words.

Dated: October 16, 2026

*/s/ Ashley Gorski*
Ashley Gorski
*Counsel for Plaintiffs*