**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

**CAIR-FOUNDATION, INC., and CAIR-FLORIDA, INC.,**

**Plaintiffs,**

**v.** **Case No. 4:26-cv-521-AW-MAF**

**RON DESANTIS, et al.,**

**Defendants.**

_________________________________/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**

The Florida Legislature recently enacted a new law that allows state officials to designate certain groups "domestic terrorist organizations" (DTOs). Soon thereafter, Florida's Governor and Cabinet designated Plaintiffs CAIR-Foundation, Inc., and CAIR-Florida, Inc., as DTOs. The designations take effect on November 5, 2026. At that point, Plaintiffs and others supporting them will be subject to criminal and civil penalties for certain activities. In this action, Plaintiffs contend the new law (or parts of it) and the DTO designations violate their First Amendment freedoms and due process protections.

Plaintiffs sued Florida's Governor, Cabinet members, Chief of Domestic Security, and the twenty State Attorneys—all in their official capacities. ECF No. 1. Plaintiffs then filed an emergency motion for a temporary restraining order and a preliminary injunction. ECF No. 6. The previous judge denied the request for a TRO

and set a hearing on the request for preliminary relief. ECF Nos. 28, 46. The case was then reassigned, ECF No. 59, and I held a hearing on October 28, *see* ECF No. 64 (Trans.). Both sides have submitted declarations and other evidence, and all agree no evidentiary hearing is necessary. ECF No. 41 at 2. Having carefully considered the matter, I now grant in part the motion for preliminary injunction.

## I.

This is Florida's second effort to designate Plaintiffs as terrorist organizations. Previously, the Governor issued an executive order that designated Plaintiffs as terrorist organizations and prevented them "or 'any person known to have provided material support or resources' to [them] 'from receiving any contract, employment, funds, or other benefit or privilege' from executive or cabinet agencies or from any county or municipality of the state." *CAIR-Foundation, Inc. v. DeSantis* (*CAIR I*), 822 F. Supp. 3d 1263, 1269 (N.D. Fla. 2026). This court preliminarily enjoined enforcement of the executive order, finding it likely violates the First Amendment. *Id.* at 1269, 1273. The Governor appealed, and the appeal remains pending.

After this court's decision, the Florida Legislature enacted HBs 1471 and 1473, which created a DTO designation process.[1] The Florida Department of Law

[1] After the legislation's enactment, the Governor publicly stated his intent to designate Plaintiffs through the new process. *CAIR-Foundation, Inc. v. DeSantis*, No. 4:26-cv-315-MW-MJF, ECF No. 69 at 2 (N.D. Fla. Oct. 1, 2026). Plaintiffs immediately filed suit, but because they were not designated DTOs at the time of

Enforcement later promulgated Emergency Rule 11RER26-8, which implements this legislation.

Pursuant to the legislation and rule, Florida's Chief of Domestic Security issued a written notice of intent to designate Plaintiffs as DTOs. ECF No. 6-1 at 14; ECF No. 6-2 at 14. Plaintiffs received this notice on September 18 and submitted written objections a week later. ECF No. 6-5 at 21-26. On September 29, the Governor and Cabinet held a public meeting, at which they approved the designations. ECF No. 6-4 at 1-3. Plaintiffs' counsel attended the meeting but had no opportunity to speak. *Id.* On October 6, FDLE published the designations in the Florida Administrative Register. ECF No. 55 at 17. Despite a statutory right to appeal the designation to Florida's Second Judicial Circuit Court, Plaintiffs chose not to appeal. *Id.* at 10. Thus, as a matter of state law, the designations are set to become effective on November 5, 2026.

In this case, Plaintiffs challenge what they term the "DTO regime," comprising the emergency rule and Florida Statutes §§ 617.1420, 775.30, 775.33-.34, 823.05, 874.03-.12, and 943.03102, to the extent they concern DTOs. ECF No. 1 ¶ 9 n.1; *see also* ECF No. 6 at 2 n.1. Once the DTO designations take effect, several of those statutes could expose Plaintiffs and others to civil and criminal penalties

---

filing, the court dismissed their complaint for lack of standing. *Id.* at 6. As explained below, Plaintiffs now have standing.

and other consequences. ECF No. 1 ¶¶ 48-72. Through their preliminary injunction motion, Plaintiffs seek "the removal, recission, and non-publication of [their] designation[s]." ECF No. 6 at 2, 52. Alternatively, they ask the court to enjoin the Attorney General and State Attorneys from enforcing the laws against them (or third parties) based on the DTO designations. *Id.* at 3.

**II.**

A preliminary injunction is an extraordinary and drastic remedy, available only when the movant clearly establishes entitlement to it. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Because preliminary injunction motions often turn on undeveloped records, it can be difficult for movants to meet this high standard. *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc). Accordingly, preliminary injunctions are usually the exception, not the rule. *Id.* at 1176.

To obtain a preliminary injunction, Plaintiffs must show (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable harm without the injunction; (3) the threatened harm to them outweighs whatever damage the injunction may cause Defendants; and (4) the injunction would not be adverse to the public interest. *Jackson v. Jones*, 179 F.4th 846, 855 (11th Cir. 2026). When, as here, Defendants are government officials sued in their official capacities, the last

two factors essentially merge into a single inquiry. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

A movant's failure on any one factor precludes relief. *ACLU of Fla.*, 557 F.3d at 1198. Generally, the most important factor is the likelihood of success. *Baker v. City of Atlanta*, 164 F.4th 850, 864 (11th Cir. 2026). That is where most movants fall short, *ACLU of Fla.*, 557 F.3d at 1198, and it is where Plaintiffs fall short except in limited part, as explained below.

## III.

A few preliminary points are in order. First, much of Plaintiffs' case is not at issue at this stage. Plaintiffs allege that state officials sought to punish them for their earlier speech and for their religious views. They have a First Amendment retaliation claim, ECF No. 1 ¶¶ 231-35, but they did not move for preliminary injunctive relief based on that claim, *see* Trans. at 99:23-24; *see also* ECF No. 6 at 2 (noting limited counts on which Plaintiffs seek preliminary injunction). They also have a preemption claim that is not yet at issue. ECF No. 1 ¶¶ 263-70. They elected to seek preliminary injunctive relief based only on their due process, freedom-of-association, prior restraint, and viewpoint and content-based discrimination claims. ECF No. 6 at 2. Thus, even if Plaintiffs are correct that they have been designated DTOs because of Defendants' "animus against Plaintiffs' faith-driven mission and advocacy," *id.* at 8, those allegations are not presently at issue.

Second, Plaintiffs are correct that the overall scheme is novel—and perhaps unprecedented. *See* ECF No. 60 at 7. Historically, it is the federal government that designates terrorist organizations. And historically, designations are of *foreign* organizations. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8-9 (2010). *But see Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 970 (9th Cir. 2012) (terrorist designation of domestic entity). Defendants point to nothing comparable to the regime they defend. Still, the Constitution does not prohibit legislation simply because it is novel. *See Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025) (en banc) ("The Constitution does not impose a 'use it or lose it' view of legislative authority." (some internal quotation marks omitted) (quoting *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring))).

Third, the issue at this stage is not whether Plaintiffs are, in fact, terrorist organizations. The parties present vastly different views on this point. Plaintiffs say "[t]heir shared mission, rooted in faith, is to enhance the public's understanding of Islam, protect civil rights, promote justice, and empower American Muslims." ECF No. 6 at 7. Defendants, on the other hand, say Plaintiffs operate as fronts for Hamas and the Muslim Brotherhood. ECF No. 55 at 9. Again, Plaintiffs claim the State reached the wrong decision on that score—and that it violated their Fourteenth Amendment rights in reaching its decision without providing due process. *See* ECF

No. 60 at 4-5. But Plaintiffs do not assert any standalone constitutional right to a factually correct decision on the question of whether they are terrorist organizations.

Fourth, an entity's designation as a terrorist organization is indeed consequential. Plaintiffs have shown that the designations, upon taking effect, will cause significant disruption, essentially leading to a closure of all their Florida operations. *See* ECF No. 6 at 51. Because one Plaintiff (CAIR Florida, Inc.) operates exclusively in Florida, it says it will shut down entirely. *Id.* At this stage, based on undisputed statements in Plaintiffs' declarations, I accept these representations as true. But while the designations and the state laws that authorize them may have broad implications, the constitutional issues Plaintiffs present are relatively narrow. The claims ask whether Plaintiffs were afforded due process before the State made the designations and whether the designations (and legal consequences flowing from them) violate Plaintiffs' speech or association rights.

Finally, it should go without saying that a court's "role is not to judge the wisdom, fairness, or logic of the law[s]" at issue. *West Virginia v. B.P.J.*, 609 U.S. 958, 990 (2026) (quoting *United States v. Skrmetti*, 605 U.S. 495, 525 (2025)). Instead, the question here is simply whether Plaintiffs have carried their burden as to each of the preliminary injunction factors.

With that out of the way, I will turn to the issue of whether Plaintiffs have met their burden on those factors, and I will start with the likelihood of success on the merits.

## IV.

## Standing

Plaintiffs cannot succeed on the merits without showing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Though no party questions Plaintiffs' standing, I have an independent obligation to consider the issue and ensure the court has jurisdiction. *See Baker*, 164 F.4th at 861 (explaining that courts "have an independent obligation to ensure that [they] have jurisdiction by determining whether the parties have Article III standing"). At this stage, Plaintiffs "must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Those elements are injury in fact, causation, and redressability. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 183 (2026). Because "standing is not dispensed in gross," Plaintiffs must make this showing "for each claim that they press against each defendant." *Murthy*, 603 U.S. at 61 (internal quotation marks omitted) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Here, Plaintiffs have shown a substantial likelihood that they can establish standing. Regarding injury in fact, Plaintiffs have shown they face a "credible threat" that the DTO regime will be enforced against them. *First Choice*, 608 U.S. at 183 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014)); *see also Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc) (noting that a state's defense of a law in court shows "an intent to enforce" the law (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010))). This imminent injury is traceable to the Attorney General and State Attorneys, who are charged with enforcing the challenged provisions.[2] And an injunction prohibiting such enforcement would redress Plaintiffs' injury. The Governor, Chief of Domestic Security, and Cabinet are also allegedly causing Plaintiffs' injury by maintaining the DTO designations. An injunction requiring those officials to remove or rescind the designations—as Plaintiffs request—would redress that injury because it would preclude actions taken in reliance on the designations.

[2] The Secretary of State, who would be responsible for initiating administrative dissolution under § 617.1420(1)(f), is not a Defendant. Still, as explained above, granting Plaintiffs' request to undo their designations would prevent their dissolution on that basis. Thus, Plaintiffs' failure to sue the Secretary does not create traceability or redressability problems as to § 617.1420. *Cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (explaining that "the plaintiff's injury [must] be 'fairly traceable' to the defendant's actions and redressable by relief against *that* defendant" (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1298, 1301 (11th Cir. 2019) (en banc))).

**Facial Challenges**

Plaintiffs' briefing left unanswered the critical question of whether they present facial or as-applied challenges. But at the hearing, Plaintiffs explained that they seek preliminary injunctive relief based on both as-applied and facial (or quasi-facial) claims as to each of the counts at issue.[3] Trans. at 5:14-6:15.

I will dispose of the facial claims first. As Defendants point out, bringing a facial challenge "comes at a cost." ECF No. 55 at 31 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). "Because 'facial challenges threaten to short circuit the democratic process,' they are, by design, 'hard to win.'" *NetChoice v. Att'y Gen., Ga.*, --- F.4th ----, 2026 WL 3079563, at *5 (11th Cir. Oct. 15, 2026) (quoting *Moody*, 603 U.S. at 723).

For their facial due process claims, Plaintiffs must show they are likely to "establish that no set of circumstances exists under which the [DTO regime] would be valid." *Edwards v. Randolph Cnty. Sheriff*, --- F.4th ----, 2026 WL 2905460, at

[3] In a quasi-facial challenge, a plaintiff claims that a law "cannot be constitutionally applied to a defined subset of people the law covers." *United States v. Alsenat*, 174 F.4th 45, 48-49 (11th Cir. 2026) (quoting *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022)). As the "quasi" label suggests, the plaintiff must "'satisfy [the] standards for a facial challenge to the extent' his claim 'reach[es] beyond [his] particular circumstances.'" *Id.* (second alteration in original) (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)). During the hearing, Plaintiffs alternatively identified the relevant subset as "expressive organizations" or "U.S. corporations." Trans. at 5:21, 6:10. These limitations (offered for the first time at the hearing) make no difference here, so for ease of reference I refer to Plaintiffs' quasi-facial and facial claims as "facial."

*9 (11th Cir. Sept. 28, 2026) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Though "the facial-challenge bar is lower" for First Amendment claims, Plaintiffs still must demonstrate a likelihood that "a substantial number of [the DTO regime's] applications are unconstitutional, judged in relation to [the regime's] plainly legitimate sweep." *NetChoice*, 2026 WL 3079563, at *5 (quoting *Moody*, 603 U.S. at 723). To do this, Plaintiffs must address the "full range" of the DTO regime's applications. *Id.* at *8. In other words, they need to give this court "the data—either hard facts or, at the very least, sufficient briefing—necessary to conduct the *Moody*-required comparative analysis." *Id.* at *7; *see also Comput. & Comms. Indus. Ass'n v. Uthmeier*, --- F.4th ----, 2026 WL 3071065, at *17 (11th Cir. Oct. 14, 2026) ("In a facial-challenge posture, we don't think it's the state's obligation to [prove constitutional applications]. Rather, the Supreme Court seems to have put the 'burden' squarely on the plaintiff: As one 'price' of its 'decision to challenge the law[] as a whole,' the challenger must 'carry its burden' of demonstrating that the invalid applications substantially outweigh the valid ones." (second alteration in original) (quoting *Moody*, 603 U.S. at 744)).

Plaintiffs have not met their burden. Their briefing does not grapple with the standards for facial relief (or even mention facial relief). Plaintiffs do not cite *Moody*, much less walk through the two-step process it requires. And they have not even

argued that every application of the regime would violate due process.[4] It follows that Plaintiffs have not shown a likelihood of success on their facial claims. The rest of this order, then, will address only Plaintiffs' as-applied challenges.

**As-Applied Due Process Claims**

Plaintiffs allege Defendants violated their due process rights by designating them as DTOs. ECF No. 6 at 20. This claim has two distinct aspects. First, Plaintiffs argue that a DTO designation is itself a criminal punishment, meaning they were entitled to the full set of procedures the Constitution guarantees to criminal defendants—a jury, proof beyond a reasonable doubt, and so forth. *Id.* at 25. Second, as a fallback, Plaintiffs contend that the DTO regime—specifically, § 943.03102 and the emergency rule—affords them "inadequate state process." *Id.* at 26 (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). Neither theory is likely to succeed.

*Criminal Punishment Theory*

Categorizing a proceeding as either civil or criminal "is first of all a question of statutory construction." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (quoting *Allen v. Illinois*, 478 U.S. 364, 368 (1986)). This involves looking to the statute's text and structure to discern whether the legislature "indicated either expressly or

[4] Arguably, Plaintiffs do make that contention as to their theory that a DTO designation constitutes criminal punishment. *See* ECF No. 6 at 25-26. But it is not clear that they do. Regardless, as discussed below, they have not shown they are likely to succeed on that theory.

impliedly a preference for one label or the other." *Smith v. Doe*, 538 U.S. 84, 92-93 (2003) (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)). Courts also consult the factors outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). But only "the clearest proof" that the statute is criminally punitive will override the legislature's choice of a civil label. *Hendricks*, 521 U.S. at 361 (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)).

Here, Plaintiffs have not shown a likelihood that designation as a DTO constitutes criminal punishment. Instead, several features of § 943.03102, the designation process statute, suggest it is civil. For one, it expressly links designation to the "nonpunitive purpose of public safety." *Smith*, 538 U.S. at 103 (cleaned up). The statute identifies "the safety of the residents of this state" as the reason for DTO designations. Fla. Stat. § 943.03102(1)(a). Along these lines, the state can designate an organization a DTO only if the organization poses an "*ongoing* threat to the security of this state or the United States." *Id.* § 943.03102(1)(a)1.c. (emphasis added). This focus on protecting the public from future harm indicates that designation "is an incident of the State's power to protect the health and safety of its citizens," rather than an effort to impose criminal punishment. *Smith*, 538 U.S. at 93-94 (quoting *Flemming v. Nestor*, 363 U.S. 603, 616 (1960)).

Conversely, nothing in § 943.03102 relates to retribution for past wrongdoings—one of criminal punishment's traditional aims. *Mendoza-Martinez*,

372 U.S. at 168; *Hendricks*, 521 U.S. at 362. And a DTO designation *itself* does not entail imprisonment or any other "affirmative disability or restraint." *Smith*, 538 U.S. at 100. Undoubtedly, as Plaintiffs emphasize, designation has potential downstream criminal consequences. *See* ECF No. 6 at 22. But a DTO designation is merely a factual predicate for various crimes. *See* ECF No. 55 at 20-21. It is not a criminal conviction on its own.[5] *Id.*

Section 943.03102(5) also requires an administrative agency to adopt implementing regulations, as civil statutes often do. *Smith*, 538 U.S. at 96; *Hudson*, 522 U.S. at 103. Granted, that agency is FDLE, a law enforcement agency. But the agency in *Smith* was charged with enforcing criminal laws as well. 538 U.S. at 96. That made no difference, the Supreme Court reasoned, because the statute "itself d[id] not require the procedures adopted [by the agency] to contain any safeguards associated with the criminal process." *Id.* The same is true here.

Plaintiffs' remaining points are unavailing.[6] Plaintiffs underscore § 943.03102's placement in Title XLVII, titled "Criminal Procedure and

---

[5] Plaintiffs contend their DTO designations automatically make them "criminal gangs" under § 874.03(1). *See* ECF No. 6 at 21-22. Defendants disagree. ECF No. 55 at 26-27. As explained below, Defendants offer the better interpretation of the statute, which further undermines Plaintiffs' criminal punishment claim.

[6] In their reply, Plaintiffs make an isolated remark about designation requiring a finding of scienter. *See* ECF No. 60 at 10 (citing Fla. Stat. § 775.30(1)(a)(2)); *see also Hendricks*, 521 U.S. at 362 ("The existence of a scienter requirement is

Corrections." *See* ECF No. 6 at 22. A statute's "location," however, cannot alone "transform a civil remedy into a criminal one." *Smith*, 538 U.S. at 94. Plaintiffs also note that their designations depend on findings that they are engaging in criminal conduct. *See* ECF No. 6 at 21. But the mere fact that a DTO designation is "tied to criminal activity" does not make it a criminal punishment, *Hendricks*, 521 U.S. at 362 (quoting *United States v. Ursery*, 518 U.S. 267, 292 (1996)). Civil proceedings often turn on findings of criminal conduct. As just one example, if a lawyer faces administrative proceedings (and potential disbarment) based on allegations of criminal conduct, those proceedings do not become criminal in nature simply because the administrative body may find the lawyer committed crimes. *Cf. Hudson*, 522 U.S. at 105 (holding that occupational debarment was a civil remedy even though the conduct for which that sanction was imposed may have been criminal). And this is true even though the civil consequence (disbarment) could lead to criminal prosecution (practicing without a license). *See, e.g.*, Fla. Stat. § 454.23 (criminalizing unauthorized practice of law in Florida).

---

customarily an important element in distinguishing criminal from civil statutes." (citing *Mendoza-Martinez*, 372 U.S. at 168)). Similarly, they assert without more that the punishment the DTO regime "metes out is plainly 'excessive.'" ECF No. 60 at 11 (quoting *Mendoza-Martinez*, 372 U.S. at 169). Plaintiffs do not develop these arguments further. At any rate, I find them unpersuasive in light of the statute's other features, as discussed above.

Given all this, it should be no surprise that terrorist designations have not historically been regarded as punishment. *See Mendoza-Martinez*, 372 U.S. at 168 (explaining that historic regard as a punishment is a factor). And Plaintiffs point to no case in which a court has held that any designating statute—or anything remotely like the laws at issue—constituted criminal punishment. *See* ECF No. 55 at 22. In short, Plaintiffs have not carried their burden on their criminal punishment theory.

*Inadequate State Process Theory*

Plaintiffs next argue that even if their DTO designations are not criminal punishments, they were entitled to more process than the state law provides. They say they had a right to a trial-type proceeding before their designations were approved. ECF No. 6 at 26, 35. And they further contend that the post-designation appeal is inadequate. *Id.* at 33-35.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed*, 598 U.S. at 236 (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). Defendants do not question whether the designations deprive Plaintiffs of a protected interest. Instead, they argue Plaintiffs have not met their burden as to the second element.

Due process requires both notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The nature and timing of

necessary procedures varies depending on the situation. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands." (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972))). To determine what process is required, courts generally weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Other courts have applied the *Mathews* factors in determining the process necessary before designating foreign terrorist organizations under analogous federal law. *See, e.g.*, *Nat'l Council of Resistance of Iran v. Dep't of State* (*NCRI*), 251 F.3d 192, 206-09 (D.C. Cir. 2001); *Al Haramain Islamic Found.*, 686 F.3d at 979-90. In *NCRI*, the D.C. Circuit identified the following procedures as sufficient: First, the government had to notify the organizations that their designations were impending and include the unclassified information on which the government relied. 251 F.3d at 208-09. Second, the government had to give those organizations an opportunity

to respond in writing to rebut their proposed designations. *Id.* at 209. A full-blown judicial trial was unnecessary. *Id.*[7]

Plaintiffs resist the comparison to *NCRI* (and similar cases) because *NCRI* involved foreign organizations rather than domestic ones like them. ECF No. 60 at 12-13. But they do not explain why that distinction matters here. As Defendants observe, the court in *NCRI* held as a threshold matter that the foreign organizations were entitled to full due process protections because they had "entered the territory of the United States and established substantial connections with this country." ECF No. 55 at 18 (quoting *NCRI*, 251 F.3d at 203); *see also Al Haramain Islamic Found.*, 686 F.3d at 984-86 (applying *Mathews* factors as to designated domestic entity without requiring the process Plaintiffs demand here).

Plaintiffs also seem to suggest that the interests in *NCRI* were insignificant. ECF No. 60 at 12 ("In *NCRI*, the court determined what process the Constitution required before the federal government deprived a foreign organization of a 'small bank account' by designating it as an FTO." (quoting *NCRI*, 251 F.3d at 201)). But

[7] Plaintiffs rely on *Jenkins v. McKeithen*, 395 U.S. 411 (1969). *See* ECF No. 6 at 32-33; ECF No. 60 at 13. But in doing so, they merely reassert their criminal-punishment argument. *Jenkins* involved a state commission that allegedly "exercise[d] a function very much akin to making an official adjudication of criminal culpability." 395 U.S. at 427 (plurality opinion); *see also id.* at 432 (Black, J., concurring in the judgment) (describing the state law at issue as "nothing more nor less than a scheme for a nonjudicial tribunal to charge, try, convict, and punish people"). As already explained, a DTO designation is not a criminal adjudication.

more than a "small bank account" was at issue. The court found that "[t]he consequences of [the] designation [were] dire." *NCRI*, 251 F.3d at 196. A designation meant "any funds which the organization ha[d] on deposit with any financial institution in the United States" would be blocked. *Id.* (citing 18 U.S.C. § 2339B(a)(2)). After designation, "[r]epresentatives and certain members of the organization [we]re barred from entry into the United States." *Id.* (citing 8 U.S.C. § 1182(a)(3)(B)(i)(IV & V)). And, "[p]erhaps most importantly, all persons within or subject to jurisdiction of the United States [we]re forbidden from 'knowingly providing material support or resources' to the organization." *Id.* (quoting 18 U.S.C. § 2339B(a)(1)). Here, too, the consequences of designation are substantial. But as in *NCRI* and *Al Haramain Islamic Foundation*, that fact alone does not require the process Plaintiffs demand.

After considering the *Mathews* factors, and consistent with the analysis in *NCRI*, I conclude the process available here is sufficient. Plaintiffs had notice. Florida's Chief of Domestic Security sent them a notice of intent to designate them as DTOs. ECF No. 6-1 at 14; ECF No. 6-2 at 14. That notice described the evidence on which the proposed designations were based. ECF No. 55-2 at 5-11. Plaintiffs then had an opportunity to submit written objections, which they did. ECF No. 6-5 at 21-26. After their DTO designations were approved and published in the Florida Administrative Register, they had thirty days to appeal the designations to state

court. Fla. Stat. § 943.03102(2)(f). During that thirty-day period, the designations would not be effective. Fla. Admin. Code R. 11RER26-8(3).

The availability of the state-court appeal—with a corresponding thirty-day grace period—is a critical factor in the analysis. On appeal, the state court would have been able to "determine whether procedural due process [wa]s accorded, whether the essential requirements of the law [were] observed, and whether the administrative findings and judgment are supported by competent substantial evidence." *City of Deerfield Beach v. Vaillant*, 419 So. 2d 624, 626 (Fla. 1982). Only after this thirty-day appeal window expired would the designations take effect.

Plaintiffs complain that much is unknown about how the appeal would work. And it is true that the statute offers little in terms of details. *See* Fla. Stat. § 943.03102(2)(f) ("Within 30 days after publication of a notice of the designation in the Florida Administrative Register, the organization designated as a domestic terrorist organization . . . , or any member of such organization, may challenge such designation in the circuit court of the Second Judicial Circuit in and for Leon County. The court may not compel the public disclosure of any document that is confidential or exempt under state law or that is confidential, restricted, or otherwise protected from public disclosure according to federal law."). But Plaintiffs have the burden here, and they cannot show the process is inadequate by speculating about what might have fallen short in a state-court appeal they chose not to pursue. Plaintiffs

correctly note they need not exhaust state remedies to pursue a § 1983 action. ECF No. 60 at 12 (citing *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 196 (2026)). Still, they do have to show that the state process was inadequate. *See Reed*, 598 U.S. at 236; *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000).

Plaintiffs also note there is no statutory guarantee of any state-court decision before the thirty days expire. ECF No. 6 at 7. But there is no reason to think that the state judge handling the appeal would not endeavor—as this court has—to move quickly in light of the designations' impending effectiveness. Florida's state courts routinely address time-sensitive matters expeditiously, even without statutory commands that they do so. And Florida law—like federal law—allows for preliminary injunctive relief. *See Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1110 (Fla. 2021) (outlining four analogous elements of a temporary injunction).

Because they have not shown that review would *not* be complete within the thirty days, Plaintiffs also have not shown that the available judicial review is a post-deprivation review. Either way, Plaintiffs had an opportunity to be heard (through their written objections) before any deprivation. And either way, they had an opportunity for judicial review.

The bottom line is that Plaintiffs have not shown they are likely to succeed on their due process claim.

## As-Applied First Amendment Claims

*Freedom of Association*

Plaintiffs contend that their "designations will bring their protected activity and associations in Florida to a halt." ECF No. 6 at 37. As a practical matter, that may be so. (As noted above, I accept that CAIR Florida, Inc., will cease all operations.) But the parties debate the extent to which the DTO designations would criminalize their actions—or the conduct of those interacting with them. They agree that under § 775.33(3), "[a] person who knowingly provides material support or resources to a designated . . . domestic terrorist organization" commits a first-degree felony. *See also* Fla. Stat. § 775.33(1)(d) ("'Material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, or transportation. The term does not include medicine or religious materials.").

However, Plaintiffs take the position that there is additional criminal liability if they "'initiate[], organize[], plan[], finance[], direct[], manage[], or supervise[]' any 'activity'—including protected associational activity—'committed with the intent to benefit, promote, or further the interests of' Plaintiffs." ECF No. 6 at 37

(alterations in original) (quoting Fla. Stat. §§ 874.10, 874.03(4)(a)). Plaintiffs advance this argument based on their conclusion that Florida law automatically makes every DTO a "criminal gang." Florida law does impose criminal liability on those who promote the interests of any "criminal gang." *See* Fla. Stat. § 874.04. "Criminal gang" is defined as follows:

> a formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations, transnational crime organizations, and hate groups.

Fla. Stat. § 874.03(1).

Both sides insist the definition is clear. Plaintiffs say it means every DTO is, *per se*, a "criminal gang." *See* ECF No. 6 at 23. Defendants say it means a DTO *could be* a criminal gang, but only if it has "as one of its primary activities the commission of criminal or delinquent acts" and meets the other included criteria. ECF No. 55 at 27 (emphasis omitted) (quoting Fla. Stat. § 874.03(1)). Defendants also say that in any prosecution for assisting a "criminal gang," the State would have to prove the entity qualified as a "criminal gang"—not merely that it had been designated a DTO. *Id.*

The statutory definition is far from clear. But in terms of statutory interpretation, Defendants have the better argument. The definition is limited to groups or organizations that have "as one of [their] primary activities the

commission of criminal or delinquent acts" and that comprise "three or more persons." Fla. Stat. § 874.03(1). A terrorist organization, like a hate group, can be one of those organizations. In other words, a terrorist organization "that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons" is a criminal gang. *Id.* Plaintiffs' interpretation would make every terrorist organization a group "that consists of three or more persons," but that is inconsistent with the statutory definition of "terrorist organization," which includes no such requirement. Fla. Stat. § 874.03(8)(a). Moreover, Plaintiffs' interpretation would make every "hate group" a criminal gang (also with three or more members and a primary purpose of committing criminal acts) even though "hate group" is defined much more broadly—without any regard to criminal purpose. Fla. Stat. § 874.03(7). It would be odd for the Legislature to label as a "hate group" an organization with no criminal purpose but then enact a separate statute making every hate group an organization with a primary purpose of committing criminal acts.

To be sure, the Legislature could have avoided this debate by rearranging the statute's clauses:

> "Criminal gang" means a formal or informal ongoing organization, association, or group, including, but not limited to, terrorist organizations, transnational crime organizations, and hate groups, that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols~~,~~

> ~~including, but not limited to, terrorist organizations, transnational crime organizations, and hate groups~~.

But its choice to employ the less clear phrasing does not support Plaintiffs' interpretation.

It is also noteworthy that all twenty State Attorneys—those who would prosecute under the criminal-gang statute—maintain through counsel that Plaintiffs' interpretation is incorrect. ECF No. 55 at 27. That does not necessarily preclude courts from reaching a contrary interpretation. *Cf. Wollschlaeger*, 848 F.3d at 1305-06 (rejecting state officials' interpretation of state statute). But it is not irrelevant. At any rate, I conclude that, as a matter of Florida law, a DTO designation does not automatically make the designated entity a "criminal gang."[8]

As for § 775.33(3), its prohibition against "knowingly provid[ing] material support or resources to a designated . . . domestic terrorist organization" does not infringe on Plaintiffs' associational rights. The prohibition targets material support of DTOs—not their associations. *See People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003) ("Petitioner argues that by forbidding all persons within or subject to the jurisdiction of the United States from 'knowingly provid[ing] material support or resources,' to it as a designated foreign terrorist organization, the statute violates its rights of free speech and association guaranteed

[8] Having said all this, Plaintiffs agreed at the hearing that this "criminal gang" issue does not substantially affect their association claim. *See* Trans. at 31:20-32:6.

by the First Amendment. We disagree." (alteration in original) (citation omitted)); *see also Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 736-37 (D.C. Cir. 2007) ("We hold that OFAC's blocking of [terrorist-related organization's] assets does not implicate [the organization's] First Amendment right of association.").

As Defendants argue, *Arcara v. Cloud Books, Inc*., 478 U.S. 697 (1986), is instructive. ECF No. 55 at 34-42. In that case, the Supreme Court upheld enforcement of a civil statute that authorized the forced closure of a business used for prostitution and lewdness—but also used to sell adult books. *Arcara*, 478 U.S. at 698. The closed business argued "that the effect of the statutory closure remedy impermissibly burden[ed] its First Amendment protected bookselling activities." *Id.* at 705. But that "argument prove[d] too much, since every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.* at 705-06. Indeed, "[o]ne liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes," and "a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement." *Id.* at 706. The same principle applies here.

Therefore, Plaintiffs have not shown a likelihood that they will succeed on their freedom-of-association claim.[9]

*Prior Restraint*

Plaintiffs next argue that a DTO designation "functions as a prior restraint because it allows Florida's executive branch to suppress disfavored speech and association before they take place." ECF No. 6 at 41. "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville B. Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4-14 (1984)). Here, a DTO designation does not explicitly forbid any communications. It does not say what a DTO can or cannot say. Plaintiffs' real argument is that the designation will effectively shut them down, meaning they will no longer be able to speak about

[9] One note: There is some overlap between Plaintiffs' association claim and their content-based speech regulation claim. As explained below, Plaintiffs have shown a likelihood of success as to the content-based claim to the extent the statute precludes their continued use of legal counsel based on the "expert advice" provision. Fla. Stat. § 775.33(3). Arguably, that same restriction would violate Plaintiffs' association rights by precluding their association with counsel. But Plaintiffs did not focus on legal advice in the section of their motion addressing their association claim. This makes some sense, as the arguments about counsel fit more neatly within Plaintiffs' content-based claim than their broader association claim. For these reasons—and because, as a practical matter, the same limited injunction would issue—I choose at this preliminary stage not to further explore any distinction between these speech and association claims as to the "expert advice" restriction.

anything. But even if true, that does not make the designation itself (or the regime that authorizes the designation) a prior restraint on speech.

In *Alexander*, the Court rejected an argument that a court order that "effectively shut down [Petitioner's] adult entertainment business[] constituted an unconstitutional prior restraint on speech." *Id.* at 549. There, the order at issue was a criminal forfeiture component of a punishment for a RICO violation. *Id.* Accordingly, its purpose was not to restrict or limit speech. Even if the forfeiture operated to "effectively shut down" the enterprise—as Plaintiffs argue the designation would do here—it was not considered a prior restraint. *Id.* at 549-50 (noting that treating the forfeiture order as an injunction against future speech would "stretch[] the term 'prior restraint' well beyond the limits established by [the Court's] cases"); *see also Arcara*, 478 U.S. at 705 n.2 (concluding there was no prior restraint because "the closure order sought would not [have] be[en] imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order ha[d] nothing to do with any expressive conduct at all").

Plaintiffs rely primarily on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). But that reliance is misplaced because in that case—unlike this one—the restriction was directly on speech. *Bantam Books* involved a commission that pressured distributors not to sell certain books and publications. *Id.* at 60-63.

Through this "informal censorship," the commission "deliberately set about to achieve the suppression of publications deemed 'objectionable.'" *Id.* at 67. Here, by contrast, the DTO designations target Plaintiffs' conduct, not their speech.

For this reason, Plaintiffs' unbridled discretion argument necessarily falls away too. In other words, because the DTO designations are not directed at Plaintiffs' speech, they cannot argue that Defendants exercised too much discretion "over whether to permit or deny [their] expressive activity." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024) (quoting *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 809 (11th Cir. 2020)).

Accordingly, Plaintiffs are not likely to succeed on their prior restraint claim.

*Viewpoint and Content-Based Discrimination*

Last, Plaintiffs contend that their designations and the DTO regime "burden [their] speech and [their] right to receive information on the basis of the speech's content and viewpoint." ECF No. 6 at 49. They specifically take issue with two provisions: § 775.33(3) (the material support prohibition) and § 874.10 (one of the criminal gang provisions). *Id.*

A speech regulation is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). These sorts of laws "trigger 'strict scrutiny,' a demanding standard that requires the government to prove its restriction on speech is 'narrowly

tailored to serve compelling state interests.'" *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (quoting *Reed*, 576 U.S. at 163). Even more pernicious are laws that discriminate against certain speech based on the speaker's viewpoint. *Id.* at 641 ("When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995))). Rarely will either type of restriction be permitted. *Id.* at 640-41.

Plaintiffs' challenge as to § 874.10 fails because, as discussed, their DTO designations do not automatically make them "criminal gangs." That leaves only § 775.33(3). As Defendants note, "material support 'most often does not take the form of speech at all.'" ECF No. 55 at 47 (quoting *Holder*, 561 U.S. at 26). And most of what constitutes "[m]aterial support or resources" under Florida law is not speech:

> "Material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, or transportation. The term does not include medicine or religious materials.

Fla. Stat. § 775.33(1)(d).

But the law expressly covers things that are speech, namely providing "expert advice," which includes legal advice. Plaintiffs argue this provision would preclude them from receiving their own lawyers' services in furtherance of this litigation, ECF No. 6 at 50; ECF No. 60 at 23-24, and Defendants have not shown otherwise.

As the parties note, the emergency rule includes this provision:

> The Department will not consider there to be cause for prosecution for a violation of section 775.33 or Chapter 874, F.S., based solely on the provision of legal counsel or legal support services to the organization for purposes of representing or providing advice in connection with existing or anticipated litigation concerning a designation or defending against a criminal prosecution.

Fla. Admin. Code R. 11RER26-8(5). That does not preclude relief here for several reasons. One, it says what the Department (FDLE) considers to be the case; it does not purport to bind the twenty State Attorneys or the Attorney General. Two, the rule does not cover Plaintiffs' providing support to each other in connection with the litigation[10]—or any other third party or employee who might provide "expert advice" in connection with the litigation. *See* ECF No. 6 at 13 n.4. And three, it purports only to cover limited types of cases—those in connection with litigation "concerning a designation" or related to criminal prosecutions. *See id.* at 13. It would not, for

[10] Section 775.33 criminalizes providing material support to a DTO. It does not seem to criminalize the DTOs' continued actions themselves. But Plaintiffs are separate entities, each with its own designation. And Plaintiffs have shown that they work together, such that either could face prosecution for materially aiding the other.

example, cover the provision of legal services in connection with the pending Eleventh Circuit appeal in *CAIR I*.

Therefore, to the extent § 775.33(3) restricts interactions with counsel or others in support of litigation, it regulates speech based on content and is therefore subject to strict scrutiny. *See Chiles*, 607 U.S. at 642 (explaining that in *Holder*, "the government threatened to prosecute lawyers . . . and others for providing . . . expert advice (such as how to use humanitarian and international law to peacefully resolve disputes) to certain groups" which meant "that application of the law . . . sought to regulate speech on the basis of its content and thus demanded strict-scrutiny review" (cleaned up)).

Strict scrutiny is a difficult standard to satisfy, and Defendants have not done so here. Defendants argue in a footnote that "[t]he designation statute creates a scheme of judicial review and thus cannot plausibly be construed to authorize the prosecution of CAIR employees who participate in judicial review." ECF No. 55 at 47 n.13. But even assuming that this purposivist interpretation is correct, the law still would not authorize employees or outside counsel to assist in this litigation—or any litigation other than the statutory appeal Plaintiffs have not taken.

In arguing that the law can survive strict-scrutiny review, Defendants say "combatting terrorism is a textbook compelling interest." *Id.* at 52 (citing *Holder*, 561 U.S. at 28). Even so, Defendants must show that their restriction—here,

precluding Plaintiffs from using or employing legal counsel for any purpose (save, perhaps, for the statutory appeal Plaintiffs do not pursue)—is the least restrictive means available to advance that interest. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). They have not done so. Indeed, their assertion that the law allows Plaintiffs to use legal counsel to preserve their non-designation status through one form of litigation (the statutory appeal) only undermines any suggestion that prohibiting Plaintiffs from using counsel to preserve that status through another form of litigation (this case) is the least restrictive means.

Defendants rely heavily on *Holder*, which upheld a federal material-support statute against a First Amendment challenge. 561 U.S. at 39. But in that case, the Court relied in large part on the federal interest in addressing international terrorism. *Id.* at 34-35. The Court declined to "suggest that Congress could extend the same prohibition on material support . . . to domestic organizations." *Id.* at 39. It also did not hold that the government could preclude the organizations from employing legal counsel to assist them in the litigation.

The bottom line is that the challenged law does, in some respects, restrict speech based on content. It criminalizes any third party's (including counsel's) providing "expert advice"—of any kind—to Plaintiffs. It thus restricts Plaintiffs' First Amendment right to receive such speech. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (noting that the First Amendment protects the right to receive speech just

as it protects the right to make speech). Aside from litigation activity, however, Plaintiffs do not offer specificity as to any other "expert advice" they wish to receive that § 775.33(3) would arguably criminalize. Thus, I agree with Defendants that much of Plaintiffs' argument is hypothetical. ECF No. 55 at 49. There was some discussion at the hearing regarding "training," which also could constitute speech the law would prohibit, but Plaintiffs have not advanced any specific argument regarding training they wish to receive.[11] The relief available is a product of Plaintiffs' litigation choices. *Cf. Holder*, 561 U.S. at 36, 39 (evaluating "the particular speech plaintiffs propose to undertake" and noting that "future applications of the material-support statute to speech or advocacy [may not] survive First Amendment scrutiny").

Still, Plaintiffs have shown it likely they will succeed in proving the "expert advice" restriction as applied to their receipt of legal services violates their First

[11] As noted above, Plaintiffs have not met their burden as to any facial claim. This is because they do not engage in the steps necessary to meet that burden. Had they focused their claim on the "expert advice" provision and attempted to meet the *Moody* requirements, this provision perhaps would have been susceptible to a facial challenge. But Plaintiffs did not do so. *Cf. Comput. & Comms. Indus. Ass'n*, 2026 WL 3071065, at *17 ("As one 'price' of its 'decision to challenge the law[] as a whole,' the challenger must 'carry its burden' of demonstrating that the invalid applications substantially outweigh the valid ones." (alteration in original) (quoting *Moody*, 603 U.S. at 744)).

Amendment rights. As to all other claims, they have not shown a likelihood of success on the merits.

## V.

The remaining preliminary injunction factors are relevant only as to an injunction prohibiting enforcement of § 775.33(3) against Plaintiffs or their employees for receiving legal services or a third party providing them. As to this, Plaintiffs have shown they face irreparable harm. Absent an injunction, they would face the termination of legal representation in this case and other actions. (As noted above, Plaintiffs are involved in a pending Eleventh Circuit appeal regarding the court's preliminary injunction as to the executive order.) Moreover, deprivation of First Amendment freedoms for any time constitutes irreparable harm. *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024). The remaining factors also favor Plaintiffs. The State has no meaningful interest in denying Plaintiffs legal counsel, and the limited injunction here would not be adverse to the public interest.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction (ECF No. 6) is GRANTED in part. The State Attorneys and Attorney General—along with their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them—are enjoined from taking any action to enforce Florida

Statutes § 775.33(3) against Plaintiffs, Plaintiffs' employees, or any third party providing legal services to Plaintiffs based on the provision of legal services to Plaintiffs. The motion is otherwise DENIED. This injunction shall take effect immediately upon Plaintiffs' posting a $1,000 bond. Any party may file a motion to increase or decrease the bond based on a showing of good cause.

Within fourteen days, the parties must confer and file a joint report with a proposed litigation plan. To the extent the parties disagree on matters relating to the litigation plan, the report must set out each side's position.

SO ORDERED on November 4, 2026.

s/ *Allen Winsor*
Chief United States District Judge